# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------- x

In re:                                                          :     **Chapter 11**
                                                                :
**JER/Jameson Mezz Borrower II LLC,**[1]                         :     **Case No. 11-13338 (MFW)**
                                                                :
                        **Debtor.**                             :     **Hr'g Date: TBD**
                                                                      **Objection Deadline: TBD**
------------------------------------------------------------------- x

## COLONY JIH LENDERS' EMERGENCY MOTION FOR ENTRY OF AN ORDER DISMISSING THE DEBTOR'S CHAPTER 11 CASE PURSUANT TO SECTION 1112(b) AND/OR 305(a) OF THE BANKRUPTCY CODE, WITH PREJUDICE

CDCF JIH Funding, LLC, together with ColFin JIH Funding, LLC (collectively,

the "Colony JIH Lenders"), hereby move (the "Motion") for entry of an order pursuant to

§ 1112(b) and/or § 305(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the

"Bankruptcy Code") dismissing the chapter 11 case of the above-captioned debtor (the "Debtor")

for cause and/or in the interests of the debtor and its creditor(s), with prejudice pursuant to

§ 349(a) of the Bankruptcy Code. In support of this Motion, the Colony JIH Lenders

respectfully submit the accompanying Declaration of Christian Fuqua dated October 20, 2011

(the "Fuqua Declaration") and the exhibits annexed thereto and represent as follows:

### PRELIMINARY STATEMENT[2]

1.      At approximately 11:00 p.m. on October 18, 2011, the Debtor, a single-

asset, special-purpose entity, initiated this chapter 11 case, little more than 12 and 1/2 hours

before the Colony JIH Lenders were to conduct an auction of the Debtor's sole asset, which was

pledged to secure a $40 million note, which due to the Debtor's default approaches

approximately $45 million of indebtedness owed to the Colony JIH Lenders.

---

[1] The last four digits of the Debtor's federal tax identification number are 6522. The Debtor's mailing address is 4770 S. Atlanta Road, Suite 200, Smyrna, Georgia 30080.

[2] Capitalized terms not otherwise defined in this Preliminary Statement have the meanings ascribed to them elsewhere in the Motion.

2. The Debtor's naked chapter 11 petition (unaccompanied by any applications or motions) and the automatic stay that comes into being by its filing does nothing more in the circumstances present here than inequitably subject the Debtor's only creditor to irreparable harm from certain unstayed foreclosure actions scheduled by the senior Mortgage Lender at an indirect, nondebtor subsidiary below this Debtor that actually owns the hotel properties that form the basis of any value flowing up to the Debtor (and to the Colony JIH Lenders' Second Mezz Loan collateral). The stay also subjects the Debtor's only creditor to having value also deteriorate from its collateral value as a result of interest accruing and expenses accruing, but remaining unpaid, on a senior First Mezz Loan. The Debtor's chapter 11 filing does nothing more than hinder and delay the Colony JIH Lenders (while in no way benefiting those lenders, the Debtor's only creditor), and is also contrary to the purposes of chapter 11.

3. The Debtor is *not* an operating company. It has *no* ongoing business operations or employees. Rather, it was established as a special-purpose entity whose *only* "business" according to the LLC Agreement which formed it is to hold the collateral securing Colony JIH Lenders' mezzanine debt, and to pay such debt. Indeed, the Debtor has but *one* asset: a 100% membership interest in the next most senior mezzanine borrower-entity. This asset was pledged to the Colony JIH Lenders, the Debtor's *only* secured creditor and, according to the Debtor's voluntary petition, the only creditor regardless of priority. *See, e.g.,* Debtor's Petition and List of Twenty Largest Unsecured Creditors (which states "none").

4. This case could not possibly achieve any legitimate objective of chapter 11. As this Court noted in an indistinguishable case, under chapter 11: "There has to be a reorganization purpose. Where [the debtor] just own[s] a piece of paper there is no reorganization purpose. What is to reorganize? [The debtor] own[s] a piece of paper that's

pledged to a creditor." Hr'g Tr. Dec. 18, 2001, *In re Primestone Investment Partners L.P.*, Case No. 01-11355 (MFW) (Bankr. D. Del.), at 62:5-9 (granting motion to dismiss bankruptcy petition),[3] *aff'd sub nom. Primestone Investment Partners L.P. v. Vornado PS, L.L.C. (In re Primestone Investment Partners, L.P.)*, 272 B.R. 554, 557 (D. Del. 2002).

5.     This case bears all the indicia of a bad faith filing of a chapter 11 case, which is both "cause" for dismissal pursuant to 11 U.S.C. § 1112(b) and, as set forth in the motion of the Colony JIH Lenders filed contemporaneously herewith, "cause" for relief from the automatic stay.

## JURISDICTION

6.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and 157(b).  The Motion is a core matter within the meaning of 28 U.S.C. § 157(b)(2).

7.     Venue of the Motion in this Court is proper pursuant to 28 U.S.C. § 1409.

8.     The statutory predicates for the relief requested herein are §§ 105(a), 305(a)(1), 349(a) and 1112(b) of the Bankruptcy Code and related Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").

## BACKGROUND

I.     **The Financing Transaction and Related Documents**

A.     **An Overview**

9.     The Colony JIH Lenders are the sole secured creditor – and, according to the papers filed with the Debtor's petition, the only creditor – of the Debtor, pursuant to a financing transaction consummated in 2006, involving the Jameson Inn portfolio of hotels.[4]  The financing involved a $175 million mortgage loan (the "Mortgage Loan") secured by mortgages

---

[3] A copy of the *Primestone* hearing transcript is attached hereto as Exhibit A.

[4] Prior to the Maturity Default, the Colony JIH Lenders purchased the Second Mezz Loan from a previous holder.

on hotel properties and four mezzanine loans (collectively, the "Mezz Loans" and together with the Mortgage Loan, the "Loans") of $40 million each, as more fully described in the following chart:



$40 MM loan ("Fourth Mezz Loan") controlled by Gramercy. No foreclosure sales or par purchases pending. No other creditors

$40 MM loan ("Third Mezz Loan") controlled by Gramercy. No foreclosure sales or par purchases pending. No other creditors.

$40 MM loan ("Second Mezz Loan") held by Colony JIH Lenders. Only asset of Debtor is equity in First Mezz Borrower that is pledged as collateral to Colony JIH Lenders. UCC Foreclosure Sale was scheduled for October 19, 2011 – stayed as a result of the commencement of this case. No other creditors.

$40 MM loan ("First Mezz Loan") held by Colony JIH Lenders (purchased from AB pursuant to Intercreditor Agreement). No other creditors.

$175 MM Mortgage Loan Serviced by Wells Fargo, secured by mortgages on hotel properties. First set of foreclosure sales scheduled for November 1, 2011.

Jameson Affiliate

Fourth Mezz Borrower

Third Mezz Borrower

Debtor

First Mezz Borrower

OpCo/Mortgage Borrowers

10.    The collateral of each Mezz Loan is 100% of the equity interest of the entity or entities immediately below the borrower of each Mezz Loan in the structure, *e.g.*, the collateral for the Mezz Loan to the Debtor is the equity in the First Mezz Borrower held by the Debtor, and such equity interest is the sole asset of each mezzanine borrower (all mezzanine borrowers are hereinafter collectively referred to as the "Mezz Borrowers"). On information and belief, this financing structure (first mortgage loan followed by various levels of increasingly subordinated mezzanine debt) has been widely used for real estate financing.

11.    JER/Jameson NC Properties LP and JER/Jameson Properties LLC (collectively, the "Mortgage Borrowers") are borrowers on the $175 million Mortgage Loan,

which is currently specially serviced by Wells Fargo Bank, N.A. ("Wells Fargo"). The Mortgage Borrowers are non-debtors.

12.     The Colony JIH Lenders hold the First Mezz Loan to JER/Jameson Mezz Borrower I LLC (the "First Mezz Borrower"), secured by, *inter alia*, a pledge of the First Mezz Borrower's 100% interest in the Mortgage Borrowers. The Colony JIH Lenders are also the lender of the Second Mezz Loan (together with the First Mezz Loan, the "Senior Mezz Loans") to the Debtor. The First Mezz Borrower is a non-debtor.

13.     The Second Mezz Loan was made pursuant to a Second Mezzanine Loan Agreement, dated July 27, 2006 (the "Loan Agreement"). A true and correct copy of the Loan Agreement is attached as Exhibit A to the Fuqua Declaration filed concurrently herewith. The obligations under the Second Mezz Loan are secured by, *inter alia*, a pledge of the Debtor's 100% membership interest in the First Mezz Borrower (the "Pledged Securities"). The pledge of the Pledged Securities was made pursuant to a Second Mezzanine Pledge and Security Agreement, dated July 27, 2006 (the "Pledge Agreement"), entered into by the Debtor. A true and correct copy of the Pledge Agreement is attached to the Fuqua Declaration as Exhibit C.

14.     The Debtor was formed as a single-asset, special purpose entity the activities and operations of which are limited by and subject to the terms of the Debtor's limited liability company agreement, dated July 27, 2006 (the "LLC Agreement"), that was entered into by the Third Mezz Borrower, as the sole equity member and Michael G. Morgan and Carrie L. Tillman, as Independent Directors. A true and correct copy of the LLC Agreement is attached to the Fuqua Declaration as Exhibit J.

15.     Upon information and belief, Gramercy Warehouse Funding I, LLC and Gramercy Loan Services LLC (collectively, "Gramercy") hold a controlling participation interest in the Third Mezz Loan and the Fourth Mezz Loan (together, the "Junior Mezz Loans"). Upon

information and belief, JER Investors Trust Inc. holds the remaining participation interests in the Third Mezz Loan and the Fourth Mezz Loan.

16.     JER/Jameson Holdco LLC, an affiliate of the Mortgage Borrowers (and collectively with the Mortgage Borrowers and Mezz Borrowers, the "Jameson Holdco Affiliates") owns the 100% equity interest in the Fourth Mezz Borrower.

**B.     The Pledge Agreement and Related Safeguards for the Colony JIH Lenders Under the Loan Agreement and the LLC Agreement[5]**

17.     Although the *Declaration of James L. Gregory in Support of Chapter 11 Petition* [D.I. 2] (the "Gregory Declaration") generally describes the capital structure of the Debtor, it neglects to mention, let alone describe, the extremely limited purpose of the Debtor and the significant rights and remedies provided to the Colony JIH Lenders under the terms of the relevant loan documents.

**1.     The Pledge Agreement**

18.     Pursuant to section 2 of the Pledge Agreement, the Debtor pledged its sole asset, the equity interest in the First Mezz Borrower (*i.e.,* the Pledged Securities), to the Colony JIH Lenders.  Additionally, the Debtor pledged to the Colony JIH Lenders, among other things, (i) all securities, moneys or property representing dividends or interest on any of the Pledged Securities or representing a distribution in respect of the Pledged Securities, (ii) the capital of the Debtor in the First Mezz Borrower and any and all profits, losses, distributions and allocations attributable thereto, as well as any proceeds of any distribution thereof, (iii) all other payments, if any, due or to become due to the Debtor in respect of the Collateral, and (iv) all Accounts, Documents, and General Intangibles (as each item is defined in the Uniform Commercial Code).

---

[5]  Capitalized terms not defined herein shall have the meanings ascribed to them in the respective document.  This background is being provided for convenience purposes only, and the inclusion and/or exclusion of certain provisions should not be deemed to be a waiver of any rights or obligations thereunder.

19.     Once an Event of Default (as defined in the Loan Agreement) has occurred and is continuing, the Colony JIH Lenders may exercise certain remedies, including, among other things, the right to re-register the Pledged Securities in the name of the Colony JIH Lenders or the Colony JIH Lenders' nominee and, thereafter to exercise all voting and all other corporate rights pertaining to the Pledged Securities, and the right to foreclose on its collateral by public or private sale.  (§§ 8-10 of the Pledge Agreement.)

## 2.     The Loan Agreement

20.     The terms of the Loan Agreement, as well as the LLC Agreement clearly demonstrate that the Debtor was structured with significant limitations on its rights, powers and activities – it was set up for the limited purposes of borrowing the Second Mezz Loan and holding the equity interest in the First Mezz Borrower and no other purposes.  For instance, the Debtor is prohibited from taking any action that would impair the Colony JIH Lenders' lien (§ 5.28 of the Loan Agreement) and from creating, incurring or assuming any additional liens (§ 5.31 of the Loan Agreement).  In fact, until the Colony JIH Lenders' debt is paid in full, the Debtor is prohibited from incurring *any* additional debt (other than in the ordinary course of business that is related to the ownership and operation of its subsidiary or is permitted or contemplated by the Loan Documents).  (§ 6.1(a)(vii)(x) of the Loan Agreement; § 9(j)(v)(C) of the LLC Agreement).

21.     Additionally, Article 10 of the Loan Agreement provides that, so long as Colony JIH Lenders' debt is outstanding, the Debtor shall maintain only one account (the "Mezzanine Cash Management Account") into which disbursements from the First Mezz Borrower may be deposited.  The Mezzanine Cash Management Account is subject to the exclusive dominion and control of the Colony JIH Lenders.  (§§ 10.1 and 10.2 of the Loan

Agreement.) The Debtor has no right to withdraw monies from the Mezzanine Cash Management Account. (§ 10.1 of the Loan Agreement.)

### 3. The LLC Agreement

22. Although the Gregory Declaration asserts that Mr. Gregory "assist[s] with the Debtor's business plans and strategies" and makes decisions "with respect to all aspects of the management and operation of the Debtor's business", in reality, under the LLC Agreement, the Debtor has no business operations.

23. Section 7 of the LLC Agreement provides that the purpose of the Debtor's existence is to engage *only* in the following activities: (i) to own 100% of the LLC interest in, and act as the sole equity member of, the First Mezz Borrower, (ii) to enter into and perform its obligations under the Loan Agreement and the other related loan documents (collectively, the "Loan Documents") with the Colony JIH Lenders; and (iii) incidental acts for the accomplishment of the foregoing. For so long as the Second Mezz Loan remains outstanding, Section 9(j) of the LLC Agreement prohibits the Debtor from incurring, creating or assuming any indebtedness or liabilities, secured or unsecured, direct or contingent, other than those incurred in the ordinary course of business that is related to the ownership and operation of the First Mezz Borrower or as expressly permitted under or contemplated by the Loan Documents (§ 9(j)(v)(C) of the LLC Agreement).

### C. The Intercreditor Agreement[6]

24. The respective rights, remedies and obligations of the lenders under the Loans, and the relative payment and collateral priorities with respect to the Loans (collectively, the "Lenders") are governed by the Intercreditor Agreement.

---

[6] A true and correct copy of the Amended and Restated Intercreditor Agreement dated as of September 28, 2006 (the "Intercreditor Agreement") is attached to the Fuqua Declaration as Exhibit I.

25.     As explained above, the collateral for each of the Mezz Loans is the equity interest in the entity or entities immediately below the borrower of each Mezz Loan, *e.g.,* the collateral for the Second Mezz Loan is the Debtor's equity interest in the First Mezz Borrower. Thus, the structure established for purposes of making the loans results in the structural subordination of (i) all of the Mezz Loans to the Mortgage Loan, (ii) the Second Mezz Loan, Third Mezz Loan, and Fourth Mezz Loan to the First Mezz Loan and the Mortgage Loan, (iii) the Third Mezz Loan and Fourth Mezz Loan to the Second Mezz Loan, the First Mezz Loan, and the Mortgage Loan, and (iv) the Fourth Mezz Loan to the Third Mezz Loan, the Second Mezz Loan, the First Mezz Loan, and the Mortgage Loan.

26.     In the Intercreditor Agreement, each of the Lenders specifically acknowledged and agreed to the subordination established by the structure implemented for purposes of making the Loans.   Under the Intercreditor Agreement, rights to payment on each of the Mezz Loans, including upon a default, are subordinated to the rights to payment on the more senior Mezz Loans and the right to payment on the Mortgage Loan.  Accordingly, under the clear terms of the Intercreditor Agreement and by virtue of the entities structure established for purposes of making the Loans, the Third Mezz Loan and the Fourth Mezz Loan are subordinate to the Senior Mezz Loans.

27.     In light of this structural subordination and pursuant to the terms of the Intercreditor Agreement, the Junior Lenders (as defined in the Intercreditor Agreement), *e.g.,* Gramercy and JER Investments Trust Inc., are prohibited from causing the borrower of a Senior Junior Loan (as defined in the Intercreditor Agreement), *e.g.* the Debtor, to file bankruptcy. Specifically,  Section 11(d)(iv) of the Intercreditor Agreement provides:

> For as long as any applicable Senior Junior Loan with respect to a Junior Lender shall remain outstanding, such Junior Lender shall not, and shall not solicit any Person to ... (1) commence any Proceeding against any applicable Senior Junior Borrower; (2) institute proceedings to have any applicable Senior Junior Borrower

adjudicated a bankrupt or insolvent; (3) consent to, or acquiesce in, the institution of bankruptcy or insolvency proceedings against any applicable Senior Junior Borrower; (4) file a petition or consent to the filing of a petition seeking reorganization, arrangement, adjustment, winding-up, dissolution, composition, liquidation or other relief by or on behalf of any applicable Senior Junior Borrower.

*Id.*

28.     Similarly, section 11(d)(ii) of the Intercreditor Agreement provides that, so long as the Mortgage Loan remains outstanding, none of the holders of the Mezz Loans shall "solicit, direct or cause" the Mortgage Borrowers, any of the Mezz Borrowers (which directly and indirectly control the Mortgage Borrowers), or any other person or entity, to commence bankruptcy, insolvency, receivership or similar proceedings with respect to the Mortgage Borrowers.

29.     Instead, a junior Mezz Lender can only prevent a more senior Mezz Lender from foreclosing or otherwise realizing upon the equity interests pledged as collateral for its Mezz Loan by exercising its right to effect a "par purchase" of the applicable senior Mezz Loans pursuant to section 14 of the Intercreditor Agreement. As set forth in section 14(c) of the Intercreditor Agreement, the par purchase price for each Mezz Loan is equal to the sum of the outstanding principal balance of the Loan, together with all accrued interest and other amounts due thereon, late charges, default interest, unreimbursed protective advances, costs and expenses (including reasonable legal fees and expenses) incurred in enforcing the applicable Loan documents, and fees and expenses to any third party servicers.

## II. Actions Taken Prior to, and in Response to, the Maturity Default

### A. Pre-Default Events

30.     Prior to the Maturity Date, on July 29, 2011 (the "July 29th Letter"), Gramercy notified the Third Mezz Borrower and the Fourth Mezz Borrower that Gramercy "intend[ed] to exercise any and all available rights and remedies upon the maturity of the Loans," including "exercis[ing] the respective rights under Section 8 of each Pledge Agreement to register the applicable Pledged Securities in the name of the applicable Lender or its nominee and/or Section 9 of the Pledge Agreement to collect, receive, appropriate and realize upon the respective Collateral."

### B. Post-Default Events

31.     The Loans, including the Second Mezz Loan, went into default on their maturity date of August 9, 2011, when the Borrowers failed to make the principal and interest payments due.

#### 1. Actions Taken By the Holders of the Senior Mezz Loans and Mortgage Loan

32.     On August 9, 2011, the Colony JIH Lenders sent notice to the Borrowers and Lenders that an event of default had occurred under the Second Mezz Loan and that the Colony JIH Lenders intended to commence an Equity Collateral Enforcement Action (as defined in the Intercreditor Agreement).

33.     On the same day, AB US REP Jameson I LLC ("AB"), sent a Notice of Default as well as a Notification of Disposition of Collateral and Notification of Retention of Collateral (collectively, the "AB Default Notices"), with respect to the First Mezz Loan, and Wells Fargo delivered notice of an event of default under the Mortgage Loan (the "Foreclosure Notice"). Thereafter, Wells Fargo delivered a notice of scheduled property foreclosures for 21 properties located in Georgia.

34. Upon receipt of the AB Default Notices, on August 10, 2011, the Colony JIH Lenders delivered notice of their intent to exercise their right under Section 14(c) of the Intercreditor Agreement to purchase the First Mezz Loan at par.

35. The Colony JIH Lenders retained Jones Lang LaSale Hotels ("JLL") to conduct an extensive two-month marketing process of the Debtor's sole asset – the equity interests in the First Mezz Borrower. In furtherance of the marketing effort, JLL established an on-line data room with information relating to the Loans and the underlying properties available to interested parties upon execution of appropriate confidentiality agreements.

36. Additional marketing activities by the Colony JIH Lenders and JLL included the following:

a. On August 12, 2011, JLL sent marketing teasers by e-mail to approximately 1,500 prospective bidders.

b. On August 23, 2011, JLL sent a second set of teasers to approximately 800 additional prospective bidders.

c. Although the foreclosure auction was originally scheduled for September 23, 2011, it was postponed several times -- to October 7, 2011, then to October 14, 2011, and lastly to October 19, 2011. JLL sent notices of the postponements to all 2,300 prospective bidders.[7]

d. JLL also ran advertisements in five media outlets (*Wall Street Journal*, *The New York Times*, *Financial Times*, *Atlanta Journal Constitution* and *Commercial Mortgage Alert*).

---

[7] As of October 18, 2011, 55 prospective bidders reviewed the purchase opportunity and, of those, 42 signed confidentiality agreements.

37. The deadline to register to participate for the October 19th auction was October 17, 2011 at 3:00 p.m. As of that date, no prospective bidder (including Gramercy) had registered to participate in the auction.

**2. Actions Taken By Gramercy as Holder of the Junior Mezz Loans**

38. Not only did Gramercy fail to register for the auction, it also failed to exercise its rights to effectuate a par purchase of the Colony JIH Lenders' debt, as specifically contemplated by the Intercreditor Agreement. Instead, Gramercy took control of the Second Mezz Borrower (the Debtor), and installed its choice of non-independent director.

39. On August 11, 2011, only two days after an Event of Default had occurred, Gramercy provided notice to the Borrowers and other Lenders of events of default under the Junior Mezz Loans and further provided a Notice of Registration of the equity interests in the Third Mezz Borrower (pledged by the Fourth Mezz Borrower to Gramercy) in the name of Gramercy. Gramercy also provided a Notice of Registration of the equity interests in the Debtor in the name of Gramercy Loan.

40. Also on August 11, 2011, Gramercy provided a Notice of Removal and Appointment of Directors of the Debtor, purporting to remove all non-independent directors of the Debtor, reduce the board of the Debtor to three directors, and appoint Mr. Gregory to the board as a non-independent director of the Debtor. Gramercy also provided a Notice of Removal and Appointment of Directors of the Third Mezz Borrower, purporting to remove all non-independent directors of the Third Mezz Borrower, reduce the board of the Third Mezz Borrower to three directors, and appoint Mr. Gregory to that board as well.

41. On the first day of his appointment, Mr. Gregory, acting in his capacity as a director of Debtor, removed the non-independent directors of the First Mezz Borrower and appointed himself as their replacement.

42.     The next day, Mr. Gregory called a joint meeting of the Boards of Directors of the First, Second and Third Mezzanine Borrowers.  Both the Independent Directors and Gramercy were invited to attend.  However, neither AB nor the Colony JIH Lenders – the sole creditors of the First Mezz Borrower and the Debtor -- were invited to the meeting.  Upon information and belief, during that meeting, Gramercy made a presentation regarding its view of the position of the Jameson Holdco Affiliates, which essentially concluded that the valuation of the Jameson Holdco Affiliates exceeded the value of the Mortgage Loan and the Senior Mezz Loans.

43.     To date, despite Gramercy's allegations that the value of the Jameson Holdco affiliates puts Gramercy "in the money," Gramercy has not exercised its contractual option under the Intercreditor Agreement to purchase at par the Senior Mezz Loans from the Colony JIH Lenders.

**C.     New York State Court Litigations**

**1.     Actions Against Junior Mezz Lender Gramercy**

44.     On August 12, 2011, the Colony JIH Lenders commenced an action against Gramercy in the State Court (Case No. 652252/2011, the "Colony Action") seeking to protect their interests as Lender under the Second Mezz Loan.  The Colony JIH Lenders asserted four causes of action against Gramercy: (1) declaratory judgment concerning the rights of the parties under the Intercreditor Agreement, Gramercy's right to register, acquire, foreclose on or execute on the equity interest; (2) breach of contract based on Gramercy purporting to register certain equity collateral in the name of Gramercy in violation of the Intercreditor Agreement; (3) anticipatory repudiation of the Intercreditor Agreement by Gramercy by soliciting directors or causing the independent directors to authorize the bankruptcy filing of the above-captioned Debtor; and (4) breach of the implied covenant of good faith and fair dealing resulting from

Gramercy's unauthorized actions to destroy the value of the Colony JIH Lenders' senior lender rights under the Intercreditor Agreement.

45.     On the afternoon of August 12, 2011, the State Court granted the Colony JIH Lenders' request for a TRO and further ordered Gramercy to show cause in a hearing to be held on September 21, 2011 why a preliminary injunction should not be issued.  [Colony Action, D.I. 8.]

46.     The State Court later dissolved the TRO against Gramercy, following Gramercy's motion to dissolve or narrow the TRO and related memorandum of law (the "TRO Dissolution Memo") [Colony Action, D.I. 9] which stated that Gramercy was not interfering with the foreclosure process, that it had not solicited, directed or caused any borrower to file a chapter 11 petition, and that it had "no intention of doing so."  (TRO Dissolution Memo at 8.)

## 2.     Action Against Mr. Gregory and the Debtor

47.     On October 7, 2011, Mr. Gregory wrote to the Colony JIH Lenders, purportedly on behalf of the Debtor, listing five reasons he believed the notices regarding the Colony JIH Lenders' foreclosure efforts under the Uniform Commercial Code were defective and why they allegedly did not "meet the standards for a commercially reasonable disposition under the UCC." (the "October 7th Letter")

48.     On October 9, 2011, the Colony JIH Lenders responded to Mr. Gregory's letter disputing each of Mr. Gregory's arguments in turn.

49.     In addition, on October 12, 2011, the Colony JIH Lenders commenced an action in the State Court against the Debtor and Mr. Gregory (Case No. 652795/2011, the "Declaratory Judgment Action") seeking declaratory and injunctive relief regarding the October 7th Letter.  Specifically, Colony seeks (i) a declaratory judgment that all issues raised in the October 7th Letter lack merit and taken as a whole, the foreclosure sale relating to the collateral

is being conducted in a commercially reasonable manner; (ii) an injunction prohibiting Mr. Gregory or the Company from taking any action in connection with the allegations made in the October 7th Letter; and (iii) a declaratory judgment that the October 7th Letter and related actions of Mr. Gregory and the Company rendered the non-recourse provisions of the Loan Agreement null and void.

50.    The Declaratory Judgment Action as it relates to the Debtor is stayed before the State Court.

**D.    The Bankruptcy Case**

51.    On October 18, 2011, at approximately 11:00 p.m., just hours before the Colony JIH Lenders' scheduled foreclosure sale at 11:30 a.m. on October 19, 2011, of the Debtor's sole asset – the equity interest in the First Mezz Borrower -- the Debtor filed the instant bankruptcy case, thwarting the Colony JIH Lenders' completion of the foreclosure process.

52.    The chapter 11 petition admitted that there are no unsecured creditors of the Debtor.  The board resolution accompanying the petition was executed by James L. Gregory (as Non-Independent Director), Michelle Dreyer (as Independent Director), and Carrie Tillman (as Independent Director) and purported to authorize the Debtor to, among other things, to commence this chapter 11 case, retain professionals and obtain post-petition financing.  Prior to the Petition Date, Colony JIH Lenders were unaware that Ms. Dreyer had been appointed as an independent director.

53.    The Debtor has not filed any motions in this chapter 11 case and has not sought to schedule a hearing or commence administration of the Debtor's bankruptcy estate.

54.    On October 19, 2011 Colony JIH Lenders' counsel had a conference call with the Debtor's counsel to discuss this case.  At that time, counsel to the Colony JIH Lenders asked the Debtor's counsel what the Debtor's proposal was to provide adequate protection to the

Colony JIH Lenders as the Debtor's only secured creditor. Debtor's counsel did not make any proposal or offer of adequate protection, instead saying that the Debtor was considering its options. In addition, Debtor's counsel did not disclose when asked how the Debtor was financing this chapter 11 case, including the retention of counsel and its financial advisor.

### E. Impending Foreclosure at Mortgage Borrower Level

55. Pursuant to the Foreclosure Notice issued by Wells Fargo, a foreclosure sale of certain of the assets of the Mortgage Borrower is scheduled for November 1, 2011.

## RELIEF REQUESTED

56. By this Motion, the Colony JIH Lenders request entry of an order pursuant to § 1112(b) and/or § 305(a)(1) of the Bankruptcy Code dismissing the Debtor's chapter 11 case for cause and/or in the interest of the Debtor and its creditors. The Colony JIH Lenders further request that such dismissal be with prejudice pursuant to § 349(a) of the Bankruptcy Code.

## BASIS FOR RELIEF REQUESTED

### I. This Case Must Be Dismissed For "Cause" Pursuant to Section 1112(b) of the Bankruptcy Code

57. Section 1112(b) of the Bankruptcy Code, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), provides, in pertinent part, that

> on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested . . . dismissal is not in the best interests of creditors and the estate, the court *shall* . . . dismiss a case under this chapter . . . if the movant establishes cause.

11 U.S.C. § 1112(b)(1) (emphasis added).[8] A request for dismissal under § 1112(b) must be scheduled by the Court no later than 30 days after filing of the motion, and must be decided by

---

[8] Prior to BAPCPA, dismissal under § 1112(b) was within the discretion of the Court. Such relief is now mandatory where the movant establishes cause.

the Court no later than 15 days after commencement of the hearing, unless the movant expressly consents to a continuance for a specific period of time or "compelling circumstances" prevent the Court from meeting the time limits. 11 U.S.C. § 1112(b)(3). By separate motion, the Colony JIH Lenders have sought an emergency hearing of this motion and the stay relief motion in light of the pending foreclosure by Wells Fargo set for November 1, 2011.

## A. The Petition Was Filed in Bad Faith

58. "Chapter 11 bankruptcy petitions are subject to dismissal under § 1112(b) unless filed in good faith, and the burden is on the bankruptcy petitioner to establish good faith." *In re 15375 Memorial Corp.*, 589 F.3d 605, 618 (3d Cir. 2009) (quotations omitted). Though couched in terms of the debtor's subjective intent, the "good faith" filing requirement "encompasses several, distinct equitable limitations that courts have placed on Chapter 11 filings . . . . to deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws." *Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 165 (3d Cir. 1999). The "good faith" inquiry, therefore, is "based more on an objective analysis of whether the debtor has sought to step outside the 'equitable limitations' of Chapter 11 than the subjective intent of the debtor." *15375 Memorial*, 589 F.3d at 618 n.8. In assessing a debtor's good faith, the bankruptcy court must consider "the totality of facts and circumstances" to determine where the bankruptcy petition falls "along the spectrum ranging from the clearly acceptable to the patently abusive." *Id.* at 618.

59. The Third Circuit has identified two essential elements for a "good faith" bankruptcy filing. First, the bankruptcy petition must "serve[] a valid bankruptcy purpose." *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 120 (3d Cir. 2004). *See 15375 Memorial*, 589 F.3d at 618; *SGL Carbon*, 200 F.3d at 165. Second, the bankruptcy cannot be filed "merely to obtain tactical litigation

advantage." *15375 Memorial*, 589 F.3d 605; *SGL Carbon*, 200 F.3d at 165. These equitable

limitations on the chapter 11 process are necessary to ensure that the hardship on particular

creditors resulting from the exercise of the debtor's considerable bankruptcy powers (the

automatic stay, the exclusive right to propose a plan, the discharge of debts, etc.) are justified.

*SGL Carbon*, 200 F.3d at 165-66. *See Integrated Telecom*, 384 F.3d at 120 n.4 ("The good faith

requirement is necessitated as much by the hardship of Chapter 11 to certain interests as it is by

the benefit to others.").

### 1. The Debtor's Case Serves No Valid Bankruptcy Purpose

60.     The basic purposes of chapter 11 are (i) "preserving going concerns," and

(ii) "maximizing property available to satisfy creditors." *Integrated Telecom*, 384 F.3d at 119. It

is beyond dispute that the Debtor is not a "going concern" because it is a special purpose entity

having no employees or operations, which was created for the limited purposes of—and may not

conduct any activities other than—(i) owning a 100% membership interest in the First Mezz

Borrower and (ii) paying the Second Mezz Loan.[9] *See 15375 Memorial*, 589 F.3d at 619

(acknowledging there was no "going concern" where debtor had "no employees, offices or

business other than the handling of litigation"). Accordingly, to establish a valid bankruptcy

purpose, the Debtor must show the chapter 11 case will maximize the value of the Debtor's

estate. *Id.*

61.     With respect to the Debtor's purposes in seeking chapter 11 relief, the

Gregory Declaration asserts that (i) the Debtor sought bankruptcy relief to halt the foreclosure

process and "permit the Debtor and other parties in interest to maximize value for all

stakeholders;" (ii) the "Debtor is a part of a complex and inter-related enterprise;" (iii) the

enforcement steps taken by the Colony JIH Lenders "would have consequences to various parties

---

[9]  (LLC Agmt. §§ 7(a), 9(j)(v)(B) & (G).)

in interest," and not merely the Colony JIH Lenders; (iv) permitting the Colony JIH Lenders to exercise their remedies "without the involvement of other interested parties" would serve only the interests of the Colony JIH Lenders and would "eliminate any potential for the sharing of value among any of the Debtor's other constituents;" and (v) the Debtor intends "to pursue all options for the orderly maximization of value for all stakeholders." (*Id.* ¶¶ 31-32.)

62.     To say that a bankruptcy maximizes the value of the estate is to say that the bankruptcy "create[s] or preserve[s] some value that would be lost—*not merely distributed to a different stakeholder*—outside of bankruptcy." *Integrated Telecom*, 384 F.3d at 120 (emphasis added). Notably, none of the assertions in the Gregory Declaration speak to this. At best, they raise issues either having no causal connection to the Debtor's bankruptcy filing, or relating to the procedural benefits to be gained by bankruptcy which do not themselves "maximize value." *See 15375 Memorial Corp.*, 589 F.3d at 625. The allegedly "complex and inter-related" structure of the Jameson Hotels enterprise has nothing to do with the bankruptcy filing of a lone, special-purpose mezzanine entity that exists solely to hold a single asset and pay a single loan. Indeed, in reality there are not even any "parties in interest" or "stakeholders" (much less "various" ones) in this chapter 11 case other than Debtor, the Colony JIH Lenders, and the Third Mezz Borrower (as sole member of the Debtor).[10] (*See* Gregory Decl. ¶ 3 (acknowledging the Debtor has no employees); 20 Largest Creditors' List [D.I. 1] (indicating "None").)

63.     Against this backdrop, the ostensible purposes for the Debtor's bankruptcy filing as set forth in the Gregory Declaration boil down to a single purpose, namely: to halt the state-law foreclosure process using the automatic stay and to substitute an alternative process of liquidating and distributing the Debtor's assets that the Debtor perceives will be more favorable

---

[10]   Of course, the real economic party in interest standing behind the Third Mezz Borrower is Gramercy, which has no contractual or other relationship with the Debtor and thus could not legitimately be considered a "party in interest" or "stakeholder" of the Debtor.

to the Debtor's sole equity holder.[11] But the Third Circuit has consistently held that a naked desire to obtain the protections of the automatic stay is not a valid justification for seeking bankruptcy relief. *15375 Memorial*, 589 F.3d 620; *Integrated Telecom*, 384 F.3d at 128. In addition, the Third Circuit has held that the liquidation and distribution of the debtor's estate to stakeholders, standing alone, are not valid bankruptcy purposes justifying chapter 11 relief. *Integrated Telecom*, 384 F.3d at 126 (finding "no authority that the Code can be used to effectuate a liquidation that has no hope of maximizing the value of the company . . . but simply facilitates dissolution on terms favorable to equity interests"). This is particularly so where the bankruptcy liquidation and distribution processes would not result in any efficiencies not available under state law. *Id.*[12]

64. The Colony JIH Lenders cannot, of course, anticipate every conceivable "bankruptcy purpose" the Debtor may yet contend establishes its good faith in commencing this chapter 11 case. But the Colony JIH Lenders are confident that any purported justification for the Debtor's bankruptcy filing will not withstand scrutiny in light of the extraordinary circumstances presented by this case, which include nearly *all* of the indicia of "bad faith" filings ordinarily identified by the courts, namely: (i) a single asset case, (ii) few unsecured creditors (here, none), (iii) no ongoing business or employees, (iv) a petition filed on eve of foreclosure,

---

[11] In this connection, the Colony JIH Lenders note that no parties registered to participate in the Article 9 foreclosure sale of the Debtor's 100% membership interest in the First Mezz Borrower despite an extensive two-month marketing effort by JLL, the recognized leader in this market. By filing this proceeding, the Debtor and its directors are forcing the Colony JIH Lenders – the Debtor's only creditors – to bear the risk of an imminent foreclosure on the Mortgage Loans at the level of the Mortgage Loan Borrower, which will impair the value of the Colony JIH Lenders' collateral for the sole purported benefit of the Debtor's equity owner and the equity owner's creditors.

[12] Where a debtor owns a mix of personal and real property located in multiple jurisdictions, for example, the consolidation of the liquidation process in a single forum having universal *in rem* jurisdiction over the debtor's property could result in efficiencies when compared to a multi-jurisdictional liquidation under each applicable state's law. Such considerations are inapplicable here, of course, because the Debtor has a sole asset consisting of intangible personal property.

(v) a two-party dispute which can be resolved in pending state court action (here, a foreclosure proceeding, as well as the Declaratory Action), (vi) no cash or income, (vii) no pressure from non-moving creditors (here, there are none), (viii) no possibility of reorganization,[13] and (ix) filing solely to invoke the automatic stay. *See Primestone*, 272 B.R. at 557 (noting factors). Indeed, the *Primestone* case is particularly instructive.

65. The Debtor in *Primestone* was a special-purpose entity organized for the purpose of acquiring, holding, exchanging, or otherwise disposing of limited partnership units (the "Prime Units") exchangeable into common shares of beneficial interest in a real estate investment trust whose subsidiary owned, managed, leased, developed and redeveloped office and industrial real estate. The debtor had senior and junior loans secured by the Prime Units; the lenders' rights vis-à-vis one another were governed by an intercreditor agreement that required the junior lender to obtain the consent of the senior lender, or buy out the senior lender's position, prior to exercising remedies on the junior loan. The junior lender sought to enforce its remedies. When the senior lender did not consent, the junior lender bought out the senior lender pursuant to the intercreditor agreement and, thereafter, informed the debtor of its intention to dispose of the Prime Units at a public auction. *Primestone*, 272 B.R. at 556.

66. The lender retained an investment banker who distributed information to potentially qualified purchasers of the Prime Units and publicized notices of the auction. In response to the lender's actions, the debtor objected to the auction process as "commercially unreasonable." The lender commenced litigation against the debtor in Delaware Chancery Court seeking a declaration that the auction process was commercially reasonable and an injunction against interference with the foreclosure process. At 11:51 p.m. the night before the auction, the

---

[13] To confirm a chapter 11 plan, the Debtor would need to have at least one impaired, accepting class of creditors. 11 U.S.C. § 1129(a)(10). As the Colony JIH Lenders are the Debtor's sole creditors, the Debtor cannot confirm a chapter 11 plan over their dissent.

debtor filed a chapter 11 petition, resulting in the automatic stay of the foreclosure proceeding and the chancery action. The debtor's 20 largest creditors list did not list any creditors. The lender moved to dismiss the case for lack of good faith. This Court granted the motion, reasoning as follows:

> [A]ll of the factors support dismissal of this case. It is a single asset, not operating asset. There is a dispute with one creditor, few other creditors, that appear to have been manufactured by the debtor. . . .
>
> There are no employees, no operations, no income, no ongoing business operation to be preserved by the filing of a bankruptcy. The bankruptcy was filed on the eve of foreclosure, apparently in an attempt to stay the foreclosure on these assets.
>
> The debtor asserts it has a valid reorganization purposes, but I think the refinance or restructure of one creditor secured by one asset is not a valid bankruptcy purpose and I don't believe it permits allowing this debtor to remain in Chapter 11.

Hr'g Tr. Dec. 18, 2001, *Primestone*, Case No. 01-11355, at 63:20-64:16 (Walrath, J.).

67.     This Court also found that the debtor was sufficiently protected by its bargained-for contractual rights under state law, and that it would be inappropriate to arm the debtor with the powers of chapter 11 to disadvantage its sole secured creditor. *Primestone*, 272 B.R. at 558. The district court affirmed. *Id.*

68.     Just like the debtor in *Primestone*, the Debtor here is invoking the bankruptcy process to thwart the foreclosure process for which it bargained in the Loan Documents, to the detriment of the Colony JIH Lenders, the Debtor's only creditors. Arming the Debtor with the substantial powers of chapter 11 is not justified by any legitimate bankruptcy purpose. Accordingly, the chapter 11 case was not commenced in good faith as defined by governing Third Circuit precedent, and must be dismissed under § 1112(b) of the Bankruptcy Code.

69. The facts in this case are also similar to the *Westland DevCo, L.P.* case, in which the debtor owned a single asset, had no income, had no foreseeable prospects for a successful reorganization and filed the bankruptcy petition at the last minute to thwart a pending state-court foreclosure action. In response to a motion to dismiss on the basis of bad faith, Judge Sontchi dismissed the case. Order, *In re Westland DevCo, L.P.*, Case No. 10-1166 (CSS), D.I. 104 (Bankr. D. Del. May 10, 2010).[14]

70. One of the independent directors who authorized the bankruptcy filing in the *Westland DevCo* case was Michelle Dreyer, who as a purported Independent Director of the Debtor whose vote was necessary for this case to be filed, again voted to file for bankruptcy in this case, even after Judge Sontchi dismissed Westland DevCo's petition. Upon information and belief, Ms. Dreyer was not an independent director of the Debtor at the time the Second Mezz Loan went into default. The Colony JIH Lenders received no notice of her appointment and were not asked to approve her appointment, even though the Loan Documents require that the Independent Directors be reasonably satisfactory to them. (Second Mezz Loan Agreement § 6.4(a).) This secret and unauthorized appointment coupled with Ms. Dreyer's history of authorizing a bad faith bankruptcy filing, further supports that this case was filed in bad faith.

## 2. The Debtor's Case Was Commenced Primarily to Obtain a Tactical Litigation Advantage

71. A chapter 11 case is subject to dismissal if it was commenced primarily to obtain a tactical litigation advantage. *15375 Memorial*, 589 F.3d at 605; *SGL Carbon*, 200 F.3d at 165. The tactical advantages gained by the Debtor in commencing this case are obvious. The Debtor's naked chapter 11 petition automatically stayed the pending foreclosure sale and related litigation with no showing whatsoever by the Debtor. This is significant because, for the Debtor to have obtained similar relief outside of bankruptcy, it would have needed to convince a court to

---

[14] A true and correct copy of the Order is attached hereto as Exhibit B.

enjoin the foreclosure. The bankruptcy filing also saddled the Colony JIH Lenders with the burden of coming forward to affirmatively seek relief from the Debtor's abusive filing. Indeed, because the Debtor did not seek any first-day relief (surely a strategic choice), it is likely the Court was unaware of the chapter 11 case until it received this Motion.

72.     But for the imposition of the automatic stay to prevent foreclosure by the Colony JIH Lenders, which are both structurally and contractually senior to Gramercy within the Jameson Hotels capital structure, Gramercy would have had to buy out the Colony JIH Lenders' debt position or bid at the foreclosure sale in order to preserve its position at the Third Mezz Borrower. Subject to certain limitations, Gramercy has these rights under the Intercreditor Agreement. But Gramercy has not opted to directly protect its interest by exercising these contractual rights. The stay of the Colony JIH Lenders' foreclosure at the Second Mezz Borrower level forces the Colony JIH Lenders to bear all the risk.

73.     In sum, taking into account the lack of a valid bankruptcy purpose for the chapter 11 case, the timing of the filing of the petition, and the tactical advantages gained from the bankruptcy filing by the Debtor, the only reasonable conclusion is that the Debtor filed its petition primarily as a litigation tactic to frustrate the Colony JIH Lenders' exercise of their remedies, which is not a good faith purpose for invoking bankruptcy protection.

**B. Debtor's Inability to Effectuate a Plan Constitutes "Cause" for Dismissal under § 1112(b)**

74.     Under § 1112(b)(4) of the Bankruptcy Code, "substantial and continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" constitutes "cause" for dismissal. 11 U.S.C. § 1112(b)(4)(A)-(B). As the Debtor has no cash flow, is likely balance-sheet insolvent (as discussed in the motion for relief from stay filed concurrently herewith), and has no "going concern" to preserve in bankruptcy, the Debtor's estate faces a serious threat of loss or diminution resulting from the accrual of chapter 11

administrative expenses (assuming the Court permits such expenses to be allowed).[15] Here, the

Debtor has refused to disclose to the Colony JIH Lenders how it intends to fund this chapter 11

case. In addition, there is no reasonable likelihood of rehabilitation because a chapter 11 plan

cannot be confirmed over the dissent of the Colony JIH Lenders, the Debtor's sole creditors. *See*

11 U.S.C. § 1129(a)(10) (requiring at least one impaired accepting class).

75.     For these reasons, *even if* the Debtor had commenced its case in good faith

(which, as discussed above, it did not), dismissal would still be mandatory under § 1112(b)(4).

Moreover, even if there were no "loss or continuing diminution to the estate," the Debtor's

inability to effectuate a chapter 11 plan would alone constitute "cause" for dismissal. *In re 3*

*RAM, Inc.*, 343 B.R. 113, 117 n.14 (noting the "loss or continuing diminution" element of

§ 1112(b)(4) might not be implicated, strictly speaking, in the case of a holding-company debtor

having no operations; nonetheless, the inability to effectuate a chapter 11 plan would constitute

independent "cause" for dismissal).

## II.     Alternatively, This Court Should Abstain From Hearing This Case and Dismiss It Pursuant to Section 305(a) of the Bankruptcy Code

76.     Alternatively, the Court should abstain from exercising its jurisdiction

over this chapter 11 case and dismiss it pursuant to section 305(a)(1) of the Bankruptcy Code.

Section 305(a)(1) empowers bankruptcy courts to dismiss an otherwise proper bankruptcy case at

any time if "the interests of creditors and the debtor would be better served by such dismissal."

*See* 11 U.S.C. § 305(a)(1). Pursuant to section 305(c) of the Bankruptcy Code, the decision to

dismiss a bankruptcy case under section 305(a)(1) is left to the discretion of the bankruptcy

---

[15] The Colony JIH Lenders reserve all rights as to whether the Debtor, either as a matter of corporate authority or as a matter of bankruptcy law, should be permitted to incur administrative expenses in the chapter 11 case. Although the board resolution authorizing the bankruptcy filing purports to permit the Debtor to obtain debtor-in-possession financing, the LLC Agreement clearly prevents the Debtor from incurring any debt other than ordinary course debt. (LLC Agmt. § 9(j)(v)(C).)

judge and is not reviewable by the respective court of appeals or United States Supreme Court, although it is reviewable on appeal by the respective district court (or a bankruptcy appellate panel, where applicable) under an "abuse of discretion" standard. *See* 11 U.S.C. § 305(c); *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 463 (Bankr. S.D.N.Y. 2008); *Pennino v. Evergreen Presbyterian Ministries (In re Pennino)*, 299 B.R. 536, 538 (B.A.P. 8th Cir. 2003); *Steinman v. Spencer (In re Argus Group 1700)*, 206 B.R. 737, 755 (Bankr. E.D. Pa. 1996).[16] The Colony JIH Lenders, the parties seeking dismissal under section 305(a)(1), bears the burden of demonstrating that the interests of the Debtor and its creditor(s) would be "better served" from such dismissal. *Monitor Single Lift I*, 381 B.R. at 462-63.

77.     Although abstention under section 305(a) is generally considered "an extraordinary remedy," *id.* at 462, the rare set of circumstances presented by this case falls squarely within the type of case that courts have found to merit dismissal under section 305(a)(1). In considering whether dismissal under section 305(a)(1) is warranted, "'courts have considered a wide range of factors, including but not limited to who filed the bankruptcy petition, the availability of another forum to resolve the pending disputes, the necessity of federal proceedings to achieve a just and equitable solution, the expense of the federal proceedings in comparison with the proceedings in another forum, the purpose of the party seeking to remain in bankruptcy court, the economy and efficiency of having the bankruptcy court handle the matter and the possible prejudice to various parties.'" *Argus Group*, 206 B.R. at 755 (quoting *In re Carl Mazzocone*, 200 B.R. 568, 575 (E.D. Pa. 1996)). *Accord Santa Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Mem. Corp.)*, 382 B.R. 652, 686 (Bankr. D. Del. 2008*), rev'd on other grounds*, 400 B.R. 420 (D. Del. 2009). "In addition, if the bankruptcy court is being used as a forum to resolve what is essentially a two-party dispute, this factor may also be considered

---

[16]  Accordingly, there is no binding precedent regarding when dismissal under section 305(a) is appropriate. Ample persuasive authority, however, shows that dismissal of this case is proper.

in deciding whether to apply § 305(a)." *Argus Group*, 206 B.R. at 755. However, the exact

factors to be considered and the weight to be given to each factor "is 'highly sensitive to the facts

of each individual case.'" *Id.*

78.     Upon review of the factors set forth above and the totality of the

circumstances, it is clear that the Debtor and its only real creditors – the Colony JIH Lenders --

would be better served if this case were dismissed. As the Court can see from the scant

pleadings filed to date, this is an extraordinary case. The Debtor acknowledges that it does not

have a single unsecured creditor. (*See* List of Creditors Holding 20 Largest Unsecured Claims

[D.I. 1].) As noted above, the Debtor's status as nothing more than a mezzanine financing

vehicle makes this case a true two-party dispute.[17] This factor alone strongly militates in favor

of dismissing this case under section 305(a)(1). *See, e.g., Argus Group*, 206 B.R. at 755-57

(dismissing case that was essentially a two-party partnership dispute under section 305(a)(1)); *In

re Business Information Co.*, 81 B.R. 382, 387 (Bankr. W.D. Pa. 1988) (dismissing case that was

essentially a two-party dispute under section 305(a)(1)); *In re Seff Enters. & Holdings, LLC*,

2009 Bankr. Lexis 2483 (Bankr. D.N.H. August 26, 2009) (dismissing case under section

305(a)(1) because it was essentially a two-party dispute).

79.     The other factors frequently considered by courts when deciding whether

to dismiss a case under section 305(a)(1) also weigh in favor of dismissal. The Debtor would

most certainly not be able to confirm a plan of liquidation or reorganization without the support

---

[17] The Debtor does list 23 persons on its Creditor Matrix [D.I. 1]. It appears, however, that
many of the persons listed on the Creditor Matrix are listed for notice purposes only. In any
event, however, "[t]he presence of more than one creditor on a debtor's schedules does not
preclude a court from finding that a case is essentially a two-party dispute." *Barry v. Sommers
(In re Cochener)*, 382 B.R. 311, 336-337 (S.D. Tex. 2007); *see also In re SB Properties, Inc.*,
185 B.R. 206, 208-09 (Bankr. E.D. Pa. 1995) (dismissing chapter 11 case *sua sponte* because it
was "essentially a two party dispute ... commenced for the sole purpose of relocating pending
litigation" from state court even though more than one creditor was named on the debtor's
schedules).

of the Colony JIH Lenders. *See* 11 U.S.C. § 1129(a)(10) (requiring at least one impaired

accepting class); *see also Monsour Medical Ctr., Inc. v. Stein*, 154 B.R. 201, 203 (Bankr. W.D.

Pa. 1993) (dismissing case under section 305(a)(1) to allow state receivership to proceed

primarily because it appeared no plan would be confirmable without the support of the party

seeking dismissal under section 305(a)(1)).

80.     Moreover, if this case were to be dismissed, then the Colony JIH Lenders,

the sole creditors of the Debtor, would foreclose on and conduct a public auction of the Debtor's

only asset, its 100% equity interest in the First Mezz Borrower. As detailed above, this public

auction will benefit from an extensive marketing process that has already been undertaken by the

Colony JIH Lenders. *See supra* ¶¶ 35-37. The proceeds of the public auction would then be

distributed, as would be done in connection with any other similar mezzanine financing and as

all relevant parties expressly contemplated. Given that the Debtor has no actual business and no

true creditors other than the Colony JIH Lenders, no more value could be created for the Debtor

or its creditors inside of bankruptcy than could be realized through public auction; and the

commercial reasonableness of the auction, if genuinely disputed, would be subject to challenge

and approval in state court, in a proceeding that is already pending. Accordingly, the Article 9

public auction and its related state court approval process provide "the availability of another

forum to resolve the pending disputes" at issue herein. *See Argus Group*, 206 B.R. at 755. This

public auction process shows there is no "necessity of federal proceedings to achieve a just and

equitable solution." *See id.* Moreover, the public auction process would be significantly less

costly than a chapter 11 bankruptcy case, even after taking into account costs associated with

obtaining court approval of the auction – an important consideration given that two of the factors

most frequently considered by courts evaluating whether to dismiss a case under section

305(a)(1) are "the expense of the federal proceedings in comparison with the proceedings in

another forum" and "the economy and efficiency of having the bankruptcy court handle the matter." *See id.*; *see also Business Information Co.*, 81 B.R. at 387. The safeguards of the public auction process and related state court litigation will also ensure that there is no "possible prejudice," *see Argus Group*, 206 B.R. at 755, resulting from the disposition of the Debtor's sole asset through Article 9 public auction rather than a bankruptcy auction or other method of disposition in bankruptcy. *See In re Beacon Reef Ltd. Partnership*, 43 B.R. 644, 646-647 (Bankr. S.D. Fla. 1984) (dismissing involuntary bankruptcy case pursuant to section 305(a)(1) so that state foreclosure process could proceed because "there are adequate remedies at state law to raise defenses in the pending foreclosure proceedings and as between the parties to the partnership agreement" in dispute "primarily only between the two general partners remaining active in the partnership and the single investor who is the sole limited partner").

81.     Finally, and perhaps most importantly, "the purpose of the party seeking to remain in bankruptcy court" also strongly counsels in favor of dismissal under section 305(a)(1). *See Argus Group*, 206 B.R. at 755. Filing bankruptcy solely to avoid a state law foreclosure process justifies dismissal of under section 305(a)(1). *See In re Fast Food Properties, Ltd. #1*, 5 B.R. 539, 540 (Bankr. C.D. Cal. 1980) ("It is obvious to me that this Chapter 11 case was filed solely for the purpose of frustrating the enforcement of the power of sale provision under Su-Jac's deed of trust and that the Chapter 11 case should be dismissed."). And, here, the Debtor essentially acknowledges that this is the sole reason it filed bankruptcy. (*See* Gregory Declaration, ¶ 31 ("The Debtor filed this chapter 11 case to halt the accelerated foreclosure process and permit the Debtor and other parties in interest to thoughtfully maximize value for all stakeholders.").) Coupled with the fact that the Debtor cannot accomplish any legitimate bankruptcy purpose through this chapter 11 case, as explained above, dismissal of this case under section 305(a)(1) is appropriate.

82.     For all of the foregoing reasons, the Court should dismiss this case pursuant to section 305(a)(1) of the Bankruptcy Code.

### III. Dismissal of the Chapter 11 Case Should be With Prejudice Pursuant to Sections 105(a) and 349(a) of the Bankruptcy Code

83.     Section 349(a) of the Bankruptcy Code provides that "[u]nless the court, for cause, orders otherwise, the dismissal of a case under this title does not bar a discharge, in a later case under this title, of debts that were dischargeable in the case dismissed; nor does the dismissal of a case under this title prejudice the debtor with regard to the filing of a subsequent petition under this title, except as provided in section 109(g) of this title." 11 U.S.C. § 349(a) (emphasis added); *see* 11 U.S.C. § 109(g) (applicable to individuals and family farmers only).

84.     Pursuant to § 105(a) of the Bankruptcy Code, the Court may "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, *or to prevent an abuse of process*." 11 U.S.C. § 105(a) (emphasis added).

85.     A bankruptcy court may apply its inherent powers under §§ 105(a) and 349(a) to dismiss a debtor's chapter 11 case with prejudice and proscribe subsequent filings, where the debtor has commenced its bankruptcy case for an improper purpose and in bad faith. *See Casse v. Key Bank Nat'l Assoc'n (In re Casse)*, 198 F.3d 327, 336 (2d Cir. 1999).

86.     It is necessary for the Court to dismiss the Debtor's case with prejudice to prevent the Debtor from attempting to file a successive bankruptcy petition in this or some other jurisdiction to further forestall the Colony JIH Lenders' foreclosure sale and otherwise frustrate their rights with respect to their collateral. The Debtor's bad faith filing provides ample justification for the Court to proscribe the Debtor from seeking further relief under the Bankruptcy Code without first seeking leave of this Court.

87.     The Colony JIH Lenders have vigorously and extensively marketed the opportunity to purchase the collateral at the foreclosure sale. As a consequence of the Debtor's

bad faith filing, the Colony JIH Lenders have suffered significant setbacks in completing the foreclosure sale, have incurred significant enforcement costs, and face risk of material diminution in the value of their collateral based upon the events unfolding at the Mortgage Loan Borrower level within the Jameson Hotels capital structure. Accordingly, to prevent further harm to the Colony JIH Lenders, the Court should make its dismissal of the Debtor's chapter 11 case with prejudice and prospectively enjoin any further filings by the Debtor.

## **NOTICE**

88. Notice of this Motion has been provided to (i) counsel for the United States Trustee for the District of Delaware, (ii) counsel for the Debtor, (iii) counsel for Gramercy, and (iv) all parties who have filed appearances in the chapter 11 case. The Colony JIH Lenders submit that no other or further notice is necessary under the circumstances.

*[Remainder of page intentionally left blank]*

## CONCLUSION

For the foregoing reasons, the Colony JIH Lenders respectfully request entry of an order dismissing the above-captioned chapter 11 case pursuant to §§ 1112(b) and/or 305(a) of the Bankruptcy Code, with prejudice, and (ii) granting such other relief as may be just and appropriate.

Dated:    Wilmington, Delaware
          October 21, 2011

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Pauline K. Morgan*
Pauline K. Morgan (No. 3650)
John T. Dorsey (No. 2988)
Margaret Whiteman Greecher (No. 4652)
Patrick A. Jackson (No. 4976)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Lindsee P. Granfield, Esq.
Sean A. O'Neal, Esq.
Jane VanLare, Esq.
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

*Attorneys for the Colony JIH Lenders*