IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JER/JAMESON MEZZ BORROWER II LLC,[1] | ) | Case No. 11-13338 (MFW) |
| | ) | |
| Debtor. | ) | |
| | ) | **Relating to Docket Nos. 9, 10** |

**OMNIBUS OBJECTION OF DEBTOR TO COLONY JIH LENDERS' EMERGENCY MOTIONS FOR ENTRY OF ORDERS (A) DISMISSING THE DEBTOR'S CHAPTER 11 CASE PURSUANT TO SECTION 1112(b) AND/OR 305(a) OF THE BANKRUPTCY CODE, WITH PREJUDICE, AND (B) GRANTING RELIEF FROM THE AUTOMATIC STAY PURSUANT TO SECTIONS 362(d) AND (f) OF THE BANKRUPTCY CODE**

JER/JAMESON MEZZ BORROWER II LLC (the "Debtor" or "Mezz Borrower 2"), the above-captioned debtor and debtor in possession, hereby submits this omnibus objection to the (a) Emergency Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case Pursuant to Section 1112(b) and/or 305(a) of the Bankruptcy Code, with Prejudice [Docket No. 9] (the "Dismissal Motion"), and (b) Emergency Motion for Entry of an Order Granting Relief from the Automatic Stay Pursuant to Sections 362(d) and (f) of the Bankruptcy Code [Docket No. 10] (the "Stay Relief Motion"), filed by CDCF JIH Funding, LLC, together with ColFin JIH Funding, LLC (collectively, "Colony"), and in support hereof respectfully submits as follows:

---

[1] The Debtor in this case, along with the last four digits of its federal tax identification number, is JER/JAMESON MEZZ BORROWER II LLC (6522). The Debtor's mailing address is 4770 S. Atlanta Road, Suite 200, Smyrna, Georgia 30080.

## PRELIMINARY STATEMENT

1. The Debtor represents a single tranche in a multi-tiered capital structure for a business enterprise that owns and operates over 100 hotel properties in twelve states (the "Business"). The Business continues to operate profitably and to generate sufficient excess cash to service accruing interest obligations owed by the Debtor and its subsidiaries. All secured creditors with claims against the Debtor or its subsidiaries are adequately protected, both by ongoing cash receipts and a substantial equity cushion. The problem here is solely timing -- the maturity date at the various debt levels occurred on August 9, 2011. To date, the Debtor and its affiliates have been unable to refinance such debt. The purpose of this bankruptcy case is to provide the Debtor, along with its subsidiaries, a reasonable opportunity to restructure the debt obligations against the Business and propose a confirmable plan.

2. Colony, as the holder of the approximately $39 million in secured debt against the Debtor, has commenced the process to foreclose on the Debtor's principal asset -- its membership interest in a wholly-owned subsidiary that in turn owns the entities that hold the Business. In order to preserve and protect the value that exists at the Debtor for its various stakeholders, the Debtor's board (including two independent members) exercised its fiduciary duty and sound business judgment to commence the instant case.

3. The Debtor is a special purpose entity with only two assets -- its indirect ownership interests in entities that hold and control the Business and intercompany receivables from such property-owning subsidiaries. The Debtor has no operations and no employees. However, the Debtor does have a legitimate reorganization purpose in this case and, primarily

for that reason, there is no "cause" to dismiss this case under section 1112(b) of the Bankruptcy Code or to abstain from this case under section 305(b) of the Bankruptcy Code. The facts that support the Court's denial of the Dismissal Motion are summarized below:

- This is not a simple two-party dispute. The Debtor is part of a complex and inter-related capital structure that underlies the Business, which even Colony admits is a financing structure that "has been widely used for real estate financing." *See* Dismissal Motion at ¶10. The whole of such capital structure, with multiple layers of secured debt and varying creditor constituencies, is currently in default and will require a global restructuring. The Debtor's immediate subsidiary filed its chapter 11 case in this Court earlier today in response to Colony's efforts to re-register the ownership interests in the Debtor's property-owning subsidiaries. It is anticipated that additional bankruptcy filings by the Debtor's subsidiaries are likely and imminent. Among other things, the board of one of the Debtor's property-owning subsidiaries has already authorized a filing to protect its assets from a pending foreclosure sale noticed by the Mortgage Lender (as defined below) for twenty-one hotel properties scheduled to occur on November 1, 2011.

- This case was not filed as a stall tactic or litigation ploy, but rather to preserve and protect the estate's assets. The Business is profitable and continues to generate excess cash. For the twelve months ended June 30, 2011, the Debtor's property-owning subsidiaries' net operating income ("NOI"), a standard measure of performance in the real estate industry, was $26.2 million, on total revenues of $78.5 million. On an operational basis, the Debtor's subsidiaries generate positive free cash flow sufficient to fully service all secured debt owed by the Debtor and its subsidiaries (at both the contract and default rates of interest), such that all secured debt is adequately protected.

- The Business has a value that renders Colony *oversecured*. The Debtor believes that the value of the Business is approximately $302.5 million, which amount is in excess of Colony's approximately $39 million claim against the Debtor (after deduction for senior debt) by approximately $54 million. This translates to an equity cushion of approximately 138% for Colony.

- The Debtor has an active and functioning board. The Debtor's board consists of one non-independent director (James L. Gregory)[2] and two independent directors (Michelle Dreyer and Carrie Tillman). The Debtor's board, faced with an imminent foreclosure by Colony, chose the only course available to the Debtor to preserve and protect asset value for all constituents. The board's decision was made after meeting with Colony, including hearing an extensive presentation from Colony and its financial advisors regarding their views.

- Colony is not an innocent third party in this proceeding. The filing of this case was, in part, caused by Colony's interference in the Debtor's internal affairs and corporate governance by challenging the appointment of Mr. Gregory as a non-independent director. Colony's conduct has already resulted in prepetition litigation and an order of a New York state court dissolving a temporary restraining order that called into question Mr. Gregory's status as a director of the Debtor. As a result of Colony's actions, the Debtor's board has been unable to obtain full access to financial and operational information with respect to the Debtor's subsidiaries and the Business. In turn, the Debtor and its subsidiaries have been forestalled from engaging in a fulsome marketing, sale, refinancing, and/or restructuring effort. Because Colony has improperly prejudiced the Debtor's reorganization efforts with the goal of itself realizing the value in the Business, Colony should not benefit from dismissal of this case.

- Colony is intent on dismissing this case so that it can take control of the Debtor's subsidiaries and restructure the capital structure for the Business for Colony's sole benefit. In its haste to assume control, Colony has commenced a defective foreclosure process by, among other things, noticing a sale of the wrong entity's membership interests, failing to prepare appropriate informational materials, neglecting to respond to inquiries from prospective buyers, and otherwise ignoring obvious and standard avenues to maximizing value.

---

[2] Mr. Gregory is not considered independent because he was appointed by Gramercy Loan Services LLC, holder of the debt at the Debtor's direct and indirect parent affiliates.

- Now that any confusion cast by Colony on the Debtor's governance has been addressed, the Debtor and its subsidiaries are moving forward with the process of reorganizing their affairs. The Debtor is negotiating a debtor-in-possession financing facility to satisfy its projected administrative expenses and professional fees, which facility will be provided by affiliates of the Debtor's parent and will be junior to Colony's debt (hence, no diminution in value for Colony). The Debtor and its subsidiaries also have retained Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey") as investment bankers who will be charged with the task of pursuing the Debtor's and its affiliates' restructuring alternatives, which include marketing the Business for sale, refinancing or other restructuring. Further, the non-independent members of the boards of the Debtor's property-owning subsidiaries have been replaced with the goal of effectuating a restructuring (the independent board members of these entities remain in place). The Debtor will aggressively pursue the restructuring process during its exclusive period to propose a plan.

4.     In sum, this case should not dismissed because the Debtor, as part of a much larger enterprise that is in need of restructuring given the maturity of its outstanding debt, filed this case with the honest and good faith purpose of reorganizing its affairs and confirming a plan. The Debtor's immediate subsidiary commenced its chapter 11 case today. Additional filings are soon to follow, as evidenced by the authorization by at least one property-owning subsidiary to file a chapter 11 case in this Court in response to a pending foreclosure sale of twenty-one hotel properties presently scheduled for November 1, 2011. Because Colony is oversecured and otherwise adequately protected, the Debtor and its subsidiaries need time in order to effectuate an orderly restructuring. In the interim, the Business continues to generate sufficient cash to service the Debtor's and its subsidiaries' accruing interest obligations.

5.     Judge Gropper of the U.S. Bankruptcy Court for the Southern District of New York recently encountered a similar situation in *In re General Growth Properties, Inc.*, 409 B.R. 43 (Bankr. S.D.N.Y. 2009). The debtors there constituted an inter-related real estate

enterprise with numerous sets of project level, mezzanine and other affiliated entities. *Id*. at 47-48. Faced with motions to dismiss that were focused on certain special purpose or bankruptcy remote debtors, the court refused to dismiss such cases as bad faith filings because there was a reasonable prospect for reorganization of the company as a whole. *Id*. at 61-65, 69. The court also concluded that there is no requirement for the debtor to prove that it can confirm a plan in order to file a petition. *Id*. at 65.

6.      Just like the debtors in *General Growth*, the Debtor here is part of an inter-related capital structure that should be given an opportunity to reorganize and thereby allow the Debtor to propose a confirmable plan. Given the current state of the Business and its continuing ability to generate cash and adequately protect Colony and the other lenders, the Debtor's reorganization is a legitimate prospect that should not be cut off prematurely by the dismissal of this case. For these same reasons, there is no basis to grant the Stay Relief Motion because Colony's interests are adequately protected. The Debtor should be given a reasonable chance to reorganize with its assets and property intact.

[Remainder of Page Intentionally Blank]

# FACTUAL BACKGROUND

## A.    Overview of the Debtor

7.    The Debtor or Mezz Borrower 2 is a mezzanine borrower within a multi-tiered financing structure for operating companies JER/Jameson NC Properties LP and JER/Jameson Properties LLC (collectively, the "Mortgage Borrowers"). The Mortgage Borrowers own or lease, and operate, over 100 hotel properties in twelve different states (*i.e.*, the Business). These properties are operated under the Jameson Inn and Signature Inn brands, and are managed by Park Management Group, Inc. ("PMG"). The Mortgage Borrowers and the Debtor have no employees.

8.    Jameson Inns, Inc., the indirect equity holder of the Debtor, owns and operates, through JER/Jameson Holdco LLC and its subsidiaries, limited service hotel properties under (a) the trademarks The Jameson Inn® and The Jameson Inn and Suites® in the southeastern and midwestern United States and (b) the trademark Signature Inn® in the midwestern United States. A detailed organization chart of the Debtor and its non-Debtor affiliated companies is attached as Exhibit A to the Declaration of James L. Gregory in Support



of Chapter 11 Petition, filed on October 18, 2011 [Docket No. 2] (the "Gregory Declaration").

9.      The Mortgage Borrowers operate the Business through management and license agreements with PMG for each hotel property. PMG, the Mortgage Borrowers, the Debtor and the Debtor's affiliates share common ownership. Pursuant to the management agreement, the Mortgage Borrowers pay PMG fees and reimbursements to provide numerous services including:

- accounting services, tax and audit preparation, treasury functions, legal services and other general corporate benefits associated with the activities of the Mortgage Borrowers;

- placement of general liability, property insurance and worker's compensation coverage for each of the properties; and

- negotiating and arranging the various acquisitions of real estate and development.

The Mortgage Borrowers pay a base management fee to PMG equal to three percent of annual gross receipts plus reimbursement of certain expenses. The management agreement also calls for an incentive fee equal to one and one half of annual gross receipts once certain income targets are met.

## B.     **Equity and Significant Indebtedness**

10.      In 2006, the Mortgage Borrowers and several affiliated entities (including the Debtor) entered into a transaction through which they obtained approximately $335 million in financing. The $335 million loan was initially provided by Wachovia Bank and its affiliates and/or assignees by way of five different credit agreements representing five different tranches of debt, as explained below. The lenders on each tranche of debt are collectively referred to as the "Lenders."

11.     The Mortgage Borrowers obtained a $175 million mortgage loan secured by each of the various hotel properties. That loan is currently held by a securitization trust named "Commercial Mortgage Pass-Through Certificate Series 2006-WHALE7." It is serviced and specially serviced by Wells Fargo Bank, N.A., as successor in interest to Wachovia Bank, N.A (the "Mortgage Lender"). The current principal balance is approximately $171 million.

12.     All of the interests in the Mortgage Borrowers are held by Mezz Borrower 1. Mezz Borrower 1 obtained a $40 million loan (the "Mezz Loan 1") secured by all of Mezz Borrower 1's equity interests in the Mortgage Borrowers. Upon information and belief, the Mezz Loan 1 was recently assigned and conveyed by AB US REP Jameson LLC ("AB") to Colony. The current principal balance of the Mezz Loan 2 is approximately $39 million.

13.     All of the interests in Mezz Borrower 1 are held by Mezz Borrower 2. Mezz Borrower 2 obtained a $40 million loan (the "Mezz Loan 2") secured by all of its equity interests in Mezz Borrower 1. The Mezz Loan 2 is currently held by Colony. The current principal balance of the Mezz Loan 2 is approximately $39 million.

[Remainder of Page Intentionally Blank]

# Summary Organizational and Capital Structure



14.     All of the interests in Mezz Borrower 2 are held by Mezz Borrower 3.

Mezz Borrower 3 obtained a $40 million loan (the "Mezz Loan 3") secured by all of its equity

interests in Mezz Borrower 2.  The Mezz Loan 3 is currently held by (a) a collateralized debt

obligation managed by an affiliate of Gramercy Loan Services LLC (the "Gramercy"), and (b)

JER Investors Trust, Inc. ("JER") or its affiliate.  Those two parties have entered into a

participation agreement through which Gramercy, as lead lender, is responsible for making the

majority of decisions regarding the Mezz Loan 3, and Gramercy has been authorized to act as servicer of the same.

15.     All of the interests in Mezz Borrower 3 are held by Mezz Borrower 4 (collectively, the four mezzanine borrowers are referred to herein as the "Mezz Borrowers"). Mezz Borrower 4 obtained a $40 million loan (the "Mezz Loan 4") secured by all of its equity interests in Mezz Borrower 3.  The Mezz Loan 4 is currently held by (a) a collateralized debt obligation managed by an affiliate of Gramercy, and (b) JER or its affiliate.  As with the Mezz Loan 3, those two parties have entered into a participation agreement through which Gramercy, as lead lender, is responsible for making the majority of decisions regarding the Mezz Loan 4, and Gramercy has been authorized to act as servicer of the same.

16.     All of the interests in Mezz Borrower 4 are held by JER/Jameson Holdco LLC.

17.     Each of the Mezz Borrowers is a Delaware limited liability company governed by an operating agreement that provides that the companies will be managed by a board of directors (collectively, the "LLC Agreements").  Each of the LLC Agreements requires that the respective board contain both independent directors and non-independent directors." Upon information and belief, individuals associated with the management company operating the hotel properties, PMG, were initially named as non-independent directors and officers of the Mezz Borrowers.

18.     The five loans are memorialized in a series of documents.  For each of the mezzanine loans, there is a loan agreement and a pledge and security agreement

(respectively, the "Loan Agreements" and the "Pledge Agreements"). Upon information and belief, those agreements vary only in the parties named and the interests pledged.

19. Upon information and belief, the various Lenders also entered into an intercreditor agreement (the "Intercreditor Agreement"). That agreement specifies the rights among and between the Mortgage Lender and the mezzanine Lenders. None of the Mezzanine Borrowers or the Mortgage Borrower is a party to the Intercreditor Agreement.

20. All of the loans referenced above matured on August 9, 2011, and each of the borrowers, including Mezz Borrower 2, defaulted on that day. **Prior to the default, all of the borrowers consistently serviced the debt for their respective loans. The net cash flow (derived from the net revenues of the hotel properties after payment of fees and expenses to PMG) was sufficient to make interest payments associated with the loans. *This continues to be the case today.***

21. On August 9, 2011, AB, as the lender to Mezz Borrower 1, issued a notice of strict foreclosure under the Uniform Commercial Code. AB also indicated its alternative intention to conduct a public sale of the equity interests in the Mortgage Borrowers on September 8, 2011. Upon information and belief, AB revoked each of the foregoing notices on August 24, 2011.

22. On August 9, 2011, and August 30, 2011, Colony, as the lender to Mezz Borrower 2, provided notice of its intent to conduct a public sale of the equity interests in Mezz Borrower 1 on September 23, 2011. Upon information and belief, Colony periodically

adjourned the sale and intended to proceed with a public sale of the collateral on October 19, 2011.

23.     On October 19, 2011, Colony provided Mezz Borrower 1 notice of Colony's intent to re-register the ownership interests in the Mortgage Borrowers, which notice period under the Pledge Agreements will expire ten days from the date of the notice. Upon re-registration of such ownership interests, Colony would have full voting control as to the Mortgage Borrowers, substantially equivalent to a foreclosure. To avoid this consequence and preserve value for all constituents, Mezz Borrower 1 commenced a bankruptcy filing in this Court earlier today.

24.     At least one of the Mortgage Borrowers, JER/Jameson Properties LLC, which owns all of the hotels in the Business outside the State of North Carolina, has authorized a filing under chapter 11 in this Court in response to the Mortgage Lender's notice of a foreclosure sale for twenty-one hotel properties to occur on November 1, 2011.

C.     **Significant Prior Legal Proceedings**

25.     Prior to the filing of this case, AB and Colony (together, the "Plaintiffs") commenced actions related to the Loan Agreements and Pledge Agreements in the Supreme Court of the State of New York, County of New York, Case Index Nos. 652251/11 and 652252 (the "Prior Suits"). On or about August 12, 2011, the Plaintiffs sought, by Order to Show Cause, temporary restraining orders preventing Gramercy and Gramercy Warehouse Funding I LLC from taking various actions (together, the "TROs").

26.     The Prior Suits were filed following the default by certain borrowers (including Mezz Borrower 2) under loans made by the Plaintiffs.  As described above, upon the occurrence of the event of default, the Plaintiffs also gave notice of their intention to foreclose on their collateral.

27.     Separately, Gramercy, the registered agent for the Lenders to Mezz Borrower 3 and Mezz Borrower 4, gave notice that it was removing the then-current non-independent directors of Mezz Borrower 2 and Mezz Borrower 3; reducing the number of non-independent directors to one; and appointing James L. Gregory to each board as the non-independent director (collectively, the "Board Changes").

28.     In addition, after being appointed the director of Mezz Borrower 2, Mr. Gregory exercised his authority to institute similar Board Changes with respect to its wholly-owned subsidiary, Mezz Borrower 1.  All of the Board Changes were effectuated on August 11, 2011.

29.     Through the Prior Suits, the Plaintiffs contested Gramercy's authority to make the Board Changes, and have directly challenged the boards of Mezz Borrower 1, Mezz Borrower 2 and Mezz Borrower 3, and interfered with each board's management of those companies.  The Plaintiffs expressly told Mr. Gregory that he is not a director, and have thwarted the directors' requests for information about ongoing operations.

30.     On September 21, 2011, the New York State Supreme Court held a hearing regarding the Plaintiffs' motion for a preliminary injunction.

31.     In a decision and order dated September 28, 2011, and entered on

September 30, 2011, Justice Bernard J. Fried of the New York State Supreme Court found that

Gramercy had the right to institute the Board Changes (including Mr. Gregory's appointment as

a non-independent director of Mezz Borrower 2 and Mezz Borrower 3), and that Colony had

failed to demonstrate a likelihood of success on the merits of its claim that Gramercy was

seeking to interfere with the foreclosure sale by soliciting a bankruptcy filing.

32.     Accordingly, Justice Fried dissolved (i.e., vacated) the TROs, denied the

Plaintiffs' request for a preliminary injunction, and ordered the parties to appear for a

preliminary conference on November 15, 2011.

33.     The Debtor now has an active and functioning board.  The Debtor's

board presently consists of one non-independent director (Mr. Gregory) and two independent

directors (Michelle Dreyer and Carrie Tillman).

**D.      Circumstances Leading to the Commencement
         of the Chapter 11 Case and Goals of Chapter 11 Case**

34.     Colony, as the Lender to Mezz Borrower 2, has provided notice to the

Debtor that it intends to proceed with a public sale of its collateral on October 19, 2011.  On

October 7, 2010, Mr. Gregory sent a letter to Colony (the "Objection Letter") objecting, on

behalf of Mezz Borrower 2, to the pending public foreclosure sale related to the collateral.  As

described in the Objection Letter, the notices did not meet the standards for a commercially

reasonable disposition under the Uniform Commercial Code (the "UCC").  For instance, Colony

noticed a sale of the wrong entity's membership interests, failed to prepare appropriate

informational materials, neglected to respond to inquiries from prospective buyers, and

otherwise ignored obvious and standard avenues to maximizing value. A copy of the Objection Letter is attached as Exhibit B to the Gregory Declaration.

35.     On October 9, 2011, Colony responded to Mr. Gregory's letter (the "Response"). In the Response, Colony disputed the allegations that the foreclosure process has not been conducted in a commercially reasonable manner. According to Colony, the objection to the foreclosure and sale process were made in bad faith and at the behest of Gramercy. A copy of the Response is attached as Exhibit C to the Gregory Declaration.

36.     In addition, on October 12, 2011, Colony commenced an action in the Supreme Court of the State of New York against the Debtor (Mezz Borrower 2) and Mr. Gregory (the "Declaratory Action"). In the Declaratory Action, Colony seeks a declaratory judgment that the UCC notices are legally effective, and that the process proposed by Colony for the foreclosure is commercially reasonable. Colony also seeks an injunction restraining the Debtor from taking "any action" in connection with the matters raised in the Objection Letter. A hearing on Colony's Declaratory Action is scheduled for November 15, 2011 at 9:30 a.m.

37.     As a result of Colony's actions, the Debtor's board has been unable to obtain full access to financial and operational information with respect to the Debtor's subsidiaries and the Business. Most recently, the Debtor's efforts to obtain information from PMG, the management company for the Business, have been rebuffed, purportedly given the uncertainty surrounding the Debtor's control of Mezz Borrower 1 created by virtue of the filing of the Dismissal Motion. In turn, the Debtor and its subsidiaries have been forestalled from engaging in a fulsome marketing, sale, refinancing, and/or restructuring effort.

38. Given the continuing cloud of uncertainty created by Colony's conduct, on October 18, 2011 (the "Petition Date"), the Debtor's board (including two independent directors) unanimously authorized the filing of this chapter 11 case to halt the accelerated foreclosure process and permit the Debtor and other parties in interest to thoughtfully maximize value for all stakeholders. The board's decision was made after meeting with Colony, including hearing an extensive presentation from Colony and its financial advisors regarding their views. As noted above, the Debtor is a part of a complex and inter-related enterprise; the enforcement steps undertaken by Colony would have consequences to various parties in interest, not merely the lender. Permitting Colony to consummate its foreclosure proceedings and other actions against the Debtor without the involvement of other interested parties, would serve only the interests of Colony and eliminate any potential for the sharing of value among any of the Debtor's other constituents.

39. The Debtor intends to pursue all options for the orderly maximization of value for all stakeholders. The Debtor is negotiating a debtor-in-possession financing facility to satisfy its projected administrative expenses and professional fees, which facility will be provided by affiliates of the Debtor's parent and will be junior to Colony's debt (hence, no diminution in value for Colony). The Debtor and its subsidiaries also have retained Houlihan Lokey as investment bankers who will be charged with the task of marketing the Business for sale, refinancing or other restructuring. Further, the non-independent members of the boards of the Debtor's property-owning subsidiaries have been replaced with Mr. Gregory and Marc A. Beilinson, an experienced turnaround professional in the hospitality industry, with the goal of

effectuating a restructuring (the independent board members of these entities were not replaced). The Debtor will aggressively pursue the restructuring process during its exclusive period to propose a plan.

**E.** **The Debtor's and Its Subsidiaries' Financial Performance**

40.     Since 2006 when the present multi-tiered capital structure was put in place, the Business has generated and continues to generate sufficient cash to service the debt at all levels. The only default that has occurred is that the maturity date of August 11, 2011 has passed. In order to address such default, the Debtor and its subsidiaries need a reasonable opportunity to effectuate a global restructuring of their capital structure. Colony will be adequately protected in the interim through ongoing cash receipts by the Business and a substantial equity cushion.

41.     For the twelve months ended June 30, 2011, the Mortgage Borrowers' NOI was $26.2 million on total revenues of $78.5 million. These results are consistent with years 2009 and 2010 when the Mortgage Borrowers achieved NOI of $28.5 million and $26.5 million on revenues of $80.5 million and $78.4 million, respectively. PMG, as manager, is holding approximately $8.0 million in working capital, down from in excess of $20.0 million in working capital as of the end of June 2011. Although the Debtor is informed that the Mortgage Lender has been sweeping all cash presumably to pay accruing interest or to reduce the principal obligations on the senior mortgages, the Business generates sufficient positive cash flow to service its total secured debt (at both the contract and default rates of interest).

42.     Moreover, the Business has a value that substantially exceeds Colony's outstanding debt plus all other secured obligations senior thereto.  Houlihan Lokey has prepared a preliminary valuation analysis of the Business utilizing standard and generally accepted valuation methodologies, including discounted cash flow, precedent transaction and comparable company methodologies.  Houlihan Lokey's preliminary conclusion of the range of value for the Business based on each methodology is as follows:

(i)      Discounted cash flow ($275 million to $310 million);

(ii)     Precedent transaction ($255 million to $315 million); and

(iii)    Comparable company ($310 million to $350 million).

Houlihan Lokey's preliminary valuation analysis ascribes no value to the $8.0 million in working capital embedded in the Business, nor does it deduct any potential deferred capital expenditures associated with the 103 hotel properties (which is estimated in the range of $6.0 million).  Based on the foregoing valuation analyses, by averaging the median valuation under each methodology, the mid-point valuation for the Business is $302.5 million.  At this valuation, the Mortgage Lender's first mortgage of approximately $171 million is 57% loan to value, and there is ample value to cover all of Colony's claims against both Mezz Borrower 1 and the Debtor.  As to Colony's approximately $39 million of claims solely against the Debtor, the equity cushion is approximately 138% or $54 million in excess value.

# ARGUMENT

## A.   The Dismissal Motion Should Be Denied for Lack of Cause Under Section 1112(b) of the Bankruptcy Code

43.   Section 1112(b)(1) of the Bankruptcy Code provides that "on request of a party in interest, and after notice and a hearing ... the court shall ... dismiss a case under [chapter 11] . . . *if the movant establishes cause*." 11 U.S.C. § 1112(b)(1) (emphasis added to show amendment by the Bankruptcy Abuse Prevention Act and Consumer Protection of 2005 (the "BAPCPA")). As amended by the BAPCPA in 2005, the Bankruptcy Code *mandates* that the movant establish cause for dismissal. Subsection (b)(4) sets forth non-exhaustive examples of "cause."[3] 11 U.S.C. § 1112(b)(4)(A)-(P). Moreover, section 1112(b)(2) of the Bankruptcy Code provides that the dismissal, if any "provided in paragraph (1) shall not be granted . . . if the debtor or another party in interest objects and establishes that — (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in

---

[3] Notably, the Dismissal Motion fails to mention any specific factors listed in section 1112(b), other than: (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation (which for the reasons stated below does not apply here). 11 U.S.C. § 1112(b)(4)(A). Colony does not allege that any of the other factors set forth in section 1112(b) are applicable in this case, consisting of: (B) gross mismanagement of the estate; (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public; (D) unauthorized use of cash collateral substantially harmful to one or more creditors; (E) failure to comply with an order of the court; (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter; (G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor; (H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any); (I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief; (J) failure to file a disclosure statement, or to file or confirm a plan within the time fixed by this title or by order of the court; (K) failure to pay any fees or charges required under chapter 123 of title 28; (L) revocation of an order of confirmation under section 1144; (M) inability to effectuate substantial consummation of a confirmed plan; (N) material default by the debtor with respect to a confirmed plan; (0) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and (P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition. 11 U.S.C. § 1112(b)(4)(B)-(P).

sections 1121(e) and 1129(e) of this title, . . . ; and (B) the grounds for [dismissing the case] include an act or omission of the debtor other than under paragraph 4(A) — (i) for which there exists a reasonable justification for the act or omission; and (ii) that will be cured within a reasonable period of time fixed by the court." 11 U.S.C. § 1112(b)(2).

44.     The United States Court of Appeals for the Third Circuit has held that implicit in section 1112(b)(1) of the Bankruptcy Code is a requirement that a chapter 11 petition be filed in good faith. *See NMSBPCSLDHB, LP v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004) (dismissing chapter 11 case where debtor was financially healthy at time of filing and admitted filing was solely to take advantage of the Bankruptcy Code's provision capping landlord's rejection claim); *In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir. 1999) (dismissing chapter 11 case where debtor was financially healthy at time of filing and admitted that sole purpose of filing was to obtain a tactical advantage in litigation); *Santa Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Memorial Corp.)*, 589 F.3d 605 (3d Cir. 2009) (dismissing chapter 11 case filed by a debtor with no material assets to preserve other than insurance coverage in order to obtain a tactical advantage in pending lawsuits for property damage and personal injury).

45.     The Third Circuit has determined that "[w]hether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine the 'totality of facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'" *Integrated Telecom*, 382 F.3d at 118 (quoting *SGL Carbon Corp.*, 200 F.3d at 162). The Third Circuit has provided instruction

in applying the totality of circumstances test to determine good faith: "Our cases have accordingly focused on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose, *e.g.,* by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage." *Id.* at 119-120.

46.  "Under the first of these considerations, the courts in this Circuit have made clear that even where the debtors are not attempting to preserve going concern, for example when a liquidation plan will be filed, they can still satisfy the good faith requirement, provided that the filing preserves 'some value that otherwise would be lost outside of bankruptcy.'" *Crown Village Farm, LLC v. Arl, LLC (In re Crown Village, LLC)*, 415 B.R. 86, 92 (Bankr. D. Del. 2009). "Therefore, so long as the liquidation plan is maximizing the value of the debtor's estate, it serves a valid bankruptcy purpose and meets the good faith requirement." *Id.* "As for the second question, timing is a key element. Generally, a judge will evaluate whether the timing of the filing of a Chapter 11 petition indicates that the "*primary*, if not *sole*, purpose of the filing was a litigation tactic." *Id.* Case law recognizes that a bankruptcy petition should be dismissed for lack of good faith only sparingly and with great caution. *In re General Growth Properties, Inc.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009) (citing *See CarolinCorp. v. Miller*, 886 F.2d 693, 700 (4th Cir. 1989); *In re G.S. Distrib., Inc.*, 331 B.R. 552, 566 (Bankr. S.D.N.Y. 2005)).

47.  The focus of the allegations in the Dismissal Motion is that this case was filed in bad faith, without a valid bankruptcy purpose, and to obtain a tactical litigation

advantage. Colony asks the Court to ignore the facts and circumstances surrounding the Debtor, including (a) the Business and the equity value associated therewith, (b) the overarching capital structure of the Debtor and its subsidiaries, (c) the imminent bankruptcy filings in this Court of the Debtor's subsidiaries, including the Mortgage Borrowers, and (d) the need for a global restructuring that will involve both the Debtor and its affiliates. Instead, Colony proposes that the Court effectively wear "blinders" by focusing solely on the Debtor as a special purpose entity and disregarding the circumstances that led to Colony and all other parties in interest ending up in their present positions. Colony also seeks to sidestep its own prepetition conduct in hindering the Debtor's and its subsidiaries' efforts to restructure outside of bankruptcy. For all the reasons outlined below, the Dismissal Motion should be denied for lack of "cause" under section 1112(b) of the Bankruptcy Code.

**B.** **The Debtor Commenced This Case in Good Faith and With a Valid Reorganization Purpose to Preserve and Maximize the Value of the Estate**

48.     The Debtor, its assets and liabilities, and its present financial posture cannot be considered in a vacuum. The Debtor is part of a multi-layered capital structure that was created in 2006 to raise $335 million in new capital. The Mortgage Borrowers own and operate the Business subject to approximately $171 million of senior debt. The Mortgage Borrowers are owned by four tranches of Mezz Borrowers, including the Debtor, that are each subject to approximately $39 million of secured debt. Such debt is secured by each Mezz Borrower's respective ownership interest in its immediate subsidiary. Specifically, the Debtor, as Mezz Borrower 2, is sole owner of the membership interests in Mezz Borrower 1, which in turn holds the interests in the Mortgage Borrowers. Even Colony admits that this type of

financing structure "has been widely used for real estate financing." *See* Dismissal Motion at ¶10.

49.     The Debtor's filing is simply the first step in a broad-based restructuring of the Mortgage Borrowers and the Mezz Borrowers that is designed to maximize value. All of the secured debt in the capital structure described above had the same inception date and matured on the same date, August 9, 2011. Hence, the Mortgage Borrowers and the Mezz Borrowers face the same problem -- they need to refinance, sell their assets, or otherwise restructure their debt. The Debtor is just one piece of a much bigger puzzle. It was forced to file first given Colony's aggressive efforts almost immediately following the maturity date to foreclose on the Debtor's ownership interests in Mezz Borrower 1 and thereby take control of the Mortgage Borrowers for Colony's sole benefit. Mezz Borrower 1 has just today commenced its bankruptcy case in this Court in order to forestall Colony's efforts to re-register Mezz Borrower 1's ownership interests in the Mortgage Borrowers, and to allow Mezz Borrower 1 to effectuate a restructuring. Additional filings in this Court are imminent. The Mortgage Borrowers presently have 21 properties scheduled for a foreclosure sale on November 1, 2011. In response, one Mortgage Borrower, JER/Jameson Properties LLC, has already authorized a bankruptcy filing in this Court, which shall take place in the near term.

50.     Last week, the Debtor was faced with Colony's imminent foreclosure of the Debtor's principal asset. The Debtor's board (including two independent board members) unanimously made the decision in the exercise of its sound business judgment to authorize the Debtor's bankruptcy filing in order to preserve and maximize the value of the Debtor's estate

for all stakeholders. The only other option was to sit idly while Colony foreclosed on the ownership interests in Mezz Borrower 1. *See Crown Village*, 415 B.R. at 93 (denying motion to dismiss while emphasizing that the debtor was faced with two choices: (i) to abandon its sole asset or (ii) to seek to maximize the value of its asset through the bankruptcy process).

51.     In *Crown Village*, like the situation here, Judge Gross refused to dismiss a single asset real estate case with no employees or operations where the debtor intended to market its sole asset -- undeveloped land -- for sale to the highest bidder. *Id.* at 91-93. Judge Gross concluded that a bankruptcy strategy to maximize the value of this sole asset was a valid bankruptcy purpose. *Id.* at 93.

52.     Here too, the Debtor should be given a chance to maximize the value of its assets. There is significant equity in the Business for the Debtor to protect. The Business is profitable and generates excess cash that is more than sufficient to adequately protect the Mortgage Lender and Colony. For the twelve months ended June 30, 2011, the Mortgage Borrowers' NOI was $26.2 million on total revenues of $78.5 million. These results are consistent with years 2009 and 2010 when the Mortgage Borrowers realized unlevered cash flows of $28.5 million and $26.5 million on revenues of $80.5 million and $78.4 million, respectively. On an operational basis, the Mortgage Borrowers generate more than sufficient cash to service Colony's debt, plus senior debt service (at both contract and default rates of interest). Under any scenario, there is no ongoing diminution of Colony's collateral.

53.     Further, the Business has a value that substantially exceeds Colony's outstanding debt plus all other secured obligations senior thereto. Based on a preliminary

valuation analysis performed by Houlihan Lokey, the Debtor believes that the value of the Business is approximately $302.5 million, which amount is in excess of Colony's approximately $39 million debt (after deduction for senior debt) by at least $54 million. This translates to an equity cushion of approximately 138% for Colony. Hence, there is no circumstance where Colony will be prejudiced.

54.     The Debtor intends to move quickly to realize upon the equity value in the Business. The Debtor is negotiating a debtor-in-possession financing facility to satisfy its projected administrative expenses and professional fees, which facility will be provided by affiliates of Gramercy and will be junior to Colony's debt (hence, no diminution in value for Colony). The Debtor, Mezz Borrower 1 and the Mortgage Borrowers also have retained Houlihan Lokey as investment bankers who will be charged with the task of marketing the Business for sale, refinancing or other restructuring. Further, the non-independent members of the boards of the Mortgage Borrowers have been replaced with the goal of effectuating a restructuring (the independent board members of these entities were not replaced). The Debtor will aggressively pursue the restructuring process during its exclusive period to propose a plan.

55.     This is precisely the scenario faced by Judge Gropper in the *General Growth* case. The debtors there constituted an inter-related real estate enterprise with numerous sets of project level, mezzanine and other affiliated entities. *General Growth*, 409 B.R. at 47-48. The court refused to dismiss such cases as bad faith filings because there was a reasonable prospect for reorganization of the company as a whole. *Id.* at 61-65, 69.

56. Judge Gropper stated as follows:

> Movants argue that the SPE or bankruptcy-remote structure of the
> project-level Debtors requires that each Debtor's financial distress
> be analyzed exclusively from its perspective, that the Court should
> consider only the financial circumstances of the individual
> Debtors, and that consideration of the financial problems of the
> Group in judging the good faith of an individual filing would
> violate the purpose of the SPE structure. There is no question that
> the SPE structure was intended to insulate the financial position of
> each of the Subject Debtors from the problems of its affiliates, and
> to make the prospect of a default less likely. There is also no
> question that this structure was designed to make each Subject
> Debtor "bankruptcy remote." Nevertheless, the record also
> establishes that the Movants each extended a loan to the respective
> Subject Debtor with a balloon payment that would require
> refinancing in a period of years and that would default if financing
> could not be obtained by the SPE or by the SPE's parent coming to
> its rescue. Movants do not contend that they were unaware that
> they were extending credit to a company that was part of a much
> larger group, and that there were benefits as well as possible
> detriments from this structure. If the ability of the Group to obtain
> refinancing became impaired, the financial situation of the
> subsidiary would inevitably be impaired.

*Id.* at 61; *see also In re Heisley v. U.I.P. Engineered Prods. Corp. (In re U.I.P. Engineered Prods. Corp.),* 831 F.2d 54, 56 (4th Cir. 1987) (concluding that it was irrelevant whether debtor subsidiaries of a debtor parent could independently demonstrate good faith for their filings and explaining that the nature of a corporate family created an "'identity of interest' . . . that justifies the protection of the subsidiaries as well as the parent corporation.").

57. The same result is required in the instant case. The Debtor's restructuring cannot be divorced from the Business, the remainder of the capital structure affecting the Debtor and its subsidiaries, and the imminent bankruptcy filings of Mezz Borrower 1 and the Mortgage Borrowers. Colony's loans to the Debtor and Mezz Borrower 1, and the

Mortgage Lenders' loans to the Mortgage Borrowers, are part of an integrated enterprise that needs to restructured in a coordinated way that will benefit all constituents, rather than the one creditor who happens to foreclose most abruptly. Although each of the Debtor's subsidiaries have separate boards and independent board members, the Debtor anticipates that the bankruptcy filings of the Mortgage Borrowers are imminent. The Debtor is informed that the boards of at least one of the Mortgage Borrowers, JER/Jameson Properties LLC, has already authorized a chapter 11 filing in this Court in response to a pending foreclosure sale. Mezz Borrower 1 commenced its chapter 11 case in this Court earlier today. The restructuring that will follow will require each of these debtor entities to participate in a broad-based marketing and capital raising effort that will be led by Houlihan Lokey and the boards of the Mortgage Borrowers. Given the value that is apparent in the Business and the amount of unlevered cash flow generated therefrom, the Debtor believes that a highly advantageous reorganization will ensue in this case.

58.     Colony relies on *Primestone Investment Partners, L.P. v. Vornado PS, L.L.C. (In re Primestone Investment Partners, L.P.)*, 272 B.R. 554, 557 (D. Del. 2002), in support of the Dismissal Motion. The facts in that case were very different from both the case at bar and the facts in *General Growth*. In *Primestone*, the debtor was a single limited partnership established to hold membership units in a real estate trust, the shares of which were publicly traded on the New York Stock Exchange. *Id*. at 555-556. Such real estate trust held interests in another limited liability partnership that in turn held interests in certain commercial real estate properties. *Id*. There was no suggestion in *Primestone* that the debtor

in that case was anything but one shareholder out of many other shareholders in a publicly traded real estate trust. *Id.* There was also no suggestion that the real estate trust was in financial distress or required a restructuring of any kind. *Id.* Rather, the facts of *Primestone* suggest that the debtor was a single asset entity created specifically to hold an investment in a completely unrelated publicly-traded real estate trust. *Id.* The debtor's interests in the real estate trust were pledged to a creditor that sought to foreclose on its collateral. *Id.* The debtor filed for bankruptcy in order to avoid the foreclosure. *Id.* The case was dismissed as a textbook example of a two party dispute. *Id.* at 557-558.

59.     Far from a mere two-party dispute, the instant case is distinguishable on numerous grounds. The Debtor's principal asset here is its ownership interests in Mezz Borrower 1, which in turn owns the Mortgage Borrowers. Each of the Mezzanine Borrowers and the Mortgage Borrowers is subject to a capital structure that was consummated on the same date and matured on the same date. Each of these entities is presently in default on its senior secured debt obligations and requires a global restructuring in order to address such default. Each of these entities has a direct or indirect interest in a valuable Business that continues to generate more than sufficient cash to service debt obligations at all levels. The Debtor soon will be joined by its subsidiaries in this Court by virtue of their anticipated bankruptcy filings under chapter 11. Unlike *Primestone*, the present case does not involve a single asset debtor that filed to address its issues with a single creditor. The Debtor here is part of an integrated, multi-tiered capital structure, just like the *General Growth* case, that needs to be restructured as a whole.

60.     The Debtor did not file this case in bad faith to avoid the inevitable, but rather with the honest purpose of reorganizing its affairs.  The Debtor has already made progress in this regard by obtaining debtor-in-possession financing on a junior basis, hiring Houlihan Lokey as investment bankers, and putting in place non-independent members of the boards of the Mortgage Borrowers in order to effectuate a prompt restructuring.

**C.      The Debtor Did Not Commence This Case to Obtain a Tactical Litigation Advantage**

61.     Colony argues that the filing of the Debtor's case on the eve of the scheduled foreclosure of the Debtor's interests in Mezz Borrower 1 establishes that this case was filed for tactical advantage.  Courts, including those in this district, have recognized that the mere filing of a petition during litigation, even on the eve of foreclosure or other methods of debt collection, does not constitute *per se* bad faith.  *See, e.g., Primestone*, 272 B.R. at 558; *In re Newark Airport/Hotel Ltd. Partn.*, 156 B.R. 444, 449 (Bankr. D.N.J. 1993), *affd*,155 B.R. 93 (D.N.J. 1993); *In re EnCap Golf Holdings, LLC*, 2008 WL 4200324 at *7 (Bankr. D.N.J. Sept. 4, 2008); *Lehman-Gibson Assocs., Inc. v. Baltimore Joint Venture XVI*, 64 B.R. 479 (D.D.C. 1986); *In re Kasdorf*, 64 B.R. 294, 295 (Bankr. D. Colo. 1986).

62.     Certainly the Debtor filed this case to forestall Colony's imminent foreclosure proceedings, but the principal aim of the filing was not to obtain a tactical advantage, but rather as set forth above, to effectuate a global restructuring of the Debtor and its subsidiaries.  The Debtor's filing was merely the first of several affiliate filings yet to come.  It was required because Colony aggressively proceeded with a foreclosure process following the maturity date on August 9, 2011 and, at the same time, prevented the Debtor and its subsidiaries

in the weeks ahead of the scheduled foreclosure sale from effectively evaluating alternatives.

Notably, Colony's rushed foreclosure efforts were defective in various ways. For instance,

Colony noticed a sale of the wrong entity's membership interests, failed to prepare appropriate

informational materials, neglected to respond to inquiries from prospective buyers, and

otherwise ignored obvious and standard avenues to maximizing value.

63.     Colony also proceeded to file prepetition state court lawsuits (*i.e.*, the

Prior Suits) in an effort to hinder effective management at the Debtor and its subsidiaries.

Colony challenged the appointment of Mr. Gregory as a non-independent director, which

required an order of Justice Fried of the New York State Supreme Court confirming Mr.

Gregory's status as a director of the Debtor. As a result of Colony's actions, the Debtor's board

has been unable to obtain full access to financial and operational information with respect to the

Debtor's subsidiaries and the Business. The Debtor requests for information also continue to be

rebuffed by PMG, the property manager for the Mortgage Borrowers. As a result, the Debtor,

Mezz Borrower 1 and the Mortgage Borrowers have been forestalled from engaging in a

fulsome marketing, sale, refinancing, and/or restructuring effort. Hence, if any party has

engaged in gamesmanship and litigation for tactical advantage, it has been Colony by

attempting to impair the Debtor's governance and interfering with the Debtor's ability to gain

access to key information.

**D.      The Debtor's Present Inability to Propose a Plan is Not "Cause" for Dismissal**

64.     Relying on section 1112(b)(4)(A)-(B) of the Bankruptcy Code, Colony

asserts that there is "cause" to dismiss this case based on "substantial and continuing loss to or

diminution of the estate and the absence of a reasonable likelihood of rehabilitation." First, as noted above, there is no diminution here given the ongoing performance of the Business. Second, the Debtor, when considered in the context of the overall capital structure, is a good candidate for rehabilitation. The Debtor just needs a reasonable opportunity, without interference from Colony, to achieve a successful restructuring.

65.     There is no requirement in the Bankruptcy Code that a debtor must prove that a plan is confirmable in order to file a petition. *General Growth*, 409 B.R at 65 (citing *In re Century/ML Cable Venture*, 294 B.R. 9, 36 (Bankr. S.D.N.Y. 2003); *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991)); *In re Lizeric Realty Corp.*, 188 B.R. 499, 503-04 (Bankr. S.D.N.Y. 1995); *In re Toyota of Yonkers*, 135 B.R. 471, 476-77 (Bankr. S.D.N.Y. 1992)). Courts have consistently refused to dismiss on this ground before a plan has been proposed. *Id.* (citing *In re RCM Global*, 200 B.R. 514, 524 (Bankr. S.D.N.Y. 1996); *Faflich Assocs. v. Court Living Corp. (In re Court Living Corp.)*, 1996 U.S. Dist. Lexis 13588, at *13-*14 (S.D.N.Y. Sept. 1, 1996) (conversion); *In re Lizeric Realty Corp.*, 188 B.R. 499, 503-04 (Bankr. S.D.N.Y. 1995) (rejecting argument that plan could not be confirmed because creditor would not give approval); *In re Hempstead Realty Assocs.*, 38 B.R. 287, 290 (Bankr. S.D.N.Y. 1984)).

66.     The Debtor is proceeding expeditiously towards reorganizing itself and its subsidiaries. There is no basis to dismiss this case without giving the Debtor a chance to propose a confirmable plan.

**E.    The Key Factors Relevant to Dismissal for a Bad Faith Filing Weigh in Favor of the Debtor**

67.    In determining whether a chapter 11 petition has been filed in good faith, courts generally review the evidentiary record for the following factors (the most important of which weigh against dismissal of this case):

- few or no unsecured creditors (not true if you take into account the capital structure surrounding the Business; *this factor arguably weighs in favor of the Debtor*);

- a previous bankruptcy petition by the debtor or a related entity (not the case here; *this factor weighs in favor of Debtor*);

- the prepetition conduct of the debtor has been improper (not the case here; rather, it was Colony that commenced a hasty and defective foreclosure process and has improperly created corporate governance issues that required a ruling from the New York state court; *this factor weighs in favor of the Debtor*);

- the petition effectively allows the debtor to evade court orders (not the case here; rather, dismissal would allow Colony to avoid the ramifications of the New York state court's order; *this factor weighs in favor of the Debtor*);

- there are few debts to non-moving creditors (not true if you take into account the capital structure surrounding the Business; *this factor arguably weighs in favor of the Debtor*);

- the petition was filed on the eve of foreclosure (this is true; *this factor weighs in favor of the movant*);

- a single-asset case (not true if you take into account the capital structure surrounding the Business; *this factor arguably weighs in favor of the Debtor*);

- the debtor has no ongoing business or employees (not true if you take into account the capital structure surrounding the Business; *this factor arguably weighs in favor of the Debtor*);

- no cash or income (the Debtor earns income on account of the Mortgage Borrowers' intercompany obligations to the Debtor; *this factor weighs in favor of the Debtor*);

- there is no possibility of reorganization (as addressed throughout this objection, this is not true and is *the most important factor here that weighs in favor of the Debtor*);

- the debtor's income is not sufficient to operate (this is not true; *this factor weighs in favor of the Debtor*);

- no pressure from non-moving creditors (not true if you take into account the capital structure surrounding the Business and the other creditors involved, including the Mortgage Lender's pending foreclosure actions; *this factor arguably weighs in favor of the Debtor*);

- reorganization essentially involves the resolution of a two-party dispute (this is not true; *this factor weighs in favor of the Debtor*);

- a corporate debtor was formed and received title to its major assets immediately before the petition (this is not true; *this factor weighs in favor of the Debtor*);

- the debtor filed solely to create the automatic stay (this is not true; *this factor weighs in favor of the Debtor*); and

- the subjective intent of the debtor (the Debtor's intent here is to reorganize; *this factor weighs in favor of the Debtor*).

*See, e.g., Primestone*, 272 B.R. at 557; *Crown Village*, 415 B.R. at 92. "This list is not exhaustive, and no one factor should controlling." *Crown Village*, 415 B.R. at 92.

68.　　Based on the weight of the foregoing factors, the Debtor should be permitted to remain a debtor and debtor in possession in this case. The Debtor filed in good faith and deserves a chance to reorganize. Although Colony may be inconvenienced in the process, this fact alone cannot be the basis to ignore the substantive rights of the Debtor and its subsidiaries to maximize the value of the Business for all stakeholders.

69.     As held by Judge Gropper in *General Growth*:

> It is clear, on this record, that Movants have been inconvenienced by the Chapter 11 filings. For example, the cash flows of the Debtors have been partially interrupted and special servicers have had to be appointed . . . However, inconvenience to a secured creditor is not a reason to dismiss a Chapter 11 case. The salient point for purposes of these Motions is that the fundamental protections that the Movants negotiated and that the SPE [*i.e.*, special purpose entity] structure represents are still in place and will remain in place during the Chapter 11 cases. This includes protection against the substantive consolidation of the project-level Debtors with any other entities. There is no question that a principal goal of the SPE structure is to guard against substantive consolidation, but the question of substantive consolidation is entirely different from the issue whether the Board of a debtor that is part of a corporate group can consider the interests of the group along with the interests of the individual debtor when making a decision to file a bankruptcy case. Nothing in this Opinion implies that the assets and liabilities of any of the Subject Debtors could properly be substantively consolidated with those of any other entity.
>
> These Motions are a diversion from the parties' real task, which is to get each of the Subject Debtors out of bankruptcy as soon as feasible.

*General Growth*, 409 B.R. 69-70.

70.     Likewise, the Dismissal Motion here is nothing but a diversion from the

true task at hand, which is for the Debtor and its subsidiaries to reorganize. The Debtor urges

the Court to deny the Dismissal Motion so that the restructuring process can begin.

## C.     No Extraordinary Basis Exists for This Court to Abstain Under Section 305(a) of the Bankruptcy Code

71.     In the alternative, Colony invokes section 305(a) of the Bankruptcy Code

in order to persuade this Court to abstain from hearing this proceeding.

72.     A "motion under section 305(a) to dismiss a petition or suspend the bankruptcy case is a form of extraordinary relief, and abstention under section 305(a) is a power that should only be utilized under extraordinary circumstances." *Crown Village*, 415 B.R. at 96 (quoting *In re Century/ML Cable Venture*, 294 B.R. 9, 37 (S.D.N.Y. 2003)).

73.     Factors to consider when determining whether 305(a) abstention is appropriate include: "(1) economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought." *Id.* at 97 (citing *In re Century/ML Cable Venture*, 294 B.R. at 38).

74.     In *Crown Village*, Judge Gross declined to dismiss the case or to abstain because dismissal or abstention "would harm the administration or preservation of Debtor's estate." *Id.* Similarly, for all the reasons noted above, this Court should not abstain from the Debtor's bankruptcy case because to do so would prevent the Debtor from maximizing the value of its estate for all constituents.

**D. The Stay Relief Motion Should Be Denied Because Colony is Adequately Protected and the Debtor Has Equity in Its Assets**

75.     By the Stay Relief Motion, Colony seeks relief from the automatic stay under section 362 of the Bankruptcy Code to proceed with its foreclosure sale of the Debtor's ownership interests in Mezz Borrower 1. Section 362(d) of the Bankruptcy Code provides as follows:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the [automatic] stay ..., such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
>
> > (A) the debtor does not have an equity in such property; and
> >
> > (B) such property is not necessary to an effective reorganization; . . . .

11 U.S.C. § 362(d).

76.     Section 362(d) of the Bankruptcy Code is intended to balance the interests of the creditors and the debtor. *Nantucket Investors II v. California Fed. Bank (In re Indian Palms Assocs., Ltd.)*, 61 F.3d 197, 206 (3d Cir. 1995). "The text of section 362(d)(1), which governs relief from the automatic stay for good cause including lack of adequate protection, does not contain the term 'equity.'" *Id.* at 207. "However, in determining whether a secured creditor's interest is adequately protected, most courts engage in an analysis of the property's 'equity cushion' -- the value of the property after deducting the claim of the creditor

seeking relief from the automatic stay and all senior claims." *Id.* (citing *In re Colonial Center, Inc.*, 156 B.R. 452, 459 (Bankr. E.D. Pa. 1993); *La Jolla Mortgage Fund v. Rancho El Cajon Assocs.*, 18 B.R. 283, 289 (Bankr. S.D. Cal. 1982)). "Junior liens are disregarded for 'equity cushion' analysis because the secured creditor is entitled to adequate protection only as to its claim; it may not claim protection for others." *Id.* (citing *La Jolla Mortgage Fund*, 18 B.R. at 289). "In contrast, all liens are considered in calculating the equity retained by the debtor under section 362(d)(2), because the equity analysis in that section focuses on 'the value, above all secured claims against the property, that can be realized from the sale of the property for the benefit of all unsecured creditors.'" *Id.* (quoting *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 n. 2 (9th Cir. 1984)).

77.     Here, whether considering the existence of an "equity cushion" for purposes of adequate protection under section 362(d)(1) of the Bankruptcy Code or "equity" for the Debtor's estate under section 362(d)(2) of the Bankruptcy Code, there is no basis for relief from stay in favor of Colony.  Under either scenario, Colony is oversecured and the Debtor's estate is in the money.  Colony is also otherwise adequately protected by ongoing cash collections realized by the Business.

78.     As addressed earlier, the Business has a value that substantially exceeds Colony's outstanding debt plus all other secured obligations senior thereto, and provides Colony with an equity cushion equivalent to approximately 138%.  It is black letter law that a sufficient equity cushion in excess of 20% constitutes adequate protection of a secured lender.  *See, e.g., Jay Vending Inc. v. McGowan (In re McGowan)*, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (10%

cushion is sufficient to be adequate protection); *Heritage Sav. & Loan Ass'n v. Rogers Dev. Corp. (In re Rogers Dev. Corp.)*, 2 B.R. 679, 685 (Bankr. E.D. Va. 1980) (approximately 15% to 20% was sufficient adequate protection to the creditor); *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 (9th Cir. 1984) (equity cushion of 20% is clear adequate protection of a secured creditor's interest in cash collateral, at least for some period of time).

79.    Further, also as addressed earlier, Colony is protected by the excess cash that the Business continues to generate in an amount sufficient to service the debt at the Debtor and its subsidiaries.  The Debtor also is negotiating a debtor in possession financing facility that will allow the Debtor's administrative expenses to be paid through a loan that will be junior to the obligations to Colony.  Hence, there is no diminution in Colony's collateral that would justify relief from the automatic stay.

## CONCLUSION

80.     Based on the foregoing, the Debtor urges the Court to deny the

Dismissal Motion and the Stay Relief Motion, and allow the Debtor an opportunity to pursue

its restructuring options, along with its subsidiaries.

Dated:  October 25, 2011            PACHULSKI STANG ZIEHL & JONES LLP


                                    Laura Davis Jones (Bar No. 2436)
                                    Alan J. Kornfeld (CA Bar No. 130063)
                                    David M. Bertenthal (CA Bar No. 167624)
                                    Timothy P. Cairns (Bar No. 4228)
                                    919 North Market Street, 17th Floor
                                    P.O. Box 8705
                                    Wilmington, DE  19899-8705 (Courier 19801)
                                    Telephone:  (302) 652-4100
                                    Facsimile:  (302) 652-4400
                                    Email:  ljones@pszjlaw.com
                                            akornfeld@pszjlaw.com
                                            dbertenthal@pszjlaw.com
                                            tcairns@pszjlaw.com

                                    [Proposed] Counsel for Debtor and
                                    Debtor in Possession