IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| JER/JAMESON MEZZ BORROWER II LLC, et al., | ) ) ) ) | Case No. 11-13338 (MFW) |
| Debtors. | ) ) ) | (Jointly Administered) |
| | ) | **Related to Docket No. 124** |

## PMG'S RESPONSE TO INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL AS IT PERTAINS TO THE PMG WORKING CAPITAL ACCOUNT AND PMG EXPENSES

Park Management Group., Inc., Park Management Group, LLC, formerly known as SSI PMG LLC ("PMG") hereby files its Response (the "Response") to the Interim Order Authorizing Use of Cash Collateral (Docket No. 124) (the "Interim Order") as it Pertains to the PMG Working Capital Account and PMG Expenses and in support thereof states as follows:

### RELEVANT BACKGROUND

1. On October 18, 2011 (the "Petition Date"), Debtor JER/JAMESON MEZZ BORROWER II LLC commenced its chapter 11 case by filing a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code. On October 25, 2011, Debtor JER/JAMESON MEZZ BORROWER I LLC commenced its chapter 11 case by filing a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code. On October 26, 2011, Debtors JER/JAMESON PROPERTIES LLC, JER/JAMESON PROPERTIES LP, and JER/JAMESON GP LLC commenced their cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have

continued in the possession of their property and have continued to operate and manage their business as debtors in possession.

2.  The Debtors own, and PMG manages, 103 hotel properties (the "Hotels").[1] The Hotels are managed by PMG under the Management Agreement. Pursuant to the Management Agreement, PMG and its hotel management professionals (the "Managers") operate, direct, and manage each of the Hotels according to proprietary systems that are consistent with industry and brand standards specific to each class of hotels.

3.  Pursuant to the Management Agreement and the applicable loan agreements, each Owner (as defined therein) is required to provide PMG with funds to be used for operating expenses and provides for such funds to be held in a segregated PMG reserve account. *See* Management Agreement, section 6.2 and 6.3. A copy of the Management Agreement is attached hereto as Exhibit A.

### A. The Working Capital Account

4.  On July 27, 2006, JER/Jameson Properties LLC and JER/Jameson NC Properties LP (individually and collectively, the "Borrower") and Wachovia Bank, N.A., n/k/a Wells Fargo Bank, N.A. ("Lender") executed that certain Mortgage Loan Agreement and Promissory Note (collectively with all other related agreements, documentation, extensions, and modifications, the "Loan Documents") pursuant to which the Lender extended $175,000,000 to the Borrower to be repaid in accordance with the terms set forth in the Loan Documents.

---

[1] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Debtor's' Motion for Use of Cash Collateral (Docket No. 79) (the "Cash Collateral Motion").

5.  Pursuant to section 10(c)(iii) of the Mortgage Loan Agreement, during the existence of a Debt Yield Reserve Period,[2] funds sufficient to pay Operating Expenses in accordance with the related Annual Budget is required to be paid to PMG on behalf of, and at the direction of, the Borrower. Section 10(c)(ix) also requires that PMG will be provided sufficient funds for a working capital reserve to be held in a PMG account (the "Working Capital Account") to cover the payment of future Operating Expenses (as defined in section 1.1 of the Mortgage Loan Agreement) consistent with the Annual Budget in the event of a shortfall of revenue from operations. The balance in the Working Capital Account as of the Petition Date is approximately $8,800,000. *See also* Management Agreement, ¶ 6.3.

### B. The Interim Order on Cash Collateral

6.  In the Interim Order, this Court directs that:

> Wells Fargo will provide weekly a distribution on the Wednesday of the preceding week, to satisfy the aggregate expenses set forth in the Budget for the following week, to (a) PMG (for deposit to the operating expense account maintained by PMG on behalf of the Operating Debtors) for disbursement in accordance with the Management Agreement, and (b) as otherwise directed by the Operating Debtors for disbursement in accordance with the Budget. The Operating Debtors shall retain the existing balance of approximately $8.8 million, which the Debtors assert is unencumbered cash, in the working capital deposit account held by PMG (the "Working Capital Account"). The Working Capital Account shall not be subject to the Adequate Protection Liens.

Interim Order, at ¶ 11.[3]

---

[2] "Debt Yield Reserve Period" is defined in the Mortgage Loan Agreement to mean the period commencing on the date in which the Debt Yield falls below the following applicable threshold and ending on the date the Debt Yield equals or exceeds the applicable threshold for two (2) consecutive calendar quarters. The applicable thresholds are set forth in the Mortgage Loan Agreement. The Debt Yield Reserve Period commenced in approximately August 2009 and ran through the maturity in August 2011.

[3] Subject to paragraph 5 of the Interim Order which provides for a limited adequate protection lien on the Working Capital Account to the extent of aggregate diminution of cash collateral during the interim period.

40000/9150-8079979v1

7. The Interim Order also provides a carve-out for the benefit of PMG:

> The Prepetition Liens, the Adequate Protection Liens and the Superpriority Claim shall be junior and subordinate to the Carve Out. As used in this Interim Order, the term "Carve Out" means: (a) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Court (collectively, the "UST/Clerk Fees") (b) the then accrued but unreimbursed costs and expenses of administering the Debtors' Chapter 11 Cases incurred, in accordance with the Budget, prior to the occurrence of an Event of Default under this Interim Order; and (c) <u>the then accrued but unreimbursed expenses incurred by PMG, in accordance with the Budget and otherwise consistent with the terms of the Management Agreement, prior to the occurrence of an Event of Default under this Interim Order</u>.

Interim Order, ¶ 12.

## ARGUMENT

### A. THE WORKING CAPITAL ACCOUNT SHOULD BE MAINTAINED AT A LEVEL SUFFICIENT TO COVER AT LEAST ONE MONTH OF OPERATING EXPENSES TO PROTECT PMG FROM EXPOSURE ON FORWARD EXPENSES AND TO PRESERVE HOTEL OPERATIONS

8. PMG submits that the final order on cash collateral should keep the Working Capital Account in place in an amount not less one month of operating expenses.[4] As described in detail in the Debtor's Cash Collateral Motion, funds in the Working Capital Account are separate from all of the Debtors' other cash accounts and specifically designated for the purpose of covering a shortfall in revenue from operations

---

[4] Although monthly operating expense can and do fluctuate depending on circumstances and seasonality of the business, PMG would submit that $5 million is a reasonable estimate for one month's operating expenses for purposes of the Working Capital Account. PMG is aware that certain parties may assert or dispute liens with respect to the Working Capital Account. PMG reserves all of its rights with respect to any such dispute, including but not limited to, any setoff rights PMG may have with respect to the Working Capital Account against any claims that may result if the Management Agreement is ever rejected by the Debtors. To the extent all prepetition and postpetition obligations due under the Management Agreement, including but not limited to, fees costs and expenses of PMG are fully funded and protected by other provisions of the final cash collateral order, including but not limited to the Carve-Out provision discussed *infra* further adjustments to the Working Capital Account may be reasonable.

4

40000/9150-8079979v1

such that funds would be available to fulfill forward obligations in operating the Hotels. This protects PMG from exposure to alleged claims that may be asserted by creditors of the Debtors and for which the Debtors indemnify PMG under section 7.3 of the Management Agreement. Maintaining the Working Capital Account in this fashion is also consistent with prudent management practices and provides a backstop to absorb some degradation of revenue that occurs as part of the chapter 11 process in order to ensure consistent and uninterrupted operation of the Hotels postpetition.

9. Since maturity of the secured debt, the Working Capital Account has been depleted from approximately $26 million to the current $8.8 million to maintain operation of the Hotels.

10. The success and ultimate viability of the Debtors is dependent upon effective, consistent, prudent, and uninterrupted management and operation of the Hotels by PMG under the Management Agreement in order maintain customer service and loyalty while the chapter 11 process and pending litigation between lenders is resolved.

11. PMG's functions, including that of its property support office ("PSO"), are funded by Hotel revenues. Such revenues fluctuate from month to month based on the seasonality of Hotel demand and other external market factors. When Hotel revenues are insufficient to cover the basic and necessary management functions performed by PMG, funds from the Working Capital Account are intended to be used to cover the shortfall in order to maintain operations at current levels and limit PMG's forward obligation exposure for which they are indemnified by the Debtors. Any disruption in operation of the Hotels would precipitate a drastic and irreparable decline in customer loyalty, brand

5

40000/9150-8079979v1

integrity, and, ultimately, revenues, with a directly adverse effect on the value of the Debtors' estates, their creditors, and any reorganization effort.

12. PMG submits that maintaining the Working Capital Account at no less than one month of operating expenses is an essential element of the Hotels' daily operation by PMG, and a critical component to maintaining value and prudent management during the chapter 11 process.

### B. THE CARVE-OUT FOR PMG'S EXPENSES SHOULD BE MAINTAINED IN THE FINAL ORDER

13. It is also crucially important that PMG's accrued but unreimbursed expenses (pre- and post petition), including but not limited to professional fees and other costs incurred as a result of the chapter 11 process and pending litigation between lenders, remain within the carve-out as presently reflected in the Interim Cash Collateral Order. PMG has been extraordinarily taxed by all parties in these chapter 11 cases as a result of time and manner in which the bankruptcy has unfolded and the attendant litigation between various lenders. PMG operates and manages the Debtor's business and is therefore effectively a *de facto* debtor-in-possession but without the typical advance preparation time for a chapter 11 case and further compounded by extraordinary and accelerated litigation between lenders from the outset of the process. In addition to all the normal expenses incurred by PMG in performance of its duties under the Management Agreement in running the Hotels, all of its extraordinary costs and expenses

40000/9150-8079979v1

incurred as a result of these bankruptcy cases should also be reimbursed under the Management Agreement.[5]

## CONCLUSION

For all of the reasons set forth above, PMG respectfully requests that this Court extend and approve on a final basis the Interim Order consistent with the foregoing rationale as it pertains to paragraphs 11 and 12.

---

[5] See Section 3.1, Section 6.2, Section 6.3, Section 7.3, Sections 9.1, 9.2, 9.3. Notably, section 9 of the Management Agreement entitled "Reimbursement of PMG" provides that PMG shall be promptly reimbursed for expenditures of its own funds in payment of any obligations of the Owners in accordance with section 6 of the Management Agreement. Section 9 provides that PMG shall be reimbursed for, among other things, advertising costs, public relations brochures, printing costs, and other expenses incurred by PMG in the management and operation of the Owner's Project. See Exhibit A.

7

Dated: November 18, 2011
Wilmington, Delaware

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

/s/ Marion M. Quirk

Marion M. Quirk (No. 4136)
Sanjay Bhatnagar (No. 4829)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19899
Phone: (302) 652-3131
Facsimile: (302) 652-3117

-and-

McGUIREWOODS LLP
Douglas M. Foley (VSB No. 34364)
Cullen A. Drescher (VSB No. 79096)
9000 World Trade Center
101 West Main Street
Norfolk, Virginia, 23510
(757) 640-3700

*Counsel for Park Management Group, Inc., Park Management Group, LLC, and SSI PMG LLC*