# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| JER/JAMESON MEZZ BORROWER II, LLC, *et. al.*,[1] | ) Case No. 11-13338 (MFW) |
| | ) (Jointly Administered) |
| | ) |
| Debtors. | ) Related Docket Nos. 79, 95 |
| | ) |
| | ) **Hearing Date: November 22, 2011 at 12:30 p.m.** |
| | ) **Obj. Deadline: November 18, 2011 at 4:00 p.m.** |
| | ) |

## OBJECTION OF WELLS FARGO BANK, N.A., AS SPECIAL SERVICER, TO DEBTORS' MOTION FOR AUTHORITY TO USE CASH COLLATERAL ON FINAL BASIS

Wells Fargo Bank, N.A., solely in its capacity as special servicer for U.S. Bank National Association, as Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2006-WHALE 7 (**"Wells Fargo"**), files this objection (the **"Objection"**) to the *Motion of Debtors Pursuant to Sections 105, 361, 362, 363 and 507 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Rule 4001-2 for Entry of Interim and Final Orders (A)(I) Authorizing the Use of Cash Collateral,(II) Providing Adequate Protection, and (III) Modifying the Automatic Stay, and (B) Scheduling Final Hearing* [Doc. No. 79] (the **"Motion"**) filed by JER/Jameson Properties LLC and JER/Jameson NC Properties LLC (together, the **"Operating Debtors"**). In support of its Objection, Wells Fargo respectfully shows as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification numbers, are JER/Jameson Mezz Borrower II LLC (6522); JER/Jameson Mezz Borrower I LLC (6488); JER/Jameson Properties LLC (6426); JER/Jameson NC Properties LP (8691); and JER/Jameson GP LLC (6272). The Debtors' mailing address is 4770 S. Atlanta Road, Suite 200, Smyrna, Georgia 30080.

## I. PRELIMINARY STATEMENT[2]

1.    Although Wells Fargo consented—subject to a broad reservation of rights—to the Operating Debtors' interim use of Cash Collateral in accordance with the interim order and is willing to consent to the Operating Debtor's continued use of the Lender's Cash Collateral to fund their operations and the Operating Debtors' reasonable administrative expenses, Wells Fargo has two primary unresolved issues with the Operating Debtors' request to use the Lender's Cash Collateral on a final basis.[3] First, through the proposed Final Order, the Operating Debtors seek to establish that Wells Fargo does not have a perfected security interest in the Cash Collateral that is maintained in the working capital account held by PMG (the "**Working Capital Account**"), approximately $8.8 million. From statements made in Court and in depositions, the Operating Debtors may try establish that the $8.8 million held in the Working Capital Account is not the Lender's Cash Collateral because the Lender did not perfect its security interest in that account by control as contemplated by Sections 9-312(b)(1) and 9-104 of the Uniform Commercial Code (the "**UCC**"). Despite the fact that the Assignment and Subordination Agreement provides Wells Fargo with control over funds held by PMG, including amounts in the Working Capital Account, the Operating Debtors have also failed to recognize that notwithstanding the perfection-by-control requirement contemplated by Sections 9-312(b)(1) and 9-104 of the UCC, a secured party has a perfected security interest in the proceeds of its

---

[2] Capitalized terms not otherwise defined in the Preliminary Statement are defined below.

[3] To be clear, Wells Fargo does not object to the adequate protection set forth in the proposed Final Order, including the proposed adequate protection payments (subject to minor adjustments to take into account the actual contract rate of interest that is accruing), replacement liens, and the granting of a Section 507(b) superpriority claim. Wells Fargo also does not object to the use of the Lender's Cash Collateral to fund the Operating Debtors' necessary expenses as set forth in a budget approved by Wells Fargo.

collateral if the security interest in the original collateral was also perfected pursuant to by Section 9-315(c) of the UCC.

2.    As discussed in detail below, because the Lender perfected its security interest in certain collateral under the Security Instruments (that is, in the revenues, room receipts, cash, and other cash equivalents derived from the operations of the hotels, which were transferred into the Working Capital Account), the Lender's perfected security interest extends to the proceeds of that original collateral—the Working Capital Account.  Accordingly, the cash in the Working Capital Account is the Lender's Cash Collateral, and the Operating Debtors must obtain the Court's authority to use it.[4]

3.    Second, the Operating Debtors cannot use the Lender's Cash Collateral to, in essence, make postpetition intercompany loans (or equity distributions) to Mezz I Debtor, Mezz II Debtor, and Jameson Properties GP (collectively, the "**Non-Operating Debtors**") to fund the Non-Operating Debtors' professionals fees and other litigation expenses.  The Non-Operating Debtors' formation documents preclude them from incurring non-ordinary course indebtedness. The mere happenstance of bankruptcy does not expand or override the Non-Operating Debtors' state law corporate governance restrictions, which were an important aspect of the Mortgage Loan transaction and structure.

4.    Moreover, aside from the fact that the Non-Operating Debtors' formation documents prohibit them from using the Lender's Cash Collateral, discovery has further confirmed that the primary focus of these bankruptcy cases is not on the Operating Debtors, but

---

[4] The Lender, subject to the other objections herein, nonetheless is willing to consent to the Operating Debtors'—not the Non-Operating Debtors'—use of Cash Collateral in the Working Capital Account pursuant to a budget approved by Wells Fargo and conditioned on the same proposed adequate protection (with slight adjustments) in the proposed final cash collateral order (the "**Final Order**").

is, instead, focused on infighting between the Non-Operating Debtors' mezzanine lenders concerning who will ultimately be the equityholders. If the Non-Operating Debtors desire to litigate over value and whether certain actions or inactions were appropriate, they should do so with their own funds, not the Lender's Cash Collateral. Accordingly, the Court should condition the Operating Debtors' use of the Lender's Cash Collateral based on the limitations set forth in this Objection.

## II.     FACTUAL BACKGROUND

### A.     Procedural Background

5.     On October 26, 2011 (the "**Petition Date**"), the Operating Debtors filed their voluntary petitions under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") after JER/Jameson Mezz Borrower I LLC ("**Mezz I Debtor**") and JER/Jameson Mezz Borrower II LLC ("**Mezz II Debtor**) commenced their respective bankruptcy cases.

6.     On October 27, 2011, the Court entered an order directing the joint administration of the Operating Debtors' Chapter 11 cases with the voluntary petitions filed by three debtor affiliates: JER/Jameson GP LLC ("**Jameson Properties GP**"), Mezz I Debtor, and Mezz II Debtor (together with Jameson Properties GP, Mezz I Debtor, and the Operating Debtors, collectively, the "**Debtors**"). The Debtors' bankruptcy cases, however, are not substantively consolidated.

7.     The United States Trustee has not appointed an official committee of unsecured creditors in any of the Debtors' bankruptcy cases pursuant to Section 1102 of the Bankruptcy Code.

### B.     Prepetition Secured Debt

8.     On or around July 27, 2006, Wells Fargo Bank, N.A., as successor by merger to Wachovia Bank, National Association, made a mortgage loan (the "**Mortgage Loan**") to the

Operating Debtors pursuant to the Mortgage Loan Agreement, dated July 27, 2006 (as assigned, amended, supplemented or otherwise modified from time to time, the "**Mortgage Loan Agreement**").

9.    The Mortgage Loan is evidenced by a Promissory Note, dated July 27, 2006 (as assigned, amended, supplemented or otherwise modified from time to time, the "**Mortgage Loan Note**") in the original principal amount of $175,000,000.00.

10.    The indebtedness and other obligations arising under the Mortgage Loan are secured by, among other things, various recorded Deeds to Secure Debt, Deeds of Trust, Multiple Indebtedness Mortgages, personal property financing statements, UCC-1 financing statements, fixture filings, and Assignments of Leases and Rents and Security Agreements from one or more of the Operating Debtors, dated July 27, 2006 (as amended, renewed, continued, or modified from time to time) (collectively, the "**Security Instruments**").

11.    The Security Instruments grant the Lender first-priority security interests in and liens on certain real estate and personal property as more particularly described therein, including 103 Jameson Inn hotels (together, the "**Property**") and all rents, profits, proceeds, and revenues therefrom ("**Cash Collateral**").

12.    The Mortgage Loan was later pooled and securitized into the U.S. Bank National Association, as Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2006-WHALE 7 (the "**Trust**" or "**Lender**"). Wells Fargo is the servicer of the Mortgage Loan on behalf of the Trust.

13.     The Mortgage Loan matured August 9, 2011, and the Mortgage Loan is continuing to accrue interest, fees and expenses, including attorney fees and interest at the default rate.[5]

### C.     Mezzanine Indebtedness

14.     Contemporaneous with the Mortgage Loan, Mezz I Debtor and Mezz II Debtor issued two $40 million notes to CDCF JIH Funding, LLC and/or ColFin JIH Funding, LLC (collectively, the "**Colony JIH Lenders**"). Initially, Mezz I Debtor executed the note in favor of Alliance Bernstein, and the Colony JIH Lenders later purchased that note.

15.     Regarding the Mezz I Debtor loan, the Colony JIH Lenders are apparently secured by a pledge of 100% of the membership interests (the equity) of the Operating Debtors. Regarding the Mezz II Debtor loan, the Colony JIH Lenders are apparently secured by a pledge of 100% of the membership interests in Mezz I Debtor.

16.     These Non-Operating Debtors have no employees, and their activities and powers are restricted under their relevant formation documents and loan documents to owning the equity interests in the Mezz I Debtor and the Operating Debtors, respectively.

17.     For example, under Mezz II Debtor's Limited Liability Company Agreement ("**LLC Agreement**"),[6] Mezz II Debtor is prohibited from incurring any additional indebtedness

---

[5] Despite the fact that the budget may provide for the payment of non-default rate of interest for the budget period in addition to a small amount for expenses incurred by Wells Fargo, Wells Fargo, on behalf of the Lender, is entitled to and will continue to accrue interest on the Mortgage Loan at the default interest rate and other expenses contemplated by the Loan Documents, and nothing in the Limited Objection, the Interim Order, this Objection, the Final Order, or any other pleadings or papers shall constitute a waiver, relinquishment, modification, or amendment to Wells Fargo's rights to assert that the Operating Debtors are fully liable for all accrued, but unpaid amounts contemplated by the Loan Documents, including interest at the default rate and attorney fees.

[6] A copy of the LLC Agreement was attached as Exhibit A to the *Limited Objection of Wells Fargo Bank, N.A., as Special Servicer, to Debtors' Motion for Authority to Use Cash Collateral* [Docket No. 95] ("**Wells Fargo's Limited Objection**"). Well Fargo hereby incorporates, by reference, its Limited Objection and the exhibits thereto, as if fully set forth herein.

(other than in the ordinary course of business that is related to the ownership and operating of the subsidiary).  LLC Agreement § 9(j)(V)(c); *see also* Mezz II Debtor's Second Mezzanine Loan Agreement, dated July 27, 2006 at § 6.1(a)(7) (the "**Mezz Loan Agreement**").[7]

### D.        PMG Management Agreement and Working Capital Account

18.    Pursuant to the Master Property Management Agreement, dated July 27, 2006 (the "**PMG Management Agreement**"),[8] PMG created the Working Capital Account, into which Wells Fargo remits (from its Cash Management Account) revenues from the Property so PMG can pay the operating expense of the Operating Debtors pursuant to an approved budget. PMG Management Agreement § 6.3.

19.    As part of the Mortgage Loan transaction, the predecessor to Park Management Group, Inc. ("**PMG**")—SSI PMG, LLC, a Georgia limited liability company—signed an Assignment and Subordination of Management Agreement and Consent of Manager, dated July 27, 2006 (the "**Assignment and Subordination Agreement**").

20.    Under the Assignment and Subordination Agreement, PMG, as successor, expressly subordinated its right, title, and interest to any Property, including the leases, rents, proceeds, and other revenues.  Assignment and Subordination Agreement §§ 3, 13.

21.    PMG has also confirmed that the funds in the Working Capital Account are the Lender's Cash Collateral.  At PMG's Fed. R. Civ. P. 30(b)(6) deposition on November 11, 2011, Michael D. Shea, PMG's CEO, testified and confirmed that all funds in the Working Capital Account were the Lender's Cash Collateral and that the Working Capital Account was a separate

---

[7] A copy of the Mezz Loan Agreement is attached as Exhibit B to Wells Fargo's Limited Objection.

[8] A copy of the PMG Management Agreement was attached as Exhibit C to the Limited Objection.

PMG account that held the identifiable cash proceeds from the Property securing the Mortgage

Loan:

> **Q** And it's pursuant to the lending agreement that payments to PMG were made through the Wells Fargo cash management account; is that correct?
> **A** That's correct.
> **Q** And it's from the Wells Fargo cash management account that PMG receives distributions; is that correct?
> **A** That is correct, yes.
> **Q** And funds in the PMG working capital account, those came from the cash management accounts, is that correct?
> **A** That's correct.
> **Q** And the funds that were deposited in the Wells Fargo cash management account those were from the proceeds from the operations of the hotel; is that correct?
> **A** It is.
> **Q** And the working capital account is the separate account held by PMG; is that correct?
> **A** It is.
> **Q** And it's a separate identifiable account?
> **A** That, it is.
> **Q** And that working capital account is held in accordance with the loan agreement, correct?
> **A** Correct. As well as the management agreement.

Deposition Transcript of Michael D. Shea, 30(b)(6) Representative of PMG (the "**PMG**

**Transcript**"),[9] at 226-230.

### E. The Cash Collateral Motion

22. The precipitating factor behind the filing of the Debtors' bankruptcy cases is the

infighting between the Colony JIH Lenders and Gramercy Warehouse Funding I, LLC and

Gramercy Loan Services, LLC (collectively, "**Gramercy**"), resulting from the Colony JIH

---

[9] The PMG Transcript is not attached because it is subject to a confidentiality agreement.

Lenders' impending foreclosure and the seriatim replacement of the directors by Gramercy at the mezzanine tranche immediately before bankruptcy.[10]

23.     To fund that litigation, the Operating Debtors seek to use the Lender's Cash Collateral for expenses incurred by the Non-Operating Debtors.  Motion at 7 (stating that the "Debtors" not the "Operating Debtors" are authorized to use Cash Collateral).

24.     Upon information and belief, the sole expense of the Non-Operating Debtors relate to the professional fees and other litigation costs that have been (or will be) incurred in connection with their litigation with the Colony JIH Lenders.  As such, the Operating Debtors are asking this Court to approve postpetition intercompany loans, or equity distributions, of the Lender's Cash Collateral to the Non-Operating Debtors to fund litigation expenses with the Colony JIH Lenders. *See* Motion at 3, 4, and 7.

### III.    OBJECTION AND CITATION OF AUTHORITY

### A.    The Funds in the Working Capital Account Are the Lender's Cash Collateral

25.     The funds in the Working Capital Account are the Lender's Cash Collateral. Accordingly, the Operating Debtors must obtain this Court's authority to use them.  *See* 11 U.S.C. § 363(c)(2).  Apparently, the Operating Debtors contend that the funds in the Working Capital Account are unencumbered because the Lender did not perfect its security interest therein by control pursuant to UCC § 9-312.  Although the Operating Debtors are generally correct that, to perfect a security interest in a deposit account as original collateral, a secured

---

[10] *See generally Colony JIH Lenders' Emergency Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case Pursuant to Section 1112(b) and/or 305(a) of the Bankruptcy Code, With Prejudice* [Docket No. 9] (**"Motion to Dismiss"**); *Omnibus Objection of Debtor to Colony JIH Lenders' Emergency Motions for Entry of an Orders (A) Dismissing the Debtor's Chapter 11 Case Pursuant to Section 1112(b) and/or 305(a) of the Bankruptcy Code, With Prejudice and (B) Granting Relief from the Automatic Stay Pursuant to Sections 362(d) and (f) of the Bankruptcy Code* [Docket No. 25] (**"Objection to Motion to Dismiss"**).

party (other than the bank in which the deposit account is maintained) must obtain "control" of the account either by obtaining the bank's authenticated agreement (a deposit account control agreement) or by becoming the bank's customer with respect to the deposit account, *see* UCC § 9-312, their argument is misplaced for two reasons.

26.     First, the Debtors ignore the Assignment and Subordination Agreement between the Lender and PMG.  Pursuant to the Assignment and Subordination Agreement, which incorporates both the Mortgage Loan Agreement and the PMG Management Agreement, the Lender has "control" over the Working Capital Account.  *See* Assignment and Subordination Agreement § 1; Mortgage Loan Agreement, Article X; PMG Management Agreement § 6. Specifically, in Section 6.3 of the PMG Agreement, PMG acknowledged and agreed that funds in the Working Capital Account could only be used as approved by Wells Fargo.

27.     Second, perfection by control is required only when the deposit account itself serves as the *original collateral*, not when collateral in which the Lender has a perfected security interest ends up in a deposit account.  *See* UCC §§ 9-312(b)(1).  Indeed, the Operating Debtors' argument ignores Section 9-312(b) of the UCC.  The introductory clause to that subsection expressly carves out certain perfected proceeds—as defined in Section 9-315(c)—from the requirement that a security interest in deposit accounts can only be perfected by control.  *See* UCC §§ 9-312(b) (stating that "*Except as otherwise provided in Section 9-315(c) and (d) for proceeds*, a security interest in a deposit account may be perfected only by control under Section 9-314") (emphasis added).

28.     Section 9-315(c) provides, "A security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected." UCC § 9-315(c); *see also Burtch v. Connecticut Comty Bank, N.A. (In re J. Silver Clothing, Inc.)*, 453 B.R. 518, 532

(Bankr. D. Del. 2011) (Gross, J.) (holding that the trustee's argument that the bank did not have a perfected security interest in proceeds of its inventory that ended up in a deposit account because the bank did not perfect by control via a deposit control agreement "is the proverbial red-herring" because the introductory clause in UCC § 9-312 provides an exception for perfected proceeds in UCC § 9-315(c)). In other words, when Article 9 was revised in 1998, it carried forward the rule under former Article 9 that perfection in the original collateral suffices for perfection in the proceeds, at least for twenty days. *See* UCC § 9-315(c) and (e).[11] The security interest becomes unperfected on the twenty-first day after attachment in the proceeds unless, among other things, the proceeds are "identifiable cash proceeds." *See* UCC § 9-315(d)(2).

29.     Here, each Security Instrument provides that the Lender is perfected in, among other things, the hotel receipts, room revenues, and other cash or cash equivalents derived from the operations of the Property, specifically:

> all revenues and credit card receipts from telephone services, laundry, vending and television, all revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms, and recreational facilities, health club membership fees, food and beverage wholesale and retail sales, vending machine sales, services, charges and all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession, or other grant of the right of the use and occupancy of property or rendering of services by Borrower or any operator or manager of the hotel or commercial space located in the Improvements or any of their respective agents or employees. . . .[12]

---

[11] Official Comment 3 to UCC § 327 further confirms that a secured lender's perfected security interest in proceeds of its original collateral is not cut off merely because those funds are transferred to a deposit account, stating that "[u]nder paragraph 1, security interests perfected by control (Sections 9-314, 9-104) take priority over those perfected otherwise, e.g., as identifiable cash proceeds under Section 9-315." If the Operating Debtors were correct that, by transferring the original collateral from the Cash Management Account to the Working Capital Account, the Lender's perfected security interest in those funds was cut off, Official Comment 3 to UCC § 327 would be superfluous.  Stated differently, Official Comment 3 presumes the existence of two secured creditors with conflicting secured claims to funds in the deposit account.

[12] *See* Sample Deed of Trust for Bainbridge, Georgia hotel at 4 § (h), which is attached hereto as Exhibit A.

When these revenues were transferred from the Cash Management Account to the Working

Capital Account, the Working Capital Account became a cash proceed of the original collateral.

*See* UCC § 9-102(a)(9) (deposit accounts are "cash proceeds").

30.     Moreover, because the Working Capital Account contains "identifiable cash

proceeds," nothing need be done to continue perfection under UCC § 9-315(d).    When

questioned by counsel for Wells Fargo, Mr. Shea, PMG's CEO, testified as follows:

> **Q**     And it's pursuant to the lending agreement that payments to PMG were made through the Wells Fargo cash management account; is that correct?
> **A**     That's correct.
> **Q**     And it's from the Wells Fargo cash management account that PMG receives distributions; is that correct?
> **A**     That is correct, yes.
> **Q**     And funds in the PMG working capital account, those came from the cash management accounts, is that correct?
> **A**     That's correct.
> **Q**     And the funds that were deposited in the Wells Fargo cash management account those were from the proceeds from the operations of the hotel; is that correct?
> **A**     It is.
> **Q**     And the working capital account is the separate account held by PMG; is that correct?
> **A**     It is.
> **Q**     And it's a separate identifiable account?
> **A**     That, it is.
> **Q**     And that working capital account is held in accordance with the loan agreement, correct?
> **A**     Correct. As well as the management agreement.

PMG Transcript at 226-230.

31.     As such, the Lender has indefinite automatic perfection to the extent the original

collateral was perfected, which it was as evidenced by the Security Instruments, and the proceeds

are "identifiable," which they are as confirmed by PMG's testimony.   PMG, pursuant to the

Assignment and Subordination Agreement, has also expressly agreed that the Lender has a

superior right to the monies in the Working Capital Account.   *See* Assignment and Subordination

Agreement §§ 3, 13. Based on the foregoing, the funds in the Working Capital Account are the Lender's Cash Collateral, and the Operating Debtors must obtain this Court's permission to use the same. Wells Fargo nonetheless consents to the use of the Lender's Cash Collateral in the Working Capital Account, provided that Wells Fargo approves the budget and such use is protected by the various adequate protection provisions in the proposed Final Order.

32.     Alternatively, even if the Court concludes that the Lender is unperfected as to the funds in the Working Capital Account, the Court should condition any use of the Lender's Cash Collateral by requiring the Operating Debtors to first exhaust the funds in the Working Capital Account. The Operating Debtors should be precluded from using the Lender's Cash Collateral if the Court determines that they have other unencumbered funds that they can use to fund their operations because the Operating Debtors must establish a "need" to use the Lender's Cash Collateral. Fed. R. Bankr. P. 4001(b) advisory committee's note to 1987 amendment.

33.     Given that PMG is holding approximately $8.8 million in cash, which pursuant to Section 6.3 of the PMG Management Agreement must be used by PMG to, among other things, "pay the obligations of [the Operating Debtors,]" the Operating Debtors cannot establish a need to resort to the Lender's Cash Collateral if the Court determines the funds in the Working Capital Account are unencumbered. Moreover, for the reasons set forth in section B below, the Court should only permit the Operating Debtors to use the funds in the Working Capital Account for their operations pursuant to the approved budget, not for the Non-Operating Debtors' litigation with the Colony JIH Lenders. Thus, the Court should condition the Operating Debtors' use of the Lender's Cash Collateral by first requiring them to expend the approximately $8.8 million in cash in the Working Capital Account.

**B.** **The Operating Debtors Cannot Make Postpetition Loans to the Non-Operating Debtors Using the Lender's Cash Collateral**

34. The Court should not permit the Operating Debtors to, in essence, loan or distribute via an equity distribution the Lender's Cash Collateral to the Non-Operating Debtors for at least two reasons: (1) the Non-Operating Debtors lack the corporate authority to obtain postpetition intercompany loans of the Lender's Cash Collateral from the Operating Debtors to fund their litigation with the Colony JIH Lenders; and (2) using Cash Collateral to fund litigation that in no way benefits (and, in fact, may harm) the Property securing the Lender's Mortgage Loan is an insufficient *need* under Section 363(c)(2) of the Bankruptcy Code and Fed. R. Bankr. P. 4001(b).

**1.** **The Non-Operating Debtors Lack Corporate Authority to Incur Indebtedness from the Operating Debtors**

35. First, the Court should not permit the Non-Operating Debtors to use the Lender's Cash Collateral to fund their litigation with the Colony JIH Lenders, which appears to be the precipitating factor behind these bankruptcy filings. The Non-Operating Debtors have no interest in or right to the Lender's Cash Collateral, and they ignore this fact in their Motion. Although the Debtors' estates are administratively consolidated for procedural reasons, they are not substantively consolidated. As such, the Non-Operating Debtors would have to procure an intercompany loan or equity distribution from the Operating Debtors, which would give the Operating Debtors an administrative claim against the Non-Operating Debtors' estates on account of the loan or improper distribution if it is determined that the Operating Debtors are insolvent. The Non-Operating Debtors, however, cannot draw a loan on the Lender's Cash Collateral under their organic documents. Similarly, it is improper to effect an equity

distribution during the pendency of the Operating Debtors' bankruptcy cases to their equity holders[13] to fund their separate and distinct litigation.

36. As evidenced by Mezz II Debtor's LLC Agreement, the Non-Operating Debtors cannot incur any additional non-ordinary course indebtedness. *See* LLC Agreement, Limited Objection, Exhibit A § 9(j)(V)(c).[14] Further, the rights, powers, and activities of the Non-Operating Debtors are restricted to borrowing from the mezzanine lender and holding the equity interests of the Mezz I Debtor and the Operating Debtors. *See* Mezz Loan Agreement, Limited Objection, Exhibit B§ 6.1(a)(7). Thus, the Non-Operating Debtors are organically prohibited from incurring indebtedness to the Operating Debtors through postpetition intercompany loans of the Lender's Cash Collateral. *See* Del. Code Ann. tit. 6, § 18-101(7) (stating that "[a] limited liability company is bound by its limited liability company agreement. . . .").

37. Federal bankruptcy jurisdiction does not erase or abridge the corporate governance limitations and prohibitions in the LLC Agreements or otherwise enlarge the rights of the Non-Operating Debtors. *Butner v. United States*, 440 U.S. 48, 55 (1979). Rather, the issue of whether a particular debtor has authority to file a petition in bankruptcy or to take certain actions while in bankruptcy is an issue of state law. *Green Bridge Capital S.A. v. Shapiro (In re FKF Madison Park Group Owner, LLC)*, Adversary No. 10–56158, 2011 WL 350306, at *3 (Bankr. D. Del. Jan. 31, 2011) (Gross, J.). The recent decision in *In re FKF Madison Park Group Owner, LLC*, 2011 WL 350306 is instructive on this point because the court there faced a similar situation to the one this Court is facing: "The parties in this adversary proceeding are

---

[13] Mezz II Debtor owns 100% of Mezz I Debtor and Mezz I Debtor owns. directly or indirectly, 100% of the Operating Debtors.

[14] The same provision is in Mezz I Debtor's LLC Agreement.

battling over control of a limited liability company and to establish who has authority to steer debtors through their bankruptcy case"; "[t]he ownership of [the mezzanine entity] and whether [certain members] took authorized actions and has authority to act on [the mezzanine entity's] and, as manager, Debtors' behalf are the issues presented." *Id.* at *1.

38.    In *FKF Madison Park Group Owner, LLC*, the court held that the provisions in the debtor's LLC documents requiring unanimous member consent to authorize material actions were enforceable and voided the debtor's attempt to appoint a restructuring officer and obtain debtor in possession financing. *Id.* at *3. The debtor, a New York LLC, obtained a $238.5 million construction loan from a subsidiary of Credit Suisse and an additional $15 million mezzanine loan from another entity, which loan was eventually increased to 24.6 million. *Id.* at *1-82. As part of the mezzanine loan agreement, the mezzanine lender obtained an option—that it exercised before bankruptcy—that allowed it to purchase a thirty-five percent membership interest in the debtor. *Id.* at *2. Because the relevant LLC documents required unanimous member consent to authorize material actions (including the filing of a bankruptcy), the option gave the mezzanine lender a strategic blocking position. *Id.* at *3.

39.    In June 2010, creditors filed involuntary petitions against the debtors. *Id.* at *2. With the consent of the mezzanine lender, the debtor's president, Shapiro, moved to dismiss the involuntary petitions. *Id.* Although the mezzanine lender consented to the defense of the involuntary petitions, it made it clear that it was not authorizing any further action. *Id.* at *2, *3. Despite the mezzanine lender's express limitations on its consent, Shapiro subsequently withdrew the debtor's opposition to the involuntary petitions, allowed entry of an order for relief under chapter 7, and agreed to convert the case to chapter 11 without consulting the mezzanine lender. *Id.* at *2. Shapiro also caused motions to be filed with the bankruptcy court on the

debtor's behalf, requesting appointment of a restructuring officer and approving debtor in possession financing that would prime the first lien lender's secured interest, as well as a motion to sell the debtors' assets under a plan. When the mezzanine lender realized that Shapiro had exceeded his authority, it initiated an adversary proceeding and sought to enjoin Shapiro's *ultra vires* actions. *Id.* at *3.

40.     Judge Gross concluded that certain of Shapiro's actions were *ultra vires* from the outset and noted that "[t]he decision will rest upon the governing documents" and "[t]he controlling legal principles are not complex and command the result." *Id.* at *1, *3. The court held that for a LLC, the relevant provisions of the operating agreement are controlling. *Id.* at *3. The debtor's operating agreement explicitly required the unanimous consent of the LLC members to take material actions. Although the mezzanine lender acquiesced in conversion of the case to Chapter 11, unanimous consent was not obtained for debtor in possession financing and the additional actions in furtherance of bankruptcy, and thus, the court enjoined Shapiro from acting further. *Id.* at *3.

41.     Accordingly, because the LLC Agreements here prevent the Non-Operating Debtors from obtaining a postpetition loan from the Operating Debtors and would render such actions *ultra vires*, the Non-Operating Debtors cannot use the Lender's Cash Collateral. This result does not offend, but is actually aligned with, public policy supporting freedom of contract between members of a LLC. *See* Del. Code Ann. tit. 6, § 18-1101(b) (stating, "It is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."). The Court should therefore deny the Motion to the extent it seeks to use the Lender's Cash Collateral to fund the Non-Operating Debtors' litigation expenses.

### 2. The Operating Debtors Cannot Establish a Need to Use the Lender's Cash Collateral to Fund the Non-Operating Debtors' Professional Fees and Litigation Expenses in Their Dispute with the Colony JIH Lenders

42.     Second, as stated above, the Operating Debtors must allege "facts demonstrating the *need* to use the cash collateral." Fed. R. Bankr. P. 4001(b) advisory committee's note to 1987 amendment (emphasis added).  In the Motion, the Operating Debtors' putative need for the use of the Lender's Cash Collateral is so the Non-Operating Debtors can fund the "additional payments that will be required to be made in connection with the administration" of the Non-Operating Debtors' Chapter 11 cases.  Motion at 4, ¶ 5.  These "additional payments" are, in fact, the professional fees and litigation costs associated with the Non-Operating Debtors' dispute with the Colony JIH Lenders.

43.     For example, Mezz I Debtor, Mezz II Debtor, and JER/Jameson Mezz Borrower III, LLC engaged Houlihan Lokey Capital, Inc. ("**Houlihan**") on October 12, 2011, with funds advanced by Gramercy, to provide financial advisory services and to determine value for those entities.[15]  At that point, the scope of Houlihan's services was defined.  Then, on October 24, 201—almost two weeks later and two days before the Operating Debtors filed their voluntary petitions—the Operating Debtors signed a Joinder Agreement, by which the Operating Debtors were joined to the original engagement letter and bound by its terms.  *Id.*  Based on its participation in extensive discovery relating to the Motion to Dismiss, Wells Fargo has seen that the bulk of services provided by Houlihan and the Non-Operating Debtors' other professionals relate to the litigation with the Colony JIH Lenders.

---

[15] *See Application For Entry Of An Order Authorizing Retention And Employment Of Houlihan Lokey Capital, Inc. As Investment Banker To The Debtors And Debtors-In-Possession, Nunc Pro Tunc To The Petition Date And Waiving Certain Requirements Of Delaware Local Rule 2016-2(G)* [Docket No. 83] (the "**Houlihan Application**"), Exhibit A.

44.     These fees and expenses do not benefit the properties securing the Mortgage Loan.  To the contrary, the Cash Collateral would be used by the Non-Operating Debtors to serve the litigation interests of Gramercy in its dispute with the Colony JIH Lenders.[16]  As can already be seen from the Court's docket, this litigation and these professional fees have been and will continue to be expensive and will unnecessarily drain the Lender's Cash Collateral over the life of this case.  Moreover, as a matter of corporate governance, each Debtor has its own board of directors that is charged with making decisions that are in the best interest of that particular entity.  Wells Fargo submits that the boards of the Operating Debtors cannot make any rational argument to support an intercompany loan to a Non-Operating Debtor that has no operations and no assets other than the equity it directly or indirectly owns in the Operating Debtors.

45.     If the Non-Operating Debtors desire to litigate over value and whether certain actions or inactions were appropriate, they should do so with their own funds, not the Lender's Cash Collateral.  To the extent the Court is inclined to permit the Operating Debtors to make postpetition intercompany loans to the Non-Operating Debtors, all professionals should be required to allocate their fees and expenses to the appropriate Debtor and acknowledge that the fees and expenses incurred with respect to an administratively insolvent Debtor/estate are subject to disgorgement.

---

[16] Although the Debtor informed the Court that it had obtained a commitment for a debtor in possession loan to Mezz II Debtor at the October 26, 2011 hearing, as reflected in footnote 2 of the Motion, the Operating Debtors have apparently determined that it is in the best interests of their estates to use the Lenders' Cash Collateral to fund the professional fees and related litigation expenses of their direct and indirect equity owners.

WHEREFORE, Wells Fargo respectfully requests that the Court condition the use of the

Lender's Cash Collateral based on the limitations set forth in this Objection and grant Wells

Fargo such other and further relief as the Court deems just and appropriate.

Dated this 18th day of November, 2011.

**MORRIS JAMES LLP**

Jeffrey R. Waxman (Bar No. 4159)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
(P) 302.888.6800
(F) 302.571.1750
jwaxman@morrisjames.com

-and-

Jason H. Watson (GA Bar No. 741414)
David A. Wender (GA Bar No. 748117)
Jonathan T. Edwards (GA Bar No. 134100)
**ALSTON & BIRD LLP**
1201 West Peachtree St.
Atlanta, Georgia 30309-3424
(P) 404.881.7000
(F) 404.881.7777
jason.watson@alston.com
david.wender@alston.com
jonathan.edwards@alston.com