IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x
In re:                                                        :   Chapter 11
                                                              :
JER/Jameson Mezz Borrower II LLC, *et al.*[1]                 :   Case No. 11-13338 (MFW)
                                                              :   (Jointly Administered)
                         Debtors.                             :
                                                              :   Ref. Docket Nos. 79 & 98
------------------------------------------------------------- x

## COLONY JIH LENDERS' SUPPLEMENTAL OBJECTION
## TO DEBTORS' CASH COLLATERAL MOTION

CDCF JIH Funding, LLC, together with ColFin JIH Funding, LLC (collectively, the "Colony JIH Lenders"), hereby file this supplemental objection (the "Supplemental Objection") to (i) the *Motion of Debtors Pursuant to Sections 105, 361, 362, 363 and 507 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Rule 4001-2 for Entry of Interim and Final Orders (A)(I) Authorizing the Use of Cash Collateral, (II) Providing Adequate Protection, and (III) Modifying the Automatic Stay, and (B) Scheduling a Final Hearing* [D.I. 79] (the "Cash Collateral Motion") filed on October 31, 2011. In support of this Supplemental Objection, the Colony JIH Lenders rely on their *Objection to Debtors' Cash Collateral Motion* [D.I. 98] (the "Prior Objection") filed November 1, 2011, which is incorporated by reference as if set forth fully herein. In further support of this Supplemental Objection, the Colony JIH Lenders respectfully represent as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: JER/Jameson Mezz Borrower II LLC (the "Second Mezz Borrower") (6522); JER/Jameson Mezz Borrower I LLC (the "First Mezz Borrower" and, together with the Second Mezz Borrower, the "Mezz Debtors") (6488); JER/Jameson Properties LLC (6426); JER/Jameson NC Properties LP (8691); and JER/Jameson GP LLC (6272). Each Debtor's mailing address is 4770 S. Atlanta Road, Suite 200, Smyrna, Georgia 30080.

1

## PRELIMINARY STATEMENT[2]

1.  The *Interim Order Authorizing Use of Cash Collateral* [D.I. 124] (the "Interim Order") entered November 3, 2011, (i) prohibited the use of cash collateral to pre-fund the fees of professionals whose retention had not yet been approved by the Court, and (ii) contained broad reservations of rights of the Colony JIH Lenders with respect to their motions for dismissal and stay relief (the "Emergency Motions") filed in the Second Mezz Borrower's case, the disposition of which may well moot some of the relief requested in the Cash Collateral Motion (with respect to the payment of the professional fees of the Second Mezz Borrower). The Debtors have proposed to hold the "final" hearing on their Cash Collateral Motion on November 22, 2011. However, the retention applications for the Debtors' proposed professionals and interim compensation procedures are not scheduled for hearing until December 6, 2011 (with an objection deadline of November 29, 2011) [D.I. 146-147], and the hearing on the Emergency Motion will begin on November 22, 2011 [D.I. 113], but will likely carry over to a later date (or dates). Thus, as a threshold matter, consideration of the Cash Collateral Motion on a "final" basis on November 22 – even if the Court were inclined to do so –would be premature. At most, the Court should permit additional interim relief, which should be subject to (i) the Colony JIH Lenders' review and opportunity to be heard with respect to any additional budget, (ii) a continued prohibition on the pre-funding or payment of professional fees, and (iii) broad reservations of the Colony JIH Lenders' rights with respect to the Emergency Motions and any purported obligations of the Mezz Debtors under the order.[3] A final hearing on the Cash

---

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Prior Objection.

[3] As the Court may recall, one of the issues raised in the Prior Objection is that the Cash Collateral Motion, though properly a request for relief on behalf of *the Operating Debtors* only (which are the only Debtors whose cash is proposed to be used), is nonetheless cast as a request for relief on behalf of "the Debtors" generically. As the Mezz Debtors have no obligations under

2

Collateral Motion should be deferred until after the Court rules on the Emergency Motions, the retention applications of the proposed professionals, and the proposed interim compensation procedures.

2. To be clear, the Cash Collateral Motion is not objectionable insofar as it seeks authority for JER/Jameson Properties LLC and JER/Jameson NC Properties LP (the "Operating Debtors") to use cash collateral and to honor the Property Management Agreement in connection with the operation of hotels owned by the Operating Debtors (subject to the Colony JIH Lenders' right to be heard with respect to any proposed budget, and the reservations of rights discussed in the preceding paragraph). The Colony JIH Lenders have always been, and remain, supportive of efforts to keep the Operating Debtors' hotels running seamlessly during the pendency of the Operating Debtors' chapter 11 cases.

3. The Cash Collateral Motion is objectionable, however, to the extent that it seeks authority to use the Operating Debtors' cash to pay the Mezz Debtors' professional fees. As a threshold matter, the Mezz Debtors and the Operating Debtors are all special-purpose entities whose formational documents generally prohibit them from intermingling their financial affairs or entering into transactions (including, but not limited to, the incurrence of debt) outside the narrow scope of permitted activities for which they were created. This prohibition includes (i) the Operating Debtors' payment of the professionals engaged by the Mezz Debtors,[4] and (ii) the Mezz Debtors' incurrence of inter-company debt to the Operating Debtors on account of such payments.

---

the loan documents with the Operating Debtors' secured lenders, they likewise should have no obligations under any order in connection with the Cash Collateral Motion.

[4] The Colony JIH Lenders dispute whether any professionals may be retained by the Mezz Debtors, and reserve all rights to object to the professionals' retention applications at the appropriate time. For the sake of discussion, this Supplemental Objection assumes *arguendo* that the Mezz Debtors would be permitted to retain professionals, whose fees and expenses would be paid with cash of the Operating Debtors in accordance with the proposed cash collateral budget.

3

4. Beyond its being *ultra vires*, the Operating Debtors' proposal to use cash collateral to pay the professional fees of the 100% equity owner of their 100% equity owner makes no economic sense. The Mezz Debtors are paper companies holding paper assets. Whether these paper assets are held by the Mezz Debtors or by some other party has no bearing on the value of *the Operating Debtors'* property, or on *the Operating Debtors'* prospects for reorganization. Thus, the suggestion in the Cash Collateral Motion that the Operating Debtors "would be forced to cease operations and liquidate their assets" if the proposed use of cash collateral were not approved is false. (Cash Coll. Mot. ¶ 4.)

5. Indeed, the only parties for whom the proposed use of cash collateral makes economic sense are the creditors (the "Junior Mezz Creditors") of the Debtors' ultimate equity holder, JER/Jameson Mezz Borrower III LLC (the "Third Mezz Borrower"). On information and belief, the Junior Mezz Creditors, like the Debtors, take the position that the value of the Operating Debtors' business is sufficient to put the Third Mezz Borrower (and, therefore, its creditors) "in the money." If the Junior Mezz Creditors believed strongly enough in this position, of course, they could make an *equity* contribution to the Mezz Debtors, which they could use for any purpose permitted under their formational documents and the Bankruptcy Code. But any such contribution would be recovered, if at all, only after the Colony JIH Lenders have been paid in full by the Mezz Debtors, in which case the Junior Mezz Creditors would – *appropriately* – bear the downside risk with respect to valuation of the Operating Debtors' business. If the Mezz Debtors' professional fees are paid by the Operating Debtors, by way of contrast, then the Junior Mezz Creditors are out of pocket nothing, and the Colony JIH Lenders bear all of the downside risk with respect to valuation, because every dollar paid to the Mezz Debtors' professionals by the Operating Debtors is a dollar that cannot be upstreamed to the First Mezz Borrower (or to the Second Mezz Borrower above it) to pay its debts to the Colony JIH

4

Lenders. In essence, the Colony JIH Lenders' collateral would be indirectly funding the Second Mezz Borrower's litigation against the Colony JIH Lenders, all for the benefit of (but with no risk to) the Junior Mezz Creditors. The Court should not permit the Operating Debtors – nor indeed require the Colony JIH Lenders – to carry the Junior Mezz Creditors' water under the auspices of preserving the Operating Debtors' business. No matter how many times "the Debtors" claim to be an integrated enterprise, it does not change the fact that the Operating Debtors are severable from the entities above them in the organizational chart, each of which represents a distinct tranche of structurally subordinated debt.

## ARGUMENT

### I. The Operating Debtors and the Mezz Debtors Lack Organizational Authority under Delaware Law for the Proposed Use of the Operating Debtors' Cash

6. In the Prior Objection, the Colony JIH Lenders noted that the limited liability company ("LLC") agreements for the Mezz Debtors[5] explicitly prohibit the Mezz Debtors from incurring any inter-company indebtedness to the Operating Debtors. Specifically, the agreements provide that the Mezz Debtors shall not

- "incur . . . any indebtedness or liabilities, secured or unsecured, direct or contingent, other than those incurred in the ordinary course of business that is related to the ownership and operation of the Subsidiary or as expressly permitted under or contemplated by the Loan Documents" (Mezz LLC Agmts. § 9(j)(v)(C)); or

- "enter into or be a party to any transaction with its members or other Affiliates except (i) in the ordinary course of business . . . and (ii) except for capital contributions and distributions" (*id.* § 9(j)(v)(K)).

The Operating Debtors constitute "Affiliates" within the meaning of the LLC agreement. (*See id.* Sched. A ("Affiliate" definition).) Thus, to the extent the proposed payment of the Mezz Debtors' professional fees by the Operating Debtors is intended to give rise to reimbursement

---

[5] The Mezz Debtors' LLC agreements are attached as Exhibits J and K to the *Declaration of Christian Fuqua* [D.I. 12] filed October 20, 2011. The agreements are substantially identical and are cited herein, collectively, as "Mezz LLC Agmts."

5

obligations from the Mezz Debtors to the Operating Debtors (a subject on which the Cash Collateral Motion is oddly silent), the Mezz Debtors lack the organizational authority to enter into such an arrangement. (Prior Obj. ¶¶ 20-25.)

7. The Colony JIH Lenders also note that the Mezz Debtors' LLC agreements require each of the Mezz Debtors to "pay its own liabilities and expenses . . . out of its own funds and assets." (Mezz LLC Agmts. § 9(j)(iv)(H).) Thus, the Mezz Debtors lack the organizational authority to accept payment of their professional fees from the Operating Debtors, *even gratuitously*.

8. The LLC agreement and limited partnership ("LP") agreement for the Operating Debtors similarly prohibit them from *paying* the Mezz Debtors' professional fees, either gratuitously or by means of an inter-company loan. Specifically, the LLC agreement for JER/Jameson Properties LLC[6] provides that, so long as the Mortgage Loans remain outstanding, the company:

- "will not assume or guarantee or become obligated for the debts of any other Person . . . and will not hold out its credit as being available to satisfy the obligations of any other Person, except as may be permitted or required pursuant to the Loan Documents and with respect to the other [Operating Debtor] under the Contribution Agreement" (Op. LLC Agmt. § 11.1(q));

- "except as contemplated by the Loan Documents with respect to [the other Operating Debtor] will not pledge its assets to secure the obligations of any other Person" (*id.* § 11.1(u));

- "will not make loans or advances to any Person . . . other than (i) cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity and (ii) amounts payable by the other [Operating Debtor] under the Contribution Agreement" (*id.* § 11.1(x)); and

- "will not enter into or be a party to any transaction with its members or other Affiliates except (i) in the ordinary course of business . . . and (ii) for the Contribution Agreement with respect to the [other Operating Debtor]" (*id.* § 11.1(z)).

---

[6] A copy of the LLC agreement (cited as the "Op. LLC Agmt.") is attached hereto as Exhibit A.

The Mezz Debtors constitute both "Affiliates" and "Persons" within the meaning of the LLC agreement. (*See id.* Art. I(b) & (ll).). And the "ordinary course of business" would not include the payment of professional fees of the Mezz Debtors because the LLC agreement provides that the company "will not be engaged in any business unrelated to the acquisitions, financing, ownership, leasing, maintenance, management or operation of the Property and business related thereto . . . ." (*Id.* § 11.1(a). The LP agreement for JER/Jameson NC Properties LP[7] contains substantially identical provisions. (*See* Op. LP Agmt. §§ 20.1(a), (q), (u), (x), and (z).)

9. Like LLCs, Delaware LPs are "creatures of contract." 6 Del. C. § 17-1101(b) ("It is the policy of this chapter to give the maximum effect to the principle of freedom of contract and the enforceability of partnership agreements."); *compare* 6 Del. C. § 18-1101(b) (same, with respect to LLCs). Also like LLCs, LPs are bound under Delaware law to act by the terms of their constituent, organizing documents. 6 Del. C. § 17-101(12) ("A limited partnership is bound by its partnership agreement whether or not the limited partnership executes the partnership agreement."). Thus, the Operating Debtors both lack organizational authority under Delaware law to pay the professional fees of the Mezz Debtors, and the Cash Collateral Motion improperly seeks this Court's sanction of an *ultra vires* act.

## II. Nothing in the Bankruptcy Code Supplants Delaware Law with Respect to the Proposed Use of the Operating Debtors' Cash

10. It is well-settled that "the Bankruptcy Code was written with the expectation that it would be applied in the context of state law," and "federal courts are not licensed to disregard interests created by state law when that course is not clearly required to effectuate federal interests." *Integrated Solutions, Inc. v. Services Support Specialties, Inc.*, 124 F.3d 487, 492 (3d Cir. 1997) (quoting *In re Roach*, 824 F.2d 1370, 1374 (3d Cir. 1987)). Thus, as the Supreme Court has instructed:

---

[7] A copy of the LP agreement (cited as the "Op. LP Agmt.") is attached hereto as Exhibit B.

> Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy.

*Butner v. United States*, 440 U.S. 48, 55 (1979). Because congressional intent to pre-empt state law "will not be inferred lightly," any pre-emption "must be either explicit, or compelled due to an unavoidable conflict between the state law and the federal law." *Integrated*, 124 F.3d at 492 (quoting *Roach*, 824 F.2d at 1373).

11. In *Integrated*, the Third Circuit considered whether § 363(b)(1) of the Bankruptcy Code pre-empted state law so as to permit a chapter 7 trustee's sale of pre-judgment tort claims in derogation of state law forbidding the assignment of such claims. 124 F.3d at 491. The court began by noting that § 363(b)(1) did not contain pre-emptive language found elsewhere in the Bankruptcy Code. *Id.* at 493; *see, e.g.*, 11 U.S.C. § 1123(a) ("Notwithstanding any otherwise applicable nonbankruptcy law..."), § 541(c)(1) ("notwithstanding any provision in ... applicable nonbankruptcy law ..."), and § 728(b) ("Notwithstanding any State or local law ..."). Based on these textual cues, the court endorsed the reasoning of *In re Schauer*, 835 F.2d 1222 (8th Cir. 1987), which held that § 363(b)(1) is simply an "*enabling statute[] that give[s] the trustee the authority to sell or dispose of property if the debtor would have had the same right under state law.*" *Integrated*, 124 F.3d at 493-94 (emphasis in original) (quoting *Schauer*, 835 F.2d at 1225). Accordingly, the court found that the trustee "*lacked the legal authority* to assign the tort claims." *Id.* at 494 (emphasis added). The court did not find persuasive the appellant's policy-based argument that the inability to assign tort claims would frustrate the Code's purpose of ensuring expeditious distributions to creditors, stating:

> [B]y refusing to find preemption of state law restrictions on the transferability of estate property, we are giving effect to an equally important purpose of the Bankruptcy Code: namely, upholding the fundamental principle that the estate

only succeeds to the nature and the rights of the property interest that the debtor possessed pre-petition. Indeed, were we to find federal preemption of the state law restrictions at issue here, the trustee would possess *greater* rights in the property interest than the debtor. Clearly, unless the Code expressly indicates an intention to augment the rights and nature of the property interest in bankruptcy, the trustee only succeeds to the same rights the debtor possessed in the property prepetition.

*Id.* at 495 (emphasis in original).

12. The *Integrated* reasoning is dispositive here. The Operating Debtors' request for authorization to use cash collateral outside the ordinary course of business to fund the professional fees of the Mezz Debtors is subject to approval under § 363(b)(1) of the Bankruptcy Code, which is merely an enabling provision that does not displace state law. *See also* 28 U.S.C. § 959(b) (requiring a debtor in possession to "manage and operate the property in [its] possession . . . according to the requirements of the valid laws of the State in which such property is situated"); 1 *Collier on Bankruptcy* ¶ 10.03 at 10-5 (15th ed. rev. 2005) ("Under 28 U.S.C. § 959(b), a debtor in possession . . . in a case under the Code must comply with all applicable state laws that regulate any aspect of 'carrying on' a business."). Because the proposed use of the Operating Debtors' cash would be prohibited by the organizational documents of the Operating Debtors (as well as the organizational documents of the Mezz Debtors), there is no authority under § 363(b)(1) (or, for that matter, under any other provision of the Bankruptcy Code) for the Court to approve the proposed use.

### III. The Proposed Use of the Operating Debtors' Cash Does Not Meet the Standard for Approval under Section 363 of the Bankruptcy Code

13. Even assuming *arguendo* that § 363(b)(1) of the Bankruptcy Code could permit the Operating Debtors to use cash in violation of their organizational documents, the Operating Debtors cannot meet the standard for approval of a non-ordinary course transaction. Use of property of the estate outside the ordinary course of business is appropriate only if there is an articulated business justification for such use. *See In re Delaware & Hudson Ry. Co.*, 124

B.R. 169, 176 (D. Del. 1991). The Cash Collateral Motion articulates no business justification for the Operating Debtors to use their cash to fund the professional fees of the 100% equity owner of their 100% equity owner, and the Colony JIH Lenders can think of none. Any threat to the Operating Debtors' business is alleviated by their use of cash collateral to fund the operations of their hotels, which the Colony JIH Lenders do not dispute. The payment of the Mezz Debtors' professional fees in no way fosters the reorganization of the Operating Debtors or preserves the value of their estates. To the contrary, it is an outright subsidy that will not generate a return for the Operating Debtors, because the Mezz Debtors have no assets apart from their equity interests in the Operating Debtors. Accordingly, the Operating Debtors' request to use their cash to fund the Mezz Debtors' professional fees should be denied.

*[Remainder of page intentionally left blank.]*

## CONCLUSION

For the foregoing reasons, the Colony JIH Lenders respectfully request that the Court limit any order with respect to the Cash Collateral Motion as set forth above and grant the Colony JIH Lenders such other and further relief as is just and proper.

Dated: Wilmington, Delaware
November 18, 2011

                                              YOUNG CONAWAY STARGATT & TAYLOR, LLP

                                              */s/ Pauline K. Morgan*
                                              Pauline K. Morgan (No. 3650)
                                              John T. Dorsey (No. 2988)
                                              Margaret Whiteman Greecher (No. 4652)
                                              Patrick A. Jackson (No. 4976)
                                              The Brandywine Building
                                              1000 West Street, 17th Floor
                                              Wilmington, Delaware 19801
                                              Telephone: (302) 571-6600
                                              Facsimile: (302) 571-1253

                                              -and-

                                              CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                              Lindsee P. Granfield, Esq.
                                              Sean A. O'Neal, Esq.
                                              Jane VanLare, Esq.
                                              One Liberty Plaza
                                              New York, New York 10006
                                              Telephone: (212) 225-2000
                                              Facsimile: (212) 225-3999

                                              *Attorneys for the Colony JIH Lenders*