<u>EXHIBIT A</u>

**Limited Liability Company Agreement of
JER/Jameson Properties LLC**

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF

JER/JAMESON PROPERTIES LLC

by and among

JER/JAMESON MEZZ BORROWER I LLC,

CHERYL A. TUSSIE

and

SUZANNE M. HAY

## AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

This **AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** (this "Agreement") of the company set forth on the cover page and Schedule A attached hereto, a Delaware limited liability company (the "Company"), is made and entered into as of the date set forth on Schedule A, by and between **JER/JAMESON MEZZ BORROWER I LLC**, a Delaware limited liability company (hereinafter referred to as the "Member"), Cheryl A. Tussie (hereinafter referred to as "Springing Member 1") and Suzanne M. Hay (hereinafter referred to as "Springing Member 2").

## RECITALS:

A.      The Company was formed as a limited liability company under the Act, pursuant to the Certificate of Formation, as filed in the office of the Secretary of State of the State of Delaware on June 5, 2006, and the Limited Liability Company Agreement of the Company, dated June 5, 2006 (the "Original Agreement"), by Whiskey Merger Corp., a Georgia Corporation as the initial member of the Company (the "Initial Member").

B.      The Company is a single-member limited liability company, and the Member is the sole member of the Company.

C.      In entering into this Agreement, the Member wishes to (a) amend and restate in its entirety any limited liability company agreement existing prior to the date of this Agreement and (b) make a full statement of its intention with respect to the Company in order that, except to the extent this Agreement expressly incorporates by reference provisions of the Act, the Code or the Treasury Regulations (as each is defined below) or any provision of this Agreement is expressly prohibited or ineffective under the Act, to the fullest extent permitted by law, this Agreement shall govern, even when inconsistent with, or different from, the provisions of the Act or any other law or rule.

D.      Jameson Inns, Inc., a Georgia corporation (as successor by merger to the Initial Member) has assigned and transferred 100% of its interest in the Company to the entities listed on Schedule A attached hereto (the "Secondary Members") in the pro rata percentage set forth opposite the names of such Secondary Member on Schedule A attached hereto pursuant to that certain Assignment, Admission and Amendment Agreement dated as of the date hereof between the Initial Member and the Secondary Members and the Secondary Members were admitted to the Company as members of the Company.

E.      The Initial Member and the Secondary Members have assigned and transferred 100% of their collective membership interests in the Company to JER/Jameson Holdco LLC ("Holdco") pursuant to that certain Assignment, Admission and Amendment Agreement dated as of the date hereof between the Initial Member and the Secondary Members, as assignors, and Holdco, as assignee, at which time (x) Holdco was admitted to the Company as a member of the Company and (y) the Initial Member and Secondary Members ceased to be members of the Company; whereafter (i) Holdco has assigned and transferred 100% of its membership interests in the Company to JER/Jameson Mezz Borrower IV LLC, at which time (x) JER/Jameson Mezz Borrower IV LLC was admitted to the Company as a member of the Company and (y) Holdco ceased to be a member of the Company; (ii) JER/Jameson Mezz Borrower IV LLC has assigned and transferred 100% of its membership interests in the Company to JER/Jameson Mezz Borrower III LLC, at which time (x) JER/Jameson Mezz Borrower III LLC was admitted to the Company as a member of the Company and (y) JER/Jameson Mezz Borrower IV LLC ceased to be a member of the Company; (iii) JER/Jameson Mezz Borrower III LLC has assigned and transferred 100% of its membership interests in the Company to JER/Jameson Mezz Borrower II LLC, at which time (x)

JER/Jameson Mezz Borrower II LLC was admitted to the Company as a member of the Company and (y) JER/Jameson Mezz Borrower III LLC ceased to be a member of the Company; (iv) JER/Jameson Mezz Borrower II LLC has assigned and transferred 100% of its membership interests in the Company to the Member, at which time (x) the Member was admitted to the Company as a member of the Company and (y) JER/Jameson Mezz Borrower II LLC ceased to be a member of the Company. Subsections (i) through (iv) above were effectuated pursuant to that certain Assignment, Admission and Amendment Agreement dated as of the date hereof and entered into between Holdco, JER/Jameson Mezz Borrower IV LLC, JER/Jameson Mezz Borrower III LLC, JER/Jameson Mezz Borrower II LLC and the Member.

     F.     In entering into this Agreement, the Member hereby acknowledges and accepts and/or approves the transfer of the 100% of the Membership Interest from the Initial Member to the Secondary Members, and the Member hereby acknowledges and accepts and/or approves the transfer of the Membership Interest from (i) the Initial Member and the Secondary Members to Holdco, then (ii) from Holdco to JER/Jameson Mezz Borrower IV LLC, then (iii) from JER/Jameson Mezz Borrower IV LLC to JER/Jameson Mezz Borrower III LLC, then (iv) from JER/Jameson Mezz Borrower III LLC to JER/Jameson Mezz Borrower II LLC, and then (v) from JER/Jameson Mezz Borrower II LLC to the Member.

## ARTICLE I

## DEFINITIONS

Unless otherwise expressly provided herein, the following terms used in this Limited Liability Company Agreement shall have the following meanings:

     (a)     "Act" means Delaware Limited Liability Company Act (6 Del. C. §18-101 et seq.), as amended from time to time.

     (b)     "Affiliate" means, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such Person or of an Affiliate of such Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction, management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

     (c)     "Agreement" has the meaning set forth in the Preamble of this document.

     (d)     "Bankruptcy" means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) if 120 days after the commencement of any proceeding

against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statue, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Act.

(e)     "Bankruptcy Action" means, with respect to any Person: (a) such Person filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (b) the filing of an involuntary petition against such Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition against such Person; (c) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (d) such Person seeking, consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for such Person or any portion of any Property; (e) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due; or (f) such Person taking any action in furtherance of any of the foregoing.

(f)     "Bankruptcy Code" mean 11 U.S.C. § 101 et seq., as the same may be amended from time to time.

(g)     "Basic Documents" shall mean this Agreement, the Loan Documents, the Contribution Agreement and all documents and certificates contemplated thereby or delivered in connection therewith.

(h)     "Board of Managers" shall mean the Board of Managers of the Company.

(i)     "Borrowers" shall mean the Company and JER/Jameson NC Properties LP, a Delaware limited partnership.

(j)     "Capital Account" means a capital account established for any Member to which such Member's Capital Contributions shall from time to time be credited, which shall be maintained in accordance with the provisions of Section 704(b) of the Code and the Treasury Regulations promulgated thereunder.

(k)     "Capital Contribution" means any contribution to the capital of the Company in cash or other property or services rendered, or a promissory note or other obligation to contribute cash or property or to perform services. The initial Capital Contribution of the Member to the Company is deemed to be the Property.

(l)     "Certificate of Formation" means the Certificate of Formation for the Company filed with the Secretary of State of the State of Delaware on June 5, 2006, as the same, from time to time, may be amended, restated or otherwise modified and any and all amendments thereto and restatements thereof filed or to be filed on behalf of the Company with the office of the Secretary of State of the State of Delaware pursuant to the Act.

(m)  "Code" means the Internal Revenue Code of 1986, as amended.

(n)  "Company" means the company named in Schedule A.

(o)  "Contribution Agreement" shall mean that certain Contribution Agreement, dated as of the date of the Loan Agreement, by and among each Borrower and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

(p)  "Debt" means the outstanding principal balance of the Loan set forth in, and evidenced by, the Loan Agreement and the Note, together with all interest accrued and unpaid thereon and all other sums (including any prepayment premium and/or spread maintenance premium, if applicable) due to Lender in respect of the Loan under the Loan Agreement and the other Loan Documents.

(q)  "GAAP" means generally accepted accounting principles, consistently applied, in the United States of America as of the date of the applicable financial report.

(r)  "Indebtedness" shall mean, on a particular date, the sum (without duplication) at such date of (a) all indebtedness or liability of the Company (including, without limitation, amounts for borrowed money and indebtedness in the form of mezzanine debt and preferred equity); (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations for which the Company is liable); (d) obligations under reimbursement agreements in connection with letters of credit; (e) obligations under acceptance facilities; (f) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person or entity, or otherwise to assure a creditor against loss; and (g) obligations secured by any Liens, whether or not the obligations have been assumed.

(s)  "Independent Manager" means a natural person selected by the Member who is reasonably satisfactory to Lender and who is not at the time of his or her initial appointment, or at any time while serving as a manager, and has not been at any time during the preceding five (5) years: (a) a stockholder, director or manager (with the exception of serving as an independent director or independent manager of any Borrower or the general partner or managing member of any Borrower), officer, employee, partner, member, attorney or counsel of any Borrower, the general partner of any Borrower, the Member or any Affiliate of any of them; (b) a customer, supplier or other Person who derives any of its purchases or revenues from its activities with any Borrower or the general partner of any Borrower, the Member or any Affiliate of any of them; (c) a Person controlling, controlled by or under common control with any such stockholder, director, officer, employee, partner, member, manager, customer, supplier or other Person; or (d) a member of the immediate family of any such stockholder, director, officer, employee, partner, member, manager, customer, supplier or other Person.  A natural person who satisfies the foregoing definition other than clause (b) shall not be disqualified from serving as Independent Manager of the Company if such individual is an Independent Manager provided by a nationally recognized company that provides professional independent directors and managers and such company also provides other corporate services in the ordinary course of its business.  A natural person who otherwise satisfies the foregoing definition except for being the independent director or independent manager of a "special purpose entity" Affiliated with any Borrower shall not be disqualified from serving as an Independent Manager of the Company if such special purpose entity does not own a direct or indirect interest in any Borrower (except for serving as the general

partner of any Borrower or a managing member of any Borrower that is not a single member limited liability company) and such person is an independent director or independent manager provided by a nationally-recognized company that provides professional independent directors or managers in the ordinary course of its business. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise. For purposes of this paragraph, a "special purpose entity" is an entity whose organizational documents (i) contain restrictions on its activities and impose requirements intended to preserve such entity's separateness that are substantially similar to those set forth in Article IV of the Loan Agreement and (ii) provide, inter alia, that such entity (A) is organized for the limited purpose of owning and operating one or more properties or of being the general partner, member or manager of a special purpose entity organized for the limited purpose of owning and operating one or more properties (i.e., of an "SPE Owner"), (B) has restrictions on its ability to incur indebtedness, dissolve, liquidate, consolidate, merge and/or sell assets, (C) may not file voluntarily a bankruptcy petition either on its own behalf or, if it is a general partner, member or manager of an SPE Owner, on behalf of such SPE Owner, without the consent of an independent director or independent manager, and (D) shall conduct itself and, if it is a general partner, member or manager of an SPE Owner, cause the SPE Owner to conduct itself, in accordance with certain "separateness covenants", including, but not limited to, the maintenance of its (and the SPE Owner's) books, records, bank accounts and assets separate from those of any other Person.

(t)     "Lender" means Wachovia Bank, National Association, in its capacity as holder of the Loan, together with its successors and assigns.

(u)     "Lien" means any mortgage, deed of trust, deed to secure debt, lien, pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest or any other encumbrance, charge or transfer of, or any agreement to enter into or create, any of the foregoing, on or affecting the Company or the Property or any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

(v)     "Initial Member" means the initial Member of the company named in Schedule A.

(w)     "LLC Certificate" shall have the meaning given to such term in Section 11.5(a) of this Agreement.

(x)     "Loan" means the loan in the original principal amount set forth on Schedule A made by Lender to Borrowers pursuant to the Loan Agreement.

(y)     "Loan Agreement" means the Mortgage Loan Agreement between Lender, as lender, and the Company and the other Borrower, as borrowers, dated on or about the date hereof.

(z)     "Loan Documents" has the meaning set forth in the Loan Agreement.

(aa)     "Member" means JER/Jameson Mezz Borrower I LLC, a Delaware limited liability company, as a member of the Company, and also includes any Persons subsequently

admitted as a Member of the Company in accordance with this Agreement, but does not include (i) any Person who has ceased to be a Member of the Company, and (ii) the Springing Member until its admission as a Member of the Company in accordance with (and subject to the limitations set forth in) Section 12.1 of this Agreement. An assignee of a Member's Membership Interest shall not become a Member until the requirements of this Agreement applicable to qualifying or confirming an assignee as a Member have been satisfied.

(bb)    "Membership Interest" means the limited liability company interest of a Member in the Company. Membership Interest in the Company shall, for all purposes, be personal property. A Member shall have no interest in any specific assets or property of the Company. The Membership Interests of a Member shall mean such Member's right to any and all of the benefits to which such Member may be entitled as provided in this Agreement and the Act, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

(cc)    "Mezzanine Borrower" shall have the meaning given to such term in Section 9.2 of this Agreement.

(dd)    "Mezzanine Lender" shall have the meaning given to such term in Section 9.2 of this Agreement.

(ee)    "Mezzanine Loan Documents" has the meaning given to such term in the Loan Agreement.

(ff)    "Mezzanine Pledge Agreement" shall have the meaning given to such term in Section 9.2 of this Agreement.

(gg)    "Net Cash Flow" means the gross cash proceeds to the Company from all sources less the portion thereof used to pay or establish reserves for Company operating expenses, debt payments, capital improvements, replacements and contingencies, with the amount of all reserves being determined by the Member based upon the anticipated requirements of all existing assets then owned by the Company or as provided in a budget of the Company.

(hh)    "Note" shall mean that certain promissory note dated the date of the Loan Agreement made by Borrowers in favor of Lender in the principal amount of the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

(ii)    "Obligations" means, collectively, the indebtedness, liabilities and obligations of the Company under or in connection with this Agreement, the Loan Documents, the other Basic Documents or any related document in effect as of any date of determination.

(jj)    "Operating Lessee" means a special purpose entity intended to qualify as a "taxable REIT subsidiary" under the Code, together with its successors and permitted assigns.

(kk)    "Percentage Interest" means the percentage of the whole of Membership Interests owned by a Member.

(ll)    "Person" means an individual, or a corporation, limited liability company, partnership (whether general or limited), joint venture, trust (including a business trust or real

7
80641-00011 NY:1296404.6

estate investment trust), unincorporated organization, joint stock company, association, or other legal entity, or any government, or any agency or subdivision thereof.

(mm)   "Profit" and "Loss" mean, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with the Code.

(nn)   "Property" means the properties located at the addresses set forth on Schedule B together with all of the improvements thereon. The Property was transferred to the Company by the Initial Member in exchange for membership interests in the Company.

(oo)   "Rating Agency" shall mean, prior to the final securitization of the Loan, each of Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Moody's Investors Service, Inc. and Fitch, Inc., or any other nationally-recognized statistical rating agency which has been designated by Lender and, after the final securitization of the Loan, shall mean any of the foregoing that have rated any of the Securities.

(pp)   "Rating Agency Confirmation" shall mean a written affirmation from each of the Rating Agencies that the credit rating of the Securities by such Rating Agency immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion.

(qq)   "Secondary Members" shall have the meaning set forth in the Preamble of this Agreement.

(rr)   "Securities" shall mean any certificates, notes or other securities issued in connection with the securitization of the Loan or any portion thereof in a single asset securitization or a pooled loan securitization.

(ss)   "Special Purpose Provisions" shall have the meaning given to the term in Section 11.1(e) of this Agreement.

(tt)   "Springing Member" means Springing Member 1 or, if Springing Member 1 has died or is otherwise no longer able to step into the role of Springing Member as and when required under Section 12.1, Springing Member 2, who in either case is a Person who is not a Member of the Company but who has signed this Agreement in order that, upon the conditions described in Section 12.1, such Person can become a Member of the Company pursuant to the terms, and with the rights and obligations described in Section 12.1 without any delay in order that at all times the Company shall have at least one Member.

(uu)   "Treasury Regulations" means the regulations promulgated by the United States Treasury Department under the Code, as modified from time to time.

## ARTICLE II

## FORMATION OF COMPANY

2.1 **Formation.** The Company was formed effective upon the filing of the Certificate of Formation in the office of the Secretary of State for the State of Delaware in accordance with and pursuant to the Act. The Member does hereby confirm its intent that the Company shall be governed by the terms of this Agreement as more particularly described in Recital Paragraph C hereto, the terms and provisions of which are herein incorporated. Steven Cephas is hereby designated as an "authorized person" within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of the State of Delaware. Upon the filing of the Certificate of Formation with the Secretary of State of Delaware, his powers as "authorized person" ceased. The member is hereby the designated authorized person" and shall continue as the designated "authorized person" within the meaning of the Act. The member or an Officer shall execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in New York and in any other jurisdiction in which the Company may wish to conduct business.

2.2 **Name.** The name of the Company is as set forth on Schedule A. Such name shall be used for no purpose other than those set forth in Article III hereof.

2.3 **Principal Place of Business.** The principal place of business of the Company shall be the location of the Property. The principal office of the Company shall initially be located c/o SSI PMG LLC, 4770 South Atlanta Road, Suite 200, Smyrna, Georgia 30080. The Company may relocate its principal place of business to any other place or places as the Member may from time to time deem advisable. Additional offices may be maintained and acts done at any other place appropriate for accomplishing the purposes of the Company, all as determined by the Member.

2.4 **Registered Office and Registered Agent.** The Company's initial registered office shall be at the office of its registered agent at 2711 Centerville Road Suite 400, Wilmington, Delaware 19808, and the name of its initial registered agent at such address shall be Corporation Service Company. The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Delaware Secretary of State pursuant to the Act.

2.5 **Term.** The term of the Company began upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware and shall continue in perpetuity until dissolved, wound up and terminated pursuant to the provisions of this Agreement or as otherwise provided by the Act. The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate of Formation as provided in the Act.

## ARTICLE III

## BUSINESS PURPOSE

Notwithstanding anything to the contrary in this Agreement or in any other document governing the formation, management or operation of the Company, the purpose of the Company is (i) to acquire, own, operate, lease, sell, mortgage, finance, refinance and maintain the Property as an investment for the production of income and profit, and to engage in all activities related thereto, (ii) in all respects to act as owner of the Property, all upon and subject to the terms and provisions of this Agreement, (iii) to enter into and perform its obligations under the Loan Documents, (iv) to sell, transfer, service, convey, dispose of, pledge, assign, borrow money against, finance or otherwise deal with the Property to the extent permitted under the Loan Documents, (v) to own an interest in the Operating Lessee and (vi) to conduct any other lawful business, purpose or activity approved by the Member that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above-mentioned purposes. Notwithstanding anything to the contrary contained in this Agreement, the Company shall not conduct, or cause to be conducted, any business or activity that would diminish the limitation on liability afforded to the Member under the Act and/or this Agreement, or the status of the Company as a disregarded entity for federal income tax purposes.

The Company, and the Member or any manager or officer on behalf of the Company, may enter into and perform the Loan Documents, this Agreement, and all documents, agreements, certificates, or financing statements contemplated thereby or related thereto, all without any further act, vote or approval of any Member, manager, officer or other Person notwithstanding any other provision of this Agreement, the Act or applicable law, rule or regulation. The foregoing authorization shall not be deemed a restriction on the powers of the Member or any manager or officer to enter into other agreements on behalf of the Company.


## ARTICLE IV

## MANAGEMENT AND AUTHORITY

4.1.    **Management.**  Subject to Article XI, all management of the Company shall be vested solely in the Member.  The affirmative consent (regardless of whether written, oral, or by course of conduct) of the Member shall constitute the consent of all of the members for purposes of any provision of this Agreement or the Act.  All decisions concerning the business affairs of the Company shall be made by the Member.

Subject to Article III, the Member has the power to bind the Company as provided in this Article. The act of the Member shall bind the Company and no person dealing with the Company shall have any obligation to inquire into the power or authority of the Member acting on behalf of the Company.

4.2   **Loan Documents.**   The Member, on behalf of the Company, is hereby authorized to negotiate, execute, deliver and perform the Company's obligations under the Loan Documents as well as all other agreements, instruments, certificates and authorizations related thereto or contemplated thereby, and without any further act, vote or approval of any Person. The foregoing authorization shall not be deemed a restriction on the power of the Member to enter into other agreements on behalf of the Company, subject to the terms of this Agreement.


## ARTICLE V

## DUTIES AND RIGHTS OF MEMBER

5.1   **Member's Duty to Company.**

(a)   Notwithstanding any provision to the contrary at law or in equity: (i) the Member shall be entitled to enter into transactions that may be considered to be competitive with, or a business opportunity that may be beneficial to, the Company, it being expressly understood that the Member may be entering into transactions that are similar to the transactions into which the Company may enter; (ii) the Company shall not have any right, by virtue of this Agreement, to share or participate in such transaction of the Member or to the income or proceeds derived therefrom; and (iii) the Member shall not incur any liability to the Company as a result of engaging in any other business venture.

(b)   Notwithstanding any provision to the contrary at law or in equity, the Member does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest. Subject to the terms of the Loan Documents and this Agreement, the Member may transact other business with the Company. The rights and obligations of the Member transacting business with the Company are the same as those of a person who is not a Member, subject to applicable law. No transaction with the Company shall be voidable solely because the Member has a direct or indirect interest in the transaction if the transaction is fair to the Company.

80641-00011 NY:1296404.6

5.2 **Affiliated Compensation.** Subject to the terms of this Agreement, the Member may retain such Persons as it shall determine (including any Person in which the Member shall have an interest or of which it is an Affiliate) to provide services to or on behalf of the Company for such compensation as the Member deems to be appropriate.

5.3 **Limitation of Liability.** The Member shall have no personal liability for the liabilities and obligations of the Company except as required in Section 6.1(b) of this Agreement, the Act and other applicable law. Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and neither the Member nor the Springing Member nor any member of the Board of Managers shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member, Springing Member or member of the Board of Managers of the Company.

5.4 **Liability of the Member to the Company.** A Member who receives the return in whole or in part of its Capital Contribution is liable to the Company only to the extent, if any, provided by the Act.

**ARTICLE VI**

**CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS**

6.1 **Member's Capital in the Company.**

(a) The Member is deemed to have contributed to the Company as its Capital Contribution such cash or property equal to the value of the Property as of the execution of this Agreement. The Member is the sole Member and owns and holds one hundred percent (100%) of the Percentage Interests in the Company. No interest shall accrue on any Capital Contribution, and the Member shall not have the right to withdraw or be repaid any Capital Contribution except as provided in the Agreement.

(b) Anything in this Agreement to the contrary notwithstanding, no Member shall have any personal liability for liabilities or obligations of the Company, except to the extent of its Capital Contributions made to the Company as aforesaid and except as otherwise expressly provided by the Act, and no Member shall be required to make any further or additional contributions to the capital of the Company or to lend or advance funds to the Company for any purpose.

(c) The obligation, if any, of a Member to contribute to the capital of the Company is solely and exclusively for the benefit of the Company and the Member, and is not intended to confer rights on any third party (under Section 18-502(b) of the Act or otherwise). Without limiting the generality of the foregoing, except as provided in Section 12.12, no creditor of the Company shall be deemed a third party beneficiary of any obligation of any Member to contribute capital or make advances to the Company.

# ARTICLE VII

## PROFIT, LOSS, AND DISTRIBUTIONS

7.1 **Distributions of Net Cash Flow.** Net Cash Flow of the Company shall be distributed at such time and from time to time as the Member shall determine. No distribution shall be made unless, (i) after the distribution is made, the assets of the Company are in excess of all liabilities of the Company, and (ii) such distribution would not violate, or constitute a default under, the Loan Documents, this Agreement, or Section 18-607 or 18-804 of the Act.

7.2 **Allocation of Profit or Loss.** All Profit or Loss shall be allocated to the Members in accordance with their Percentage Interests.

7.3 **Mezzanine Distributions.** Any payments made pursuant to the Loan Documents to or for the benefit of the Mezzanine Borrower shall constitute distributions from the Company to the Member to or at the direction of the Member.

# ARTICLE VIII

## TRANSFERABILITY

8.1 **Assignment.** Subject to the terms of the Loan Documents and Article IX below, the Member's Membership Interest in the Company shall be transferable in whole or in part without consent of any other Person, and, upon its execution of a counterpart signature page to this Agreement, the assignee shall be admitted as a Member with all the rights of the Member who assigned its Membership Interest. Such admission shall be deemed effective immediately prior to the transfer, and, if the Member transfers all of its Membership Interest, immediately following such admission, the transferor Member shall cease to be a member of the Company. No transfer (whether voluntary or involuntary) shall, in and of itself and to the fullest extent permitted by law, effect a dissolution of the Company.

8.2 **Resignation.** The Member shall be permitted to retire, resign or withdraw from the Company at any time; provided that, so long as any obligations under the Loan are outstanding, the Member may not retire, resign or withdraw except as permitted under the Loan Documents and unless (a) an additional Member of the Company is admitted in accordance with Article IX below, either prior to or simultaneously with the occurrence of such event that causes the Member to cease to be a Member of the Company, and (b) the Company receives the written consent of the Lender, or after securitization of the Loan, only if (i) the Company and the Lender receives confirmation that the applicable Rating Agencies have issued a Rating Agency Confirmation and (ii) the Company receives the written consent of the Lender.

## ARTICLE IX

## ADDITIONAL MEMBERS

9.1    **Admission of Additional Members.**  Subject to the terms of the Loan Documents, the following paragraph and Section 12.1, any Person acceptable to the Member may become a Member in the Company subject to the conditions imposed by the Member and upon such additional Member's execution of a counterpart signature page to this Agreement.  At or about the time an additional Member is admitted, this Agreement shall be amended as necessary or proper to reflect a change from a single-member limited liability company to a multiple-member limited liability company.

So long as any obligation under the Loan remains outstanding, no transfer of any direct or indirect ownership interest in the Company, or any admission of an additional Member to the Company pursuant to this Article IX, may be made except as permitted by the Loan Documents.

9.2    **Mezzanine Pledge Agreement.**  Upon a foreclosure, sale or other transfer of the limited liability company interests in the Company pursuant to that certain Pledge and Security Agreement, dated as of the date of the Loan Agreement (the "Mezzanine Pledge Agreement"), among the Member ("Mezzanine Borrower") and Wachovia Bank, National Association, in its capacity as Mezzanine Lender, together with its successors and assigns, ("Mezzanine Lender") the holder of such limited liability company interests shall, upon the execution of a counterpart to this Agreement, automatically be admitted as a successor Member of the Company upon such foreclosure, sale or other transfer, with all of the rights and obligations of the Member hereunder, subject to the limitations on transferability of such interests as described in this Section 9.2.  The Company acknowledges that the pledge of the Membership Interest in the Company made by the Member in connection with the Mezzanine Pledge Agreement shall be a pledge not only of Profits and Losses of the Company, but also a pledge of all rights and obligations of the Member.  Upon a foreclosure, sale or other transfer of the limited liability company interests of the Company pursuant to the Mezzanine Pledge Agreement, the successor Member may transfer its interests in the Company, subject to this Section 9.2.  Notwithstanding any provision in the Act or any other provision contained herein to the contrary, the Member shall be permitted to pledge and, upon any foreclosure of such pledge in connection with the admission of the Mezzanine Lender as a Member, to transfer to the Mezzanine Lender its rights and powers to manage and control the affairs of the Company pursuant to the terms of the Mezzanine Pledge Agreement.  Upon the exercise of its rights under the Mezzanine Pledge Agreement, the Mezzanine Lender shall have, among its other powers, the right to appoint and remove members of the Board of Managers pursuant to the terms of Section 11.2 herein and the right to substitute Springing Members.

Notwithstanding anything to the contrary contained herein, for so long as any amounts remain outstanding under the Mezzanine Loan Documents, the Member shall not, without the prior written consent of the Mezzanine Lender, issue and shall not permit the issuance of any additional limited liability company interests of the Company other than its issuance of limited liability company interests issued on or prior to the date of this Agreement.

## ARTICLE X

## DISSOLUTION AND TERMINATION

10.1 **Dissolution.** Subject to the terms of Article XI of this Agreement, the Company shall dissolve and its affairs shall be wound up upon the earliest to occur of:

(a) the termination of the legal existence of the last remaining Member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining Member of the Company in the Company unless the business of the Company is continued in a manner permitted by this Agreement or the Act. Upon the occurrence of any event that causes the last remaining Member of the Company to cease to be a Member of the Company (other than (1) upon an assignment by the Member of all of its limited liability company interest in the Company and the admission of the transferee pursuant to Section 8.1 and Article IX, or (2) the resignation of the Member and the admission of an additional Member of the Company pursuant to Section 8.2 and Article IX), to the fullest extent permitted by law, the personal representative of such Member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such Member in the Company, agree in writing (i) to continue the Company and (ii) unless a Springing Member has already become a Member pursuant to Section 12.1, to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute Member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member of the Company in the Company;

(b) the entry of a decree of dissolution under Section 18-802 of the Act; provided, however, that, to the fullest extent permitted by law, no Member shall file or pursue any dissolution or liquidation petition or action in any court except as specifically provided in this Agreement; and

(c) at such time as no obligations under the Loan Agreement remain outstanding, the written determination of the Member that the Company dissolve following the sale or other disposition of all or substantially all of the assets of the Company or for any other legitimate business purpose.

10.2 **Winding Up, Liquidation and Distribution of Assets.** Upon dissolution, the Member shall proceed to wind up the affairs of the Company, and liquidate and distribute the assets of the Company as it sees fit, subject to the Act. Upon completion of the winding up, liquidation and distribution of the assets and the filing of a certificate of cancellation of the Certificate of Formation, the Company shall be deemed terminated.

Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704 1(b)(2)(ii)(g) of the Treasury Regulations, if the Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), the Member shall have no obligation to make any Capital Contribution, and the negative balance of the Member's

Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

10.3  **Bankruptcy or Dissolution of Member.**  Notwithstanding any other provisions of this Agreement, the Bankruptcy or dissolution of the Member or a Springing Member shall not cause the Member or Springing Member to cease to be a Member of the Company and upon the occurrence of such an event, the business of the Company shall continue without dissolution.

10.4  **Waiver of Dissolution Rights.**  Notwithstanding any other provision of this Agreement, each of the Member and the Springing Member waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of the Member or a Springing Member, or the occurrence of an event that causes the Member or a Springing Member to cease to be a Member of the Company.

10.5  **Termination of Company.**  The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company shall have been distributed to the Members in the manner provided for in this Agreement, and (ii) the Certificate of Formation shall have been canceled in the manner required by the Act.


# ARTICLE XI

## BANKRUPTCY REMOTE AND SEPARATENESS PROVISIONS

11.1  _Separateness Provision._  Notwithstanding any provision of this Agreement to the contrary, until such time as the Debt is paid in full or otherwise satisfied, in order to preserve and ensure its separate and distinct identity and to qualify the Company as a special purpose entity, in addition to the other provisions set forth in this Agreement, the Company shall conduct its affairs in accordance with the following provisions and the Member shall act in a manner to ensure that the Company:

(a)  will not be engaged in any business unrelated to the acquisition, financing, ownership, leasing, maintenance, management or operation of the Property and business related thereto, including any business related to its ownership interest in the Operating Lessee;

(b)  will not have any assets other than those related to the Property, or any assets related to its ownership interest in the Operating Lessee;

(c)  will not own any subsidiary, or make any investment in, any Person, other than the Operating Lessee;

(d)  to the fullest extent of the law, except as expressly permitted by the Loan Agreement or the other Loan Documents or in connection with a repayment of the Debt, will not engage in, seek or consent to any dissolution, winding up, liquidation in whole or in part, termination, consolidation, merger or sale of all or substantially all of its assets;

(e)  will not, until such time as no Obligations under the Loan Documents remain outstanding (including, without limitation, until such time as the Debt shall be paid in full): (A) amend the Certificate of Formation without the prior written consent of the Lender;

(B) amend, alter, change or repeal Articles I, III, IV, VIII, IX, X and XI or Sections 2.2, 2.5, 6.1(c), 7.1, 7.3, 12.1, 12.4, 12.5, 12.12 and 12.13, 12.15, 12.16 or Exhibit 1 of this Agreement (the "Special Purpose Provisions") without the prior written consent of the Lender and, after securitization of the Loan, the receipt by the Company and the Lender of a Rating Agency Confirmation from the applicable Rating Agencies, and with respect to Sections 7.3 and 9.2, and the consent of the Mezzanine Lender in writing. Subject to this Section 11.1(e), the Member reserves the right to amend, alter, change or repeal any provisions contained in this Agreement in accordance with Section 12.5;

(f)     intends to remain solvent and intends to continue to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due; and intends to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(g)     will maintain a sufficient number of employees in light of its contemplated business operations;

(h)     will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(i)     will file its own tax returns, except to the extent that it is a disregarded entity for tax purposes or is required to file consolidated tax returns by law;

(j)     except as contemplated by the Loan Documents and with respect to the other Borrower under the Contribution Agreement, will not commingle its funds or assets with those of any other Person and will not participate in any cash management system with any other Person;

(k)     will hold its assets in its own name;

(l)     will conduct its business in its name or in a name franchised or licensed to it by an entity other than an Affiliate of the Company or any other Borrower, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in subsection (y) below, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of the Company;

(m)     will maintain its records, books of account, bank accounts, financial statements, accounting records and other entity documents separate from any other Person, and will not permit its assets to be listed as assets on the financial statement of any other entity except that its financial position, assets, liabilities, net worth and operating results may be included in the consolidated financial statements of an Affiliate, provided that such consolidated financial statements contain a footnote indicating that the Company is a separate legal entity and that it maintains separate books and records;

(n)     except as contemplated by the Loan Documents and with respect to the other Borrower under the Contribution Agreement, the Company will pay its own liabilities and expenses, including the salaries of its own employees, out of its own funds and assets;

(o)     will observe all limited liability company formalities, preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable

Legal Requirements (as defined in the Loan Agreement) of the jurisdiction of its organization or formation, and will not amend, modify, terminate or fail to comply with the provisions of its organizational documents;

(p) will have no Indebtedness other than the Loan and Indebtedness incurred in the ordinary course of its business that is related to the ownership and operation of the Property and is expressly permitted under the Loan Documents and the Contribution Agreement with respect to the other Borrower;

(q) will not assume or guarantee or become obligated for the debts of any other Person and has not held out and will not hold out its credit as being available to satisfy the obligations of any other Person, except as may be permitted or required pursuant to the Loan Documents and with respect to the other Borrower under the Contribution Agreement;

(r) will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate, other than amounts payable by the other Borrower under the Contribution Agreement;

(s) will allocate, fairly and reasonably, any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

(t) will use separate stationery, invoices and checks bearing its own name;

(u) except as contemplated by the Loan Documents with respect to the co-borrower, has not pledged and will not pledge its assets to secure the obligations of any other Person;

(v) will hold itself out and identify itself as a separate and distinct legal entity under its own name or in a name franchised or licensed to it by an entity other than an Affiliate of any Borrower and not as a division or part of any other Person, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in subsection (y) below, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of the Company;

(w) will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(x) will not make loans or advances to any Person or hold evidence of indebtedness issued by any other Person other than (i) cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity and (ii) amounts payable by the other Borrower under the Contribution Agreement;

(y) will not identify its members, or any Affiliate of any of them, as a division or part of it, and shall not identify itself as a department or division of any other Person;

(z) will not enter into or be a party to any transaction with its members or other Affiliates except (i) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party, except for capital contributions and distributions and (ii) for the Contribution Agreement with respect to the co-borrower;

(aa) will not have any obligation to indemnify, and will not indemnify, its managers, officers or members, as the case may be, unless such an obligation is fully subordinated to the Obligations under the Loan Documents and will not constitute a claim against it in the event that cash flow in excess of the amount required to pay the Obligations under the Loan Documents is insufficient to pay such obligation; and

(bb) except as expressly contemplated by the Loan Documents with respect to a non-recourse carve-out guarantee or environmental indemnity, will not have any of its Obligations guaranteed by any Affiliate.

Failure of the Company to comply with any of the foregoing covenants shall not affect the status of the Company as a separate legal entity or adversely affect the limited liability of any Member.

11.2 **Board of Managers.** Notwithstanding any provision of this Agreement to the contrary, until such time as the Debt is paid in full or otherwise satisfied, the Company shall have a Board of Managers which shall be governed by the following provisions:

(a) The sole power and purpose of the Board of Managers shall be to consider and either consent or withhold its consent to any and all of the following actions by the Company, in accordance with the terms of this Agreement: (i) the taking of any Bankruptcy Action relating to the Company and (ii) amending or modifying the provisions of this Agreement specified in Section 11.1(e)(B) or the Certificate of Formation. Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, the Member, any manager, any officer or the Company or any other Person, neither the Member, any manager, nor any officer nor any other Person shall be authorized or empowered to, nor shall they permit the Company to, without the prior unanimous written consent of the Member and the Board of Managers (including all Independent Managers), take any Bankruptcy Action with respect to the Company, *provided, however,* the Board of Managers may not vote on, or authorize the taking of, any such Bankruptcy Action unless there are at least two Independent Managers then serving in such capacity and such Independent Managers participate in such vote.

(b) The Board of Managers shall at all times be comprised of four (4) "managers" chosen by the Member, two of whom shall be the Independent Managers and the other two of whom shall initially be Alex P. Gilbert and Michael D. Shea. Each Independent Manager shall hold office until his or her successor is appointed and qualifies or until the Independent Manager's death, resignation or removal in the manner hereinafter provided.

(c) Meetings of the Board of Managers may be called by any member of the Board of Managers at the request of a majority of the Board of Managers then in office. Subject to clause (f) of this Section 11.2, the manager calling the meeting may fix any place either in or outside the State of Delaware as the place for holding any meeting of the Board of Managers.

(d) Notice of any meeting of the Board of Managers shall be given to each manager. Notice which is personally delivered or sent by facsimile shall be given at least five (5) business days before the meeting. Notice which is given by mail shall be given at least ten (10) business days before the meeting. Notice given by mail will be deemed to be received forty-eight (48) hours after it is placed in the U.S. Mail, certified mail, return receipt requested, postage fully prepaid thereon. The general business to be transacted at, or the purpose of, a meeting of the Board of Managers must be stated in the notice; provided, however, that the failure to state any business or purpose in the notice of meeting shall not prohibit the Board of Managers from

considering and acting with respect to any such business or purpose of such meeting in accordance with this Section 11.2. Any manager may waive notice of any meeting. The attendance of a manager at any meeting shall constitute a waiver of notice of such meeting, except where a manager attends a meeting for the express purpose of objecting to the transaction of any business at such meeting because the meeting is not lawfully called or convened.

(e)     The entire Board of Managers shall constitute a quorum for the transaction of business at any meeting of the Board of Managers. The affirmative vote of all of the members of the Board of Managers shall be required for the Board of Managers to take action.

(f)     Members of the Board of Managers may participate in a meeting by means of a conference telephone or similar communications equipment if all persons participating in the meeting can hear each other at the same time. Participation in a meeting by these means shall constitute presence in person at the meeting.

(g)     Any action required or permitted to be taken at any meeting of the members of the Board of Managers may be taken without a meeting if a consent in writing to the action is signed by all of the members of the Board of Managers, and the written consent is filed with the minutes of proceedings of the Board of Managers.

(h)     Any vacancy on the Board of Managers shall be filled by the Member.

(i)     Managers, other than the Independent Managers, shall not receive any stated salary for their services as managers but, by resolution approved by the Members, a fixed sum and expenses of attendance, if any, may be allowed to some or all of the managers for attendance at each meeting of the Board of Managers.

(j)     Subject to Section 11.3(b), the Member may, at any time, remove with or without cause any manager and may elect a successor to fill the resulting vacancy created by the removal of such manager.

(k)     An Independent Manager may resign upon written notice to the Company; provided, however, that such resigning Independent Manager must continue to hold office until such time as his or her successor has been appointed and qualifies in accordance with Section 11.3(b).

(l)     No manager shall be liable, responsible, or accountable, for any damages or otherwise, to the Company or the Member for any act performed or omitted by him or her with respect to Company matters, except for damages resulting from his or her fraud.

(m)     To the fullest extent permitted by law, the Company shall indemnify all managers for any act performed or omitted by any of them with respect to Company matters, except for damages resulting from his or her fraud. Notwithstanding the foregoing, any indemnification set forth herein shall be fully subordinate to the Loan and, to the fullest extent permitted by law, shall not constitute a claim against the Company in the event that the Company's cash flow is insufficient to pay its obligations under the Loan Documents.

(n)     Each manager on the Board of Managers shall be deemed to be a "manager" within the meaning of Section 18-101(10) of the Act.

11.3    **Independent Managers.**  Notwithstanding any provision of this Agreement to the contrary, until such time as the Debt is paid in full or otherwise satisfied, the following provisions shall apply to the Independent Managers:

(a)    When voting on matters requiring the affirmative vote or written consent of the Independent Managers, notwithstanding that the Company is not then insolvent, the Independent Managers shall, to the fullest extent permitted by law (including Section 18-1101(c) of the Act), take into account the interests of the creditors of the Company (other than Affiliates who may be creditors of the Company) as well as the interests of the Company and shall not be required to consider the best interests of a Member.

(b)    So long as any part of the Debt remains unsatisfied and notwithstanding anything to the contrary contained herein, no Independent Manager may be removed from the Board of Managers unless his or her successor has been elected, and such successor shall have accepted his or her appointment as an Independent Manager by a written instrument, unless at the time of such removal, and after giving effect to such removal, there would be at least two Independent Managers on the Board of Managers.  In the event of a vacancy in the position of Independent Manager, the Member shall, as soon as practicable, appoint a successor Independent Manager. All right, power and authority of the Independent Managers shall be limited to the extent necessary to exercise those rights and perform those duties specifically set forth in this Agreement.

(c)    Except as provided in Section 11.3(a), in exercising their rights and performing their duties under this Agreement, any Independent Manager shall have a fiduciary duty of loyalty and care similar to that of a director of a business corporation organized under the General Corporation Law of the State of Delaware.  No Independent Manager shall at any time serve as trustee in bankruptcy for any Affiliate of the Company.

11.4    **Certain Actions.**  Until the Loan is paid in full or otherwise satisfied, to the fullest extent permitted by law, the Company shall not engage in or consent to any transfer which would result in an Event of Default under the Loan Documents (as defined in the Loan Agreement).

11.5    **LLC Certificate.**

(a)    The Company shall issue one (1) limited liability company certificate in the form of Exhibit 1 attached hereto (the "LLC Certificate") in the name of the Member certifying that the Member is the record holder of one hundred percent (100%) of the limited liability company interests in the Company.  If at any time the Company shall have more than one Member, the Company shall issue an LLC Certificate in the name of each Member certifying that the Member named therein is the record holder of the limited liability company interests set forth therein.  For purposes of this Agreement, the term "record holder" shall mean the Person whose name appears on the books and records of the Company as the Member owning the limited liability company interests at issue.

(b)    The Company shall maintain books for the purpose of registering the transfer of limited liability company interests in the Company.  A limited liability company interest in the Company which is transferred in accordance with the terms of this Agreement shall be transferable on the books of the Company by the record holder thereof in person or by such record holder's duly authorized attorney, but, except as provided in Section 11.5(c) hereof with respect to lost, stolen or destroyed certificates, no transfer of a limited liability company interest

in the Company shall be entered until the previously issued LLC Certificate representing such interest shall have been endorsed and surrendered to the Company and canceled and a replacement LLC Certificate issued to the assignee of such interest in accordance with such procedures as the Company may establish. Subject to Section 8.1, in the event of a transfer of less than all of a Member's limited liability company interests in the Company, the Company shall issue to the transferring Member a new LLC Certificate representing the limited liability company interests in the Company not being transferred. Except as otherwise required by law, the Company shall be entitled to treat the record holder of an LLC Certificate on its books as the owner thereof for all purposes regardless of any notice or knowledge to the contrary.

(c)    Subject to Section 8.1, the Company shall issue a new LLC Certificate in place of any LLC Certificate previously issued if the record holder of the LLC Certificate:

(i)    makes proof by affidavit, in form and substance satisfactory to the Company, that a previously issued LLC Certificate has been lost, destroyed or stolen;

(ii)    requests the issuance of a new LLC Certificate before the Company has notice that the LLC Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

(iii)    indemnifies the Company against any claim that may be made on account of the alleged loss, destruction or theft of the LLC Certificate; and

(iv)    satisfies any other reasonable requirements imposed by the Company.

If a Member fails to notify the Company within a reasonable time after it has notice of the loss, destruction or theft of an LLC Certificate, and a transfer of the limited liability company interests in the Company represented by the LLC Certificate is registered before receiving such notification, the Company shall have no liability with respect to any claim against the Company for such transfer or for a new LLC Certificate.

(d)    Notwithstanding anything to the contrary contained in this Agreement, for so long as any obligations under the Loan Agreement remain outstanding, the Company shall not issue any LLC Certificate (other than the LLC Certificate issued to the Member pursuant to Section 11.5(a)) without the consent of the Lender.

(e)    Each limited liability company interest in the Company shall constitute and shall remain a "security" within the meaning of, and governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware (6 Del. C. § 8-101, et seq.) (the "UCC"), and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995. Notwithstanding any provision of this Agreement to the contrary, to the extent that any provision of this Agreement is inconsistent with any non-waivable provision of Article 8 of the UCC, such provision of Article 8 of the UCC shall control.

12.10 **Construction of Certain Terms.** The terms "hereof," "herein," "hereunder" and "hereinafter" and words of similar import, shall be construed to refer to this Agreement as a whole, and not to any particular paragraph or provision, unless expressly so stated.

12.11 **Number and Gender.** All words or terms used in this Agreement, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require.

12.12 **No Third Party Beneficiary.** Except for the Mezzanine Lender with respect to Sections 7.3 and 9.2 and the Lender and its successors or assigns as holders of the Loan with respect to the Special Purpose Provisions, the provisions of this Agreement are not intended to be, nor shall they be construed to be, for the benefit of any third party, except as provided in Section 12.13 hereof. Pursuant to Section 12.13, the Lender and its successors and assigns are intended third-party beneficiaries of this Agreement and may enforce the Special Purpose Provisions.

12.13 **Binding Agreement.** Notwithstanding any other provision of this Agreement, the Member agrees that this Agreement constitutes a legal, valid and binding agreement of the Member, and is enforceable against the Member by the Independent Managers in accordance with its terms. In addition, the Independent Managers, the Lender (until such time as all obligations under the Loan Agreement shall be paid in full) shall be intended beneficiaries of this Agreement.

12.14 **Tax Status.** It is intended that the Company, solely for tax purposes, shall be disregarded as an entity separate from its Member for federal, state, and local income tax purposes.

12.15 **Entire Agreement.** This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

12.16 **Waiver of Partition; Nature of Interest.** Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each of the Member, the Independent Managers, the Springing Members, and any additional Member admitted to the Company hereby irrevocably waives any right or power that such Person might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company. The Member shall not have any interest in any specific assets of the Company, and the Member shall not have the status of a creditor with respect to any distribution pursuant to Article VII hereof. The interest of the Member in the Company is personal property.

12.17 **Effectiveness.** This Agreement shall be effective as of the date set forth on the first page.

[Signature pages follow]

80641-00011 NY:1296404.6

A-23

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

SOLE MEMBER:

JER/JAMESON MEZZ BORROWER I LLC, a
Delaware limited liability company

By: _____
C. David Carley III, Vice President

*[Signature page to LLC Agreement]*

SPRINGING MEMBER 1:

CHERYL A. TUSSIE:

_____

SPRINGING MEMBER 2:

SUZANNE M. HAY:

_____

*[Signature page to LLC Agreement]*

## SCHEDULE A

| | |
|---|---|
| **Date of Agreement:** | 07-27-06 |
| **Name of Company:** | JER/Jameson Properties LLC |
| **Loan Amount** | $ 175,000,000 |
| **Initial Member** | Whiskey Merger Corp. |

| **Secondary Members** | **Percentage Interest** |
|---|---|
| Jameson Alabama, Inc. | 13% |
| Jameson Inns Financing 01, LP | 7% |
| Jameson Inns Financing 02, LP | 24% |
| Jameson Properties LLC | 10% |
| Jameson Properties of Tennessee, L.P. | 11% |

## SCHEDULE B

| | Property | Address | County |
|---|---|---|---|
| 1 | Jameson Inn | 315 Martling Rd., Albertville, Alabama 35950 | Marshall |
| 2 | Jameson Inn | 4335 Hwy 280, Alexander City, Alabama 35010 | Tallapoosa |
| 3 | Jameson Inn | 706 N. Brindlee Mtn. Pkwy., Arab, Alabama 35016 | Marshall |
| 4 | Jameson Inn | 1212 Mall Pkwy, Auburn, Alabama 36831 | Lee |
| 5 | Jameson Inn | 5021 Academy Lane, Bessemer, Alabama 35022 | Jefferson |
| 6 | Jameson Inn | 2120 Jameson Place SW, Decatur, Alabama 35603 | Morgan |
| 7 | Jameson Inn | 136 Towne Center Blvd, Eufaula, Alabama 36027 | Barbour |
| 8 | Jameson Inn | 115 Ana Dr, Florence, Alabama 35630 | Lauderdale |
| 9 | Jameson Inn | 71 Jameson Lane, Greenville, Alabama 36037 | Butler |
| 11 | Jameson Inn | 1100 Hwy 78, Jasper, Alabama 35501 | Walker |
| 12 | Jameson Inn | 161 Colonial Dr., Oxford, Alabama 36203 | Calhoun |
| 13 | Jameson Inn | 120 Hwy 231 South, Ozark, Alabama 36360 | Dale |
| 14 | Jameson Inn | 104 Jameson Court, Prattville, Alabama 36067 | Autauga |
| 15 | Jameson Inn | 208 Micah Way, Scottsboro, Alabama 35768 | Jackson |
| 16 | Jameson Inn | 2420 Broad St., Selma, Alabama 36701 | Dallas |
| 17 | Jameson Inn | 89 Gene Stewart Blvd., Sylacauga, Alabama 35151 | Talladega |
| 18 | Jameson Inn | 4730 Norrell Dr., Trussville, Alabama 35173 | Jefferson |
| 19 | Jameson Inn | 5021 Oscar Baxter Rd., Tuscaloosa, Alabama 35403 | Tuscaloosa |
| 20 | Jameson Inn | 151 Cracker Barrel Dr., Crestview, Florida 32536 | Okaloosa |
| 21 | Jameson Inn | 7030 Bonneval Rd., Jacksonville, Florida 32216 | Duval |
| 22 | Jameson Inn | 285 SW Commerce Boulevard, Lake City, Florida 32025 | Columbia |
| 23 | Jameson Inn | 4375 Lakeland Park Dr., Lakeland, Florida 33809 | Polk |
| 24 | Jameson Inn | 175 Interchange Blvd., Ormond Beach, Florida 32174 | Volusia |
| 25 | Jameson Inn | 890 Palm Bay Rd, Palm Bay, Florida 32905 | Brevard |
| 26 | Jameson Inn | 2720 Dawson Road, Albany, GA 31707 | Dougherty |
| 27 | Jameson Inn | 1605 E. Lamar St, Americus, GA 31709 | Sumter |
| 28 | Jameson Inn | 1403 Tallahassee Hwy, Bainbridge, Georgia 34801 | Decatur |
| 29 | Jameson Inn | 661 Scranton Rd., Brunswick, Georgia 31520 | Glynn |
| 30 | Jameson Inn | 189 Jameson St., Calhoun, Georgia 30701 | Gordon |
| 31 | Jameson Inn | 700 S. Park St., Carrollton, Georgia 30177 | Carroll |
| 32 | Jameson Inn | 1164 Dogwood Drive, Conyers, Georgia 30012 | Rockdale |
| 33 | Jameson Inn | 790 College Drive, Dalton, Georgia 30720 | Whitfield |
| 34 | Jameson Inn | 100 P.M. Watson Dr., Dublin, Georgia 31021 | Laurens |
| 35 | Jameson Inn | 205 N. Hwy 301, Jesup, Georgia 31545 | Wayne |
| 36 | Jameson Inn | 105 Maycreek Blvd., Kingsland, Georgia 31548 | Camden |
| 37 | Jameson Inn | 110 Jameson Dr., LaGrange, Georgia 30240 | Troup |
| 38 | Jameson Inn | 40 Lakeside Way, Newnan, Georgia 30265 | Coweta |
| 39 | Jameson Inn | 125 Bourne Ave., Pooler, Georgia 31322 | Chatam |
| 40 | Jameson Inn | 40 Grace Dr., Rome, Georgia 30161 | Floyd |
| 41 | Jameson Inn | 1010 Hwy 19 N., Thomaston, Georgia 30286 | Upson |
| 42 | Jameson Inn | 1670 Remington Ave, Thomasville, Georgia 31792 | Thomas |
| 43 | Jameson Inn | 1725 Gornto Rd., Valdosta, Georgia 31601 | Lowndes |
| 44 | Jameson Inn | 2731 Watson Blvd., Warner Robins, Georgia 31093 | Houston |
| 45 | Jameson Inn | 950 City Blvd, Waycross, Georgia 31501 | Ware |
| 46 | Jameson Inn | 1436 N. Liberty St., Waynesboro, Georgia 30830 | Burke |
| 47 | Signature Inn | 101 S. Veterans Pkwy, Normal, Illinois 61761 | McLean |

| | | | |
|---|---|---|---|
| 48 | Signature Inn | 4112 N Brandywine, Peoria, Illinois  61614 | Peoria |
| 49 | Signature Inn | 3090 Stevenson Dr.,Springfield, Illinois  62703 | Sangamon |
| 50 | Jameson Inn | 3010 Brittany Ct., Elkhart, Indiana  46514 | Elkhart |
| 51 | Signature Inn | 1101 N. Green River Rd., Evansville, Indiana  47715 | Vanderburgh |
| 52 | Signature Inn | 1734 West Washington Ctr Rd., Ft Wayne, Indiana 46818 | Allen |
| 53 | Signature Inn | 10201 N. Meridian St., Indianapolis, Indiana  46280 | Hamilton |
| 54 | Jameson Inn | 8380 Kelly Lane, Indianapolis, Indiana  46250 | Indianapolis & Marion |
| 55 | Jameson Inn | 4402 E. Creek View Rd., Indianapolis, Indiana  46237 | Indianapolis & Marion |
| 56 | Jameson Inn | 3850 Eagle View Dr., Indianapolis, Indiana  46254 | Indianapolis & Marion |
| 57 | Signature Inn | 4021 S. LaFountain St., Kokomo, Indiana  46902 | Howard |
| 58 | Signature Inn | 3400 N. Chadam LN., Muncie, Indiana  47304 | Delaware |
| 59 | Signature Inn | 215 Dixie Way South, South Bend, Indiana  46637 | St. Joseph |
| 60 | Jameson Inn | 1301 Kentucky Mills Dr., Louisville, Kentucky  40299 | Louisville & Jefferson |
| 61 | Jameson Inn | 6515 Signature Dr., Louisville, Kentucky  40213 | Louisville & Jefferson |
| 62 | Jameson Inn | 2006 Colby Taylor Drive, Richmond, Kentucky  40475 | Madison |
| 63 | Signature Inn | 4320 State Rd 26 East, Lafayette, Indiana  47905 | Tippecanoe |
| 64 | Jameson Inn | 2200 NE Evangeline Thruway, Lafayette, Louisiana  70501 | Lafayette |
| 65 | Jameson Inn | 6715 Rasberry Lane, Shreveport, Louisiana  71129 | Caddo |
| 66 | Jameson Inn | 213 Constitution Drive, West Monroe, Louisiana  71292 | Ouachita |
| 67 | Jameson Inn | 1575 Jameson Dr., Grenada, Mississippi  38901 | Grenada |
| 68 | Jameson Inn | 585 East Beasley Road, Jackson, Mississippi  39206 | Hinds |
| 69 | Jameson Inn | 1292 Vann Drive, Jackson, Tennessee  38305 | Madison |
| 70 | Jameson Inn | 524 Bonita Lakes, Meridian, Mississippi  39301 | Lauderdale |
| 71 | Jameson Inn | 434 Riverwind Dr., Pearl, Mississippi  39208 | Rankin |
| 72 | Jameson Inn | 879 Mississippi Dr., Tupelo, Mississippi  38804 | Lee |
| 73 | Jameson Inn | 3975 South Frontage Road, Vicksburg, Mississippi  39180. | Warren |
| 85 | Jameson Inn | 128 Interstate Blvd., Anderson, South Carolina  29621 | Anderson |
| 86 | Jameson Inn | 885 Chesterfield Hwy, Cheraw, South Carolina  29520 | Chesterfield |
| 87 | Jameson Inn | 1546 E. Main, Duncan, South Carolina  29334 | Spartanburg |
| 88 | Jameson Inn | 211 Dayton School Rd, Easley, South Carolina  29642 | Pickens |
| 89 | Jameson Inn | 101 Stuard St., Gaffney, South Carolina  29341 | Cherokee |
| 90 | Jameson Inn | 120 Church Street, Georgetown, South Carolina  29440 | Georgetown |
| 91 | Jameson Inn | 109 Enterprise Court, Greenwood, South Carolina  29649 | Greenwood |
| 92 | Jameson Inn | 114 Commerce Blvd., Lancaster, South Carolina  29720 | Lancaster |
| 93 | Jameson Inn | 2350 Chestnut St NE, Orangeburg, South Carolina  29115 | Orangeburg |
| 94 | Jameson Inn | 226 Hi-Tech Road, Seneca, South Carolina  29678 | Oconee |
| 95 | Jameson Inn | 206 Corporate Place, Alcoa, Tennessee  37701 | Blount |
| 96 | Jameson Inn | 360 Paul Huff Pkwy, Cleveland, Tennessee  37312 | Bradley |
| 97 | Jameson Inn | 715 James M. Cambell Blvd., Columbia, Tennessee  34801 | Maury |
| 98 | Jameson Inn | 1838 Decherd Blvd.,Decherd / Winchester, Tennessee  37324 | Franklin |
| 99 | Jameson Inn | 1001 Village Green Crossing, Gallatin, Tennessee  37066 | Sumner |
| 100 | Jameson Inn | 3160 E. Andrew Johnson Hwy, Greeneville, Tennessee  37745 | Greene |
| 101 | Jameson Inn | 119 Pinnacle Dr, Johnson City, Tennessee  37615 | Washington |
| 102 | Jameson Inn | 3004 Bays Meadow, Kingsport, Tennessee  37664 | Sullivan |
| 103 | Jameson Inn | 209 Marketplace Ln., Knoxville, Tennessee  37922 | Knox |
| 104 | Jameson Inn | 216 S. Rutgers Ave, Oak Ridge, Tennessee  37830 | Anderson |
| 105 | Jameson Inn | 2113 N. Jackson St., Tullahoma, Tennessee  37388 | Coffee |
| 106 | Jameson Inn | 1881 Evelyn Byrd Ave., Harrisonburg, Virginia  22801 | Rockingham |
| 107 | Jameson Inn | 378 Commonwealth Blvd., Martinsville, Virginia  24112 | Henry |