# EXHIBIT B

**Limited Partnership Agreement of
JER/Jameson NC Properties LP**

AMENDED AND RESTATED AGREEMENT

OF

LIMITED PARTNERSHIP OF

JER/JAMESON NC PROPERTIES LP

by and among

JER/JAMESON GP LLC

and

JER/JAMESON MEZZ BORROWER I LLC

1

## AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP

A.      The Partnership (as defined below) was formed as a limited partnership under the Act, pursuant to the Certificate of Limited Partnership, as filed in the office of the Secretary of State of the State of Delaware on June 12, 2006, and the Limited Partnership Agreement of the Partnership, dated June 12, 2006 (the "Original Agreement"), by JER/Jameson GP LLC, as general partner (referred to as the "General Partner"), and, Whiskey Merger Corp., as the initial limited partner of the Partnership (referred to as the "Initial Limited Partner").

B.      This Amended and Restated Agreement of Limited Partnership is made effective as of the date set forth on Schedule A attached hereto by and among the General Partner and JER/Jameson Mezz Borrower I LLC, a Delaware limited liability company (referred to as the "Limited Partner"), as limited partner, and amends and restates in its entirety any limited partnership agreement existing prior to the date of this Agreement.

C.      Jameson Inns, Inc., a Georgia corporation (as successor by merger to the Initial Limited Partner) has assigned and transferred 100% of its Limited Partner Units (as defined below) to JER/Jameson Properties of Tennessee, LP (the "Secondary Limited Partner") pursuant to that certain Assignment, Admission and Amendment Agreement dated as of the date hereof between the Initial Limited Partner and the Secondary Limited Partner at which time the Secondary Limited Partner was admitted to the Partnership as limited partner of the Partnership and the Initial Limited Partner ceased to be a partner of the Partnership.

D.      The Secondary Limited Partner has assigned and transferred 100% of its Limited Partner Units to JER/Jameson Holdco LLC ("Holdco") pursuant to that certain Assignment, Admission and Amendment Agreement dated as of the date hereof between the Initial Limited Partner and the Secondary Limited Partner and certain other parties thereto, as Assignors, and Holdco, as Assignee, at which time (x) Holdco was admitted to the Partnership as a limited partner of the Partnership and (y) the Secondary Limited Partner ceased to be a partner of the Partnership; whereafter (i) Holdco has assigned and transferred 100% of its Limited Partner Units in the Partnership to JER/Jameson Mezz Borrower IV LLC, at which time (x) JER/Jameson Mezz Borrower IV LLC was admitted to the Partnership as a limited partner of the Partnership and (y) Holdco ceased to be a limited partner of the Partnership; (ii) JER/Jameson Mezz Borrower IV LLC has assigned and transferred 100% of its Limited Partner Units in the Partnership to JER/Jameson Mezz Borrower III LLC, at which time (x) JER/Jameson Mezz Borrower III LLC was admitted to the Partnership as a limited partner of the Partnership and (y) JER/Jameson Mezz Borrower IV LLC ceased to be a limited partner of the Partnership; (iii) JER/Jameson Mezz Borrower III LLC has assigned and transferred 100% of its Limited Partner Units in the Partnership to JER/Jameson Mezz Borrower II LLC, at which time (x) JER/Jameson Mezz Borrower II LLC was admitted to the Partnership as a limited partner of the Partnership and (y) JER/Jameson Mezz Borrower III LLC ceased to be a limited partner of the Partnership; and (iv) JER/Jameson Mezz Borrower II LLC has assigned and transferred 100% of its Limited Partner Units in the Partnership to the Limited Partner, at which time (x) the Limited Partner was admitted to the Partnership as a limited partner of the Partnership and (y) JER/Jameson Mezz Borrower II LLC ceased to be a limited partner of the Partnership.  Subsections (i) through (iv) above were done pursuant to that certain Assignment, Admission and Amendment Agreement dated as of the date hereof and entered into between Holdco, JER/Jameson Mezz Borrower IV LLC, JER/Jameson Mezz Borrower III LLC, JER/Jameson Mezz Borrower II LLC and the Limited Partner.

E.      In entering into this Agreement (as defined below), the Partners hereby acknowledge and accept and/or approve the transfer of 100% of the Limited Partner Units from the Initial Limited Partner to the Secondary Limited Partner, and the Partners hereby acknowledge and accept and/or approve the transfer of the Limited Partner Units from (i) the Secondary Limited Partner to Holdco, then (ii) from Holdco to JER/Jameson Mezz Borrower IV LLC, then (iii) from JER/Jameson Mezz Borrower IV LLC to JER/Jameson Mezz Borrower III LLC, then (iv) from JER/Jameson Mezz Borrower III LLC to JER/Jameson Mezz Borrower II LLC, and then (v) from JER/Jameson Mezz Borrower II LLC to the Limited Partner.

## AGREEMENT:

In consideration of the mutual agreements herein contained and other good and valuable consideration, receipt of which is acknowledged, the parties to this Agreement agree as follows:

## ARTICLE I.

## FORMATION

Section 1.1      Formation of the Partnership.  The partnership named on the cover page and on Schedule A hereto (the "Partnership") is a limited partnership under the Delaware Code, Title 6, Chapter 17 §§ 17-101, et seq. (as amended from time to time, the "Act"), formed by the filing of a Certificate of Limited Partnership (the "Certificate") with the Secretary of State of the State of Delaware on June 12, 2006, and the Partnership Agreement, dated as of June 12, 2006 (as amended from time to time, the "Original Agreement"). It is the intention of the parties hereto that this document constitute the partnership agreement within the meaning of the Act.

Section 1.2      Name.  The name of the Partnership is as set forth on Schedule A.  All business and affairs of the Partnership shall be conducted solely under, and all Partnership assets shall be held solely in, such name unless otherwise determined by the General Partner.

Section 1.3      Term.  The term of the Partnership commenced as of the date it filed the Certificate with the Secretary of State of the State of Delaware as described in Section 1.1 and shall continue under this Agreement (as amended from time to time) and the Act, unless the Partnership is sooner dissolved in accordance with Article 12 of this Agreement.  The existence of the Partnership as a separate legal entity shall continue until cancellation of the Certificate as provided in the Act.

Section 1.4      Principal Place of Business.  The principal office and place of business of the Partnership, unless subsequently changed by the General Partner upon notice to the Limited Partner, will be: c/o SSI PMG LLC, 4770 South Atlanta Road, Suite 200, Smyrna, Georgia 30080.  The General Partner shall be responsible for maintaining at the Partnership's principal place of business those books and records required by the Act to be maintained there.

Section 1.5      Registered Agent and Office.  The registered agent for the Partnership and registered office, unless subsequently changed by the General Partner upon notice to the Limited Partner and upon any required filing with the Secretary of State of Delaware, will be Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808.

2

Section 1.6    Schedule of Partners.  The names, residence addresses, number of Units and Sharing Ratios, and classes of Partners appear on the Schedule of Partners maintained by the Partnership pursuant to Section 6.1 hereof.

## ARTICLE II.

## PURPOSE

Section 2.1    Purpose and Scope of the Business.  Notwithstanding anything to the contrary in this Agreement or in any other document governing the formation, management or operation of the Partnership, the purpose of the Partnership is (i) to acquire, own, operate, lease, sell, mortgage, finance, refinance and maintain the Property as an investment for the production of income and profit, and to engage in all activities related thereto, and (ii) in all respects to act as owner of the Property, all upon and subject to the terms and provisions of this Agreement, (iii) to enter into and perform its obligations under the Loan Documents, (iv) to sell, transfer, service, convey, dispose of, pledge, assign, borrow money against, finance or otherwise deal with the Property to the extent permitted under the Loan Documents, (v) to own an interest in the Operating Lessee, and (vi) to conduct any other lawful business, purpose or activity approved by the General Partner that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above-mentioned purposes.  Notwithstanding anything to the contrary contained in this Agreement, the Partnership shall not conduct, or cause to be conducted, any business or activity that would diminish the limitation on liability afforded to the Limited Partners under the Act and/or this Agreement, or the status of the Partnership as a partnership for federal income tax purposes.

Section 2.2    Documents.  The Partnership, and the General Partner, or any officer of the General Partner, on behalf of the Partnership, may enter into and perform the Loan Documents, and all documents, agreements, certificates or financing statements contemplated thereby or related thereto, all without any further act, vote or approval of any Partner or other Person notwithstanding any other provision of this Agreement, the Act or applicable law, rule or regulation.  The foregoing authorization shall not be deemed a restriction on the powers of the General Partner or any officer of the General Partner to enter into other agreements on behalf of the Partnership.

## ARTICLE III

## DEFINITIONS

"Act" shall have the meaning set forth in Section 1.1 of this agreement.

"Adjusted Capital Account" means, with respect to any Partner, such Partner's Capital Account as of the end of the relevant fiscal year:

(a)    Increased by any amounts which such Partner is obligated to restore (pursuant to subsection 4.1.2 of this Agreement or otherwise) or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)    Decreased by the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

3

The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such Person or of an Affiliate of such Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction, management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" means this Amended and Restated Agreement of Limited Partnership, as amended from time to time.

"Allocated Loan Amount" shall mean the amount set forth on Schedule A attached hereto.

"Auditor" means the certified public accountant or accounting firm appointed pursuant to Section 9.1.

"Bankruptcy Action" means, with respect to any Person: (a) such Person filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (b) the filing of an involuntary petition against such Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition against such Person; (c) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (d) such Person seeking, consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for such Person or any portion of any Property; (e) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due; or (f) such Person taking any action in furtherance of any of the foregoing.

"Bankruptcy Code" means 11 U.S.C. § 101 et seq., as the same may be amended from time to time.

"Basic Documents" means this Agreement, the Loan Documents, the Contribution Agreement and all documents and certificates contemplated thereby or delivered in connection therewith.

"Board of Managers" shall mean the Board of Managers of the General Partner.

"Borrowers" shall mean the Partnership and JER/Jameson Properties LLC.

"Capital Account" means, when used with respect to each Partner, an account maintained in accordance with the following provisions and Federal income tax accounting principles:

> (a) credit such Capital Account with the Capital Contributions made by such Partner pursuant to this Agreement;

> (b) credit such Capital Account with the Partner's distributive share of Profits and any items in the nature of income and gain which are specially allocated to such Partner pursuant to this Agreement and the amount of any Partnership liabilities assumed by such Partner or which are secured by any Partnership property or assets distributed to such Partner pursuant to this Agreement;

> (c) debit such Capital Account with the amount of cash distributed to such Partner and the Gross Asset Value of any Partnership property and assets distributed to it pursuant to this Agreement; and

4

**(d)**      debit such Capital Account with such Partner's distributive share of Losses and any items in the nature of expense or loss which are specially allocated to such Partner pursuant to this Agreement, and the amount of any liabilities of such Partner assumed by the Partnership or which are secured by property or assets contributed by such Partner to the Partnership.

Except to the extent otherwise provided herein, each Capital Account shall be computed, as of any particular time, by reference to contributions and distributions having occurred prior to such time, and by reference to allocations of items of Profit, gain, Loss, and deduction with respect to accounting periods which have ended prior to such time, except that at such time during liquidation of the Partnership's assets, reference shall be made to all items of Profit, gain, Loss, and deduction accountable up to such time.

In the event the Gross Asset Values of Partnership assets are adjusted pursuant to this Agreement, the Capital Accounts of all Partners will be adjusted simultaneously to reflect the aggregate net adjustment as if the Partnership recognized Profit or Loss equal to the amount of such aggregate net adjustment.

In determining the amount of any liability for purposes of computing capital accounts the provisions of Section 752 of the Code, and Treasury Regulations thereunder, shall be taken into account.

The foregoing provisions, and the other provisions of this Agreement relating to the maintenance of Capital Accounts, are intended to comply with Treasury Regulation Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such regulations. In the event that the General Partner determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such regulations, the General Partner may make such modification provided that it meets the requirements of Article 14 hereof. The General Partner will adjust the amounts debited or credited to Capital Accounts with respect to (a) any property contributed to the Partnership or distributed to the General Partner and the Limited Partner, and (b) any liabilities that are secured by such contributed or distributed property or that are assumed by the Partnership or the General Partner and Limited Partner in the event that the General Partner determines such adjustments are necessary or appropriate pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv). The General Partner will also make any appropriate modification consistent with this Agreement in the event unanticipated events which might otherwise cause this Agreement not to comply with Treasury Regulation Section 1.704-1(b).

"Capital Contribution" means, with respect to any Partner, the amount of money contributed to the Partnership by such Partner pursuant to this Agreement and the initial Gross Asset Value of any property or assets other than money contributed to the Partnership in respect of such Partner's interest in the Partnership. The principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the Partnership by the maker of the note shall not be a Capital Contribution (and therefore, not included in the Capital Account of any Partner) until the Partnership makes a taxable disposition of the note or until, and to the extent, principal payments are made on the note all in accordance with Treasury Regulation Section 1.704(b)(2)(iv)(d)(2). The initial Capital Contribution of the Partners to the Partnership is deemed to be the Property.

"Certificate" means the Certificate of Limited Partnership for the Partnership filed with the Secretary of State of the State of Delaware on the date set forth in Schedule A, as the same, from time to time, may be amended, restated or otherwise modified and any and all amendments thereto and restatements thereof filed or to be filed on behalf of the Partnership with the office of the Secretary of State of the State of Delaware pursuant to the Act.

"Code" means the Internal Revenue Code of 1986, as amended and hereafter amended, and all regulations and rulings promulgated thereunder.

5

"Contribution Agreement" means that certain Contribution Agreement, dated as of the date of the Loan Agreement, by and among each Borrower and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Contribution Obligations" means the obligation of a Partner to make Capital Contributions to the Partnership and interest, costs and attorneys' fees pursuant to Article 4 hereof.

"Debt" means the outstanding principal balance of the Loan set forth in, and evidenced by, the Loan Agreement and the Note, together with all interest accrued and unpaid thereon and all other sums (including any prepayment premium and/or spread maintenance premium, if applicable) due to Lender in respect of the Loan under the Loan Agreement and the other Loan Documents.

"Delaware LLC Act" means Delaware Limited Liability Company Act (6 Del. C. §18-101 et seq.), as amended from time to time.

"Depreciation" means, for each fiscal year or other period, an amount equal to depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for Federal income tax purposes at the beginning of such year or other period, depreciation will be an amount which bears the same ratio to such beginning Gross Asset Value as the Federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis, provided that if the Federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partner.

"Entity" means any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization.

"First Mezzanine Loan Documents" has the meaning set forth in the Loan Agreement.

"GAAP" means generally accepted accounting principles, consistently applied, in the United States of America as of the date of the applicable financial report.

"General Partner" means the Person named as General Partner on page 1 of this Agreement, for as long as it is a general partner of the Partnership, or that Person or those Persons succeeding to its interest as General Partner in accordance with the provisions of this Agreement.

"General Partner Unit" is the basic unit of division of the interests of the General Partner in the Partnership. Each General Partner Unit represents one percent (1.00%) of the total aggregate interest in the Partnership of the General Partner and the Limited Partner.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for Federal income tax purposes, except as follows:

      (a)    The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the contributing Partner and the Partnership;

      (b)    The Gross Asset Value of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partner, as of the following times:

            (A)    The acquisition of an additional interest in the Partnership (other than pursuant to Section 2.1) or

by any new or existing Partner in exchange for more than a de minimis Capital Contribution;

(B) The distribution by the Partnership to a Partner of more than a de minimis amount of Partnership property or assets other than money;

(C) The termination of the Partnership for Federal income tax purposes pursuant to Code Section 708(b)(1)(B); and

(D) The liquidation of the Partnership within the meaning of Treasury Regulation Section 1.704(b)(2)(ii)(g).

(c) If the Gross Asset Value of an asset has been determined or adjusted pursuant to this Section, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such assets for purposes of computing Profit and Loss.

"Gross Receipts" means all revenues received by the Partnership from operations of the Property and other property owned by the Partnership, including gross rental receipts and all other gross income of the Partnership from any source, before deduction or expenditure for any purpose. The term "Gross Receipts" will not include proceeds of any Capital Contribution made by any Partner, any tenant security deposits, or any distributions or payments from reserve accounts or escrow accounts.

"Indebtedness" means, on a particular date, the sum (without duplication) at such date of (a) all indebtedness or liability of the Partnership (including, without limitation, amounts for borrowed money and indebtedness in the form of mezzanine debt and preferred equity); (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations for which the Partnership is liable); (d) obligations under reimbursement agreements in connection with letters of credit; (e) obligations under acceptance facilities; (f) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person or entity, or otherwise to assure a creditor against loss; and (g) obligations secured by any Liens, whether or not the obligations have been assumed.

"Independent Manager" means a natural person selected by the member of the General Partner who is reasonably satisfactory to Lender and who is not at the time of his or her initial appointment, or at any time while serving as a manager, and has not been at any time during the preceding five (5) years: (a) a stockholder, director or manager (with the exception of serving as an independent director or independent manager of any Borrower or the general partner or managing member of any Borrower), officer, employee, partner, member, attorney or counsel of any Borrower, the general partner of a Borrower or any Affiliate of any of them; (b) a customer, supplier or other Person who derives any of its purchases or revenues from its activities with any Borrower, the general partner of a Borrower or any Affiliate of any of them; (c) a Person controlling, controlled by or under common control with any such stockholder, director, officer, employee, partner, member, manager, customer, supplier or other Person; or (d) a member of the immediate family of any such stockholder, director, officer, employee, partner, member, manager, customer, supplier or other Person. A natural person who satisfies the foregoing definition other than clause (b) shall not be disqualified from serving as Independent Manager of the General Partner if such individual is an Independent Manager provided by a nationally recognized company that provides professional independent directors and managers and such company also provides other

7

corporate services in the ordinary course of its business. A natural person who otherwise satisfies the foregoing definition except for being the independent director or independent manager of a "special purpose entity" affiliated with any Borrower or the General Partner shall not be disqualified from serving as an Independent Manager of the General Partner if such special purpose entity does not own a direct or indirect interest in any Borrower (except for serving as general partner of any Borrower or a managing member of any Borrower that is not a single member limited liability company) or the General Partner and such person is an independent director or independent manager provided by a nationally-recognized company that provides professional independent directors or managers in the ordinary course of its business. As used in this definition, the term "<u>control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise. For purposes of this paragraph, a "<u>special purpose entity</u>" is an entity whose organizational documents (i) contain restrictions on its activities and impose requirements intended to preserve such entity's separateness that are substantially similar to those set forth in Article VI of the Loan Agreement and (ii) provide, inter alia, that such entity (A) is organized for the limited purpose of owning and operating one or more properties or of being the general partner, member or manager of a special purpose entity organized for the limited purpose of owning and operating one or more properties (i.e., of an "SPE Owner"), (B) has restrictions on its ability to incur indebtedness, dissolve, liquidate, consolidate, merge and/or sell assets, (C) may not file voluntarily a bankruptcy petition either on its own behalf or, if it is a general partner, member or manager of an SPE Owner, on behalf of such SPE Owner, without the consent of an independent director or independent manager, and (D) shall conduct itself and, if it is a general partner, member or manager of an SPE Owner, cause the SPE Owner to conduct itself, in accordance with certain "separateness covenants", including, but not limited to, the maintenance of its (and the SPE Owner's) books, records, bank accounts and assets separate from those of any other Person.

"<u>Lender</u>" means Wachovia Bank, National Association, in its capacity as holder of the Loan, together with its successors and assigns.

"<u>Lien</u>" means any mortgage, deed of trust, deed to secure debt, lien, pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest or any other encumbrance, charge or transfer of, or any agreement to enter into or create, any of the foregoing, on or affecting the Partnership or the Property or any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"<u>Limited Partner</u>" means the Person named as Limited Partner on page 1 of this Agreement, for as long as it is a limited partner of the Partnership, or that Person or those Persons succeeding to its interest as Limited Partner in accordance with the provisions of this Agreement.

"<u>Limited Partner Unit</u>" is the basic unit of division of the interests of the Limited Partner in the Partnership. Each Limited Partner Unit represents one percent (1.00%) of the total aggregate interest in the Partnership of the General Partner and the Limited Partner.

"<u>Liquidating Trustee</u>" shall have the meaning given to such term in <u>Section 12.3</u> of this Agreement.

"<u>Loan</u>" means the loan in the original principal amount set forth on <u>Schedule A</u> made by Lender to Borrowers pursuant to the Loan Agreement.

"<u>Loan Agreement</u>" means the Loan Agreement between Lender, the Partnership and the other Borrower, as borrowers, dated on or about the date hereof.

"<u>Loan Documents</u>" has the meaning set forth in the Loan Agreement.

"<u>Mezzanine Borrower</u>" shall have the meaning given to such term in Section 18.8 of this Agreement.

8

"Mezzanine Lender" shall have the meaning given to such term in Section 18.8 of this Agreement.

"Mezzanine Pledge Agreement" shall have the meaning given to such term in Section 18.8 of this Agreement.

"Net Asset Value of the Partnership" means the fair market value of the Property as of such date together with any other real estate owned by the Partnership, to be determined by a Qualified Appraiser as hereinafter described, plus the current value of any cash or other assets held by the Partnership, minus the aggregate amount of outstanding Partnership liabilities, if any. The fair market value of the Property and any other real estate owned by the Partnership will be determined by an independent Qualified Appraiser selected by the new general partner and the General Partner in the following manner. The General Partner and the new general partner will each choose a Qualified Appraiser. The two appraisers so chosen shall thereafter meet promptly to choose a third Qualified Appraiser who shall determine the fair market value of the Property and such other real estate, if any.

"Net Operating Income" means the annualized income from operations determined in accordance with GAAP, before interest, income taxes, depreciation and amortization (EBITDA) of the Partnership or any other entity. Gains from the sale of assets and other extraordinary items shall be excluded for purposes of computing Net Operating Income.

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b) of the Regulations. The amount of Nonrecourse Deductions for a Partnership fiscal year equals the excess, if any, of the net increase, if any, in the amount of Partnership Minimum Gain during that fiscal year over the aggregate amount of any distributions during that fiscal year of proceeds of a Nonrecourse Liability that are allocable to an increase in Partnership Minimum Gain, determined according to the provisions of Section 1.704-2(c) of the Treasury Regulations.

"Nonrecourse Liability" has the meaning set forth in Section 1.752-1(a)(2) of the Treasury Regulations.

"Note" means that certain Promissory Note, dated the date of the Loan Agreement, made by Borrowers in favor of Lender in the principal amount of the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Obligations" means, collectively, the indebtedness, liabilities and obligations of the Partnership under or in connection with this Agreement, the Loan Documents, the other Basic Documents or any related document in effect as of any date of determination.

"Operating Lessee" means a special purpose entity intended to qualify as a "taxable REIT subsidiary" under the Code, together with its successors and permitted assigns.

"Partner Minimum Gain" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i) of the Treasury Regulations.

"Partner Nonrecourse Debt" has the meaning set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"Partner Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(i)(2) of the Treasury Regulations. The amount of Partner Nonrecourse Deductions with respect to a Partner's Nonrecourse Debt for a Partnership fiscal year equals the excess, if any, of the net increase, if any, in the amount of Partner Minimum Gain attributable to such Partner Nonrecourse Debt during that fiscal year over the aggregate amount of any distributions during that fiscal year to the Partner that bears the economic risk of loss for such Partner Nonrecourse Debt to the extent such distributions are from the proceeds of such Partner Nonrecourse Debt and are allocable to an increase in Partner Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(2) of the Treasury Regulations.

9

"Partners" means the General Partner and the Limited Partner, collectively. Reference to a Partner means any one of the General Partner or the Limited Partners.

"Partnership" means the limited partnership formed under this Agreement.

"Partnership Minimum Gain" has the meaning set forth in, and shall be computed in accordance with, Treasury Regulation Section 1.704-2(d).

"Person" means an individual, or a corporation, limited liability company, partnership (whether general or limited), joint venture, trust (including a business trust or real estate investment trust), unincorporated organization, joint stock company, association, or other Entity, or any government, or any agency or subdivision thereof.

"Profits and Losses" means, for each fiscal year or other period, an amount equal to the Partnership's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Partnership that is exempt from Federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(b)     Any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(1), and not otherwise taken into account in computing Profits or Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

(c)     In the event the Gross Asset Value of any Partnership asset is adjusted pursuant to this Agreement, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d)     Gain or loss resulting from any disposition of Partnership Property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(e)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period, computed in accordance with this Agreement; and

(f)     Notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to this Agreement shall not be taken into account in computing Profits or Losses.

"Property" means the hotel property located at the address listed on Schedule B attached hereto, together with all improvements thereon. The Property is deemed to have been transferred to the Partnership by the General Partner and the Initial Limited Partner in exchange for Units in the Partnership.

10

"Qualified Appraiser" means an appraiser who is a member of the American Institute of Real Estate Appraisers or a senior real property appraiser in the Society of Real Estate Appraisers, actively engaged for at least the preceding five (5) year period, in the business of preparing appraisals for property similar to and in the same market areas as the Property.

"Rating Agency" means prior to the final securitization of the Loan, each of Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Moody's Investors Service, Inc. and Fitch, Inc., or any other nationally-recognized statistical rating agency which has been designated by Lender and, after the final securitization of the Loan, shall mean any of the foregoing that have rated any of the Securities.

"Rating Agency Confirmation" means a written affirmation from each of the Rating Agencies that the credit rating of the Securities by such Rating Agency immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion.

"Regulations or Treasury Regulations" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Reserves" means all reserves required to be established by this Agreement or any mortgagee and all other reasonable Partnership reserves established by the General Partner, in its sole discretion, for Partnership purposes, including, but not limited to, accrued or deferred expenses and other working capital needs, improvements, contingent liabilities, and taxes.

"Schedule of Partners" means the record of Partners created and maintained pursuant to the Act and Section 6.1 hereof. The current Schedule of Partners is attached as Schedule C.

"Securities" shall mean any certificates, notes or other securities issued in connection with the securitization of the Loan or any portion thereof in a single asset securitization or a pooled loan securitization.

"Sharing Ratio" means a Partner's basic sharing percentage in the Partnership. The Sharing Ratio applicable to the Limited Partner is 99.00%. The Sharing Ratio applicable to the General Partner is 1.00%.

"Special Purpose Provisions" has the meaning given in Section 20.1(e) of this Agreement.

"Springing Member" has the meaning set forth in the limited liability company agreement of the General Partner.

"State" means the state where the Property is located.

"Substitute General Partner" has the meaning set forth in Section 11.1.2.

"Substitute Limited Partner" means a Person who has acquired a Unit from the Limited Partner and who has been substituted for such Limited Partner as a limited partner in accordance with this Agreement.

"Tax Matters Partner" means the General Partner who is designated as such pursuant to Code Section 6231(a)(7)A.

"Transfer" means, as a noun, any voluntary or involuntary transfer, sale, pledge, hypothecation, or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, pledge, hypothecate, or otherwise dispose of.

"Unit" means an interest of a Partner in the Partnership regardless of class. The General Partner's and the Initial Limited Partner's Units in the Partnership were transferred to the General Partner and the Initial

Limited Partner in consideration of the General Partner and the Initial Limited Partner transferring the Property to the Partnership.

"Withdrawing General Partner" has the meaning set forth in Section 11.1.1.

**ARTICLE IV**

**CONTRIBUTIONS TO CAPITAL**

Section 4.1      Capital Contributions of the Partners. As of the date hereof, the Partners are deemed to have contributed to the Partnership property of an agreed value as listed in the books and records of the Partnership.

4.1.1    The General Partner does not have the right to withdraw or reduce its Capital Contribution except as provided in this Agreement or by law. The General Partner has no right to demand or receive property other than cash in return for its Capital Contribution nor will it have the right to a partition of Partnership property. No interest will be paid to the General Partner on the amount of its Capital Contribution or Capital Account.

4.1.2    Immediately prior to dissolution or following an earlier liquidation of the Partnership or its interest in the Partnership (by the end of the fiscal year of liquidation, or if later, within ninety (90) days after the date of such liquidation) as defined in Section 1.704-1(b)(2)(ii)(b)(3) of the Treasury Regulations, after giving effect to the allocations of Profit and Loss and other items of income, gain, expense and loss under Article 16 hereof and the adjustments provided with respect to Gross Asset Value herein, the General Partner shall be obliged to contribute cash to the Partnership in the amount of any deficit balance in its Capital Account.

4.1.3    In the event that a distribution is to be made to a General Partner pursuant to Section 17.1, the Partnership shall not make the actual distribution until it is determined whether, and to what extent, such distribution, after making tentative allocations of Profit and Loss and items thereof pursuant to Section 16.1 as if the General Partner did not have an obligation to restore a negative Capital Account pursuant to this Section, would create or increase a deficit in such Partner's Adjusted Capital Account. If a deficit would exist such that at some time in the future a Contribution Obligation would likely arise pursuant to the second paragraph of this Section, the Partnership shall withhold so much of the distribution as would create the deficit, and for all purposes of this Agreement, the amount withheld shall be deemed to have been distributed to such General Partner and recontributed pursuant to this Section.

Section 4.2      No Interest. No interest shall be paid by the Partnership on any Capital Contribution of any Partner. Loans to the Partnership by any Partner will not be considered Capital Contributions. No Partner will be liable for the return of the Capital Contributions of any other Partner or the payment of interest thereon.

Section 4.3      No Securities Act Registration. The Partnership records, and the records of its transfer agent, if any, shall be noted to reflect that the Units are not registered under the

12

Securities Act of 1933, and that any transfer of such Units must comply with the Securities Act of 1933 and applicable state securities laws or applicable exemptions contained therein. The Partnership is under no obligation to register the Units for sale under the Securities Act of 1933 or any state securities law.

Section 4.4    Financial Authorization.    Each Partner hereby authorizes any lending institution or other party which may become the assignee of the rights and benefits of the Partnership hereunder (in connection with an extension of credit by such lending institution in a transaction related to the Partnership) to obtain such information as it may require concerning such Partner's financial condition and hereby further authorizes its credit association or bank or the Partnership to deliver any of said information to such lending institution upon request by such lending institution.

## ARTICLE V.

## THE GENERAL PARTNER

Section 5.1    General Partner Loans.    Except to the extent such loans would be in violation of this Agreement or the Loan Documents, the General Partner or any Affiliate thereof may, but will have no obligation to, loan any monies to the Partnership which are necessary for maintaining and protecting the assets of the Partnership or conducting its business. Notwithstanding anything to the contrary herein, until such time as the Debt is paid in full or otherwise satisfied, neither the General Partner nor any Affiliate thereof shall make any loan to the Partnership.

Any loan made by the General Partner (or any Affiliate thereof) to the Partnership pursuant to this paragraph will be repaid with interest at the rate of two percent (2%) above the prevailing prime rate of SouthTrust Bank, N.A., Atlanta, Georgia (determined at the date that such loans are made, but in no event will the rate exceed the maximum rate permitted by law) on ninety (90) day term loans in the amount of One Hundred Thousand Dollars ($100,000) to its best commercial customers. Any such loans shall be repaid at such time or times as sufficient cash is available to the Partnership to permit such repayment without impairing the solvency of the Partnership; except that any unpaid loan and accrued interest thereon will immediately become due and payable upon the dissolution and liquidation of the Partnership. Any and all such loans from time to time made by or on behalf of the General Partner (or any Affiliate thereof) to the Partnership shall be and are hereby fully subordinated to the complete payment and performance of any and all mortgage indebtedness of the Partnership from time to time outstanding.

Section 5.2    General Partner as Special Purpose Entity.    So long as the Loan Documents encumber the Property, the General Partner shall remain, and any Substitute General Partner shall be and shall remain, a Delaware limited liability company with organizational documents that are substantially similar to the organizational documents of the General Partner as of the origination date of the Loan or with any changes thereto approved by the Lender and which owns at least a 0.5% interest in the Partnership as the General Partner. As long as any Obligation is outstanding under the Loan Documents, the Partnership shall not have any general partners that are not special purpose entities.

13

## ARTICLE VI

## THE LIMITED PARTNER

Section 6.1    Status of Limited Partner/Schedule of Partners.  The Partnership shall maintain a record of all Partners of the Partnership which readily shows, in alphabetical order or by alphabetical index, the names of the Partners, their class of partnership interest (i.e. general or limited), with the last known address or addresses of each Partner, the number and class of Units held by each Partner and their Sharing Ratio.  The current Schedule of Partners is attached hereto as Schedule C.

Section 6.2    Limited Liability of Limited Partner.  Except as otherwise provided in the Act, the Limited Partner will not be personally liable for the expenses, liabilities, or obligations of the Partnership beyond the amount of its required Capital Contribution to the extent not paid, and its share of undistributed profits of the Partnership, if any.

Section 6.3    Assessability of Limited Partner's Interest.  The Limited Partner's Units are fully paid and nonassessable.

Section 6.4    No Control of Management.  Except as provided in this Agreement, the Limited Partner has no right or authority to act for or bind the Partnership.  The Limited Partner will not in any way be prohibited from or restricted in engaging or owning an interest in any other business venture of any nature, and the Partnership may engage the Limited Partner or persons or firms associated with the Limited Partner for specific purposes and may otherwise deal with the Limited Partner on terms and for compensation to be agreed upon by the Limited Partner and the General Partner; provided, however, that the Limited Partner will not be entitled to participate in the management or control of the business of the Partnership (it being understood that the exercise of voting or consensual rights contained in this Agreement shall not constitute participation in the management or control of the business).

Section 6.5    No Withdrawal of Contributions.  The Limited Partner will not have the right to withdraw or reduce its Capital Contribution except as provided by law or this Agreement. The Limited Partner will not have the right to demand or receive property other than cash in return for its Capital Contribution.  Any withdrawal or reduction of Partnership capital will be made in accordance with this Agreement.

Section 6.6    No Right to Partition.  The Limited Partner will not have the right to require the partition of Partnership property or compel any sale or appraisement of Partnership assets or sale of a deceased Partner's interests therein, except as provided in this Agreement, notwithstanding any provision of law to the contrary.

Section 6.7    The Limited Partner's Individual Rights.  The Limited Partner shall be entitled:

6.7.1    to all rights and powers of the Limited Partner as set forth elsewhere in this Agreement;

6.7.2    subject to Section 10.3, to be indemnified with respect to payments made and personal liabilities reasonably incurred by it for the preservation of the Partnership business or property;

14

6.7.3    to cast one vote for each Unit held by it on all matters with respect to which the Limited Partner is given the right to vote pursuant to this Agreement; and

6.7.4    to have a copy of the Schedule of Partners mailed to it upon payment of such reasonable cost as the General Partner determines proper.

Upon admission to the Partnership as a Substitute Limited Partner, the legal representative of any deceased Limited Partner or any Limited Partner under legal disability shall have all the rights of a Limited Partner.

Section 6.8    Additional Rights of Limited Partner.  The Limited Partner may without the vote, consent, or concurrence of the General Partner:

6.8.1    So long as no obligations remain outstanding under the Loan Documents, consent to, approve or disapprove the sale, exchange or other disposition of all, or substantially all, of the Partnership's assets (other than in the ordinary course of the Partnership's business) which is to occur as part of a single transaction or plan.  For purposes of this paragraph, assets shall be deemed to be less than substantially all if the value of the assets does not exceed two thirds (2/3rds) of the value of all assets of the Partnership and the revenues represented or produced by such assets do not exceed two thirds (2/3rds) of the total revenues of the Partnership;

6.8.2    remove the General Partner as provided in Section 11.2;

6.8.3    subject to Section 11.1.6, when required or permitted under this Agreement, elect a Substitute General Partner.

Section 6.9    Bankruptcy Action, Dissolution or other Cessation of Limited Partner.  The Bankruptcy Action, death, disability or declaration of incompetence of a Limited Partner shall not, in and of itself, dissolve the Partnership, but the rights of a Limited Partner to share in the Profits and Losses of the Partnership and to receive distributions of Partnership funds shall, on the happening of such an event, devolve upon the Limited Partner's personal representative (as defined in the Act), subject to this Agreement, and the Partnership shall continue as a limited partnership. The Limited Partner's personal representative shall be liable for all of the obligations of the Limited Partner.  However, such personal representative shall not have the right to become a Substitute Limited Partner in the place of its predecessor in interest unless the conditions of this Article 6 and Article 18 (other than the requirements that the Assignor execute and acknowledge instruments) are first satisfied.

Section 6.10    Continuation of Partnership Notwithstanding Loss of Limited Partners.  Upon the occurrence of any event that would result in there being no limited partner in the Partnership, the Partnership shall not dissolve and the general partners or the personal representative of the last remaining limited partner is hereby authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such limited partner in the Partnership, agree in writing (i) to continue the Partnership, and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a Substitute Limited Partner of the Partnership, effective as of the occurrence of the event that terminated the continued membership of the last remaining limited partner of the Partnership in the

15

Partnership. Notwithstanding anything to the contrary in this Agreement, no Limited Partner shall be entitled to withdraw from the Partnership.

Section 6.11   Duty to Account for Profits.   The Limited Partner shall account to the Partnership for any benefit and shall hold as trustee for the Partnership any profit derived by it without the consent of the General Partner from any transaction connected with the formation, conduct or liquidation of the Partnership or from any use of the Partnership property.

Section 6.12   Miscellaneous Obligations.   Upon request of the General Partner the Limited Partner shall provide the Partnership with the following information, which the Tax Matters Partner is specifically authorized to provide to the Internal Revenue Service in the event of an audit: current name, address and taxpayer identification number or social security number.

Section 6.13   LP Certificates.

6.13.1  The Partnership shall issue limited partnership certificates in the form of Exhibit 1 attached hereto (the "LP Certificate") in the name of the General Partner and the Limited Partner, as applicable, certifying that the General Partner and the Limited Partners, as applicable, are the record holders of the interests of the Partnership set forth on the Schedule of Partners.  For purposes of this Agreement, the term "record holder" shall mean the Person whose name appears on the books and records of the Partnership as the Partner owning the limited partnership interests at issue.

6.13.2  The Partnership shall maintain books for the purpose of registering the Transfer of limited partnership interests in the Partnership.  A limited partnership interest in the Partnership which is Transferred in accordance with the terms of this Agreement shall be transferable on the books of the Partnership by the record holder thereof in person or by such record holder's duly authorized attorney, but, except as provided in Section 6.13.3 hereof with respect to lost, stolen or destroyed LP Certificates, no Transfer of a limited partnership interest in the Partnership shall be entered until the previously issued LP Certificate representing such interest shall have been endorsed and surrendered to the Partnership and canceled and a replacement LP Certificate issued to the assignee of such interest in accordance with such procedures as the Partnership may establish.  Subject to Article 18, in the event of a Transfer of less than all of a Partner's limited partnership interests in the Partnership, the Partnership shall issue to the transferring Partner a new LP Certificate representing the limited partnership interests in the Partnership not being Transferred.  Except as otherwise required by law, the Partnership shall be entitled to treat the record holder of an LP Certificate on its books as the owner of the interests represented thereby for all purposes regardless of any notice or knowledge to the contrary.

6.13.3  Subject to Article 18, the Partnership shall issue a new LP Certificate in place of any LP Certificate previously issued if the record holder of the LP Certificate:

(a)     makes proof by affidavit, in form and substance satisfactory to the Partnership, that a previously issued LP Certificate has been lost, destroyed or stolen;

16

(b)     requests the issuance of a new LP Certificate before the Partnership has notice that the LP Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

(c)     indemnifies the Partnership against any claim that may be made on account of the alleged loss, destruction or theft of the LP Certificate; and

(d)     satisfies any other reasonable requirements imposed by the Partnership.

6.13.4  If a Partner fails to notify the Partnership within a reasonable time after it has notice of the loss, destruction or theft of an LP Certificate, and a Transfer of the limited partnership interests in the Partnership represented by the LP Certificate is registered before receiving such notification, the Partnership shall have no liability with respect to any claim against the Partnership for such Transfer or for a new LP Certificate.

Each limited partnership interest in the Partnership shall constitute and shall remain a "security" within the meaning of, and governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware (the "UCC"), and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995. Notwithstanding any provision of this Agreement to the contrary, to the extent that any provision of this Agreement is inconsistent with any non-waivable provision of Article 8 of the UCC, such provision of Article 8 of the UCC shall control.

## ARTICLE VII

## RIGHTS AND POWERS OF THE GENERAL PARTNER

Section 7.1     Management of the Partnership.

7.1.1  Except as otherwise required by law and subject to Article 20, all powers of management of the Partnership will be vested in the General Partner. The General Partner will have exclusive responsibility for the management of the Partnership business with all rights and powers generally conferred by law or necessary, advisable or consistent in connection therewith.

7.1.2  The General Partner shall devote such time to the Partnership as is necessary to adequately manage and supervise the Partnership business.

7.1.3  No person dealing with the General Partner shall be required to determine its authority to make any commitment or undertaking on behalf of the Partnership, nor to determine any fact or circumstance bearing upon the existence of its authority. No purchaser of any property or interest owned by the Partnership shall be required to determine the right to sell and the authority of the General Partner or its designee to sign and deliver on behalf of the Partnership any such instrument of transfer, or to see to the application or distribution of revenues or proceeds paid or credited in connection

therewith. Instruments conveying an interest in the Property when signed on behalf of the Partnership by the General Partner shall be binding on the Partnership and may be presumed by third parties to be authorized.

Section 7.2    Rights and Powers of General Partner.  In addition to any other rights and powers which it may possess, and except as otherwise limited by this Agreement, but subject to restrictions contained in Section 7.3 and Article 20, the General Partner, acting pursuant to Section 7.1, shall have all rights and powers required by or appropriate to its management of the Partnership business which, by way of illustration and not by way of limitation, include the right and power to:

7.2.1    manage, develop, improve, maintain and service Partnership property; to carry out any of the purposes of the Partnership;

7.2.2    borrow money, and if security is required therefor, to mortgage, subject to any other security device, all or any portion of the property of the Partnership (including specifically the authority to borrow the Loan and to enter into the Loan Documents on behalf of the Partnership as well as all other agreements, instruments, certificates and authorizations related thereto or contemplated thereby, and without further act, vote or approval of any Person) to obtain replacements of any mortgage or other security device, and to repay, in whole or in part, refinance, increase, modify, and consolidate such indebtedness as determined in its discretion to be in the best interest of the Partnership;

7.2.3    enter into contracts of liability and other insurance necessary and proper for the protection of the Partnership and the conservation of its assets;

7.2.4    place record title to, or the right to use, Partnership assets in the name or names of a nominee or nominees for any purpose convenient or beneficial to the Partnership;

7.2.5    subject to Section 10.1, to acquire and to enter into any contract of liability and other insurance which the General Partner deems necessary and proper for the protection of the Partners and Partnership for the conservation of its assets or for any purpose convenient or beneficial to the Partnership;

7.2.6    employ from time to time persons, firms or corporations for the operation and management of the Partnership business, including, but not limited to, attorneys, accountants, advisors, supervisory and managing agents, property managers and personnel, building managing agents, construction or maintenance and repair contractors, architects, land planners, financial consultants, engineers, insurance brokers, real estate brokers and loan brokers on such terms and for such compensation as the General Partner may determine. The General Partner is hereby specifically authorized in its sole and absolute discretion to employ any of its Affiliates, as provided in, and subject to, the provisions of Section 7.3 and Articles 8 and 10 of this Agreement.  Compensation connected with such employment will be an expense of the Partnership;

7.2.7    pay and be reimbursed by the Partnership, to the extent described in the Memorandum, for expenses and fees incurred and services performed by the General Partner and its Affiliates in connection with the acquisition, construction and equipping of the Property, the organization, formation and operation of the Partnership, the

18

management and operation of the Property, the admission and substitution of limited partners, and the preparation and filing of this Agreement and amendments of this Agreement;

7.2.8    compromise, arbitrate or otherwise adjust claims in favor of or against the Partnership and to commence or defend litigation with respect to the Partnership or any assets of the Partnership as the General Partner may deem advisable, all or any of the above matters being at the expense of the Partnership;

7.2.9    make (or not make) elections under the tax laws of the United States or any state as to the treatment of Partnership income, gain, loss, deduction, and credit and as to all other relevant matters including making (and if made, revoking with the approval of the Internal Revenue Service) the election referred to in Section 754 of the Code and any similar provision, or provision enacted in lieu thereof.  The Tax Matters Partner is designated as the Designated Organizer under the Code. The Tax Matters Partner shall:

  (a)    receive notice of the beginning of administrative proceedings by the Internal Revenue Service at the Partnership level;

  (b)    receive notice of the final partnership administrative adjustment resulting from any Internal Revenue Service administrative proceedings;

  (c)    keep all Partners informed of all administrative and judicial proceedings as to proposed adjustments at the Partnership level;

  (d)    have authority to enter into a settlement agreement with the Internal Revenue Service with respect to a determination of Partnership tax items which will bind other Partners who have not received notice of the proceedings from the Internal Revenue Service and who have not filed a statement with the Secretary of Treasury providing that the Tax Matters Partner will not have authority to bind the Partner, which settlement may be on such terms as the Tax Matters Partner will determine in its sole discretion to be in the best interests of the Partners as a class;

  (e)    have authority to commence judicial action for readjustment of Partnership items included in a notice of final partnership administrative adjustment, with the appropriate court and the Partnership items to be contested selected at the sole discretion of the Tax Matters Partner, or to elect not to commence such action at its sole discretion; provided, that without the consent of the Limited Partner no action shall be commenced by the Tax Matters Partner with respect to the litigation of any amount due except in the Tax Court; further provided that in the event the Tax Matters Partner determines not to file a petition for readjustment within the period allowed it shall notify the Limited Partner in writing of this decision and the alternatives available to it;

  (f)    have authority in its sole discretion to intervene on behalf of the Partnership in any judicial action commenced by any other Partner as to Partnership tax matters;

(g) have authority in its sole discretion to file a request with the Internal Revenue Service for an administrative adjustment, as a substituted Partnership return, or otherwise, and to request judicial review on behalf of the Partnership as to any part of a request for administrative adjustment not allowed by the Internal Revenue Service;

(h) have authority in its sole discretion to enter into an agreement with respect to all Partners to extend the period for assessing any tax which is attributable to any Partnership item (and no other person will be authorized to enter into such an agreement);

(i) upon receipt of a notice of the beginning of administrative proceedings from the Internal Revenue Service, furnish to the Internal Revenue Service the name, address, profit interest and taxpayer identification number of each Partner in the Partnership during the applicable Partnership tax year, and such revised or additional information as may be required by law;

(j) conform to any tax administrative requirements as may be placed on the Tax Matters Partner by Treasury Regulations adopted after the formation of the Partnership as to income tax or windfall profit tax; and

(k) register the Partnership, if such registration is necessary, as a tax shelter under Section 6111 of the Code; and

7.2.10  do all things and execute and deliver all documents necessary or proper or required to acquire, construct, equip and operate the Property and transact the Partnership's business.

Section 7.3    Restriction on Rights and Powers of General Partner.  Subject to the Special Purpose Provisions, the General Partner will have all the rights and powers and be subject to all the restrictions and liabilities of a partner in a partnership without limited partners, except that, notwithstanding anything in this Agreement or other document to the contrary (other than the Special Purpose Provisions):

7.3.1  Without the prior consent of the Limited Partner as provided in this Agreement, the General Partner has no authority to:

(a) do any act in contravention of this Agreement, as amended from time to time;

(b) do any act which would make it impossible to carry on the ordinary business of the Partnership, it being understood that the Limited Partner hereby agrees that a sale of the Partnership's property, including all or substantially all of the Partnership's property or interests therein, does not constitute an act which would make it impossible to carry on the ordinary business of the Partnership;

(c) confess a judgment against the Partnership;

20

(d)    reinvest proceeds received by the Partnership from the sale, lease (except in the ordinary course of business), or refinancing of any real property or other property of the Partnership in property which is not or will not be part of or enhance the Property; or

(e)    purchase or acquire for the Partnership any real property other than the Property.

7.3.2   Without the consent of the Limited Partner, as provided in this Agreement, the General Partner has no authority to:

(a)    refinance the Property for any purpose not in the ordinary course of the Partnership's business;

(b)    other than encumbering Partnership property to secure the Property pursuant to agreements to acquire, construct and equip the Property, pledge Partnership property, or assign the rights of the Partnership in specific Partnership property in any way except in the ordinary course of the Partnership's business;

(c)    admit a Person as a general partner except as provided in this Agreement;

(d)    admit a Person as a limited partner except as provided in this Agreement;

(e)    sell, exchange or convey all or substantially all the assets of the Partnership or grant options for the sale of such property. For purposes of this paragraph, assets shall be deemed to be less than substantially all if the value of the assets does not exceed two thirds (2/3rds) of the value of all assets of the Partnership and the revenues represented or produced by such assets do not exceed two thirds (2/3rds) of the total revenues of the Partnership;

(f)    merge or consolidate with any other entity; or

(g)    reinvest proceeds received by the Partnership from the sale, lease or refinancing of any real property or other property of the Partnership in property which is not or will not be part of or enhance the Property; provided, however, that the General Partner may invest Partnership funds as provided in Article 16 hereof.

Section 7.4   Term of Agreements made by General Partner. Agreements entered into by the Partnership, including, but not limited to, security agreements, mortgages and leases may extend for terms in excess of the term of the Partnership.

Section 7.5   General Partner as Limited Partner. The General Partner and its Affiliates may acquire Limited Partner Units. In the event a Person is both a general and limited partner the Schedule of Partners will separately designate its interests. Such a Person will have the rights and powers of a general partner and will be subject to the restrictions and liabilities of a general partner, and also, to the extent of his participation in the Partnership as a limited partner,

21

the rights and powers of a limited partner subject to the restrictions and liabilities, if any, of a limited partner under this Agreement.

Section 7.6  Partnership Management. The General Partner will be responsible for management of the Partnership business and will, itself or through a property manager designated by it pursuant to Section 8.2, establish and maintain accounting and record keeping systems, prepare financial reports, and oversee the preparation of Partnership tax returns.

## ARTICLE VIII.

## TRANSACTIONS WITH GENERAL PARTNER OR ITS AFFILIATES AND COMPETITION

Section 8.1  Restrictions on Conflict of Interest Transactions of General Partner.

8.1.1  Subject to Article 20, the Partnership may enter into transactions, contracts, agreements or arrangements with the General Partner or its Affiliates except in violation of this Agreement. Except as may otherwise be provided in this Agreement (including, without limitation, Article 20) or the Memorandum, the General Partner may contract on behalf of the Partnership with Persons affiliated with the General Partner or with the Partnership to provide services or materials for the Partnership, provided that the fees to be paid therefor and the terms and conditions thereof are not less favorable (considering all of the relevant factors) to the Partnership than those which could be reasonably obtained by the Partnership from unaffiliated third parties.

8.1.2  No loans may be made by the Partnership to the General Partner or any of its Affiliates, nor may the General Partner or any of its Affiliates utilize Partnership funds as compensating balances for their own benefits.

8.1.3  Neither the General Partner nor any of its Affiliates may receive from the Partnership a rebate or give-up or participate in any reciprocal business arrangements which would enable the General Partner or any of its Affiliates to do so.

8.1.4  The General Partner will not cause the Partnership to enter into any transactions with any other partnership or entity in which the General Partner or its Affiliates have an interest even if such other partnership or entity is not otherwise an Affiliate, if such transaction would be prohibited hereunder with an Affiliate, including, but not limited to, any transaction involving the sale, lease or purchase of any property to or from the Partnership, the rendering of services to or by the Partnership, or the lending of any monies or other property to or by the Partnership.

Section 8.2  Property Management. Subject to Article 20, the Partnership may enter into a property management agreement with an Affiliate of the General Partner which must meet the requirements of Section 8.1, for providing daily property management services for the Property pursuant to which it will be paid a property management fee. These services must include, but are not limited to, monitoring the operations of the Property, supervision of all matters related to rental procedures, periodical physical inspections of the Property, assistance in property tax appeals, and supervision of preparation of Partnership property tax returns and periodic reports on the Property.

Section 8.3  Competition by General Partner. The General Partner or its Affiliates, or any Person holding a legal or beneficial interest in the General Partner or in an entity which is an

22

Affiliate of the General Partner, may engage in or possess an interest in other business ventures of every nature and description, independently or with others, including, but not limited to, the ownership, financing, leasing, operation, management, syndication, insuring, brokerage and development of real property. Neither the Partnership nor the Partners will have any right by virtue of this Agreement in and to such independent ventures or to income or profits derived therefrom. Notwithstanding the foregoing, without the prior written consent of the Limited Partner, the General Partner shall not engage directly or indirectly, through Affiliates or otherwise, in the development, ownership, leasing or operation of another hotel facility within a three-mile radius of the Property during the term of this Agreement.

Section 8.4    Prohibition on Certain Fees. Neither the General Partner nor any of its Affiliates will receive: (a) any real estate or brokerage commission in connection with the sale, conveyance, or exchange of any property of the Partnership, real, personal or mixed in excess of two percent (2.00%) of the purchase price, or (b) any mortgage banking fee, origination fee, debt placement fee or compensation in connection with the refinancing of the Property or the Partnership in excess of one percent (1.00%) of the Loan amount.

## ARTICLE IX.

## BOOKS, RECORDS, ACCOUNTS, AND REPORTS

Section 9.1    Books, Records, Accounts, and Reports. At all times during the existence of the Partnership, the General Partner will keep, or cause to be kept, full and true books of accounts in accordance with generally accepted accounting principles. The books shall be maintained on an accrual basis. The books of the Partnership, together with a certified copy of the Agreement and the Certificate and any amendments thereto, will be maintained at the principal office of the Partnership. The Partnership shall from time to time appoint a certified public accountant or accounting firm as auditor.

Section 9.2    Financial Statements and Reports. On or before _____, 2006, and not less frequently than annually thereafter, compiled financial statements of the Partnership will be prepared by the Auditor and shall be accompanied by the Auditor's report. Such statements and reports will be distributed to the Limited Partner within ninety (90) days after the close of the fiscal year. During the year 2006 and thereafter, semi-annual narrative reports of the business of the Partnership will be prepared and distributed to the Limited Partner at the direction of the General Partner.

Section 9.3    Tax Returns and Governmental Filings. In addition to the financial statements and semi-annual report, the General Partner will cause federal, state and local income tax returns and reports for the Partnership to be prepared by the Auditor and filed with the appropriate authorities and the General Partner will also cause such reports as may be required by the Securities and Exchange Commission or other governmental authorities to be prepared, filed and distributed. Within seventy-five (75) days after the close of each fiscal year of the Partnership, the General Partner will furnish the Limited Partner with all information pertaining to the Partnership necessary for the preparation of the Limited Partner's Federal income tax returns.

Section 9.4    Capital Accounts. The Partnership will maintain Capital Accounts for each Partner. If any Person will at the same time be a general and limited partner, separate Capital

23

Accounts will be maintained with respect to such Person in his capacities as a general partner and limited partner.

Section 9.5      Costs of Preparation. The preparation of all Partnership books, records, accounts and reports will be at the expense of the Partnership.

Section 9.6      Fiscal Year. The Partnership fiscal year will be the calendar year, unless the General Partner elects another fiscal year and obtains the approval of the Internal Revenue Service.

Section 9.7      Bank Accounts. All funds of the Partnership are to be deposited in the Partnership name in such bank account or accounts as will be designated by the General Partner. To the extent practical, funds not immediately needed to meet operating expenses will be invested in interest bearing accounts or will be invested in short term United States Government or municipal obligations maturing within one (1) year. Withdrawals from any such bank account or accounts will be made upon such signature or signatures as the General Partner may designate.

Section 9.8      Maintenance of Specific Records. The General Partner will cause the Partnership, as part of the obligations hereunder, to maintain:

9.8.1      Schedule of Partners,

9.8.2      A copy of the Certificate, all certificates of amendment thereto, and all certificates of merger filed in mergers of which the Partnership is the surviving partnership, together with executed copies of any powers of attorney pursuant to which any certificate has been executed,

9.8.3      For at least each of the four most recent years, copies of all returns and reports described in Sections 9.1, 9.2, and 9.3 hereof, and

9.8.4      Copies of this Agreement, and any amendments thereto, and merger agreements in connection with mergers of which the Partnership was the surviving partnership.

## ARTICLE X.

## INDEMNIFICATION OF GENERAL PARTNER

Section 10.1      Standard of Conduct, Limitation of Liability and Indemnification of General Partner.

10.1.1   The General Partner shall discharge its duties as general partner pursuant to this Agreement:

        (a)      in a manner which it believes in good faith to be in the best interest of the Partnership; and

        (b)      with that level of care that does not constitute gross negligence by an ordinarily prudent person in the like position under similar circumstances.

10.1.2  In discharging its duties, the General Partner is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by:

> (a)  another general partner or one or more officers or employees of another general partner, whom the General Partner reasonably believes to be reliable and competent in the matters presented; and

> (b)  legal counsel, public accountants, investment bankers, or other persons as to matters the General Partner reasonably believes are within such Person's professional or expert competence.

In the instances described above, the General Partner is not entitled to rely if it has knowledge concerning the matter in question that makes reliance otherwise permitted by this Section unwarranted. However, the General Partner is not liable to the Partnership or its Partners for any action taken as the General Partner, or any failure to take any action, if it performs the duties of the General Partner as provided in this Agreement in compliance with this Section.

10.1.3  The General Partner shall not be liable to the Partnership or its Partners for monetary damages for breach of its duty of care or any other duty as the General Partner except as provided in this subsection 10.1.3.  The General Partner shall be liable for:

> (a)  any breach of the duty of care established in subsection 10.1.1, including gross negligence;

> (b)  any violation of subsection 10.1.1 hereof;

> (c)  acts or omissions which involve intentional misconduct or a knowing breach or violation of this Agreement or of law;

> (d)  the amount of any payment, or distribution to the General Partner or to any Affiliate of the General Partner for the amount of such distribution that exceeds the amount that was otherwise payable or distributable to such Person pursuant to this Agreement;

> (e)  any transaction from which the General Partner received an improper personal benefit; or

> (f)  liabilities arising under state or federal securities laws.

10.1.4  Subject to Section 10.3, the General Partner shall be indemnified and held harmless by the Partnership from and against any and all claims, demands, Liabilities, costs, Expenses, Proceedings and causes of action of any nature whatsoever, arising out of or incidental to the General Partner's management of the Partnership's affairs or because it is or was the General Partner provided that the General Partner acted in a manner it believed in good faith to be in, or not opposed to, the best interest of the Partnership and, in the case of any criminal Proceeding, it had no reasonable cause to believe its conduct was unlawful.

25

Notwithstanding the foregoing, the Partnership shall not indemnify the General Partner under this Section for any Liability incurred in connection with a Proceeding in which the General Partner is adjudged to be liable to the Partnership or the Limited Partner or is subjected to injunctive relief in favor of the Partnership or the Limited Partner. Furthermore, the General Partner shall not be indemnified for Liabilities arising under federal or state securities laws, unless (i) there has been a successful adjudication on the merits of each count involving a securities law violation; or (ii) such claims have been dismissed with prejudice on the merits by a court of competent jurisdiction. Nothing in this paragraph shall limit the right to advance of Expenses as stated herein.

The termination of a Proceeding by judgment, order, settlement or conviction, or upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the General Partner did not meet the standard of conduct set forth in this Section. However, in such an event indemnification permitted under this subsection in connection with any Proceeding by or in the right of the Partnership is limited to reasonable Expenses incurred in connection with the Proceeding.

Subject to Section 10.3, to the extent that the General Partner has been successful, on the merits or otherwise, in the defense of any Proceeding to which it was a Party, or in defense of any claim, issue or matter therein, because it is or was the General Partner of the Partnership, the Partnership shall indemnify the General Partner against reasonable Expenses incurred by it in connection therewith.

For purposes of this subsection 10.1.4 and subsection 10.1.5, the following words shall have the following meanings:

(a)     "Expenses" includes litigation costs and attorneys' fees, including costs of arbitration, trial and appeal.

(b)     "Liability" means the obligation to pay a judgment, settlement, penalty, fine, (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to such a Proceeding.

(c)     "Party" includes an individual who was, is, or is threatened to be made a named defendant or respondent in a Proceeding.

(d)     "Proceeding" means any threatened, pending or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal.

10.1.5   Subject to Section 10.3, the Partnership shall pay for or reimburse the reasonable Expenses incurred by the General Partner who is a Party to a Proceeding in advance of final disposition of the Proceeding if the General Partner furnishes the Partnership a written affirmation of its good faith belief that it has met the standard of conduct set forth in this Section and furnishes the Partnership a written undertaking, executed personally or on its behalf, to repay any advances if it is ultimately determined that it is not entitled to indemnification under this Section. The undertaking required by this subsection must be an unlimited general obligation of the General Partner, but the undertaking need not be

26

secured and may be accepted without reference to the financial ability to make repayment if the advance (i) is approved by the Limited Partner or (ii) is not in excess of Ten Thousand Dollars ($10,000) in the aggregate.

The General Partner of the Partnership who is a Party to a Proceeding may apply for indemnification or advances for Expenses to the court conducting the Proceeding or to another court of competent jurisdiction notwithstanding the limitation thereon provided by this Section. On receipt of an application for indemnification or advances for Expenses the court, after giving any notice the court considers necessary, may order, subject to Section 10.3, indemnification or advances for Expenses if it determines that:

(a)   The General Partner is entitled to mandatory indemnification under subsection 10.1.4 in which case the court shall also order the Partnership to pay the General Partner's reasonable Expenses incurred to obtain court ordered indemnification;

(b)   The General Partner is fairly and reasonably entitled to indemnification in view of all the relevant circumstances whether or not it met the standard of conduct set forth in subsection 10.1.1 or was adjudged liable as described in subsection 10.1.3; or

(c)   In the case of advances for Expenses, the General Partner is entitled, pursuant to this Agreement, to payment or reimbursement of its reasonable Expenses incurred as a Party to a Proceeding in advance of final disposition of the Proceeding.

10.1.6  The Partnership may purchase and maintain public liability and other insurance providing coverage for any individual or a corporation who is or was the General Partner, and who, while serving at the request of the Partnership as the General Partner, incurs Liability arising from its status as the General Partner whether or not the Partnership would have had the power to indemnify it against the same Liability under this Section.

Section 10.2   Satisfaction of Liabilities Against the Partnership.  The General Partner will satisfy any judgment, decree, decision or settlement arising out of a Partnership liability; first, out of insurance proceeds available therefor; next out of Partnership income or property; and finally, only if the General Partner is personally liable therefor, out of the separate income or property of the General Partner.

Section 10.3   Limitation on Indemnification.  Notwithstanding anything to the contrary contained in this Agreement, to the fullest extent provided by law, any indemnification set forth herein or in any other agreement between the Partnership and any other Person shall be fully subordinate to the Loan and shall not constitute a claim against the Partnership in the event that the Partnership's cash flow is insufficient to pay its Obligation under the Loan Documents.

## ARTICLE XI

## WITHDRAWAL, RESIGNATION, OR REMOVAL OF THE GENERAL PARTNER

Section 11.1   Voluntary Withdrawal of a General Partner.  The General Partner will not Transfer its Partnership interest, assign any interest in profits or other beneficial or economic

interest in its Partnership interest, or withdraw as General Partner except as provided in Section 11.4 of this Agreement unless all of the following conditions have been satisfied and unless all obligations set forth in Article 4 have been met:

11.1.1 the Limited Partner and the remaining general partners, if any, have been given not less than ninety (90) days written notice by the General Partner wishing to withdraw or Transfer its interest (the "Withdrawing General Partner") of its intent to withdraw or Transfer its interest as the case may be;

11.1.2 the Withdrawing General Partner has proposed a replacement general partner (the "Substitute General Partner") or otherwise has agreed to Transfer its interest to the remaining general partners, if any;

11.1.3 the Limited Partner consents to the transfer or withdrawal and to the admission of the Substitute General Partner, if applicable. The Limited Partner may, in the event the Withdrawing General Partner is then the sole general partner, continue the Partnership pursuant to Article 12 of this Agreement;

11.1.4 all general partners, if more than one, consent to the Transfer or withdrawal and to the admission of the Substitute General Partner;

11.1.5 the Partnership has received an opinion of counsel to the Withdrawing General Partner to the effect that such Transfer or withdrawal will not cause a termination of the Partnership under Section 708 of the Code, or cause the Partnership to be subject to taxation as an association taxable as a corporation; and

11.1.6 So long as any obligations under the Loan Documents are outstanding, the General Partner may not Transfer its General Partner Unit(s), retire, resign, withdraw from or be removed from the Partnership and the General Partner shall not be replaced except as permitted under the Loan Documents and unless (i) a Substitute General Partner which satisfies the requirements of Section 5.2 is admitted in accordance with this Agreement, either prior to or simultaneously with the occurrence of such event that causes the General Partner to cease to be a general partner of the Partnership and continues the business of the Partnership, and (ii) the Partnership receives the written consent of the Lender and, after securitization of the Loan, the Partnership and the Lender also receive a Rating Agency Confirmation from the applicable Rating Agencies in addition to the written consent of Lender.

Notwithstanding the foregoing, any general partner which is an entity may, upon compliance with subsections 11.1.1, 11.1.5 and 11.1.6, substitute in its place and stead any entity which has by merger, consolidation or otherwise acquired all or substantially all of its assets and which agrees to assume and be bound by this Agreement.

Section 11.2    Removal of General Partner.   Subject to Section 11.1.6, the General Partner may, subject to compliance with Section 11.1.6 above, be removed as a Partner of the Partnership by the Limited Partner at a meeting of the Partnership as provided in Section 15.1. Written notice of the removal of the General Partner will be served upon the General Partner either by certified or by registered mail, return receipt requested, or by personal service. Such notice will set forth the date upon which the removal is to become effective.

28

Section 11.3   Termination of Power of the General Partner.   Upon the serving of written notice of removal of the General Partner pursuant to this Article, all voting rights of the General Partner and all right, power and authority of such General Partner granted under subsections 7.1.1, 7.1.2, and Section 7.2 and elsewhere in this Agreement shall be automatically and immediately terminated, and a Person elected for such purpose acting on behalf of the Limited Partner shall be authorized to notify any and all Persons dealing with the Partnership of the termination of such rights and powers and of such removal.

Section 11.4   Bankruptcy Action, Dissolution, Substitute General Partner.

11.4.1   In the event of the insolvency of the General Partner or a Bankruptcy Action with respect to the General Partner, the interest in the Partnership of the General Partner will be subject to mandatory redemption by the Partnership in accordance with Section 11.6.

11.4.2   In the event of the continuance of the Partnership as provided in Article 12 of this Agreement, the Substitute General Partner will, upon complying with Section 11.1.6, be admitted to the Partnership and granted the interest of the General Partner as of the date of its removal.

The Substitute General Partner, if any, will continue the business of the Partnership and will immediately:

(a)   make any and all amendments to the Certificate and this Agreement to reflect the event, without further consent of the Limited Partner; and

(b)   notify the Limited Partner, creditors of the Partnership and such other Persons dealing with the Partnership of such an event.

Section 11.5   Liability after Withdrawal of the General Partner.   After withdrawal of the General Partner in accordance with Section 11.1, a former general partner shall not be liable for any obligations or liabilities incurred by the Partnership after the period in which it was the General Partner.   Nothing contained in the foregoing shall be deemed to impose liability on a former general partner solely by virtue of its status as a former general partner of the Partnership, or to constitute a waiver by a former general partner of limited partnership protection under the laws of the State of Delaware.

Section 11.6   Mandatory Redemption of General Partner's Interest.   Subject to Sections 5.2 and 11.8, in the event of a Bankruptcy Action with respect to the General Partner, the interest in the Partnership of such General Partner shall be immediately redeemed by the Partnership at a redemption price equal to the value of the General Partner's interest which shall be determined by multiplying the General Partner's Sharing Ratio times the Net Asset Value of the Partnership.   Such amount shall be paid to the General Partner, or to the appropriate trustee or legal representative of such General Partner, if a balance is still owed after, (i) deducting therefrom any amounts owed by the General Partner to the Partnership and (ii) adding thereto any amounts owed by the Partnership to the General Partner.

Section 11.7   Payment of Accrued Fees to General Partner.   In the event of the General Partner's voluntary withdrawal, or upon mandatory redemption of the General Partner's interest, all fees for future services to be paid pursuant to this Agreement to the General Partner, prorated on

29

the basis of the number of days elapsed in the year divided by three hundred and sixty-five (365), will be paid to the Substitute General Partner, if any, who performs such services. All fees accrued or due for past services will continue to be paid to the withdrawing or redeemed General Partner or its legal representatives; provided that if paid to the legal representatives, adequate provision has been made to meet the continuing obligations, if any, for which the fee was paid, and such party is meeting the terms of such obligations.

Section 11.8    No Dissolution on Bankruptcy of General Partner. Notwithstanding any other provision of this Agreement, a Bankruptcy Action of the General Partner shall not cause the General Partner to cease to be a general partner of the Partnership and upon the occurrence of such an event, the Partnership shall continue without dissolution.

## ARTICLE XII.

## DISSOLUTION, LIQUIDATION AND TERMINATION OF THE PARTNERSHIP

Section 12.1    Events Causing Dissolution of Partnership; Continuance. Subject to Sections 11.1.6 and 11.8, upon the dissolution, withdrawal or removal of the General Partner or a Bankruptcy Action with respect to the General Partner to the fullest extent permitted by law, the Limited Partner agrees to continue the business of the Partnership and within ninety (90) days of such event to procure the admission, effective as of the date of such event, of one or more new general partners who will constitute Substitute General Partners for purposes of Section 11.4. Subject to Section 5.2, upon the dissolution, withdrawal or removal of the General Partner, or a Bankruptcy Action with respect to the General Partner, the Partnership will be continued so long as there is at least one Substitute General Partner. All Substitute General Partners hereby agree to continue the business of the Partnership. In the event of a continuance of the business, the Partnership will continue, and this Agreement shall continue to constitute the partnership agreement of the Partnership. Expenses incurred in the continuance or attempted continuance of the Partnership will be an expense of the Partnership.

Subject to the terms of Article 20, the Partnership will be dissolved and its affairs must be wound up upon the first of the following to occur:

(a)    the written consent of the Limited Partner and the General Partner; provided, however, that the Partners hereby waive such right for as long as the Obligations are outstanding;

(b)    the disposition or sale by the Partnership of all or substantially all of the Property and distribution of the proceeds of any such disposition or sale;

(c)    December 31, 2046; or

(d)    by decree of court pursuant to Section 17-802 of the Act; provided, however, that, to the fullest extent permitted by law, no Partner shall file or pursue any dissolution or liquidation petition or action in any court except as provided in this Agreement.

Section 12.2    Termination of the Partnership. Subject to the terms of Article 20, the Partnership will be terminated upon the complete distribution of assets pursuant to Section 12.4, but in no event shall the complete distribution of assets occur later than one (1) year after the

30

occurrence of an event described in paragraph 12.1(c). Upon termination of the Partnership the General Partner will timely file a certificate of cancellation pursuant to Section 17-203 of the Act.

Section 12.3    Final Accounting. Upon occurrence of an event causing dissolution of the Partnership, an accounting shall be made as soon as possible and practicable, of the accounts of the Partnership, the account of each limited partner thereof and of the Partnership's assets, liabilities and income. A copy of such accounting shall be furnished to each of the limited partners within sixty (60) days of said dissolution. Upon dissolution, the General Partner or its successors or, in the event of a dissolution pursuant to Section 12.1(d), a Person appointed by the Limited Partner shall act as liquidating trustee and immediately proceed to wind up and terminate the business and affairs of the Partnership. The duties of the liquidating trustee may be delegated to a bank or other Person or firm having experience in liquidating assets of the type owned by the Partnership (the "Liquidating Trustee").

Section 12.4    Liquidation and Distribution. Upon occurrence of an event causing dissolution of the Partnership, the Partnership's affairs shall be wound up and its assets liquidated as promptly as is consistent with obtaining the fair market value thereof and consistent with Section 12.2 hereof. The proceeds shall be distributed in the order set forth below:

12.4.1 All of the debts, obligations and liabilities of the Partnership, including indebtedness to the Partners and their Affiliates shall be paid and discharged in the order of priority provided by law, including all costs of sale of the Property including real estate commissions, if any.

12.4.2 If, after the payment of any or all Partnership liabilities and obligations, the Liquidating Trustee determines that additional funds will be required to meet Partnership costs or expenses, theretofore incurred or for which the Partnership may become responsible, then the Liquidating Trustee shall be obligated to retain such required amount before any Partnership distribution is made to any Partner under subsection 12.4.3.

12.4.3 Any unexpended or undistributed amounts thereafter shall be distributed to, and allocated among, the Partners in accordance with their Capital Accounts. For this purpose, the determination of the Partners' Capital Accounts shall be made after adjustment to reflect the allocation of all Profits, Losses, and items of income, gain, expense or loss under Article 16 hereof. All distributions pursuant to this Section shall be made by the end of the fiscal year of liquidation (or, if later, within ninety (90) days after the date of such liquidation); however, the Partnership may withhold (A) Reserves established in accordance with this Agreement and (B) receivables of the Partnership for the purposes of collecting any amounts due thereunder. Any amounts so withheld (or the proceeds of the collection of receivables so withheld) shall be distributed as soon as practicable to, and allocated among, the Partners in the ratio of their positive Capital Accounts.

12.4.4 The Liquidating Trustee shall be indemnified and held harmless by the Partnership from and against any and all claims, demands, liabilities, costs, damages and causes of action of any nature whatsoever arising out of or incidental to the Liquidating Trustee's taking of any action authorized under or within the scope of this Section.

31

12.4.5  The Limited Partner shall look solely to the assets of the Partnership for the return of its Capital Contributions and if the property or proceeds therefrom remaining after payment or discharge of the debts, obligations and liabilities of the Partnership is insufficient to return its Capital Contributions it shall have no recourse therefor against the General Partner.

12.4.6  Anything contained in this Section 12.4 to the contrary notwithstanding, if the Liquidating Trustee shall determine that a complete liquidation of all of the property and assets of the Partnership would involve substantial losses or be impractical or ill-advised under the circumstances, or be undesirable for any reason, the Liquidating Trustee shall liquidate that portion of the property and assets of the Partnership sufficient to pay the expenses of liquidation and the debts and liabilities of the Partnership (excluding the debts and liabilities of the Partnership to the extent that they are adequately secured by mortgages on, or security interests in, property and assets of the Partnership), and the remaining property and assets shall be distributed to the Partners as tenants-in-common, partitioned in accordance with applicable statutes or distributed in such other reasonable manner as shall be determined by the Liquidating Trustee.  The distribution of such remaining property and assets to the Partners shall be made subject to any mortgages or security interests covering such property and assets.  If any assets are distributed (or, pursuant to Section 708(b)(1)(B) of the Code, deemed distributed) in kind, such assets shall be distributed (or deemed distributed, as the case may be) in a manner which is consistent with the order of priority set forth in subsection 12.4 hereof.  In determining such order of priority, the Capital Account of each Partner shall be credited or debited immediately prior to such distribution, in accordance with the definitions of "Gross Asset Value" and "Capital Account," with the amount of gain or loss, respectively, with which such Partner's Capital Account would be credited or debited if such assets were sold by the Partnership at their fair market values.  Upon distribution of such assets, the Capital Account of each Partner shall be debited with the fair market value of any such assets distributed to such Partner.

12.4.7  A reasonable time, including, without limitation, any time required to collect deferred payment obligations, but not exceeding a period of one year after the occurrence of one of the dissolution events described in Section 12.1 hereof, shall be allowed for the orderly liquidation of the assets of the Partnership and the discharge of liabilities to creditors so as to enable the Liquidating Trustee to minimize the normal losses attendant upon the liquidation.  Each of the Partners shall be furnished with a statement prepared by the Partnership's accountants, which shall set forth the assets and liabilities of the Partnership as of the date of complete liquidation.  Upon the Liquidating Trustee's compliance with the foregoing distribution plan, a Certificate of Cancellation of the Partnership shall be filed pursuant to Section 17-203 of the Act.  Except to the extent effectively provided by subsection 4.1.2, neither the Liquidating Trustee nor the General Partner shall be personally liable for the return of the Capital Contributions of the Limited Partner, or any portion thereof.  Any such return shall be made solely from Partnership assets and in accordance with the express provisions hereof.

12.4.8  If, in the process of collecting any deferred payment obligation generated by a sale of assets of the Partnership, the Partnership reacquires any such assets, and if, at such time, there is still a General Partner and the same so determines, the Partnership shall be continued upon the terms and conditions hereof.

32

12.4.9 In the event it becomes necessary to make distribution of the Partnership property in-kind, such property shall be transferred and conveyed to the Partners so as to vest in each of them, as tenants-in-common, an undivided interest in the whole of such property equal to that Partner's Sharing Ratio.

## ARTICLE XIII.

## POWER OF ATTORNEY

Section 13.1    Power of Attorney.

13.1.1  The Limited Partner irrevocably constitutes and appoints the General Partner as its true and lawful attorney-in-fact in its name, place and stead to make, execute, swear to, acknowledge, deliver and file:

(a)    any and all certificates of limited partnership as well as amendments thereto under the laws of the State of Delaware, and under the laws of any other state in which such certificate is required to be filed;

(b)    any other instrument which may be required to be filed by the Partnership under the laws of any state or by any governmental agency, or which the General Partner deems advisable to file;

(c)    any documents which may be required or appropriate to effect the continuation of the Partnership, the admission of additional or Substitute Limited Partners, the election of a Substitute General Partner, or the dissolution and termination of the Partnership, including without limitation documents to create and administer a liquidating trust if deemed appropriate by the General Partner, provided such continuation, admission, election, or dissolution and termination are in accordance with the terms of this Agreement;

(d)    all documents, certificates or other instruments, if any, which may be required for the organization of any new limited partnership occasioned by the bankruptcy, or insolvency of a General Partner or the transfer of General Partner's interest pursuant to Article 11; and

(e)    all documents, certificates or other instruments which may be required to reflect amendments authorized or required under Article 14 of this Agreement.

13.1.2  The above power of attorney:

(a)    is a special power of attorney coupled with an interest, is irrevocable, and will survive the death of any Partner;

(b)    may be exercised by the General Partner for each Partner by an actual or facsimile signature of a duly authorized officer of the General Partner or by listing the Partners and executing any instrument with a single actual

33

or facsimile signature of a duly authorized officer of the General Partner acting as attorney-in-fact for all of them;

(c) will survive the delivery of an assignment by a Partner of the whole or any portion of its interest; except that where the assignee thereof has been approved for admission to the Partnership in accordance with this Agreement, the power of attorney will survive the delivery of such assignment for the sole purpose of enabling the General Partner to execute, swear to or acknowledge and file any instrument necessary to effect such substitution; and

(d) will not constitute a waiver of, or be utilized to avoid the rights of the Partners or in any manner inconsistent with the status of the Partnership.

13.1.3  Upon request by the General Partner, the Partners will from time to time execute any separate power of attorney that may be necessary or proper to permit the above-listed powers to be exercised, and any document which the General Partner would be authorized to execute by virtue of any such powers.

## ARTICLE XIV.

### AMENDMENT OF THE AGREEMENT AND CERTIFICATE OF LIMITED PARTNERSHIP

Subject to Section 20.1(e), with respect to the Special Purpose Provisions herein, this Agreement may be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by the Partners. Notwithstanding anything to the contrary in this Agreement, until such time as no obligations under the Loan Documents or the First Mezzanine Loan Documents remain outstanding (including, without limitation, until such time as the Debt shall be paid in full), this Agreement may not be modified, altered, supplemented or amended without the prior written consent of the Lender and, with respect to Sections 17.5 and 18.8, the Mezzanine Lender and, after securitization of the Loan, the receipt by the Partnership and the Lender of a Rating Agency Confirmation from the applicable Rating Agencies, except: (a) to cure any ambiguity or (b) to convert or supplement any provision in a manner consistent with the intent of this Agreement and the other Basic Documents.

## ARTICLE XV.

### LIMITED PARTNER'S APPROVAL RIGHTS AND DISSENTER'S RIGHTS

Section 15.1    Meetings Not Required.  No meetings of the Partnership will be required, but the General Partner will meet with the Limited Partner upon request at reasonable times to discuss the business of the Partnership.

Section 15.2    Limited Partner Approval Procedures.  In any matter described in this Agreement on which the Limited Partner is entitled to grant (or deny) its consent, it may accomplish the same by a written communication delivered to the General Partner, or by an oral communication to the General Partner followed, within a reasonable period of time, by delivery of a written confirmation.

34

Section 15.3    Dissenters' Rights and Rights of Partition.   No Partner shall have any dissenter's rights or any rights of partition.

## ARTICLE XVI.

## ALLOCATIONS

Section 16.1    Allocation of Profits and Losses.

16.1.1   Profits and Losses, and items of income, gain, loss, deduction and credit shall be apportioned among the Partners in proportion to their Sharing Ratios except as required by subsections 16.1.2, 16.1.3, 16.1.4 and 16.1.5 hereof.

16.1.2   If there is a net decrease in Partnership Minimum Gain for a taxable year, each Partner must be allocated items of income and gain for that taxable year equal to that Partner's share of the net decrease in Partnership Minimum Gain.  A Partner's share of the net decrease in Partnership Minimum Gain is the amount of the total net decrease multiplied by the Partner's percentage share of the Partnership Minimum Gain at the end of the immediately preceding taxable year.  A Partner's share of any decrease in Partnership Minimum Gain resulting from a revaluation of Partnership property equals the increase in the Partner's Capital Account attributable to the revaluation to the extent the reduction in minimum gain is caused by the revaluation.  A Partner is not subject to the Partnership Minimum Gain Chargeback Requirement to the extent the Partner's share of the net decrease in Partnership Minimum Gain is caused by a guarantee, refinancing, or other change in the debt instrument causing it to become partially or wholly a recourse liability or a Partner Nonrecourse Liability, and the Partner bears the economic risk of loss (within the meaning of Section 1.752-2 of the Regulations) for the newly guaranteed, refinanced, or otherwise changed liability.

16.1.3   If during a taxable year there is a net decrease in Partner Minimum Gain, any Partner with a share of that Partner Minimum Gain (as determined under Section 1.704-2(i)(5)of the Regulations) as of the beginning of that taxable year must be allocated items of income and gain for that taxable year (and, if necessary, for succeeding taxable years) equal to that Partner's share of the net decrease in the Partnership Minimum Gain.  A Partner's share of the net decrease in Partner Minimum Gain is determined in a manner consistent with the provisions of this Section.  A Partner is not subject to this Partner Minimum Gain Chargeback, however, to the extent the net decrease in Partner Minimum Gain arises because the liability ceases to be Partner Nonrecourse Liability due to a conversion, refinancing, or other change in the debt instrument that causes it to become partially or wholly a Partnership Nonrecourse Liability.   The amount that would otherwise be subject to the Partner Minimum Gain Chargeback is added to the Partner's share of Partnership Minimum Gain.  In addition, rules consistent with those applicable to Partnership Minimum Gain shall be applied to determine the shares of Partner Minimum Gain and Partner Minimum Gain Chargeback to the extent provided under the Regulations issued pursuant to Section 704(b) of the Code.

16.1.4  In the event any Partner unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6), which would create, or increase, a deficit in

35

such Partner's Adjusted Capital Account, items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account deficit of such Partner as quickly as possible, provided that an allocation pursuant to this subsection 16.1.4 shall be made if and only to the extent that such Partner would have an Adjusted Capital Account deficit after all other allocations provided for in this Article 16 have been tentatively made as if this subsection 16.1.4 were not in the Agreement.

16.1.5   Because all items of income, deduction, credit, loss and cash flow are allocated pro rata in accordance with the Sharing Ratio of the Partners, it is anticipated that allocations of profit and loss will meet the requirements of Section 1.704-1(b) of the Regulations.   However, if, in any fiscal year a Partner receives any distribution which would create or increase an aggregate deficit balance in his or her Capital Account while other Partners have an aggregate positive balance in their Capital Account, items of Partnership profit or loss and, to the extent necessary if such an allocation would fail to restore such deficit, items of Partnership gross income and gain, shall be allocated to the Partners having a deficit in their Capital Account in an amount equal to the lesser of (i) the aggregate balance of the other Partners' Capital Accounts (prior to any allocation of profit or loss pursuant this paragraph) reduced by the amount of any loss for such fiscal year or increased by the amount of any profit for such fiscal year and (ii) the aggregate deficit in such Partner's Capital Account.   Furthermore, no loss shall be allocated to a Partner which would increase or create a deficit in such Partner's Capital Account as of the end of any fiscal year in which some or all of the other Partners have a positive balance in their Capital Accounts.   In the event that any Partner would have a deficit in his or her Capital Account as a result of any allocation pursuant to any other provision of this Operating Agreement, the limitation set forth in this paragraph shall be applied so as to reallocate the maximum permissible loss to each other Partner under Treasury Regulation Section 1.704-1(b)(2).

## ARTICLE XVII.

## DISTRIBUTIONS

Section 17.1       Distributions.   From time to time, the General Partner shall determine in its reasonable judgment to what extent, if any, the Partnership's cash on hand exceeds the current and anticipated needs, including, without limitation, needs for operating expenses, debt service, acquisitions, reserves, and mandatory distributions, if any.   To the extent such excess exists, the General Partner may make distributions to the Partners in accordance with their Sharing Ratios. Such distributions shall be in money or property (which need not be distributed proportionately) or partly in both, as determined by the General Partner.

Section 17.2       Computation of Distributions.   For purposes of computing distributions, amounts will be deemed to have been paid to Partners during a fiscal year if paid to Partners within thirty (30) days after the end of such fiscal year on the basis of, and arising out of, such fiscal year's operations.   Such distributions will be made to the Persons recognized as record holders of Partnership Units as of the date of the distributions, unless a contrary result is agreed to between the General Partner and the transferee.

36

Section 17.3    Special Rule in the Event of Liquidation.  The provisions of this Article 17 are subject in all respects to the provisions of Article 12, and to the extent of any inconsistency, the provisions of Article 12 shall prevail.

Section 17.4    Limitation on Distributions.  Notwithstanding any provision to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, shall not make a distribution to any Partner on account of its interest in the Partnership if such distribution would (i) violate the Act or other applicable law or (ii) constitute an Event of Default under the Loan Agreement (as defined therein).

Section 17.5    Mezzanine Distributions.  Any payments made pursuant to the Loan Documents to or for the benefit of the Mezzanine Borrower(s) shall constitute distributions to or at the direction of the Limited Partner.

## ARTICLE XVIII.

## TRANSFER OF LIMITED PARTNER UNITS

Section 18.1    Consent of General Partner Required.  No Limited Partner Unit may be Transferred or otherwise disposed of without the prior written consent of the General Partner, which consent is solely within the discretion of the General Partner and which the General Partner is under no obligation to give.  So long as any obligation under the Loan Documents remains outstanding, no Transfer of any direct or indirect ownership interest in the Partnership, or any admission of an additional Partner to the Partnership pursuant to this Article 18, may be made except as permitted by the Loan Documents.

Section 18.2    Conditions to Admission of Assignee.  Subject to Sections 6.9 and 18.8, no assignee of a Limited Partner Unit in connection with a Transfer which is permitted under the Loan Documents will have the right to become a Substitute Limited Partner in place of its assignor unless all of the following conditions are satisfied:

18.2.1   the General Partner consents to such substitution which consent is solely within the discretion of the General Partner;

18.2.2   a duly executed and sworn written instrument of assignment which has been filed with the Partnership sets forth the intention of the assignor that the assignee become a Substitute Limited Partner in its place;

18.2.3   the assignor and assignee execute and swear to or acknowledge such other instruments as the General Partner may deem reasonably necessary or desirable to effect such admission of the Substitute Limited Partner, including the written acceptance and adoption by the assignee of the provisions of this Agreement and its execution of a power of attorney, the form and content of which are described in Article 13 hereof;

18.2.4   a transfer fee has been paid to the Partnership which is sufficient to cover all reasonable expenses connected with such assignment and substitution, as such fee is determined by the General Partner; and

18.2.5   an opinion of counsel, in form and substance reasonably satisfactory to counsel for the Partnership, that neither the offering nor the assignment of the Limited Partner

37

Unit violates any registration provisions of any Federal or state securities or comparable law (this subsection 18.2.5 may be waived by the General Partner).

Section 18.3    Treatment of Assignee as Substitute Limited Partner Prior to Admission. The General Partner may elect to treat an assignee of a Limited Partner Unit in connection with a Transfer which is permitted under the Loan Documents who has not become a Substitute Limited Partner as a Substitute Limited Partner in the place of its assignor for any purpose whatsoever should it deem, in its sole discretion, that such treatment is in the best interest of the Partnership or that such admission is required by any agreement to which the Partnership is subject.

Section 18.4    Admission Amendments. The General Partner will be required to amend this Agreement only quarterly to reflect the admission of Substitute Limited Partners. Until the Agreement is so amended, the assignee will not become a Substitute Limited Partner except as provided in Section 18.3 of this Agreement. The Limited Partner must evidence its intention that its assignee be admitted as a Substitute Limited Partner in its place and execute any instruments required in connection therewith unless such admission is pursuant to Section 18.3.

Section 18.5    Limitation on Sale or Exchange of Units.

18.5.1  Anything herein to the contrary notwithstanding, no Transfer of a Unit may be made if the Unit sought to be Transferred, when added to the total of all other Partnership Units sold, assigned, exchanged or Transferred within a period of twelve consecutive months prior thereto, equals or exceeds fifty percent (50%) of the aggregate of all Partnership interests, general and limited, and any attempt to make any such Transfer will be null and void ab initio, unless such transaction is consented to by the General Partner.

18.5.2  Notwithstanding any other provisions of this Agreement to the contrary, Units cannot be assigned to any person who is insane, incompetent or has not attained his legal majority or to a Person or entity not lawfully empowered to own such interest, and any assignment or Transfer directly to a person or entity having any such disability may be disregarded by the Partnership in its discretion.

Section 18.6    Survival of Liabilities.   No admission of an assignee as a Substitute Limited Partner shall operate to relieve the assignor of the liabilities under the Act solely as a result of the assignment.

Section 18.7    Succession to Capital Interests.   In the event the Limited Partner Transfers all, or any portion of its Units in accordance with the terms of this Agreement, the transferee shall succeed to the  Capital Account of the transferor to the extent that it relates to the Transferred Unit or portion thereof.

Section 18.8    Mezzanine Pledge Agreement.  Notwithstanding any provision of this Agreement to the contrary, upon a foreclosure, sale or other Transfer of the interests in the Partnership that are held by JER/Jameson Mezz Borrower I LLC (the "Mezzanine Borrower"), as limited partner in the Partnership and as the holder of 100% of the partnership interests in the General Partner, pursuant to that certain First Mezzanine Pledge and Security Agreement, dated as of the date hereof (the "Mezzanine Pledge Agreement"), between the Mezzanine Borrower and Wachovia, National Association, in its capacity as mezzanine lender, together with its successors and assigns, ("Mezzanine Lender"), the transferee of such partnership interests shall automatically,

upon the execution of a counterpart to this Agreement, be admitted as a Substitute Limited Partner in the Partnership effective as of such foreclosure, sale or other Transfer, with all of the rights and obligations of the Mezzanine Borrower as Limited Partner hereunder. The Partnership acknowledges that the pledge of interests in the Partnership made by the Mezzanine Borrower in connection with the Mezzanine Pledge Agreement shall be a pledge not only of its rights with respect to the profits and losses of the Partnership, but also a pledge of all rights and obligations of the Mezzanine Borrower hereunder. Upon a foreclosure, sale or other Transfer of the partnership interests in the Partnership pursuant to the Mezzanine Pledge Agreement, the successor Limited Partner may transfer its interests in the Partnership, subject to this Section 18. Notwithstanding any provision in the Act or any other provision contained herein to the contrary, the Mezzanine Borrower shall be permitted to pledge and transfer to the Mezzanine Lender pursuant to the terms of the Mezzanine Pledge Agreement all such rights and powers with respect to the Partnership as it may have hereunder.

18.8.1 Notwithstanding anything to the contrary contained herein, for so long as any amounts remain outstanding under the First Mezzanine Loan Documents, the Partners shall not, without the prior written consent of the Mezzanine Lender, issue and shall not permit the issuance of any additional partnership interests of the Partnership other than its initial issuance of partnership interests issued on or prior to the date of this Agreement.

## ARTICLE XIX.

## MISCELLANEOUS

Section 19.1 <u>Notices</u>. Any notice, payment, demand, instruction or communication required or permitted to be given by this Agreement will be in writing and will be deemed to have been sufficiently given or served for all purposes on the date on which the same was delivered personally to any other party or if sent by certified mail, return receipt requested, and deposited in a regularly maintained receptacle for the deposit of United States mail, or if sent by registered mail, addressed as set forth on Schedule C to this Agreement.

Section 19.2 <u>Titles</u>. Titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

Section 19.3 <u>Gender</u>. Whenever the singular number is used in this Agreement and when required by the context, the same will include the plural; the masculine gender will include the feminine and neuter genders.

Section 19.4 <u>Counterparts</u>. This Agreement may be executed in several counterparts, and all so executed will constitute one (1) agreement, binding on all of the parties hereto, notwithstanding that all the parties are not signatory to the original or the same counterpart.

Section 19.5 <u>Binding Effect</u>. The terms and provisions of this Agreement will be binding upon and inure to the benefit of the successors and assigns of the respective Partners. In addition, the Lender (until such time as the Debt has been paid in full or otherwise satisfied) and its successors and assigns and the Mezzanine Lender (until such time as all obligations under the First Mezzanine Loan Documents are paid in full) shall be an intended third-party beneficiary of this Agreement.

39

Section 19.6    Severability.  If any provision of this Agreement or the application of such provision to any person or circumstance will be held invalid or unenforceable, the remainder of the Agreement and its application to persons or circumstances other than those as to which it is held invalid and unenforceable will not be affected thereby.

Section 19.7    Further Assurances.  At any time or times upon the request of the General Partner, the Limited Partners hereby agree to sign and swear to the certificate required by Delaware law, to sign and swear to any amendment to or cancellation of such certificate whenever such amendment or cancellation is required by law, to sign and swear to or acknowledge similar certificates or affidavits or certificates of fictitious firm name, trade name or the like (and any amendments or cancellations thereof) required by the laws of Delaware or any other jurisdiction in which the Partnership does or proposes to do business, and cause the filing of any of the same for record wherever such filing will be required by law.

Section 19.8    Limitation of Nonrecourse Loans.  A creditor who makes a nonrecourse loan to the Partnership must not have, or acquire, at any time as a result of making the loan, any direct or indirect interest in the profits, capital or property of the Partnership other than as a secured creditor.  Notwithstanding anything to the contrary herein, until such time as the Debt is paid in full or otherwise satisfied, no Person shall make loans to the Partnership (except for the Lender in connection with the Loan, and except for any extension of credit by any Borrower pursuant to the Contribution Agreement).

Section 19.9    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

Section 19.10    Protection of Partnership Assets.  The General Partner shall defend and prosecute such legal or equitable actions as it deems necessary to enforce or protect the interests of the Partnership, and such expense shall be an operating cost of the Partnership.

Section 19.11    Ratification of Prior Acts.  The Limited Partner, including any Substitute Limited Partner, by becoming a Partner, ratifies and agrees to be bound by all actions taken by the General Partner of the Partnership prior to the date such Person became a Partner.

Section 19.12    Time of Essence.  Time is of the essence in this Agreement.

Section 19.13    Entire Agreement.  This Agreement contains the entire agreement among the parties and supersedes any prior agreements among any of them respecting the matters described herein.

Section 19.14    Waiver of Partition; Nature of Interest.  To the fullest extent permitted by law, each Limited Partner (and any Substitute Limited Partner admitted under Article 18) hereby irrevocably waives any right or power that such Person might have to cause the Partnership or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Partnership, to compel any sale of all or any portion of the assets of the Partnership pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Partnership.  No Partner shall have any interest in any specific assets of the Partnership, and no Partner shall have the status of a creditor with respect to any distribution pursuant to Article 17.  The interest of the Partners in the Partnership is personal property.

40

Section 19.15    Benefits of Agreement; No Third-Party Rights.    Except for the Mezzanine Lender with respect to the provisions of Sections 17.5 and 18.8 of this Agreement and except for the Lender, its successors and assigns as holders of the Loan with respect to the Special Purpose Provisions, (i) none of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Partnership or by any creditor of the Partners, (ii) nothing in this Agreement shall be deemed to create any right in any Person not a party hereto, and (iii) this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third person (except as provided in Section 19.5). Pursuant to Section 19.5, the Lender and its successors and assigns as holders of the Loan are intended third-party beneficiaries of the Special Purpose Provisions and the Mezzanine Lender is an intended third-party beneficiary of the provisions in Sections 17.5 and 18.8.

## ARTICLE XX.

## BANKRUPTCY REMOTE AND SEPARATENESS PROVISIONS

Section 20.1    Separateness Provision.    Notwithstanding any provision of this Agreement to the contrary, until such time as the Debt is paid in full or otherwise satisfied, in order to preserve and ensure its separate and distinct identity and to qualify the Partnership as a special purpose entity, in addition to the other provisions set forth in this Agreement, the Partnership shall conduct its affairs in accordance with the following provisions and the General Partner shall act in a manner to ensure that the Partnership:

(a)    will not be engaged in any business or activity other than those permitted under Section 2.1 and this Section 20.1;

(b)    will not have any assets other than those related to the Property, or any assets related to its ownership in Operating Lessee;

(c)    will not own any subsidiary, or make any investment in, any Person, other than Operating Lessee

(d)    to the fullest extent of the law, except as expressly permitted by the Loan Agreement or the other Loan Documents or in connection with a repayment of the Debt, will not engage in, seek or consent to any dissolution, winding up, liquidation, in whole or in part, termination, consolidation, merger, sale of all or substantially all of its assets;

(e)    will not, until such time as no Obligations under the Loan Documents remain outstanding (including, without limitation, until such time as the Debt shall be paid in full): (A) amend the Certificate without the prior written consent of the Lender; (B) amend, alter, change or repeal Articles 2, 3, 5, 11, 12, 14, 18, 19, and 20 and Sections 1.3, 6.5, 6.7, 6.8, 6.9, 6.13, 7.1.1, 10.1.4, 10.1.5, 10.3, 17.4, 17.5, 19.5, 19.8, 19.14, 19.15, Exhibit 1 of this Agreement (the "Special Purpose Provisions") without the prior written consent of the Lender and, after securitization of the Loan, the receipt by the Partnership and the Lender of a Rating Agency Confirmation from the applicable Rating Agencies, and with respect to Sections 17.5 and 18.8, the consent of the Mezzanine Lender in writing. Subject to this Section 20.1(e), the General Partner reserves the right to

41

amend, alter, change or repeal any provisions contained in this Agreement in accordance with Section 14;

(f) intends to remain solvent and intends to continue to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due, and intends to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(g) will maintain a sufficient number of employees in light of its contemplated business operations;

(h) will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(i) will file its own tax returns, except to the extent that it is a disregarded entity for tax purposes or has been or is required to file consolidated tax returns by law;

(j) except as contemplated by the Loan Documents and with respect to the other Borrower under the Contribution Agreement, will not commingle its funds or assets with those of any other Person and will not participate in any cash management system with any other Person;

(k) will hold its assets in its own name;

(l) will conduct its business in its name or in a name franchised or licensed to it by an entity other than an Affiliate of the Partnership or any other Borrower, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in subsection (y) below, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of the Partnership;

(m) will maintain its records, books of account, bank accounts, financial statements, accounting records and other entity documents separate from any other Person, and will not permit its assets to be listed as assets on the financial statement of any other entity except that its financial position, assets, liabilities, net worth and operating results may be included in the consolidated financial statements of an Affiliate, provided that such consolidated financial statements contain a footnote indicating that the Partnership is a separate legal entity and that it maintains separate books and records;

(n) except as contemplated by the Loan Documents and with respect to the other Borrower under the Contribution Agreement, will pay its own liabilities and expenses, including the salaries of its own employees, out of its own funds and assets;

42

(o)     will observe all partnership formalities, preserve its existence as an entity duly formed, validly existing and in good standing (if applicable) under the applicable Legal Requirements (as defined in the Loan Agreement) of the jurisdiction of its organization or formation, and will not amend, modify, terminate or fail to comply with the provisions of its organizational documents;

(p)     will have no Indebtedness other than the Loan and Indebtedness incurred in the ordinary course of business that is related to the ownership and operation of the Property and is expressly permitted under the Loan Documents and the Contribution Agreement with respect to the other Borrower;

(q)     will not assume or guarantee or become obligated for the debts of any other Person and has not held out and will not hold out its credit as being available to satisfy the obligations of any other Person, except as may be permitted or required pursuant to the Loan Agreement and other Loan Documents and with respect to the other Borrower under the Contribution Agreement;

(r)     will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate, other than amounts payable by the Borrowers under the Contribution Agreement;

(s)     will allocate, fairly and reasonably, any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

(t)     will use separate stationery, invoices and checks bearing its own name;

(u)     except as contemplated by the Loan Documents with respect to the co-borrower, will not pledge its assets to secure the obligations of any other Person;

(v)     will hold itself out and identify itself as a separate and distinct legal entity under its own name or in a name franchised or licensed to it by an entity other than an Affiliate of any Borrower and not as a division or part of any other Person, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in subsection (y) below, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent the Partnership;

(w)     will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(x)     will not make loans or advances to any Person or hold evidence of indebtedness issued by any other Person or entity (other than (i) cash and

43

investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity and (ii) amounts payable by the other Borrower under the Contribution Agreement);

(y)     will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, and shall not identify itself, as a department or division of any other Person;

(z)     will not enter into or be a party to any transaction with its partners, members, shareholders or other Affiliates except (i) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party except for capital contributions and distributions and (ii) for the Contribution Agreement with respect to the co-borrower;

(aa)    will not have any obligation to indemnify, and will not indemnify, its partners, unless such an obligation was and is fully subordinated to the Obligations under the Loan Documents and will not constitute a claim against it in the event that cash flow in excess of the amount required to pay the Obligations under the Loan Documents is insufficient to pay such obligation; and

(bb)    except as expressly contemplated by the Loan Documents with respect to a non-recourse carveout guarantee or environmental indemnity, will not have any of its obligations guaranteed by any Affiliate.

Failure of the Partnership to comply with any of the foregoing covenants shall not affect the status of the Partnership as a separate legal entity or adversely affect the limited liability of any Limited Partner.

Section 20.2    Board of Managers.    Notwithstanding any provision of the limited liability company agreement of the General Partner (the "GP LLC Agreement") to the contrary, until such time as the Debt is paid in full or otherwise satisfied, the General Partner shall at all times be a Delaware limited liability company and shall have a Board of Managers which shall be governed by the following provisions:

(a)     The sole power and purpose of the Board of Managers shall be to consider and either consent or withhold its consent to any and all of the following actions by the General Partner or the Partnership, in accordance with the terms of this Agreement: (i) the taking of any Bankruptcy Action relating to the General Partner or the Partnership and (ii) amending or modifying (A) the provisions of the certificate of formation of the General Partner or set forth in Section 11.1(e)(B) of the limited liability company agreement of the General Partner, (B) the provisions of this Agreement specified in Section 20.1(e)(B), or (C) the provisions of the Certificate. Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Partnership, the General Partner, any officer of the General Partner or any other Person, neither the General Partner nor any officer of the General Partner nor any other Person shall be authorized or empowered

44

to, nor shall they permit the Partnership to, without the prior written consent of the General Partner, which written consent shall require the prior unanimous written consent of the Board of Managers (including all Independent Managers) and the member of the General Partner, take any Bankruptcy Action with respect to the Partnership; provided, however, the Board of Managers may not vote on, or authorize the taking of, any such Bankruptcy Action with respect to the Partnership unless there are at least two Independent Managers then serving in such capacity and such Independent Managers participate in such vote.

(b)     The Board of Managers shall at all times be comprised of four (4) "managers" chosen by the member of the General Partner, two of whom shall be the Independent Managers. Each Independent Manager shall hold office until his or her successor is appointed and qualifies or until the Independent Manager's death, resignation or removal in the manner hereinafter provided.

(c)     Meetings of the Board of Managers may be called by any member of the Board of Managers at the request of a majority of the Board of Managers then in office. Subject to clause (f) of this Section 20.2, the manager calling the meeting may fix any place either in or outside the State of Delaware as the place for holding any meeting of the Board of Managers.

(d)     Notice of any meeting of the Board of Managers shall be given to each manager. Notice which is personally delivered or sent by facsimile shall be given at least five (5) business days before the meeting. Notice which is given by mail shall be given at least ten (10) business days before the meeting. Notice given by mail will be deemed to be received forty-eight (48) hours after it is placed in the U.S. Mail, certified mail, return receipt requested, postage fully prepaid thereon. The general business to be transacted at, or the purpose of, a meeting of the Board of Managers must be stated in the notice; provided, however, that the failure to state any business or purpose in the notice of meeting shall not prohibit the Board of Managers from considering and acting with respect to any such business or purpose of such meeting in accordance with this Section 20.2. Any manager may waive notice of any meeting. The attendance of a manager at any meeting shall constitute a waiver of notice of such meeting, except where a manager attends a meeting for the express purpose of objecting to the transaction of any business at such meeting because the meeting is not lawfully called or convened.

(e)     The entire Board of Managers shall constitute a quorum for the transaction of business at any meeting of the Board of Managers. The affirmative vote of all of the members of the Board of Managers shall be required for the Board of Managers to take action.

(f)     Members of the Board of Managers may participate in a meeting by means of a conference telephone or similar communications equipment if all persons participating in the meeting can hear each other at the same

45

time. Participation in a meeting by these means shall constitute presence in person at the meeting.

(g) Any action required or permitted to be taken at any meeting of the members of the Board of Managers may be taken without a meeting if a consent in writing to the action is signed by all of the members of the Board of Managers, and the written consent is filed with the minutes of proceedings of the Board of Managers.

(h) Any vacancy on the Board of Managers shall be filled by the member of the General Partner.

(i) Managers, other than the Independent Managers, shall not receive any stated salary for their services as managers but, by resolution approved by the member of the General Partner, a fixed sum and expenses of attendance, if any, may be allowed to some or all of the managers for attendance at each meeting of the Board of Managers.

(j) Subject to Section 20.3(b), the member of the General Partner may, at any time, remove with or without cause any manager and may elect a successor to fill the resulting vacancy created by the removal of such manager.

(k) An Independent Manager may resign upon written notice to the General Partner; provided, however, that such resigning Independent Manager must continue to hold office until such time as his or her successor has been appointed and qualifies in accordance with Section 20.3(b).

(l) No manager shall be liable, responsible, or accountable, for any damages or otherwise, to the Partnership or the General Partner for any act performed or omitted by him or her with respect to Partnership matters, except for damages resulting from his or her fraud.

(m) To the fullest extent permitted by law, the Partnership shall indemnify all managers for any act performed or omitted to be performed by any of them with respect to Partnership matters, except for damages resulting from his or her fraud. Notwithstanding the foregoing, any indemnification set forth herein shall be fully subordinate to the Loan and, to the fullest extent permitted by law, shall not constitute a claim against the Partnership in the event that the Partnership's cash flow is insufficient to pay its obligations under the Loan Documents.

(n) Each manager on the Board of Managers shall be deemed to be a "manager" within the meaning of Section 18-101(10) of the Delaware LLC Act.

Section 20.3    Independent Managers.    Notwithstanding any provision of this Agreement to the contrary, until such time as both the Debt is paid in full or otherwise satisfied, the following provisions shall apply to the Independent Managers:

46

(a)    When voting on matters requiring the affirmative vote or written consent of the Independent Managers, notwithstanding that the Partnership is not then insolvent, the Independent Managers shall, to the fullest extent permitted by law (including Section 18–1101(c) of the Delaware LLC Act), take into account the interests of the creditors of the Partnership (other than Affiliates who may be creditors of the Partnership) as well as the interests of the Partnership and shall not be required to consider the best interests of a Partner.

(b)    So long as any part of the Debt remains unsatisfied and notwithstanding anything to the contrary contained herein, no Independent Manager may be removed from the Board of Managers unless his or her successor has been elected, and such successor shall have accepted his or her appointment as an Independent Manager by a written instrument, unless at the time of such removal, and after giving effect to such removal, there would be at least two Independent Managers on the Board of Managers. In the event of a vacancy in the position of Independent Manager, the member of the General Partner shall, as soon as practicable, appoint a successor Independent Manager. All right, power and authority of the Independent Managers shall be limited to the extent necessary to exercise those rights and perform those duties specifically set forth in this Agreement or the GP LLC Agreement. Except as provided in <u>Section 20.3(a)</u>, in exercising their rights and performing their duties under this Agreement or the GP LLC Agreement, any Independent Manager shall have a fiduciary duty of loyalty and care similar to that of a director of a business corporation organized under the General Corporation Law of the State of Delaware. No Independent Manager shall at any time serve as trustee in bankruptcy for any Affiliate of the Partnership.

Section 20.4    <u>Certain Actions</u>. Until the Debt is paid in full or otherwise satisfied, to the fullest extent permitted by law, the Partnership shall not engage in or consent to any transfer which would result in an Event of Default (as defined in the Loan Agreement) under the Loan Documents.

Section 20.5    <u>Springing Member</u>. Notwithstanding any provision of this Agreement to the contrary, until such time as the Debt is paid in full or otherwise satisfied, the General Partner shall have a Limited Liability Company Agreement which shall be in substantially the form of the General Partner's Limited Liability Company Agreement in effect on the date hereof and which shall include the following provisions:

(a)    Upon the occurrence of any event that causes the member of the General Partner to cease to be the member of the General Partner (other than (i) upon an assignment by the member of the General Partner of all of its limited liability company interest in the General Partner and the admission of a transferee pursuant to Section 8.1 and Article IX of the GP LLC Agreement, or (ii) the resignation of the member of the General Partner and the admission of a transferee pursuant to Section 8.2 and Article IX of the GP LLC Agreement) (a "<u>Member Cessation Event</u>"), the Springing Member shall, without any action of any Person and

47

simultaneously with there ceasing to be another member of the General Partner, be admitted to the General Partner as a substitute member and shall continue the General Partner without dissolution. It is the intent of these provisions that the General Partner never have more than one member at any particular point in time by operation of this Section 20.5. Until such time as a substitute member (other than the Springing Member) has been admitted to the General Partner, the Springing Member shall not have any right to resign from the General Partner or to assign or transfer its rights as Springing Member unless a successor Springing Member has been admitted to the General Partner as Springing Member by executing a joinder to the GP LLC Agreement; provided, however, that the Springing Member shall automatically cease to be a member of the General Partner upon the admission of a substitute member (other than the Springing Member). The Springing Member shall be a member of the General Partner but shall have no interest in the profits, losses and capital of the General Partner and shall have no right to receive any distributions of General Partner assets, in each case whether before or after being admitted as the Springing Member. Pursuant to Section 18-301 of the Delaware LLC Act, the Springing Member shall not be required to make any capital contribution to the General Partner and shall not receive a limited liability company interest as defined in Section 18-101(8) of the Delaware LLC Act in the General Partner. Except as expressly provided in the GP LLC Agreement, the Springing Member may not bind the General Partner. Except as required by any mandatory provision of the Delaware LLC Act, a Springing Member, in its capacity as Springing Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the General Partner, including, without limitation, the merger, consolidation or conversion of the General Partner. In order to implement its admission as the Springing Member, each Person executing the GP LLC Agreement as Springing Member has executed a counterpart to the GP LLC Agreement as of the date hereof. Prior to a Springing Member being admitted (if ever) as a Member pursuant to the provisions of this Section 20.5, the Springing Member shall not be a member of the General Partner. The parties acknowledge that the sole purpose of this Section 20.5 is to prevent the cessation of the General Partner's existence as a result of its having no member.

(b)     The General Partner shall at all times have a Springing Member 1 and a Springing Member 2 (as defined in the GP LLC Agreement). No resignation or removal of a Springing Member, and no appointment of a successor Springing Member, shall be effective unless and until such successor shall have executed a counterpart to the GP LLC Agreement signifying his or her agreement to act as Springing Member pursuant to the terms of the GP LLC Agreement. In the event of a vacancy in the position of Springing Member 1 or Springing Member 2, the member of the General Partner shall, as soon as practicable, appoint a successor Springing Member to fill such vacancy.

48

Section 20.6    Conflicts.    Notwithstanding any provision of this Agreement to the contrary, until such time as the Debt is paid in full or otherwise satisfied, to the extent that any provision of this Article 20 conflicts with any other provision of this Agreement, the provisions of this Article 20 shall control.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

The Partners being duly sworn, do hereby execute and acknowledge this Amended and Restated Agreement of Limited Partnership, as of the day and year first above written.

GENERAL PARTNER:

JER/JAMESON GP LLC, a Delaware limited liability company

By:    JER/JAMESON MEZZ BORROWER I LLC, a Delaware limited liability company, its sole member

By:    _____

C. David Carley III, Vice President

LIMITED PARTNER:

JER/JAMESON MEZZ BORROWER I LLC, a Delaware limited liability company

By:    _____

C. David Carley III, Vice President

## SCHEDULE A

*Certain Specified Information*

Date of Agreement:  07/27/06

Name of Partnership:  JER/Jameson NC Properties LP

Allocated Loan Amount:  $13,531,935

Date that Certificate of Limited Partnership was filed:  June 12, 2006

Agreed value of Capital Contribution:  $13,531,935

Initial Limited Partner:  Whiskey Merger Corp.

*Addresses of Properties*

| | Property | Address | County |
|---|---|---|---|
| 10 | Jameson Inn | 920 Crosswinds St, Greenville, North Carolina   27834 | Pitt |
| 74 | Jameson Inn | 901 Jackson Rd, Dunn, North Carolina   28334 | Harnett |
| 75 | Jameson Inn | 716 Linden Dr, Eden, North Carolina   27288 | Rockingham |
| 76 | Jameson Inn | 164 Jameson Inn Dr., Forest City, North Carolina   28043 | Rutherford |
| 77 | Jameson Inn | 1408 S. Harding Dr., Goldsboro, North Carolina   27530 | Wayne |
| 78 | Jameson Inn | 400 N. Cooper Dr., Henderson, North Carolina   27536 | Vance |
| 79 | Jameson Inn | 1120 13th Ave Dr. SE, Hickory, North Carolina   28602 | Catawba |
| 80 | Jameson Inn | 14 Jameson Inn Ct, Laurinburg, North Carolina   28352 | Scotland |
| 81 | Jameson Inn | 101 Old Farm Rd S, Roanoke, Roanoke Rapids, North Carolina   27870 | Halifax |
| 82 | Jameson Inn | 2614 S. Horner Blvd, Sanford, North Carolina   27330 | Lee |
| 83 | Jameson Inn | 125 S. Equity Dr., Smithfield, North Carolina   27577 | Johnston |
| 84 | Jameson Inn | 5102 Dunlea Ct, Wilmington, North Carolina   28405 | New Hanover |

*Schedule of Partners*

Maintained Pursuant to Section 6.1 of the Partnership Agreement

Summary of Units by Class
Limited Partner Units = 99.00
General Partner Units = 1.00

| Name and Address of Partner | Class of Partner | # of Units Owned and Sharing Ratio |
|---|---|---|
| JER/JAMESON GP LLC<br>4770 South Atlanta Road, Suite 200,<br>Smyrna, Georgia 30080<br>Telephone #: (404) 350-9990 | General | 1.00 Unit<br>1.00% |
| JER JAMESON MEZZ BORROWER I LLC<br>4770 South Atlanta Road, Suite 200,<br>Smyrna, Georgia 30080<br>Telephone #: (404) 350-9990 | Limited | 99.00 Units<br>99.00% |

53

EXHIBIT 1

PARTNERSHIP CERTIFICATE

THIS CERTIFICATE AND THE PARTNERSHIP INTERESTS REPRESENTED HEREBY HAVE BEEN PLEDGED TO WACHOVIA BANK, NATIONAL ASSOCIATION PURSUANT TO THE (I) LOAN AGREEMENT, AND (II) MEZZANINE PLEDGE AGREEMENT.

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE. SUCH LIMITED PARTNERSHIP INTERESTS MAY NOT BE SOLD OR TRANSFERRED UNLESS SUBSEQUENTLY REGISTERED OR QUALIFIED OR UNLESS AN EXEMPTION FROM REGISTRATION OR QUALIFICATION IS AVAILABLE. THE LP AGREEMENT (AS DEFINED BELOW) PROVIDES FOR FURTHER RESTRICTIONS ON TRANSFER OF THE PARTNERSHIP INTERESTS REPRESENTED HEREBY.

| NUMBER | | PERCENTAGE INTEREST AND TYPE |
|---|---|---|
| | JER/JAMESON NC PROPERTIES LP Formed under the Laws of the State of Delaware | 99% limited partner interest |

THIS IS TO CERTIFY JER/JAMESON MEZZ BORROWER I LLC, a Delaware limited liability company, (the "Partner"), is a limited partner holding 99% of the partnership interests JER/JAMESON NC PROPERTIES LP, a Delaware limited partnership (hereinafter called the "Partnership") transferable only on the books of the Partnership by the holder hereof in person or by its duly authorized attorney upon the surrender of this Certificate properly endorsed. This Certificate is issued pursuant to and shall be held subject to all the provisions of that certain Amended and Restated Agreement of Limited Partnership of the Partnership, dated as of July 27, 2006, (the "LP Agreement"), copies of which are on file at the offices of the Partnership at c/o SSI PMG LLC, 4770 South Atlanta Road, Suite 200, Smyrna, Georgia 30080. This Certificate evidences the partnership interests held by Partner in the Partnership, which is described in the LP Agreement, and an authorized transfer hereof may be registered upon the Partnership's books at the transferee's request. Each partnership interest in the Partnership shall constitute and shall remain a "security" within the meaning of, and governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware, and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

IN WITNESS WHEREOF, the Partnership has caused this Certificate to be signed this 27th day of July, 2006.

JER/JAMESON NC PROPERTIES LP, a Delaware limited partnership

By: JER/Jameson GP LLC, its sole general partner

By: JER/Jameson Mezz Borrower I LLC, its sole member

By: _____

Name: C. David Carley III

Title: Vice President

**REVERSE SIDE OF CERTIFICATE)**
**ASSIGNMENT OF INTERESTS**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____ (print or typewrite name of transferee), _____ (insert Social Security or other taxpayer identification number of transferee), the following specified percentage of limited liability company interests in the Company: _____ (identify the percentage interest being transferred) effective as of the date specified below, and irrevocably constitutes and appoints _____ and its authorized officers, as attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

JER/JAMESON MEZZ BORROWER I LLC, a Delaware limited liability company

Dated: _____

By: _____
 Name: C. David Carley, III
 Title: Vice President

55