IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JER/JAMESON MEZZ | ) | Case No. 11-13338 (MFW) |
| BORROWER II LLC, *et al.*,[1] | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | **Related to Docket Nos. 9, 10** |

**DEBTORS' TRIAL BRIEF IN SUPPORT OF OPPOSITION TO
COLONY'S EMERGENCY MOTIONS FOR (A) DISMISSAL OF
JER/JAMESON MEZZ BORROWER II LLC'S CHAPTER 11 CASE,
AND (B) RELIEF FROM THE AUTOMATIC STAY**

The above-captioned debtors and debtors in possession (collectively, the

"Debtors") submit this memorandum in connection with the trial on the Debtors' opposition to

the (a) *Emergency Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case*

*Pursuant to Section 1112(b) and/or 305(a) of the Bankruptcy Code, with Prejudice* [Docket No.

9] (the "Dismissal Motion"), and (b) *Emergency Motion for Entry of an Order Granting Relief*

*from the Automatic Stay Pursuant to Sections 362(d) and (f) of the Bankruptcy Code* [Docket No.

10] (the "Stay Relief Motion"), filed by CDCF JIH Funding, LLC and ColFin JIH Funding, LLC

(collectively, "Colony"). The Dismissal Motion and the Stay Relief Motion are referred to

collectively herein as the "Colony Motions." Colony seeks the dismissal of the Chapter 11 case

of JER/Jameson Mezz Borrower II LLC ("Mezz Borrower 2"), or relief from the stay to

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are JER/JAMESON MEZZ BORROWER II LLC (6522); JER/JAMESON MEZZ BORROWER I LLC (6488); JER/JAMESON PROPERTIES LLC (6426); JER/JAMESON NC PROPERTIES LP (8691); and JER/JAMESON GP LLC (6272). The Debtors' mailing address is 4770 S. Atlanta Road, Suite 200, Smyrna, Georgia 30080.

foreclose upon Mezz Borrower 2's principal asset (the "Colony Collateral"), its equity interest in

JER/Jameson Mezz Borrower I LLC ("Mezz Borrower 1").[2]

## PRELIMINARY STATEMENT

1.     The relief requested by the Colony Motions is now moot.  Following

the commencement of Mezz Borrower 2's case on October 18, 2011, the other Debtors filed

their Chapter 11 petitions on October 25 and 26, 2011.  Just as the commencement of the

additional Debtors' cases eliminated any emergency surrounding the Colony Motions, it also

eliminated the alleged bad faith surrounding the "naked" commencement, as portrayed by

Colony, of a lone case for a single layer of the Debtors' capital structure.  Currently,

JER/Jameson Properties LLC and JER/Jameson NC Properties LP (together, the "Operating

Debtors"), the two Debtors that own the 103 Jameson Inn hotels and business (the "Hotel

Chain" or "Jameson Inns"), and their two Debtor parent entities, Mezz Borrower 2 and Mezz

Borrower 1, are each subject to the jurisdiction of the Court and are prepared to quickly pursue

their restructuring options under Chapter 11.[3]

2.     Putting aside the radically changed factual circumstances, the Colony

Motions depend on a strained and myopic view of the Debtors' corporate structure and their

global prospects for reorganization.  According to Colony, the Court's task is to assess only

Mezz Borrower 2's alleged lack of good faith and its alleged inability to adequately protect

---

[2]     On October 25, 2011, Mezz Borrower 2 filed its *Omnibus Objection of Debtor to Colony JIH Lenders' Emergency Motions for Entry of Orders (A) Dismissing the Debtor's Chapter 11 Case Pursuant to Section 1112(B) and/or 305(A) of the Bankruptcy Code, With Prejudice, and (B) Granting Relief From the Automatic Stay Pursuant to Sections 362(D) and (F) of the Bankruptcy Code* [Docket No. 25] (the "Objection").  This Trial Brief supplements the prior Objection.

[3]     The fifth Debtor, JER/Jameson GP LLC, is the general partner of JER/Jameson NC Properties LP, the owner of the 12 hotel properties located in North Carolina.

Colony's interest in the Colony Collateral. In Colony's world, Mezz Borrower 2 exists as a free-floating, self-sustaining company, unrelated to the Hotel Chain and the various creditors, employees, contract-counterparties, lenders and interest holders orbiting around that business. Indeed, Colony sought to persuade the directors of Mezz Borrower 2 that their sole fiduciary concern should be Colony's freedom to complete its foreclosure sale. Any other inputs and factors normally considered by the board of a limited liability company exercising its duty of care (such as the imminent and permanent loss of value to other creditors and interest holders following a foreclosure, the potential benefits of a breathing spell, or the thoughtful pursuit of alternative means to preserve and enhance value), were not only prohibited in Colony's view, but irrelevant.

3.



DOCS_SF:78908.1 46344-001

Rather than allowing Colony to foreclose upon the value of Jameson Inns, Mezz Borrower 2's board (including two independent members), and subsequently the boards of the other Debtors, properly exercised their fiduciary duties to authorize the filing of these cases so that restructuring options could be pursued for the benefit of all constituents, and not just Colony.

4.      The Debtors will demonstrate that this case involves an integrated, interrelated enterprise. The Hotel Chain is profitable and generates sufficient annual net operating income ("NOI") to meet its daily operational expenses and service its debt. Moreover, the evidence reflects that the value of the Debtors' assets exceed both the mortgage debt obligations to Wells Fargo (in the approximate amount of $160 million) and the mezzanine debt obligations to Colony (in the approximate amount of $80 million), with a meaningful surplus. The Debtors' expert has opined that the enterprise value of the Hotel Chain ranges from $270 million to $290 million. *See Expert Valuation Report for Jameson Inns [Reflecting Conforming Changes]*, dated November 18, 2011, prepared by Houlihan Lokey Capital, Inc., at the direction of Matthew R. Niemann (the "Niemann Expert Report"). The Niemann Expert Report is attached to this memorandum as **Exhibit A**.



6.      Perhaps most importantly, the Court's task on a motion to dismiss or for relief from stay is *not* to pinpoint the precise value of the Hotel Chain at this early stage of the case; rather, the essential question presented by the Colony Motions is whether the Debtors reasonably can rehabilitate the overall business. The answer to this question does not depend on a definitive finding of value, as if the Debtors were now proposing to allocate specific slices of value among parties in interest under a plan. Rather, the answer depends on whether the various estimated values (despite their differences) support a reasonable *likelihood* of rehabilitation. The Debtors submit that the competing expert valuations, at a minimum, show that the Debtors

DOCS_SF:78908.1 46344-001

own an enterprise capable of reorganization with a meaningful prospect for the preservation of an "equity cushion" beyond Colony's debt. Indeed, the Court can take judicial notice of the fact that the parties have divergent views of value based on the conclusions of their respective experts. Further, while the Debtors pursue their restructuring options, Colony will be adequately protected by the profits generated by Jameson Inns. Nothing more should be required for purposes of denying the Colony Motions.

7.      Colony suggests that the constituent documents of Mezz Borrower 2 or its affiliated Debtors prohibit the Debtors from pursuing a restructuring under Chapter 11. This is not the case. Nor does any applicable law bar the Debtors from taking advantage of Chapter 11 under these circumstances. The fact that the Hotel Chain's capital structure has been separated across various specially formed entities does not mean that the collective interests of the Debtors' various constituents should be ignored, as Colony maintains. Nor does it mean that the sole source of value in these cases (the Hotel Chain and its revenues) cannot be used to further the collective interests of the Debtors' various constituents.[6] There is substantial value to be preserved by this reorganization, not lost to a precipitous and irrevocable foreclosure by Colony. All of the Debtors' secured creditors are adequately protected by future cash flow and a significant equity cushion.

8.      Just as the value of the Hotel Chain flows up from the Operating Debtors through Mezz Borrower 1 to Mezz Borrower 2 and beyond, so too the dismissal of the

---

[6]      In its separate objection to the Debtors' motion for authority to use cash collateral, Colony also disputes the Debtors' right to use the revenues of the Hotel Chain to sustain the collective restructuring effort of all Debtors. The Debtors will show that Wells Fargo's interest in the revenues is adequately protected, by a generous margin, and that there is no legal impediment to using such revenues to support each of the Debtors.

Chapter 11 case of Mezz Borrower 2 would inexorably flow down and presumably result in steps to sequentially dismiss the cases of Mezz Borrower 1 and the Operating Debtors, leaving Colony free to pursue its master plan to seize control. The Debtors are conjoined -- the restructuring of the underlying Hotel Chain benefits all of the Debtors' constituents, while the dismissal of the Mezz Borrower 2 case directly harms them. There is a reasonable prospect of value here beyond Colony's debt. The Debtors merely seek an opportunity to realize that value. For these reasons and those set forth below, the Colony Motions should be denied.

## OVERVIEW OF CASE IN CHIEF

9.      The Debtors have an honest and legitimate reorganization purpose to pursue in these Chapter 11 cases; hence, there is no "cause" to dismiss the Mezz Borrower 2 case either under sections 1112(b) or 305(b) of the Bankruptcy Code. Additionally, Colony's interest in the Colony Collateral is adequately, if not amply, protected. Among other things, Jameson Inns is a profitable enterprise and there is a reasonable prospect of equity value beyond Colony's claims. Accordingly, there is no "cause" to terminate the automatic stay to permit Colony to resume its value-capturing foreclosure sale.

10.     Although Colony and the Debtors have each presented competing valuations of the Colony Collateral, the Court does *not* need to make a definitive determination of value at this early stage of the cases. The Debtors are not yet proposing to distribute value among their creditors and shareholders; instead, the Debtors seek to preserve and maximize the value of the Hotel Chain while considering their restructuring options. Although the experts differ in their valuation conclusions (and the Debtors strongly disagree with the opinions of Colony's expert), the estimates clearly establish a reasonable foundation for a restructuring.

7

The range of values here is narrow -- between ████████████████ and $280

million for the Debtors' expert, the mid-point of which ($250 million) evidences an equity

cushion beyond Colony's claims. [7] Thus, for purposes of the Dismissal Motion, the valuations

show that there is a "reasonable likelihood of rehabilitation" here and, correspondingly, that the

Debtors' cases were not filed in bad faith or for tactical litigation advantage. Likewise, for

purposes of the Stay Relief Motion, the valuation evidence supports the existence of an

"adequate" equity cushion such that "cause" for relief from the stay is lacking. Moreover, not

only is Colony's position adequately protected by an equity cushion, there is no diminution in

value of Colony's position during the pendency of these proceedings. [8]

11.     The standards and facts that support the Court's denial of the Colony

Motions are summarized below:

- **Standards for Dismissal -- Sections 1112 and 305.** Colony must demonstrate that "cause" exists for dismissal of the Mezz Borrower 2 case (in the form of "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation"). 11 U.S.C. §§ 1112(b)(1), (b)(4)(A). The "likelihood of rehabilitation" standard does **not** require that a plan be filed with the petition, nor even that a debtor demonstrate its ability to satisfy each of the elements under section 1129 of the Bankruptcy Code at the outset of a case. Dismissal, moreover, is an extraordinary remedy that should be exercised "only sparingly and with great caution." [9] Dismissal under section 305(a) of the Bankruptcy Code requires an even higher burden of proof than dismissal

---

[7]     The Debtors also have accumulated approximately $13 million in cash on hand (above and beyond the $10 million Wells Fargo used to unilaterally pay down its loans shortly before the Operating Debtors' bankruptcy filing), which cash on hand further increases the equity cushion.

[8]     Both Colony and the Debtors' expert reports rely on projections that contemplate the Debtors continuing to generate positive free cash flow, thus enhancing (as opposed to diminishing) Colony's collateral position throughout these proceedings.

[9]     *In re General Growth Properties, Inc.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009).

under section 1112(b) -- dismissal must be in the best interests of *both* creditors and the debtor.[10]

- **Standards for Stay Relief -- Sections 362(d)(1) and (d)(2).** Relief from the automatic stay for "cause" under section 362(d)(1) of the Bankruptcy Code requires the Court to examine the totality of the circumstances to balance the hardship to Mezz Borrower 2 from lifting the stay against the hardship to Colony from maintaining the stay.[11] Here, lifting the stay to permit Colony to resume its foreclosure of the Colony Collateral would not only result in the extinction of any surplus value to junior participants in the Jameson corporate family, but may also result in the step-by-step dismissal of the cases of Mezz Borrower 1 and the Operating Debtors (as Colony, presumably, would then exercise its rights as a shareholder to displace management and move for the dismissal of these cases or, alternatively, use the Chapter 11 process of its sole benefit). Conversely, maintaining the stay does not outweigh the draconian usurpation of value that would result from the reinstated foreclosure process. There is a substantial equity cushion that protects Colony's interest in the Colony Collateral. Moreover, the Debtors are making adequate protection cash payments to Wells Fargo thereby minimizing any reduction in the equity cushion from the accrual of interest and expenses at the Operating Debtors' level.[12] Last, the Colony Collateral is obviously "necessary to an effective reorganization" since the foreclosure of Colony's security interest in the Colony Collateral would automatically deprive the Debtors of an opportunity to formulate a global reorganization. 11 U.S.C. §§ 362(d)(2)(B).

- **"Cause" for Dismissal Is Absent.** Colony asserts that "cause" for dismissal is based on section 1112(b)(4)(A) of the Bankruptcy Code: substantial or continuing loss to or diminution of the estate and the

---

[10]    *See In re RHTC Liquidating Co.*, 424 B.R. 714, 720-721 (Bankr. W.D. Pa. 2010) ("[T]he party seeking relief under Section 305(a) bears the burden of proof. ... Furthermore, ... the decision whether to dismiss under Section 305(a) is committed to the sound discretion of the Court based upon the totality of the circumstances. ... Courts that have construed Section 305(a)(1) have generally agreed that abstention under this provision is an extraordinary remedy that is appropriate only where the court finds that *both* creditors and the debtor would be better served by a dismissal. The test under Section 305(a)(1) requires that both creditors and the debtor benefit from a dismissal, not merely the application of a balancing test to determine whether dismissal is appropriate. A dismissal pursuant to Section 305(a)(1) is to be granted only with 'extreme caution.'") (citations omitted).

[11]    *See In re Downey Financial Corp.*, 428 B.R. 595, 608-609 (Bankr. D. Del. 2010) ("Courts conduct a 'fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay.' This Court has adopted a three-prong [test] to determine whether to grant relief from the stay: 1. Whether any great prejudice to either the bankrupt estate or the debtor will result from a lifting of the stay; 2. Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and 3. The probability of the creditor prevailing on the merits.") (citations omitted).

[12]    It is well-settled, however, that creditors are not entitled to a constant equity cushion. *In re Delta Resources, Inc.*, 54 F.3d 722 (11th Cir. 1995).

absence of a reasonable likelihood of rehabilitation. 11 U.S.C. § 1112(b)(4)(A). Colony does not allege that any of the other 15 factors set forth in section 1112(b) are applicable in this case. 11 U.S.C. § 1112(b)(4)(B)-(P). In this case, first, there is no substantial or continuing loss to the estate. Mezz Borrower 2 is a holding company with no operations. Hence, the concept of continuing loss to the estate is inapposite -- the value of the Colony Collateral is a function of the ongoing maintenance of the business of the Operating Debtors, which both Colony and the Debtors agree will be cash generative and will not decline during the pendency of these proceedings.[13]

- **Reasonable Likelihood of Rehabilitation.** Colony also cannot prove the "absence" of a chance for rehabilitation. Rather, the competing values of the Hotel Chain establish a meaningful foundation for a successful reorganization. The Debtors are an inter-related group of entities that own and operate the chain. Although the debt encumbering the enterprise is spread among distinct entities (a structure that Colony admits "has been widely used for real estate financing," Dismissal Motion at ¶10), the Debtors have a collective and good faith plan for a global restructuring. Moreover, there is no requirement in the Bankruptcy Code that a debtor must conclusively prove that a plan is confirmable, or demonstrate at the outset of a case that it can "effectuate" a plan, in order to file a petition.[14]

- **"Cause" for Stay Relief Is Absent -- Equity Cushion.** There is no "cause" to terminate the automatic stay. The Hotel Chain is profitable and continues to generate excess cash. For the twelve months ended September 30, 2011, the Operating Debtors' NOI was approximately $25 million on total revenues of $79 million. On an operational basis, the Operating Debtors generate positive free cash flow sufficient to service the secured debt owed by the Debtors. Moreover, the Hotel Chain business has a value that renders Colony *oversecured*. The Debtors believe, as set forth in the Niemann Expert Report, that the value of the business is approximately $280 million, which amount is in excess of Colony's $39 million claim against Mezz Borrower 2 (after deduction for senior debt) by approximately $38 million.[15] This translates to an approximate 100% equity cushion for the benefit of Colony. ███████████████ ██████████████████████████████████████ Although the Court does not need to reach a definitive conclusion about value, the evidence points to a

---

[13] Colony recognizes that "loss or diminution" is not implicated in the case of a holding company debtor. *See* Dismissal Motion at 26.

[14] *In re General Growth Properties, Inc.*, 409 B.R. 43, 65 (Bankr. S.D.N.Y. 2009) ("Courts have consistently refused to dismiss on this ground before a plan has been proposed.").

[15] As noted previously, these values do not include the Debtors' cash on hand (which exceeds $13 million).

significant equity cushion and excess cash flow sufficient to adequately protect the lenders at all levels of the capital structure.

- **Good Faith.** Colony asserts that "cause" for dismissal and relief from the stay also exists because the Mezz Borrower 2 case was not filed in good faith. [16] Now that the collective cases of all the Debtors are pending before this Court, there is little doubt that the Debtors have the means to maximize the value of the Debtors' assets, using all the tools available to them under Chapter 11 "to preserve going concern value and maximize the value of the debtor's estate," a *prima facie* valid bankruptcy purpose. This case was not filed as a stall tactic or litigation ploy, but rather to preserve and protect the Debtors' assets. The fact that the Debtors filed seriatim is not indicia of bad faith; on the contrary, it is evidence of the complex nature of the Debtors' capital structure and reflective of the deliberate and good faith considerations of the Debtors' various and separate boards of directors.

- **Organic Documents Do Not Mandate Dismissal.** Colony asserts that Mezz Borrower 2's organizational documents (*i.e.*, its limited liability company operating agreement – "LLC Agreement"), stand as an insurmountable obstacle to the pursuit of the Debtors' reorganization goals. [17] According to Colony, Mezz Borrower 2 has "no other purposes" aside from holding the equity interests in Mezz Borrower 1 and making the secured loan to Colony. Moreover, Colony asserts that Mezz Borrower 2 is precluded by its organizational documents from incurring any obligations. As a result, according to Colony, Mezz Borrower 2 is innately disabled from incurring any administrative obligations or confirming a plan. These restrictions, however, are merely ordinary loan covenants that have been duplicated in Mezz Borrower 2's organizational documents. Just as the loan covenants would not be enforceable upon the commencement of the Chapter 11 case, the identical terms in the organizational documents are overridden by the Bankruptcy Code. [18]

---

[16] The Third Circuit has held that "[w]hether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine the 'totality of facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'" *Integrated Telecom*, 382 F.3d at 118 (quoting *SGL Carbon Corp.*, 200 F.3d at 162). In applying the totality of circumstances test, the Court should focus "on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose, *e.g.*, by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage." *Id.* at 119-120

[17] As noted in the Dismissal Motion (at pp. 7-8), the loan documents contain parallel prohibitions that appear to have been pasted into the limited liability agreement in an effort to convert a contractual covenant, otherwise unenforceable upon the commencement of the case, into some innate limit on the Debtors' rights and authority under the Bankruptcy Code. As discussed below, these provisions are merely disguised "financial condition" clauses that are preempted and unenforceable in these Chapter 11 cases.

[18] In its objection to the Debtors' interim motion to use cash collateral, Colony cited the decision by Judge Walsh in *In re Pappas Telecasting, et al.*, Case No. 08-10916 (PJW) (Bankr. D. Del. 2008), as authority for the

Additionally, the incurrence of expenses by Mezz Borrower 2 is in no way prohibited in the LLC Agreement and it is wholly foreseeable and expected that, upon a default, the board would retain professionals to act on behalf of the company (no different than prior to default Mezz Borrower 2 compensated its board members for their efforts). To argue that Mezz Borrower 2's board is prohibited from incurring expenses of any kind to preserve and protect the interests of the company would render the functions of the board as a legal nullity.

### FACTUAL BACKGROUND

12.     The Debtors are part of a multi-tiered financing structure formed in 2006 for the acquisition of the Hotel Chain. Mezz Borrower 2 is one of five layers in this financing structure. The underlying Operating Debtors operate 103 limited-service hotel properties located in twelve states in the southeastern and midwestern United States. These properties are operated under the *Jameson Inn* and *Signature Inn* brands, and are managed by PMG pursuant to a Management Agreement.[19] Under the Management Agreement, the Operating Debtors pay PMG certain fees and reimbursements to provide the daily management services and functions specified in the agreement.

---

argument that the terms of a limited liability company agreement can trump the Bankruptcy Code. That decision, however, only stands for the rather unremarkable proposition that the scope of an officer's authority to bind its principal (*i.e.*, the debtor) may be limited. In that case, the chief restructuring officer did not have the contractual authority under his engagement agreement to enter into a DIP financing agreement. Indeed, the Court noted that the scope of the officer's retention readily could be modified by a separate motion.

[19]     The Operating Debtors are parties to that certain *Master Property Management Agreement* dated as of July 27, 2006 (the "Management Agreement"), with PMG.

13.     As part of the acquisition in 2006, the Debtors and certain affiliated

entities obtained $335 million in financing. The $335 million loan was initially provided by

Wachovia Bank and its affiliates and/or assignees by way of five different credit agreements

representing five different tranches of debt. Wachovia Bank subsequently assigned its interests

in various slices of the overall financing.

14.     The Operating Debtors are indebted under the mortgage note payable

to the lenders serviced by Wells Fargo
and secured by mortgages on each of
the 103 hotel properties within the
Hotel Chain. The mortgage loans have
a present principal balance of
approximately $160 million.



15.     The equity

interests in the Operating Debtors are

held by Debtor Mezz Borrower 1.

Mezz Borrower 1 obtained a $40 million loan (the "Mezz Loan 1") secured by the equity

interests in the Operating Debtors. Upon information and belief, the Mezz Loan 1 was recently

assigned and conveyed to Colony. The present principal balance of Mezz Loan 1 is

approximately $39 million.

16.     The equity interests in Mezz Borrower 1 (*i.e.*, the Colony Collateral)

are held by Debtor Mezz Borrower 2 . Mezz Borrower 2 obtained a $40 million loan (the

"Mezz Loan 2") secured by the Colony Collateral. The Mezz Loan 2 is currently held by Colony. The present principal balance of Mezz Loan 2 is approximately $39 million.

17.     The equity interests in Mezz Borrower 2 are held by non-debtor JER/Jameson Mezz Borrower III LLC ("Mezz Borrower 3"). Mezz Borrower 3 obtained a $40 million loan (the "Mezz Loan 3") secured by the equity interests in Mezz Borrower 2. The Mezz Loan 3 is currently held by (a) a collateralized debt obligation managed by an affiliate of Gramercy Loan Services LLC ("Gramercy"), and (b) JER Investors Trust, Inc. ("JER") or its affiliate.

18.     The equity interests in Mezz Borrower 3 are held by non-debtor JER/Jameson Mezz Borrower IV LLC ("Mezz Borrower 4"). Mezz Borrower 4 obtained a $40 million loan (the "Mezz Loan 4") secured by the equity interests in Mezz Borrower 3. The Mezz Loan 4 is currently held by (a) a collateralized debt obligation managed by an affiliate of Gramercy, and (b) JER or its affiliate.

19.     The equity interests in Mezz Borrower 4 are held by JER/Jameson Holdco LLC.

20.     Each of the above-referenced loans matured on August 9, 2011, and each of the borrowers, including the Operating Debtors, defaulted on that day. Prior to the default, the borrowers consistently serviced the debt for their respective loans, with an ample cash surplus in excess of debt service. The net cash flow (derived from the net revenues of the hotel properties after payment of fees and expenses due to PMG under the Management Agreement) was, and continues to be, more than sufficient to make interest payments associated with the loans.

14

21.     On August 9, 2011, and August 30, 2011, Colony, as the lender to Mezz Borrower 2, provided notice of its intent to conduct a public sale on September 23, 2011 of the Colony Collateral. Colony periodically adjourned the sale until October 19, 2011.

22.     During this time, Colony attempted to convince the board of Mezz Borrower 2 that the only interests to protect at the Mezz Borrower 2 level were the interests of Colony, ignoring any junior constituents or the fact that a global restructuring of the entire capital stack was required.



DOCS_SF:78908.1 46344-001



---

[20]       **This excess cash has since been reduced to approximately $8.8 million because PMG ceased making draw requests to Wells Fargo upon** maturity and used cash on hand to fund operations while Wells Fargo built **cash from operations in a lockbox account and paid itself down by $10 million.**

16

DOCS_SF:78908.1 46344-001

25. On October 18, 2011, Mezz Borrower 2 filed its chapter 11 case to halt the imminent foreclosure process, preserve all stakeholders' rights, and pursue its restructuring options.

26. On October 25, 2011, Mezz Borrower 1 commenced its chapter 11 case in response to Colony's efforts to re-register under its name the ownership interests in the Operating Debtors held by Mezz Borrower 1.

27. On October 26, 2011, the Operating Debtors and JER/Jameson GP LLC commenced their chapter 11 cases in response to Wells Fargo's notice of a foreclosure sale for 21 hotel properties located in Georgia scheduled to occur on November 1, 2011 and Wells Fargo's commencement of a foreclosure process against 12 hotel properties in North Carolina.

28. The Operating Debtors generate positive free cash flow sufficient to service debt at each of the Debtors. For the twelve months ending September 30, 2011, the Operating Debtors' realized a NOI of approximately $25 million on total revenues of approximately $79 million. These results are consistent with years 2009 and 2010 when the Operating Debtors achieved an NOI of $27 million and $25 million on revenues of $81 million and $78 million, respectively.

29. Based on the Niemann Expert Report, the mid-point enterprise valuation for the Hotel Chain is approximately $280 million.

17

█████████████ For the reasons addressed below, the Debtors submit that Mr. Kwon manipulated his valuation methodologies downward in order to reach a particular conclusion of value consistent with Colony's present litigation motives.[22]

30.    Mezz Borrower 2's bankruptcy filing on October 18, 2011 was simply the first step in a broad-based restructuring of the Debtors that is designed to preserve all parties' rights and maximize value. All of the secured debt in the Debtors' capital structure had the same inception date and matured on the same date, August 9, 2011. Hence, the Debtors each face the same problem -- they need to refinance, sell their assets, or otherwise restructure their debt. Mezz Borrower 2 is merely one piece of a larger puzzle. It was forced to file first because of Colony's aggressive efforts following the August 9 maturity date to foreclose on the ownership interests in Mezz Borrower 1 and thereby take control of Jameson Inns.

31.    Now that each of the Debtors is under the jurisdiction of the Court, the Debtors can explore a holistic solution to the debt maturity that will maximize the opportunity for value to be preserved for all constituents. As discussed below, the Debtors do not need to conclusively pinpoint value at this stage of the case, nor satisfy each of the elements for confirmation of a plan under section 1129; instead, the Court's task is to determine whether the Debtors have a reasonable likelihood of *rehabilitation*, a term that embraces all the possible means for enhancing value under the Bankruptcy Code.

**LEGAL ARGUMENT**

**DISMISSAL IS NOT WARRANTED UNDER 11 U.S.C. § 1112**

A.      **Section 1112 -- Good Faith.**

32.      The Court of Appeals for the Third Circuit has held that a "good faith" requirement is implicit in section 1112(b)(1) of the Bankruptcy Code. *See NMSBPCSLDHB, LP v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108 (3d Cir. 2004); *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999); *Santa Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Memorial Corp.)*, 589 F.3d 605 (3d Cir. 2009).

33.      According to the Third Circuit, "[w]hether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine the 'totality of facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'" *Integrated Telecom*, 382 F.3d at 118 (quoting *SGL Carbon Corp.*, 200 F.3d at 162). The Third Circuit's instructions for applying the totality of circumstances test focus on "two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose, *e.g.,* by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage." *Id.* at 119-120.

34.      "Under the first of these considerations, the courts in the Third Circuit have made clear that even where the debtors are not attempting to preserve going concern, for example when a liquidation plan will be filed, they can still satisfy the good faith requirement, provided that the filing preserves 'some value that otherwise would be lost outside of bankruptcy.'" *Crown Village Farm, LLC v. Arl, LLC (In re Crown Village, LLC)*, 415 B.R.

19

86, 92 (Bankr. D. Del. 2009). "Therefore, so long as the liquidation plan is maximizing the value of the debtor's estate, it serves a valid bankruptcy purpose and meets the good faith requirement." *Id.* "As for the second question, timing is a key element. Generally, a judge will evaluate whether the timing of the filing of a Chapter 11 petition indicates that the '*primary*, if not *sole*, purpose of the filing was a litigation tactic.'" *Id.*

35. Moreover, a bankruptcy petition should be dismissed for lack of good faith only sparingly and with great caution. *In re General Growth Properties, Inc.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009) (citing *Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th Cir. 1989), and *In re G.S. Distrib., Inc.*, 331 B.R. 552, 566 (Bankr. S.D.N.Y. 2005)). As addressed below, Colony does not come close to carrying its heavy burden for dismissal of Mezz Borrower 2's case.

**B.**     <u>**Section 1112 -- Requirement of "Cause".**</u>

36. Section 1112(b)(1) of the Bankruptcy Code provides that "on request of a party in interest, and after notice and a hearing . . . the court shall . . . dismiss a case . . . for cause." 11 U.S.C. § 1112(b)(1) (amended by the Bankruptcy Abuse Prevention Act and Consumer Protection of 2005 ("BAPCPA")). Section 1112(b)(4) sets forth non-exhaustive examples of "cause." 11 U.S.C. § 1112(b)(4)(A)-(P). Here, Colony has based its Dismissal Motion on section 1112(b)(4)(A) of the Bankruptcy Code.

37. The standard for dismissal under section 1112(b)(4)(A) of the Bankruptcy Code requires a showing of substantial or continuing loss or diminution of the estate *and* absence of reasonable likelihood of rehabilitation. Notably, "rehabilitation" does not and should not be equated with "reorganization." *Santa Fe Minerals, Inc. v. BEPCO, L.P. (In*

20

*re 15375 Mem'l Corp.*), 386 B.R. 548, 552 (Bankr. D. Del. 2008), *rev'd* on other grounds, 400 B.R. 420 (D. Del. 2009), *aff'd*, 589 F.3d 605 (citing *Loop Corp. v. U.S.*, 379 F.3d 511, 515-16 (8th Cir. 2004)). Instead, rehabilitation means the restoration of viability. *Id.* Colony attempts to equate or convert this standard into one where a court determines whether Mezz Borrower 2 can today confirm a chapter 11 plan. *See* Dismissal Motion at ¶¶ 74-75. Mezz Borrower 2 is not required to show that it has a plan or that it can confirm a plan. Rather, Mezz Borrower 2 only has to show that it will be able to rehabilitate itself. Other than its assertions of a bad faith filing, Colony has not identified any specific "causal" factors that support dismissal of the chapter 11 case under section 1112(b)(4)(A) of the Bankruptcy Code.

38.     Moreover, a motion to dismiss a case under section 1112 of the Bankruptcy Code is premature where a debtor has not been provided sufficient time to propose a plan. *In re Lizeric Realty Corp.*, 188 B.R. 499, 503-04 (Bankr. S.D.N.Y. 1995); *In re Toyota of Yonkers, Inc.*, 135 B.R. 471, 476-77 (Bankr. S.D.N.Y. 1992).[23] Mezz Borrower 2 is not asking the Court to confirm a plan of reorganization nor should it have to satisfy such a standard when the case has only been pending for a month.

## C.     "Cause" Is Lacking Under Section 1112(b).

39.     Here, "cause" for dismissal is completely lacking. The competing valuations of the Hotel Chain establish, despite their differences, that the Debtors have a meaningful prospect to implement a global restructuring for the collective benefit of Wells Fargo, Colony, and other parties in interest.

---

[23]     The case law prior to the 2005 BAPCPA amendments applies to the analysis and application of former section 1112(b)(4) of the Bankruptcy Code. *In re Gateway Solutions, Inc.*, 374 B.R. 556 (Bankr. M.D. Pa. 2007).

DOCS_SF:78908.1 46344-001

Colony asserts that the Mezz Borrower 2 case was filed in bad faith, without a valid bankruptcy purpose and to obtain a tactical litigation advantage. Colony asks the Court to ignore the facts and circumstances surrounding the collective Chapter 11 cases of the Debtors, including (a) the aggregate enterprise value associated with the Hotel Chain, (b) the inter-related capital structure of the Debtors, and (c) the need for a global restructuring that will involve and benefit all of the Debtors. Instead, Colony proposes that the Court focus solely on Mezz Borrower 2 as a special purpose entity with a single creditor and no operations.



41.     Here, there is significant equity in the business for the Debtors to protect. The Hotel Chain is profitable and generates excess cash that is sufficient to adequately protect Wells Fargo and Colony. For the twelve months ended September 30,

22

2011, the Operating Debtors' NOI was $25 million on total revenues of $79 million. These results are consistent with prior years 2009 and 2010. Further, the business has a value that substantially exceeds Colony's outstanding debt plus all other secured obligations senior thereto. Based on the Niemann Expert Report, the Debtors believe that the value of the business ranges from $270 million to $290 million, which amount is in excess of Colony's approximately $39 million debt (after deduction for senior debt) by at least $38 million. This translates to an equity cushion of approximately 100% for Colony.



DOCS_SF:78908.1 46344-001



45.      Nonetheless, as noted above, there is no need for the Court to reach a valuation conclusion at this early stage in the cases for purposes of resolving the Colony Motions. The Court can take judicial notice that there is a legitimate dispute as to value, one which can be determined at the appropriate time when the Debtors have had a chance to make a restructuring proposal. Now is not that time. The Debtors merely seek an opportunity to preserve and maximize value for the benefit of all constituents. Under the circumstances here, that is not a basis for dismissal.

**D.      "Rehabilitation" Does Not Require a Confirmation Hearing.**

46.      Judge Gropper of the U.S. Bankruptcy Court for the Southern District of New York recently addressed a highly analogous situation in *In re General Growth Properties, Inc.*, 409 B.R. 43 (Bankr. S.D.N.Y. 2009). The debtors there constituted an inter-related real estate enterprise with numerous sets of project level, mezzanine and other affiliated entities. *Id.* at 47-48. Faced with motions to dismiss that were focused on certain special purpose or bankruptcy remote debtors, the court refused to dismiss such cases as bad faith filings because there was a reasonable prospect for reorganization of the company as a whole. *Id.* at 61-65, 69. The court also concluded that there is no requirement for the debtor to prove that it can confirm a plan in order to file a petition. *Id.* at 65.

47.      Just like the debtors in *General Growth*, the Debtors here are part of an inter-related capital structure that should be given an opportunity to reorganize. Given the

25

current state of the business and its continuing ability to generate cash and adequately protect Colony and the other lenders, the Debtors' overall reorganization is a legitimate prospect that should not be cut off prematurely by the dismissal of the Mezz Borrower 2 case.[24]

48.     Colony relies on *Primestone Investment Partners, L.P. v. Vornado PS, L.L.C. (In re Primestone Investment Partners, L.P.)*, 272 B.R. 554, 557 (D. Del. 2002), in support of the Dismissal Motion. The facts in that case were drastically different from both the case at bar and the facts in *General Growth*. In *Primestone*, the debtor was a single limited partnership established to hold membership units in a real estate trust, the shares of which were publicly traded on the New York Stock Exchange. *Id.* at 555-556. Such real estate trust held interests in another limited liability partnership that in turn held interests in certain commercial real estate properties. *Id.* There was no suggestion in *Primestone* that the debtor in that case was anything *but one shareholder* out of many other shareholders in a publicly traded real estate trust. *Id.* There was also no suggestion that the real estate trust was in financial distress or required a restructuring of any kind. *Id.* Rather, the facts of *Primestone* suggest that the debtor was a single asset entity created specifically to hold an investment in a completely unrelated publicly-traded real estate trust. *Id.* The debtor's interests in the real estate trust were pledged to a creditor that sought to foreclose on its collateral. *Id.* The debtor filed for bankruptcy in order to avoid the foreclosure. *Id.* The case was dismissed as a textbook example of a two-party dispute. *Id.* at 557-558.

---

[24]     Similarly, in *Crown Village*, like the situation here, Judge Gross refused to dismiss a single asset real estate case with no employees or operations where the debtor intended to market its sole asset -- undeveloped land -- for sale to the highest bidder. 415 B.R. at 91-93. Judge Gross concluded that a bankruptcy strategy to maximize the value of this sole asset was a valid bankruptcy purpose. *Id.* at 93. Judge Gross emphasized that the debtor was faced with two choices: (i) to abandon its sole asset or (ii) to seek to maximize the value of its asset through the bankruptcy process).

26

49. Far from a mere two-party dispute, the instant case is distinguishable from *Primestone* on numerous grounds. Mezz Borrower 2's principal asset here is its ownership interests in Mezz Borrower 1, which in turn owns the Operating Debtors. Each of the Operating Debtors is subject to a capital structure that was consummated on the same date and matured on the same date. Each of these entities is presently in default on its senior secured debt obligations and requires a global restructuring in order to address such default. Each of these entities has a direct or indirect interest in an operating business that continues to generate more than sufficient cash to service debt obligations at all levels. Unlike *Primestone*, the present case does not involve a single asset debtor that filed to address its issues with a single creditor holding a security interest in a liquid public security. Here, the Debtors have interests in 103 operating hotels, with approximately 1,500 employees servicing thousands of guests, with multiple tiers of multiple creditors (from the securitization trust in which the first mortgage is held, through each of the four mezzanine tranches to the vendors and other potential creditors, including, without limitation, taxing authorities, PMG as manager and others). The Debtors are an integrated, multi-tiered capital structure, analogous to the *General Growth* case (albeit smaller), that needs to be restructured as a whole. *Primestone* is not analogous or of any precedential value here.

## ABSTENTION IS NOT PROPER UNDER 11 U.S.C. § 305

**A.    Section 305 – Abstention.**

50.    A "motion under section 305(a) to dismiss a petition or suspend the bankruptcy case is a form of extraordinary relief, and abstention under section 305(a) is a power

that should only be utilized under extraordinary circumstances." *Crown Village*, 415 B.R. at 96

(quoting *In re Century/ML Cable Venture*, 294 B.R. 9, 37 (S.D.N.Y. 2003)).

51.     Factors to consider when determining whether 305(a) abstention is

appropriate include: "(1) economy and efficiency of administration; (2) whether another forum

is available to protect the interests of both parties or there is already a pending proceeding in

state court; (3) whether federal proceedings are necessary to reach a just and equitable solution;

(4) whether there is an alternative means of achieving an equitable distribution of assets;

(5) whether the debtor and the creditors are able to work out a less expensive out-of-court

arrangement which better serves all interests in the case; (6) whether a non-federal insolvency

has proceeded so far in those proceedings that it would be costly and time consuming to start

afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy

jurisdiction has been sought." *Id.* at 97 (citing *In re Century/ML Cable Venture*, 294 B.R. at

38).

52.     In *Crown Village*, Judge Gross declined to dismiss the case or suspend

the proceedings because dismissal or suspension "would harm the administration or

preservation of Debtor's estate." *Id.* Similarly, for the reasons discussed below, this Court

should not dismiss or suspend the Debtor's bankruptcy case because to do so would prevent the

Debtors from maximizing the value of the Hotel Chain for all constituents.

**B.      Abstention is Not in the Best Interests of the Debtors.**

53.     As noted above, abstention under section 305(a)(1) of the Bankruptcy

Code "is an extraordinary remedy that is appropriate only where the court finds that *both*

creditors and the debtor would be better served by a dismissal." *In re RHTC Liquidating Co.*,

28

424 B.R. 714, 720-721 (Bankr. W.D. Pa. 2010). "The test under Section 305(a)(1) requires that both creditors and the debtor benefit from a dismissal, not merely the application of a balancing test to determine whether dismissal is appropriate." *Id.*

54.     Dismissal of the Mezz Borrower 2 case would plainly harm the Debtors by destroying any chance that the value of the Hotel Chain could be shared with any constituents other than Colony. The dismissal of the case would presumably entail the resumption of Colony's foreclosure of the Colony Collateral which, in turn, would permanently cutoff any possibility that value could flow to the junior members of the Jameson corporate family. Thus, while dismissal arguably benefits Colony by freeing it to pursue its state law remedies, there is no corresponding benefit to Mezz Borrower 2 -- a requirement for dismissal under section 305(a) of the Bankruptcy Code.

55.     Colony's case for abstention was premised on the belief that the Mezz Borrower 2 case presented only a two-party dispute. Now that the cases for the other Debtors have been commenced, this argument is no longer applicable. This Court is clearly the most efficient forum to effectuate the global restructuring that the Debtors desperately require.

## THE STAY RELIEF MOTION SHOULD BE DENIED

A.     **Section 362(d)(1) -- There is No Cause for Stay Relief.**

56.     Section 362(d) of the Bankruptcy Code is intended to balance the interests of the creditors and the debtor. *Nantucket Investors II v. California Fed. Bank (In re Indian Palms Assocs., Ltd.)*, 61 F.3d 197, 206 (3d Cir. 1995). "The text of section 362(d)(1), which governs relief from the automatic stay for good cause including lack of adequate protection, does not contain the term 'equity.'" *Id.* at 207. "However, in determining whether a

29

secured creditor's interest is adequately protected, most courts engage in an analysis of the property's 'equity cushion' -- the value of the property after deducting the claim of the creditor seeking relief from the automatic stay and all senior claims." *Id.* (citing *In re Colonial Center, Inc.*, 156 B.R. 452, 459 (Bankr. E.D. Pa. 1993); *La Jolla Mortgage Fund v. Rancho El Cajon Assocs.*, 18 B.R. 283, 289 (Bankr. S.D. Cal. 1982)).[25]

57.     In addition, regardless of its form, adequate protection is not meant to provide a secured creditor with a guarantee that it will be paid in full. *In re P.J Clarke's Restaurant Corp.*, 265 B.R. 392, 404 (Bankr. S.D.N.Y. 2001). All that the bankruptcy court must find is whether the protection is "adequate," meaning that the secured creditor's interest is protected against the possible risk of deterioration. *Id.*; *see also, Hillside Plaza Ltd. v. Pomodoro Restaurant (In re Pomodoro Restaurant)*, 251 B.R. 441 (B.A.P. 10th Cir. 1999) (same); *McCombs Properties VI, Ltd. v. First Texas Savings Assoc. (In re McCombs Properties VI, Ltd.)*, 88 B.R. 261, (Bankr. C.D. Cal. 1988) (same).

58.     Here, whether considering the existence of an "equity cushion" for purposes of adequate protection under section 362(d)(1) of the Bankruptcy Code or "lack of equity" for Mezz Borrower 2 under section 362(d)(2) of the Bankruptcy Code, there is no basis for relief from stay in favor of Colony. Under either scenario, Colony is oversecured and the Debtor has an equity in the Colony Collateral. Colony is also otherwise adequately protected by ongoing cash collections realized by the business.

---

[25]     "Junior liens are disregarded for 'equity cushion' analysis because the secured creditor is entitled to adequate protection only as to its claim; it may not claim protection for others. In contrast, all liens are considered in calculating the equity retained by the debtor under section 362(d)(2), because the equity analysis in that section focuses on 'the value, above all secured claims against the property, that can be realized from the sale of the property for the benefit of all unsecured creditors.'" *Nantucket Investors*, 61 F.3d at 207 (citations omitted).

59.     As addressed earlier, there is evidence that the Hotel Chain has a value that exceeds Colony's outstanding debt plus the other secured obligations senior thereto, and provides Colony with an equity cushion equivalent to approximately 100%. It is black letter law that a sufficient equity cushion in excess of 20% constitutes adequate protection of a secured lender. *See, e.g., Jay Vending Inc. v. McGowan (In re McGowan)*, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (10% cushion is sufficient to be adequate protection); *Heritage Sav. & Loan Ass'n v. Rogers Dev. Corp. (In re Rogers Dev. Corp.)*, 2 B.R. 679, 685 (Bankr. E.D. Va. 1980) (approximately 15% to 20% was sufficient adequate protection to the creditor); *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 (9th Cir. 1984) (equity cushion of 20% is clear adequate protection of a secured creditor's interest in cash collateral, at least for some period of time).

**B.      Section 362(d)(2) – Necessary for Effective Reorganization.**

60.      Section 362(d)(2) of the Bankruptcy Code permits a bankruptcy court to grant relief from the automatic stay if the debtor has no equity in the subject asset *and* the asset is not necessary for the debtor's reorganization. A creditor seeking relief from the stay has the burden of proving the debtor's lack of equity. 11 U.S.C § 362(g)(1). The party opposing the relief bears the burden of proving all other issues, including whether the collateral is necessary for an effective reorganization. 11 U.S.C. § 362(g); *Nazareth National Bank v. Trina–Dee, Inc.*, 731 F.2d 170, 171 (3d Cir. 1984). However, even if the debtor lacks equity in the property, a debtor need only establish through *prima facie* evidence that the collateral will likely play a significant role in the reorganization. *In re Epic Capital Corp.*, 290 B.R. 514, 520 (Bankr. D. Del. 2003).

DOCS_SF:78908.1 46344-001

61.     Where a holding a company's primary asset is its equity interest in its operating subsidiaries, the debtor's retention of such equity interest is by definition necessary for an effective reorganization. *In re Western Preferred Corp.*, 58 B.R. 201, 209 (Bankr. W.D. Tex. 1985). In *Western Preferred*, there was no dispute that the debtor had no equity in the stock of its operating subsidiaries. Nevertheless, the bankruptcy court still found that

> the capital stock of all of the Debtor's operating subsidiaries—is the Debtor's primary, and virtually exclusive, operating asset which is by definition necessary to an effective reorganization[.] [T]he Collateral [i.e. the stock] is absolutely critical to Western Preferred's reorganization efforts. Granting the Bank's motion to lift stay would be tantamount to approving the divestiture of all of the operating assets of the Company, thereby precluding reorganization.

*Id.*

62.     Similarly, where the reorganization of one entity cannot occur without such entity's affiliates, all of the assets of such debtor are necessary for an effective reorganization thereby precluding stay relief even if there is no equity in the assets. *Epic Capital*, 290 B.R. at 526; *see also*, *In re Harris*, 111 B.R. 589, 591 (E.D. Tex. 1990) (the lack of equity in the stock of a company owned by a debtor is not sufficient to grant stay relief when the ownership of such company is the only means for the debtor to generate income, rehabilitate, and eventually fund the debtor's plan); *In re Munoz*, 83, B.R. 334, 337 (Bankr. E.D. Pa. 1988) (same).

63.     Establishing that property is necessary for a debtor's reorganization does not mean that a debtor is required to demonstrate that it has actually proposed a plan of reorganization which is acceptable to its creditors. The debtor need only prove that there is a reasonable probability that it will be able to propose a plan that will result in a successful

32

reorganization within a reasonable time. Here, Mezz Borrower 2 can clearly satisfy this standard. Without the equity interests in Mezz Borrower 1, Mezz Borrower 2 would not be able to reorganize.

**THE DEBTORS ORGANIC DOCUMENTS DO NOT
MANDATE DISMISSAL OR STAY RELIEF**

A.     **Mezz Borrower 2's "Limited Purpose"**

   64. Colony stresses that Mezz Borrower 2's formation and structure as a mezzanine borrowing vehicle (a structure that is not uncommon in the real estate financing world, as Colony admits in its Dismissal Motion, at ¶ 10), require the dismissal of the Mezz Borrower 2 case because it is "organically prohibited" from incurring any administrative expenses, or incurring any debt to satisfy any such administrative expenses. From this, Colony extrapolates that Mezz Borrower 2 is unable to effectuate a plan; accordingly, its case should be dismissed. As discussed above, a debtor is not required to prove that it can meet the requirements of section 1129 of the Bankruptcy Code in order to commence a case -- the standard for dismissal is the absence of a reasonable likelihood of *rehabilitation*, not rigorous compliance with section 1129. In any event, to the extent the terms of Mezz Borrower 2's organizational documents conflict with the fundamental rights, powers and privileges of the Bankruptcy Code, they are unenforceable and thus do not pose an obstacle to the pursuit of Mezz Borrower 2's restructuring efforts in this case.

   65. The limited liability company agreement for Mezz Borrower 2 provides, in pertinent part at section 9(j)(v)(C), that:

> (v) Notwithstanding anything to the contrary in this Agreement or in any other document governing the formation, management or operation of the Company, so long as any obligation under the

Loan Documents is outstanding, the Board shall not cause or permit the Company to and the Company shall not:

*     *     *

(C)  incur, create or assume any indebtedness or liabilities, secured or unsecured, direct or contingent, other than those incurred in the ordinary course of business that is related to the ownership and operation of the Subsidiary or as expressly permitted under or contemplated by the Loan Documents.

66.     Colony (and Wells Fargo) assert that this provision disables Mezz Borrower 2 from using the cash collateral generated by the Operating Debtors from the Hotel Chain to meet the administrative obligations of Mezz Borrower 2 and Mezz Borrower 1 (or, alternatively, obtaining credit from any third party for the same purpose). The Debtors contend that this provision neither supports the dismissal of the Mezz Borrower 2 case, nor prevents the collective use of cash collateral by the Debtors. Organizational documents can no more override the Bankruptcy Code than private contracts. The Bankruptcy Code exists, among other reasons, to protect creditors from the "folly" of the debtor's pre-petition conduct or agreements. Merely transporting the terms of such agreements into the debtor's organic documents (at the behest of, and to support, the creditors crafting the financing structure), does not change their intrinsic unenforceability.

**B.     Preemption**

67.     It is well-established that pre-petition agreements purporting to interfere with a debtor's fundamental rights under the Bankruptcy Code are not enforceable. *See, e.g., In re Trans World Airlines, Inc.*, 275 B.R. 712, 723 (Bankr. D. Del. 2002) ("[P]repetition agreements purporting to interfere with a debtor's rights under the Bankruptcy Code are not enforceable."). Just as a creditor cannot compel a debtor by private contract to

34

waive the right to seek bankruptcy protection, a creditor cannot force a debtor to waive the rights and powers conferred on a debtor by the Bankruptcy Code. This would merely serve to accomplish indirectly what plainly cannot be done directly -- a prohibition on selling assets would conflict with section 363, a prohibition on rejecting contracts would conflict with section 364 and a prohibition on obtaining credit would conflict with section 364. If these restrictions on the conduct of a case were enforceable, they would nullify the very right to file a case.

68.     There is no principled reason why the use of the same contractual restrictions in a debtor's formative documents should alter the analysis. Moreover, Colony has not cited a single case in its Dismissal Motion that even remotely suggests that transporting an otherwise unenforceable contractual covenant into an organizational document magically reinstates its effectiveness. Instead, Colony simply mouths truisms about a debtor's compliance with state law in the operation of its business, or that limited liability companies "exist solely as creatures of contract." While each of these arguments is likely true in a vacuum, if the state law or the terms of a contract interfere with the objectives of the Bankruptcy Code, they must yield. *English v. General Electric Co.*, 496 U.S. 72, 79 (1990) (state laws are preempted when they stand as an obstacle "to the accomplishment and execution of the full purposes and objectives of Congress.") *See also In re Cole*, 226 B.R. 647, 651-52, n.16 & 17 (B.A.P. 9th Cir. 1998) (collecting cases voiding *ipso facto* clauses and waivers of bankruptcy rights).

69.     Recently, in the *General Growth* case, certain lenders similarly claimed that corporate governance terms restricted the debtor's ability to "upstream" the cash collateral generated by its project level entities (just as Colony here claims that the hotel revenues generated by the Operating Debtors cannot be "upstreamed" to the meet the

35

administrative obligations incurred by Mezz Borrower 1 and Mezz Borrower 2). The lenders relied on virtually identical provisions of the debtor's organization documents to claim that the transfer of cash was tantamount to a prohibited incurrence of debt. The Bankruptcy Court denied the objection as follows:

> The Debtors filed several conventional motions on the Petition Date. The only motion that was highly contested was the Debtors' request for the use of cash collateral and approval of debtor-in-possession ("DIP") financing. By the time of the final hearing on May 8, 2009, numerous project-level lenders had objected, based on concerns that the security of their loans would be adversely affected. Many of these parties argued that it would be a violation of the separateness of the individual companies for the Debtors to upstream cash from the individual properties for use at the parent-level entity. After hearing extensive argument, the Court ruled that the SPE structure did not require that the project-level Debtors be precluded from upstreaming their cash surplus at a time it was needed most by the Group.

*General Growth*, 409 B.R. at 55.

70.    The same result follows in the instant case. Once the Debtors establish that all secured creditors are adequately protected, there is no legal prohibition on the authority of this Court to allow the Debtors to use cash collateral at all levels throughout their capital structure.

WHEREFORE, based upon the foregoing reasons and evidence, the Debtors request that the Court deny the Colony Motions and enter such further and additional relief as may be necessary and appropriate under the circumstances.

Dated: November 18, 2011

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail:     ljones@pszjlaw.com
            dbertenthal@pszjlaw.com
            tcairns@pszjlaw.com

[Proposed] Counsel to Debtors and
Debtors in Possession

37