**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| IN RE: | ) | Chapter 11 |
|  | ) |  |
| JER/JAMESON MEZZ BORROWER II, | ) | Case No. 11-13338(MFW) |
| LLC, | ) |  |
|  | ) | (Jointly Administered) |
| Debtor. | ) |  |
| _____ | ) |  |

**OPINION[1]**

Before the Court are the Motions of CDCF JIH Funding, LLC and ColFin JIH Funding, LLC (collectively "Colony") to dismiss the chapter 11 petition filed by JER/Jameson Mezz Borrower II, LLC ("Mezz II") and to obtain relief from the automatic stay. The Motions are opposed by Mezz II and its affiliates who have also filed chapter 11 petitions (collectively, the "Debtors"). For the reasons stated below, the Court will grant the Motions.

I.    FACTUAL BACKGROUND

In 2006, Mezz II was formed as part of the capital structure to acquire a chain of economy hotels known as the Jameson Inns and Signature Inns for approximately $400 million.  (Shea Dep. at 17-18.)  JER/Jameson Properties LLC and JER/Jameson NC Properties LP (the "Operating Companies") borrowed $175 million secured by the real estate from a syndicate of lenders (the "Mortgage

---

[1]  This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is made applicable to contested matters by Rule 9014 of the Federal Rules of Bankruptcy Procedure.

Lenders"), serviced by Wells Fargo Commercial Mortgage Servicer ("Wells Fargo"). (Marthinsen Dep. at 12, 15-16.) Four affiliates, including Mezz II (collectively, the "Mezzanine Borrowers"), were formed for the sole purpose of borrowing additional funds (approximately $40 million each) for the acquisition. (Shea Dep. at 57, 59-61, 78-80.) JER/Jameson Mezz Borrower I, LLC ("Mezz I") is the sole member or partner of the Operating Companies, Mezz II is the sole member (owner) of Mezz I; JER/Jameson Mezz Borrower III, LLC ("Mezz III") is the sole member (owner) of Mezz II; and JER/Jameson Mezz Borrower IV, LLC ("Mezz IV") is the sole member (owner) of Mezz III. (JX 157 at ¶¶ 8-11.)

After the acquisition, the Inns and their real estate were owned (or leased) by the Operating Companies. (Shea Dep. at 83.) The Inns are operated by PMG, LLC ("PMG") under an agreement that expires December 31, 2012. (Id. at 24, 214-15.) A PMG affiliate, together with JER Argila entities, is an indirect owner of JER/Jameson Holdco LLC ("Jameson Holdco"), which owns Mezz IV. (Id. at 17-18, 24.) PMG is also the owner of the tradename, Jameson Inns, and related intellectual property it acquired from the JER Argila entities in July, 2011, for a payment of $1.5 million and an obligation to pay an additional $2.5 million in the event PMG still has a relationship with the Inns after 2012. (Id. at 33-35.) PMG also acquired a voting

proxy from the JER Argila entities and effectively controls Jameson Holdco.  (Id. at 37.)

Currently, Colony holds the debt at the Mezz I and II levels.  The Mezz III and IV loans are held by a collateralized debt obligation managed and serviced by an affiliate of Gramercy Loan Services LLC ("Gramercy") and JER Investors Trust, Inc. (collectively the "Mezz III and IV Lenders").  (JX 156 at ¶ 10.) Gramercy has the authority to act for the Mezz III and IV Lenders.  (Id.)  There is an agreement (the "Inter-creditor Agreement") among the various Mezz Lenders detailing their respective rights. (JX 127.)

All of the debt (the mortgage on the properties, as well as the mezzanine debt) matured in August, 2008, subject to three one-year extensions.  (JX 26 at § 2.3(b); JX 148 at § 2.3(b); JX 119 at § 2.3(b); JX 28 at 11.)  The three extensions were exercised and the maturity date was extended to August 9, 2011. At that time the Debtors were unable to pay the debt, and the lenders at each level commenced enforcement actions.  (Tr. 11/22/2011 at 40-41, 60-62, 84.)

Wells Fargo filed foreclosure proceedings against some of the properties owned by the Operating Companies.  (Marthinsen Dep. at 20-21; JX 130.)  Colony issued a notice of intention to auction the asset of Mezz II under Article 9 of the Uniform Commercial Code.  (JX 156 at ¶ 18.)  Colony also exercised the

right it had under the Inter-creditor Agreement to buy the secured debt at the Mezz I level. (Shea Dep. at 153; Tr. 11/22/2011 at 84.) Gramercy exercised the Mezz III and IV Lenders' right to replace the non-independent directors of Mezz II, III and IV (and ultimately of Mezz I and the Operating Companies) and appointed James Gregory as a director of each. (Trivilino Dep. at 186-87.) At Gramercy's direction, Gregory filed an objection to the Colony UCC sale. (Gregory Dep. at 78-83; JX 156 at Ex. B.) Colony then filed suit in New York seeking a declaration that its UCC notice was commercially reasonable and that the actions of Gramercy in replacing the directors was improper. It obtained an ex parte TRO which was subsequently vacated. (JX 133; JX 156 at ¶26.) The action remains pending.

Colony's UCC auction was scheduled for October 19, 2011. On October 18, 2011, at 11:00 pm, Mezz II filed a voluntary petition under chapter 11 of the Bankruptcy Code. (D.I. # 1.) That filing was followed by the filing of chapter 11 petitions by Mezz I and the Operating Companies on October 25 and 26, 2011, respectively. (D.I. # 38 at ¶ 4.)

Shortly after Mezz II filed its petition, Colony filed its Motions to dismiss and for relief from the stay. The Court scheduled the Colony Motions for October 26, 2011, at the time it had scheduled a status hearing in the Mezz II case. The parties agreed to conduct discovery on the Colony Motions. Evidence and

oral argument were presented on November 22 and 30 and December 5 and 6, 2011.  Colony has agreed that the stay will remain in effect until December 31, 2011, or a decision on its Motions. The matter has been fully briefed and is ripe for decision.


II.  JURISDICTION

     The Court has subject matter jurisdiction over this contested matter.  28 U.S.C. §§ 1334(b) & 157(b)(1) & (b)(2)(A) & (G).


III. DISCUSSION

     A.  Dismissal for Cause

     Colony asks the Court to dismiss the Mezz II bankruptcy case for cause under section 1112(b), with prejudice under section 349(a),[2] because Colony asserts it was filed in bad faith.[3]  The Debtors contend that the petition was filed in good faith with an honest intent to reorganize their affairs and maximize value for all their constituents.

---

[2]  Section 349(a) provides that any dismissal of a case does not bar the filing of a subsequent case unless the court "for cause" orders otherwise.  11 U.S.C. § 349(a).

[3]  Colony alternatively seeks abstention and dismissal of the case under section 305(a).  Because the Court finds that dismissal is appropriate under section 1112, this issue need not be addressed.

Good faith is a predicate to the right to file a petition in bankruptcy, as only the "honest but unfortunate debtor" is eligible to avail itself of the protections afforded by the Bankruptcy Code.  Marrama v. Citizens Bank of Mass., 549 U.S. 365, 374 (2007) (quoting Grogan v. Garner, 498 U.S. 279, 287 (1991).[4]

The Third Circuit has addressed this issue several times in the context of corporate debtors.  See, e.g., In re 15375 Memorial Corp., 589 F.3d 605, 609, 619 (3d Cir. 2009) (holding that petitions filed by affiliated debtors who were no longer operating were filed in bad faith primarily as a litigation tactic to protect the debtors' parent and not designed to maximize the value of the estates); In re Integrated Telecom Express, Inc., 384 F.3d 108, 118 (3d Cir. 2004) (holding that case filed by financially healthy company which had already ceased doing business and had no intention of reorganizing or liquidating its assets was filed in bad faith simply to take advantage of Bankruptcy Code's cap on landlord's claim); In re SGL Carbon Corp., 200 F.3d 154, 162 (3d Cir. 1999) (holding that chapter 11 case filed by financially healthy company solely to gain a tactical advantage in litigation was in bad faith).

---

[4]   In Marrama, the Supreme Court affirmed the bankruptcy court order dismissing a chapter 7 case rather than permitting the debtor to convert it to chapter 13, because of the debtor's bad faith in concealing property during the chapter 7 case.  549 U.S. at 370-71.

The Third Circuit has adopted a "totality of facts and circumstances" test to determine whether the petition was filed for a "valid reorganizational purpose." SGL Carbon, 200 F.3d at 165-66. See also 15375 Memorial, 589 F.3d at 618; Integrated Telecom, 384 F.3d at 120. The test is a "fact intensive inquiry" which requires a determination of where "the [bankruptcy] petition falls along the spectrum ranging from the clearly acceptable to the patently abusive." SGL Carbon, 200 F.3d at 162.

The Debtors cite authority from the Second Circuit, which emphasizes a debtor's subjective good faith. See, e.g., In re RCM Global Long Term Cap. Appreciation Fund, Ltd., 200 B.R. 514, 520 (Bankr. S.D.N.Y. 1996) (stating that the Second Circuit test considers "both objective futility of the reorganization process and subjective bad faith in filing the petition") (citing In re Cohoes Indus. Terminal, Inc., 931 F.2d 222, 227 (2d Cir. 1991)).

The Third Circuit has not adopted that test. According to the Third Circuit, the inquiry of good faith is "based more on an objective analysis of whether the debtor has sought to step outside the 'equitable limitations' of Chapter 11 than the subjective intent of the debtor." 15375 Memorial, 589 F.3d at 618 n.8.

> The term "good faith" is somewhat misleading. Though
> it suggests that the debtor's subjective intent is
> determinative, this is not the case. Instead, the
> "good faith" filing requirement encompasses several,

distinct equitable limitations that courts have placed
on Chapter 11 filings.  Courts have implied such
limitations to deter filings that seek to achieve
objectives outside the legitimate scope of the
bankruptcy laws.

SGL Carbon, 200 F.3d at 165 (quoting In re Marsch, 36 F.3d 825,

828 (9th Cir. 1994).[5]

The Debtors contend that a bankruptcy petition should be

dismissed for lack of good faith "only sparingly and with great

caution" and that Colony has not come close to carrying its heavy

burden for dismissal.  See, e.g., In re Gen. Growth, Props.,

Inc., 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009) (quoting Carolin

Corp. v. Miller, 886 F.2d 693, 700 (4th Cir. 1989)).  See also In

re G.S. Distrib., Inc., 331 B.R. 552, 566 (Bankr. S.D.N.Y. 2005).

The Debtors rely again on authority outside this circuit

which is contrary to Third Circuit authority.  Instead, the

burden is on the Debtors to establish that they filed their

petitions in good faith to preserve the Debtors' going concern

value or to maximize the value of the Debtors' estate, rather

than as a litigation tactic.  15375 Memorial, 589 F.3d at 618;

Integrated Telecom, 384 F.3d at 118, 124; SGL Carbon, 200 F.3d at

162 n.10.

---

[5]  In Marsch, the Ninth Circuit held that a chapter 11
petition filed by a judgment debtor solely for the purpose of
avoiding the need to post a bond pending appeal, though it had
sufficient nonbusiness assets to do so, was filed in "bad faith"
and had to be dismissed.  36 F.3d at 827.

1.  <u>Primestone factors</u>

In making a determination of good faith, courts consider various factors that indicate whether the case has been filed for a legitimate reorganization purpose or only as a litigation tactic or for some other improper purpose.  Colony relies on the factors articulated by the District Court in <u>Primestone Investment Partners</u>:

    a.  Single asset case;
    b.  Few unsecured creditors;
    c.  No ongoing business or employees;
    d.  Petition filed on eve of foreclosure;
    e.  Two party dispute which can be resolved in pending state court action;
    f.  No cash or income;
    g.  No pressure from non-moving creditors;
    h.  Previous bankruptcy petition;
    i.  Prepetition conduct was improper;
    j.  No possibility of reorganization;
    k.  Debtor formed immediately prepetition;
    l.  Debtor filed solely to create automatic stay; and
    m.  Subjective intent of the debtor.

<u>In re Primestone Inv. Partners, L.P.</u>, 272 B.R. 554, 557 (D. Del. 2002) (citations omitted) (noting that no single factor is determinative).

In this case, virtually all of the <u>Primestone</u> factors are present.[6]  Mezz II has only one asset (the membership interest in Mezz I).  (JX 157 at ¶ 9.)  There are few if any unsecured creditors: the only ones the Debtors could identify are the

---

[6]  Although several factors are not met (there was no prior bankruptcy petition and Mezz II was not formed immediately before the filing), Colony contends that they are not evidence of good faith.

professionals hired before the bankruptcy was filed (attorneys and financial advisors) but it appears that even they are not unsecured creditors because they were either paid by, or obtained retainers from, Gramercy before the filing.[7]  (Dreyer Dep. at 42, 75, 135; Tinianow Dep. at 42, 96.)  Those creditors, if they are creditors, were exerting no pressure on Mezz II before the filing.  Mezz II has no ongoing business operations or employees. (Gregory Dep. at 222; Dreyer Dep. at 142; JX 157 at ¶3.)  The petition was filed on the eve of foreclosure, solely to obtain the benefit of the automatic stay.  (Tinianow Dep. at 89-90; Dreyer Dep. at 127; Gregory Dep. at 174-75, 222; JX 156 at ¶ 31; JX 157 at ¶ 33.)  Mezz II has no cash or income and no possibility of a reorganization because Colony contends that it will oppose any reorganization plan.

Even considering the other Debtors in the equation, the Court finds that this case involves only a two-party dispute between Colony and the Mezz III and IV Lenders.  Even the Operating Companies have few creditors; all the employees and most of the vendors are creditors of PMG, not the Debtors.[8]  (Tr.

---

[7]  In addition, the Consolidated Lists of Creditors Holding the Largest Unsecured Claims notes that there are no unsecured creditors of Mezz I or Mezz II.  (D.I. # 136 at n.2; JX 155 at n.2.)

[8]  The Debtors have not filed schedules and statement of financial affairs and, instead, have obtained an extension of time until December 26, 2011.  (D.I. # 276.)

11/22/2011 at 16-17.)  Colony acknowledges that the mortgage debt

at the Operating Companies is senior to it and must be paid in

full or refinanced.  The revenue from operation of the Inns

historically was sufficient to pay all operating expenses and

there currently is excess cash in reserve from operations.  (Shea

Dep. at 65-67, 73-74, 97.)  Colony's threatened foreclosure will

not affect the operations of the Inns; it will simply change the

ownership of Mezz I.  The only entities affected by this action

are the Mezz III and IV Lenders, who have the right under the

Inter-creditor Agreement to buy out the secured position of

Colony.  (JX 127 at § 14.)  The Mezz III and IV Lenders could

also attend the UCC auction and bid for the ownership interest in

Mezz II, a course Gramercy did consider before directing the

Debtors to file for bankruptcy.  (Trivilino Dep. at 97.)

Furthermore, litigation is already pending in state court between

Colony and the Mezz III and IV Lenders so the latter have a forum

in which to protect their rights.  (JX 169, 170 & 171.)

　　　The Debtors argue that Primestone is distinguishable because

in that case the debtor was a single limited partnership

established to hold membership units in a real estate trust, the

shares of which were traded on the New York Stock Exchange.  Id.

at 555-56.  In that case the debtor was completely unrelated to

the operations and was merely one shareholder of many.  Id.

Even if the facts of that case are not identical to the case at bench, it highlights many factors that the Court considers relevant to an inquiry into the good faith of the Debtors in filing bankruptcy.  Those factors all suggest that the case should be dismissed as a bad faith filing.

> 2.  <u>Litigation tactic</u>

Even without considering the <u>Primestone</u> factors, however, Colony argues that Gramercy's pre-petition conduct in installing its own director, Gregory, at Mezz I, Mezz II, and the Operating Companies and then directing him to file bankruptcy for Mezz II on the eve of Colony's foreclosure sale simply to take advantage of the automatic stay is evidence of a bad faith filing.  Colony notes that Mezz II filed a bare petition and has sought no additional relief in this Court since filing.

Colony contends that the filing of bankruptcy by Mezz II was clearly just a litigation tactic designed to forestall its efforts to foreclose on its collateral, which is an impermissible use of the Bankruptcy Code.  <u>See, e.g.</u>, <u>15375 Memorial</u>, 589 F.3d at 620 (rejecting assertion that the automatic stay of litigation without more was a legitimate use of bankruptcy); <u>SGL Carbon</u>, 200 F.3d at 162 (holding that chapter 11 case filed by financially healthy company solely to gain a tactical advantage in litigation was in bad faith).

12

In this case, Colony emphasizes that the petition was filed literally on the eve of Colony's scheduled UCC sale of its collateral - Mezz II's membership interest in Mezz I.  Colony is the only creditor of Mezz II and is secured by Mezz II's only asset.  Therefore, it contends that the petition filed by Mezz II to stop Colony's efforts to realize on its collateral was a bad faith effort simply to stall Colony.

The evidence in support of Colony's position is compelling. Gregory, the sole non-independent director of Mezz II, stated that he was placed on the board at the direction of Gramercy (the servicer for the Mezz III and Mezz IV Lenders) in order to "get Colony's attention" because Gramercy's negotiations with it were not going well.  (Gregory Dep. at 19.)  Gramercy advanced at least $800,000 to Gregory to pay for counsel, financial advisors, and the fees of the independent directors of Mezz II,[9] though Gregory was unsure how Gramercy would be repaid.  (Gregory Dep. at 37-39, 58-59, 213, 227; Tinianow Dep. at 96-98; Niemann Dep. at 67; Trivilino Dep. at 106-07, 110-12.)  Gregory took direction

_____

[9]  This was done both before and after the bankruptcy filing, though there was no notice of it to other creditors or initially to the independent directors of Mezz II.  (Gregory Dep. at 107, 178, 211-14, 218-19; Dreyer Dep. at 75, 135.)  It was also not disclosed in the professionals' retention applications filed in this Court.  (D.I.  ## 83 & 88.)  Colony contends that this alone mandates dismissal.  See, e.g., In re 652 West 160th, LLC, 330 B.R. 455, 467 (Bankr. S.D.N.Y. 2005) (noting that "[m]any courts have found that a debtor's misconduct in the administration of the bankruptcy case constitutes a lack of good faith and cause to dismiss.") (citations omitted).

from (and gave information to) Gramercy throughout the process,
including objecting to Colony's notice of UCC sale, calling board
meetings, and filing the bankruptcy petition.  (Gregory Dep. at
37, 81, 94-95, 98-99, 111-17, 122-23, 133-35; JX 57, 58 & 59.)
Gregory allowed Gramercy to make a presentation to the Debtors'
boards of directors regarding its view of the enterprise value of
the Debtors.  (Gregory Dep. at 134-35.)  Gregory admitted that
the Mezz II bankruptcy petition was filed to stop Colony's UCC
sale and that the primary beneficiaries of the bankruptcy filing
were the Mezz III and IV Lenders.  (Id. at 19, 251.)

      3.  <u>Valid reorganization purpose</u>

The Debtors argue, however, that while the bankruptcy
petitions were filed to stay the Colony foreclosure, their
purpose was to preserve the enterprise value of the Debtors for
the benefit of all constituents.  They note that bankruptcy
filings often occur on the eve of action taken by one creditor to
give it an advantage over other creditors.  They assert there is
nothing wrong with that so long as the filing is for a valid
reorganization purpose.

The Debtors contend that the Court should not look at the
filing by Mezz II in isolation but must consider it as part of
the bankruptcy filing by its affiliates, Mezz I and the Operating
Companies.  They argue that the Debtors collectively have a valid
reorganization purpose: to preserve the enterprise value of the

Inns by seeking to recapitalize and restructure the entire capital stack or to conduct a sale of the Inns.  The Debtors argue that the Court must consider the good of the entire enterprise and not take a myopic view of only one of the affiliates.  This is particularly appropriate because the Debtors were all formed at the same time for the same purpose of providing funding to acquire the operating business.  (Shea Dep. at 57, 59-61, 78-80.)  While one or more of the affiliates may have few creditors, employees, or independent operations, the Debtors argue that the Court must consider that as a whole the enterprise operates a chain of 103 Inns with extensive operations across the southeastern United States.  The Debtors contend that the business enterprise must be considered holistically instead of considering each piece in isolation.  <u>See, e.g.</u>, <u>Gen. Growth</u>, 409 B.R. at 47 (refusing to dismiss special purpose entity debtors which had been formed as part of funding for enterprise owning more than 200 shopping malls and other related businesses).

Colony argues that this case is distinguishable from <u>General Growth</u> which was an extremely complex enterprise involved in several businesses with over 750 subsidiaries, many levels of interrelated debt, and complicated inter-company obligations. <u>Id.</u> at 48-53.  Here, Colony asserts, there are no inter-company claims and merely six entities, four of which have no operations

15

and were merely funding mechanisms. Colony further argues that
the intention of Mezz II must be considered as of the time it
filed its petition, at which time none of the other Debtors had
filed or were authorized to file bankruptcy. See, e.g.,
Integrated Telecom, 384 F.3d at 124 (emphasizing that debtor "was
highly solvent and cash rich at the time of the bankruptcy
filing" despite some contingent claims); SGL Carbon, 200 F.3d at
163 (finding lack of good faith where "the company was
financially healthy at the time of the filing" despite debtor's
expressed concern that a future judgment in antitrust litigation
might be crippling).

The Court concludes that it does not have to have blinders
on and ignore events subsequent to the Mezz II filing,
particularly the filing of its affiliates within ten days of its
own bankruptcy filing. Nor does the Court have to ignore the
fact that Mezz II was only created as part of the larger
enterprise. Therefore, the Court concludes it must consider the
Debtors holistically in order to determine if there is a
realistic possibility that Mezz II can be rehabilitated.

Colony argues nonetheless that there is no realistic chance
of reorganization because no plan can be confirmed in the Mezz II
case. There has been no substantive consolidation of the

Debtors.[10]  Therefore, to confirm a plan, Mezz II would need to
have at least one impaired, accepting class. 11 U.S.C. §
1129(a)(10).  See also In re Tribune Co., No. 08-13141, 2011 WL
5142420, at *37-41 (Bankr. D. Del. Oct. 31, 2011) (analyzing §
1129(a)(10) and concluding that absent substantive consolidation,
there must be a consenting class for each individual debtor in a
joint plan for it to be confirmed).  Because Colony is Mezz II's
only creditor, confirmation of a plan to which they do not
consent is not possible.  See, e.g., In re 3 RAM, Inc., 343 B.R.
113, 119 (Bankr. E.D. Pa. 2006) (holding that where debtor has no
operations and only one asset which is fully encumbered in favor
of the only creditor, debtor is unable to confirm a plan over
creditor's opposition, thereby requiring mandatory dismissal
under section 1112(b)(4)(A)).

    The Debtors contend that there is no necessity that they
prove at this early stage of the case that they can confirm a
plan; instead, they assert that they must show only that they
have a realistic opportunity to do so.  The Debtors argue that a
motion to dismiss under section 1112 is premature where they have
not been given sufficient time to propose a plan.  See, e.g.,
Gen. Growth, 409 B.R. at 65 (holding that "[t]here is no
requirement in the Bankruptcy Code that a debtor must prove that

_____

    [10]  Colony argues there cannot be in light of the loan
documents.  (JX 119 at § 7.2.)

a plan is confirmable in order to file a petition"); <u>In re</u>
<u>Lizeric Realty Corp.</u>, 188 B.R. 499, 503-04 (Bankr. S.D.N.Y. 1995)
(refusing to dismiss case for bad faith where the secured
creditor conceded that at early stage of case it is premature to
assess the debtor's ability to confirm a plan and had cited no
per se limitation on debtor's ability to confirm a plan); <u>In re</u>
<u>Toyota of Yonkers, Inc.</u>, 135 B.R. 471, 477 (Bankr. S.D.N.Y. 1995)
(concluding that "[t]he movants are premature in seeking to
dismiss the debtor's Chapter 11 case at this time because the
debtor should at least be afforded the 120-day exclusivity period
permitted under 11 U.S.C. § 1121(b) to propose a Chapter 11
plan.").

     The Court disagrees with the Debtors' suggestion that it has
to wait until the Debtors propose a plan to determine if the case
should be dismissed.  One of the grounds stated in section 1112
as a basis for dismissal of a case is that the debtor does not
have a reasonable likelihood of rehabilitation, together with
continuing loss.  11 U.S.C. § 1112(b)(4)(A).  If the Court had to
wait until a debtor files a plan to consider whether it has a
prospect for rehabilitation, no case could be dismissed under
that section for at least four months.  <u>Id.</u> at § 1121(b).  The
cases cited by the Debtors are distinguishable from the facts of
this case.  <u>See, e.g.</u>, <u>G.S. Distrib.</u>, 331 B.R. at 566 (finding
that secured creditor could not establish that debtor was unable

18

to confirm a plan because secured creditor's interest was unperfected and avoidable and debtor also needed bankruptcy to resolve a dispute with its landlord); Lizeric Realty Corp., 188 B.R. at 503-04 (movant was only one of six secured creditors, one of which had agreed to provide financing for the debtor, and movant could cite no legitimate basis why debtor could not propose a confirmable plan); Toyota of Yonkers, 135 B.R. at 475-76 (debtor had "no creditors holding secured claims who might be frustrated or delayed because the debtor filed a Chapter 11 case," had "numerous other unsecured creditors," and had a new owner willing to "infuse[] new capital into the debtor and propose[] a Chapter 11 plan.")

Although the Debtors collectively have 103 Inns and related assets and many creditors, Mezz II has only one creditor and one asset.  Mezz II cannot confirm a plan over Colony's objection because it could get no accepting class.  Therefore, in the absence of substantive consolidation, Mezz II does not have any chance of confirming a plan.  11 U.S.C. § 1129(a)(10).  Tribune Co., 2011 WL 5142420, at *41 ("I find nothing ambiguous in the language of § 1129(a)(10), which, absent substantive consolidation or consent, must be satisfied by each debtor in a joint plan.").

The Debtors argue that the term "rehabilitation" used in section 1112 contemplates more than just a reorganization and

embraces all the possible options for enhancing value under the Bankruptcy Code, including a sale.  Colony responds that the conduct of a sale alone cannot be a valid bankruptcy purpose. Integrated Telecom, 384 F.3d at 126 (finding no "authority that the Code can be used to effectuate a liquidation that has no hope of maximizing the value of the Company . . . but simply facilitates dissolution on terms favorable to equity interests").

The Court does not agree with Colony's blanket assertion that chapter 11 is not available to a debtor to conduct an orderly liquidation, as opposed to a piecemeal foreclosure process.  The Code expressly contemplates the use of a bankruptcy case to sell the assets of the estate in such a manner.  11 U.S.C. §§ 363 & 1123(a)(5).  The Integrated Telecom case is distinguishable because in that case the Debtor had already liquidated the bulk of its assets before it filed and sought bankruptcy protection only to change the priorities of distribution of the sale proceeds.  384 F.3d at 112-13.

Colony argues nonetheless that a legitimate bankruptcy filing can only be one designed to "create or preserve some value that would be lost - not merely distributed to a different stakeholder - outside of bankruptcy."  Integrated Telecom, 384 F.3d at 129).  See also 15375 Memorial, 589 F.3d at 620 (rejecting assertion that bankruptcy was designed to maximize value because "the purported benefits identified did not add or

preserve value that would otherwise be unavailable to creditors
outside of bankruptcy.")  In this case, Colony asserts that there
is no evidence that the bankruptcy filing will create value; in
fact, it is eroding value by the incurrence of substantial
administrative expenses.

The Court agrees with Colony that the sale process
contemplated in the bankruptcy case must be designed to realize
some value that would not be available outside of bankruptcy.
Here there is no evidence that the bankruptcy case will do that.
The Debtors have presented no evidence that more value will be
realized in bankruptcy than could have been realized without it.
The Debtors have known since August 2008 of the need to refinance
the debt or to sell the enterprise, have made numerous efforts to
do so, but have been unable to achieve either.  (Shea Dep. at
123-23, 139-45; JX 145 at 10.)  It is unlikely that the
bankruptcy filing will enhance their chances of finding financing
or a buyer.  Further, the Debtors have taken no steps in this
case to conduct a sale process and, although they initially
expressed optimism that they would be able to obtain DIP
financing from Gramercy, no such motion has been filed to date
(more than two months since the filing).  (Gregory Dep. at 68,
109.)

Further, there is no evidence that a sale of the Mezz II
asset in bankruptcy will be more cost effective than a sale under

the UCC procedures (which has already been commenced).  Because
the Mezz III and IV Lenders are the only entities affected by the
UCC sale[11] and because they can protect their interests outside
of bankruptcy (by bidding at the UCC sale or by buying out
Colony's position under the Inter-creditor Agreement), there is
no benefit to be gained by having Mezz II remain in bankruptcy.

4.   Dismissal with prejudice

Colony asks that the dismissal of the case be with prejudice
citing section 349(a).  That section provides that "[u]nless the
court, for cause, orders otherwise, the dismissal of a case under
this title does not bar a discharge, in a later case under this
title, of debts that were dischargeable in the case dismissed;
nor does the dismissal of a case under this title prejudice the
debtor with regard to the filing of a subsequent petition under
this title."  11 U.S.C. § 349(a).  Colony asserts that cause
exists in this case to make the dismissal with prejudice.  See,
e.g., In re Casse, 198 F.3d 327, 336-39 (2d Cir. 1999) (surveying
cases and concluding that bankruptcy court had power under §§ 105
and 349 to dismiss chapter 11 case with prejudice and to
permanently bar debtors who had filed serial bankruptcies simply
to stop foreclosure sale from filing another bankruptcy case

---

[11]  Even under the Debtors' enterprise valuation of the
Debtors as a whole, there is no "equity" in the enterprise to pay
the Mezz III and IV Lenders in full and to provide any
distribution to the ultimate equity investors.  (JX 28 at 52.)

under any chapter).

Because the Court finds that the Mezz II petition was filed in bad faith and for no legitimate bankruptcy purpose, it finds cause under section 349(a) to make the dismissal with prejudice.

B.   Relief from the Stay

Colony alternatively argues that it is entitled to relief from the automatic stay to foreclose on its collateral, the ownership interest in Mezz I.  Section 362(d) of the Code provides that the stay should be lifted on request of a party in interest "for cause, including the lack of adequate protection of an interest in property of such party" or alternatively, "if the debtor does not have an equity in such property" and "such property is not necessary to an effective reorganization."  11 U.S.C. § 362(d).  The movant has the burden of proving lack of equity and a prima facie case for cause; the debtor has the burden of proving adequate protection and the feasibility of a reorganization.  Id. at § 362(g).  See also In re Rexene Prods. Co., 141 B.R. 574, 576-77 (Bankr. D. Del. 1992).

1.   Section 362(d)(1)

Initially Colony contends that the bad faith exhibited by Mezz II in filing bankruptcy is "cause" under section 362(d)(1) for relief from the stay.  It also contends that its interests are not adequately protected because interest is accruing on its

debt (at the rate of LIBOR plus 2.75%),[12] and the Debtors have
not offered to make adequate protection payments or offered
additional collateral.  In addition, Colony states that the value
of its collateral is diminishing because of the accrual of
interest on the Mezz I debt (at the rate of LIBOR plus 1.7%)[13]
and on the Operating Companies' debt (at the rate of 5% because
the Debtors are only paying non-default interest to the Mortgage
Lenders).[14]  Therefore, interest accrues at the rate of almost
$45,000 per day or in excess of $3 million since the petition was
filed.  (JX 36 at ¶ 74.)  In addition, Colony presented evidence
that its enforcement costs currently are almost $9 million and
are expected to continue.  (Tr. 12/5/2011 at 201.)

     The Debtors contend that Colony's interests are protected
because the Debtors are cash flow positive and the Inns are being
maintained.  (Id. at 26.)  Colony points out, however, that the
Debtors' budget contradicts this assertion.  (JX 167.)  That
budget shows that the Debtors are expected to have negative cash
flow of $4.4 million after payment of the interest and expenses
of Wells Fargo and the expenses of the Debtors' professionals.
(Id. at 89-91.)

------------------------------------------------------------

    [12]  JX 119 at § 2.2.

    [13]  JX 148 at § 2.2.

    [14]  JX 36 at ¶ 74 & JX 16.  The Operating Companies are
paying interest to Wells Fargo only at the non-default contract
rate.  (Tr. 12/5/2011 at 90.)

The Debtors also contend that Colony's interests are adequately protected by an equity cushion in the value of the enterprise.  See, e.g., In re Indian Palms Assocs., Ltd., 61 F.3d 197, 207 (3d Cir. 1995) (noting that "in determining whether a secured creditor's interest is adequately protected [for purposes of section 362(d)(1)], most courts engage in an analysis of the property's 'equity cushion' - the value of the property after deducting the claim of the creditor seeking relief from the stay and all senior claims" while ignoring junior liens).[15]  The Debtors presented an expert who opined that the enterprise of the Debtors collectively has a mid-point value of $280 million, while the debt to the Colony level at Mezz II is $242 million, leaving an equity cushion of $38 million.

Colony's expert disputed that value and found that the mid-point value of the Debtors' enterprise is $220 million.  (JX 36 at ¶ 5.)  Further, the amount of the debt ($242 million) does not include accrued interest and fees (which is an additional $12 million to date).  (Id. at ¶ 74; Tr. 12/5/2011 at 201.)  Thus, Colony contends that there is no equity in the enterprise.

---

[15]  In contrast, in determining whether the debtor has equity in the property under section 362(d)(2), all liens on the property are considered.  Indian Palms, 61 F.3d at 207.  The difference in analysis is irrelevant in this case where there are no junior lenders in the specific collateral at issue, the equity interests in Mezz I.  Even considering the Debtors holistically, however, they have no equity in the enterprise considering the liens of the Mezz III and IV Lenders.  (JX 28 at 52.)

25

Both parties found numerous deficiencies in the expert opinion proffered by the other party.  For example, Colony complains that the Debtors' expert improperly included luxury and midscale hotels as comparables when the Jameson Inns are really economy lodges.  Colony also criticizes the discounted cash flow analysis done by the Debtors' expert for using a discount rate that is too low and a terminal multiple and projected cash flows that are too high.  The Debtors, in turn, criticize Colony's expert for using multiples that are lower than the lowest of his own comparable companies, using comparables that were part of a portfolio sale without knowing how the value of the whole sale was allocated to the individual properties, and using an artificially low leverage ratio.

The Court finds it unnecessary to resolve these disputes because, even assuming the enterprise value is $280 million as the Debtors contend, there is only a de minimus equity cushion which is being eroded daily.  The Debtors' assert that there is an equity cushion of $38 million (or $280 million less $242 million in debt).  However, as noted, interest of over $3 million and fees of over $9 million have accrued since the petition was filed, leaving only $26 million or a 9% equity cushion.  This is not sufficient to constitute adequate protection alone.  See, e.g., In re C.B.G. Ltd., 150 B.R. 570, 572 (Bankr. M.D. Pa. 1992) (concluding that 14% equity cushion was not sufficient adequate

protection to permit debtor to grant super-priority lien in
collateral under § 364(d)(1)(B)); In re McKillips, 81 B.R. 454,
458 (Bankr. N.D. Ill. 1987) (surveying the cases which show that
an equity cushion of more than 20% is adequate but less than 11%
is not and concluding that equity cushion of 14.5% was inadequate
in that case because of the accrual of unpaid taxes and mortgage
interest).

The Debtors contend that for purposes of determining what
the equity cushion there is, the amount of equity ($38 million)
must be compared to the amount of Colony's claim ($40 million)
yielding an equity cushion of almost 100% in this case. See,
e.g., In re 1606 New Hampshire Ave. Assocs., 85 B.R. 298, 310
(Bankr. E.D. Pa. 1998) (concluding that 20% equity cushion was
sufficient to establish adequate protection under section
362(d)(1)); In re Grant Broad. of Philadelphia, Inc., 71 B.R.
376, 380 (Bankr. E.D. Pa. 1987) (concluding that 27.5% equity
cushion, which was increasing, was adequate protection).

This is inaccurate for a number of reasons. First, Colony
now holds the debt at Mezz I in the amount of approximately $40
million for a total secured claim of $80 million. Second, the
proper calculation is to compare the equity cushion to the value
of the collateral, not to the moving creditor's claim. See,
e.g., C.B.G., 150 B.R. at 572 (calculating equity cushion of $4.6
million as 16% of the total value of the collateral ($28

27

million), not of the debt ($24 million)); <u>New Hampshire Ave.</u>
<u>Assocs.</u>, 85 B.R. at 310 (finding equity cushion of $450,000 was
20% of the value of the collateral ($2,150,000) not of the
secured claim ($1,700,000)); <u>McKillips</u>, 81 B.R. at 457 (finding
equity cushion of $35,000 was 14.5% of value of property
($240,000) not of secured debt ($202,885)).  <u>But see</u> <u>Grant</u>
<u>Broad.</u>, 71 B.R. at 383 (calculating equity cushion as percentage
of secured debt).  Therefore, the Court concludes that the equity
cushion is 9%, which is insufficient to constitute adequate
protection of Colony's position.

     While the Debtors also assert that Colony is adequately
protected by the ongoing cash collections at the Operating
Companies' level, that "excess" cash is not being offered to
Colony which is continuing to accrue unpaid interest and
enforcement expenses.  Further, the Debtors' budget proves that
any net operating income that is being realized is insufficient
to cover the costs of this case.  Allowing such a case to remain
in chapter 11 when it is administratively insolvent is not
appropriate.

     The Debtors argue that the operating cash can be used to pay
administrative expenses of these cases.  They assert that the
provision of the Limited Liability Company Agreement prohibiting
Mezz II from incurring any obligations so long as Colony remains

unpaid[16] is not enforceable because it interferes with Mezz II's fundamental right to file bankruptcy.  See, e.g., Gen. Growth, 409 B.R. at 55, 72 (holding that debtors' special purpose entity structure did not prevent the upstreaming of cash from the operating entities to other debtors pursuant to a motion for use of cash collateral/DIP financing motion and that trust structure used did not make one debtor ineligible to file for bankruptcy); In re Trans World Airlines, Inc., 275 B.R. 712, 723 (Bankr. D. Del. 2002) (holding that provision in pre-petition agreement which precluded sale of assets by debtor was not a bar to a sale under section 363 because "prepetition agreements purporting to interfere with a debtor's rights under the Bankruptcy Code are not enforceable.").

The Court rejects that argument, however, because the Bankruptcy Code does not elevate administrative claims above secured claims and the provisions of the Agreement, therefore, do not offend the Code.  There is no guarantee that administrative claims can be paid in a bankruptcy case from encumbered funds absent consent of the secured lenders, a finding that the secured lender is adequately protected, or a finding that the administrative claimant provided a benefit to the secured lender. 11 U.S.C. §§ 363 & 506(c).  As noted, the Court finds that Colony has not consented, there are no unencumbered funds at the Mezz II

---

[16]    JX 128 at § 9(j)(v)(C).

level, Colony is not adequately protected, and there is no
benefit to Colony by the filing of the bankruptcy petition over
its objection simply to prevent it from foreclosing on its
collateral.

Therefore, the Court concludes that there is no adequate
protection of Colony's interests and it is entitled to relief
from the stay under section 362(d)(1).

2. Section 362(d)(2)

Colony also contends that it is entitled to relief from the
stay under section 362(d)(2) because its collateral is not
necessary for an effective reorganization.  It argues that it is
the only creditor of Mezz II and that a reorganization is not
possible without its consent because Mezz II will have no
accepting class of creditors.  11 U.S.C. § 1129(a)(10).  See
also, In re Swedeland Dev. Group, Inc., 16 F.3d 552, 568 (3d Cir.
1994) (finding that the secured creditor's assertion that it
would oppose any proposed plan by debtor was "reason alone" to
find that an effective reorganization was not realistically
possible); In re Route 37 Bus. Park Assocs., 987 F.2d 154, 161
(3d Cir. 1993) (holding that secured creditor was entitled to
relief from the stay because the debtor's proposed plan had no
reasonable prospect of confirmation as a result of its improper
classification scheme); In re 6200 Ridge, Inc., 69 B.R. 837, 844
(Bankr. E.D. Pa. 1987) (concluding that debtor had failed to

30

prove it had a "realistic chance" of confirming a plan "in light of the opposition of the two secured creditors, both of whom are seeking relief from the stay" where it was questionable whether the debtor had any unsecured creditors).

The Debtors argue that where the only asset of a debtor, such as Mezz II, is the equity in its operating subsidiaries, the equity interest is by definition necessary to any effective reorganization of the holding company.  See, e.g., In re Western Preferred Corp., 58 B.R. 201, 209 (Bankr. W.D. Tex. 1985) (finding stay relief was not available under § 362(d)(2) because debtor's stock in subsidiaries was its "primary, and virtually exclusive, operating asset, which is by definition necessary to an effective reorganization").  Similarly, the Debtors argue that the reorganization of each of the Debtors is dependent on the others, making the assets of each necessary for an effective reorganization.  See, e.g., In re Epic Capital Corp., 290 B.R. 514, 526 (Bankr. D. Del. 2003) (denying stay relief under § 362(d) despite debtor's lack of equity in resort because that resort was integral to the reorganization of the family of resorts held by it and its affiliates); In re Harris, 111 B.R. 589, 591 (E.D. Tex. 1990) (concluding that the lack of equity in the stock of a company owned by the debtor is not sufficient grounds to grant relief from the stay when the ownership of the stock is the only means to fund the debtor's plan).

31

The Court finds that the cases cited by the Debtor are distinguishable from this case.  In <u>Harris</u>, the Court's decision was predicated on the fact that the parties with the security interest in the stock had sold the stock to the debtor (as part of the sale of the business) and had testified that they would take back the business and fire the debtor if they recovered that stock, thereby eliminating any income the debtor could use for his reorganization plan.  111 B.R. at 592.

In <u>Epic Capital</u> and <u>Western Preferred</u>, although the Courts found that there was no equity in the collateral, they found that there was a reasonable possibility of a successful reorganization based on a settlement of litigation in <u>Epic</u> and a sale offer for the collateral in <u>Western Preferred</u>.  <u>Epic Capital</u>, 290 B.R. at 526; <u>Western Preferred</u>, 58 B.R. at 210.[17]  The Court's decision in <u>Western Preferred</u> was also influenced by the fact that the debtor had other creditors who could benefit from unencumbered assets (over $117 million in net operating losses) which would be lost if the bank foreclosed on the stock.  58 B.R. at 208.

In this case there are no purchase offers, settlement funds, net operating losses or other assets available to fund a

---

[17]  In <u>Epic Capital</u> and <u>Western Preferred</u>, the Courts also found that lack of adequate protection payments could constitute cause for stay relief under section 362(d)(1).  <u>Epic Capital</u>, 290 B.R. at 526 (scheduling evidentiary hearing to determine amount of adequate protection payments); <u>Western Preferred</u>, 58 B.R. at 211-12 (ordering adequate protection payments as condition for continuance of the stay).

reorganization.  Consequently the Court concludes that Colony's collateral is not necessary for an effective reorganization and Colony is entitled to relief from the stay under section 362(d)(2).


IV.  <u>CONCLUSION</u>

    For the above reasons, the Court will grant Colony's Motion to dismiss the Mezz II case with prejudice and its Motion for relief from the stay.

    An appropriate order is attached.


Dated: December 22, 2011    BY THE COURT:


                        Mary F. Walrath
                        United States Bankruptcy Judge